IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

LLT MANAGEMENT LLC,

     Plaintiff,

     v.

DR. THERESA SWAIN EMORY, *et al.*,

     Defendants.

Case No. 4:24-cv-75

## MEMORANDUM OPINION & ORDER

Defendants Theresa Emory, John Maddox, and Richard Kradin published an article in a scientific journal, asserting that they had identified 75 people, additional to 33 in an earlier study, who had malignant mesothelioma but no known exposure to asbestos except through cosmetic talc. Plaintiff LLT Management LLC—a subsidiary of Johnson & Johnson—claims that statement was false. LLT purports to have identified six of the anonymous study subjects and alleges the defendants knew those subjects had been exposed to asbestos through other means.

LLT's Complaint posits that the defendants knowingly misled the public about the safety of cosmetic talc products, but that the defendants' real goal was to create a body of scientific literature to appease the plaintiffs' bar, who hired the defendants as expert witnesses in tort cases against LLT. The defendants moved to dismiss all three claims in the Complaint.

Count II (fraud) is barred by the statute of limitations, because with reasonable diligence, LLT should have discovered the alleged fraud at the time the defendants

published their statements. Statutory standing for Count III (false advertising under the Lanham Act) depends on construing the defendants' statements as advertising their own litigation services; but under that construction, the statements are true, so Count III fails to state a claim for false advertising. That leaves Count I ("Injurious Falsehood / Product Disparagement"), which survives the time-bar and standing analyses and adequately states a claim on which relief can be granted. The defendants' motion will be **GRANTED** as to Counts II and III but **DENIED** as to Count I.

## I.    BACKGROUND

At this stage, the Court assumes that the facts alleged in the Complaint are true. The defendants—a group of doctors who are also prolific plaintiff-side expert witnesses, ECF No. 1 ¶¶ 13–15, 20–28[1]—published an article titled "Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients" in the American Journal of Industrial Medicine. *Id.* ¶ 3; ECF No. 1-2 (article). The article claimed to "present 75 [] subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc," who were "additional" to 33 subjects discussed in an earlier study. ECF No. 1-2 at 3. Both components of that statement were false. ECF No. 1 ¶ 5.

In fact, at least six of the study's subjects had been exposed to non-talc asbestos, ECF No. 1 ¶¶ 72–132, and at least one had already been discussed in the

---

[1] This Court cites to the page numbers assigned by CM/ECF rather than the parties' pagination, but it uses the parties' paragraph numbers.

earlier study, *id.* ¶ 6. And the defendants knew that, because they had served as expert witnesses in tort cases brought by the study subjects. *Id.* ¶¶ 32*,* 70.

In publishing their article, the defendants intended to contribute to a body of literature manufactured to be presented in court. ECF No. 1 ¶ 8. They disparaged products that the plaintiffs' bar targeted, thereby fueling increased litigation. *Id.* In exchange, plaintiffs' attorneys hired the defendants as expert witnesses, and the defendants relied on their article in court, repeating its false premise time and again. *Id.* ¶¶ 56–66.

The defendants published their article in March of 2020. ECF No. 1 ¶ 145. Sales of Johnson & Johnson's talc-based baby powder declined that year. *Id.* Demand dropped due to misinformation about the product's safety—including in the defendants' article. *Id.* ¶ 146. Two months after the article came out, Johnson & Johnson discontinued its talc-based baby powder. *Id.*

## II.    LEGAL STANDARDS

### A.    Timeliness

#### i.    *Statutes of Limitations*

If the allegations in the complaint "show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim." *Jones v. Bock*, 549 U.S. 199, 215 (2007).

Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). In Virginia, the law of the place of the wrong governs substantive matters in tort cases, but

Virginia law governs procedural matters. *Jones v. R.S. Jones & Assocs.*, 431 S.E.2d 33, 34 (Va. 1993). "Statutes of limitations are considered matters of procedure in Virginia courts[] unless they are so bound up with the substantive law of a claim that the limitations period is itself considered substantive." *RMS Tech., Inc. v. TDY Indus., Inc.*, 64 F. App'x 853, 857 (4th Cir. 2003) (unpublished) (citing *Jones*, 431 S.E.2d at 35); *see also Sch. Bd. of City of Norfolk v. U.S. Gypsum Co.*, 360 S.E.2d 325, 327 (Va. 1987) ("An ordinary statute of limitations is a procedural statute . . . ."); *but see Roller v. Basic Const. Co.*, 384 S.E.2d 323, 325–26 (Va. 1989) (limitation in a statute that "created a new right . . . unknown at common law" was "part of the new right").

### ii.    *Laches*

Laches bars a claim when the defendant proves "(1) lack of diligence by the party against whom the defense is asserted[] and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961); *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990).

> The first element of laches—lack of diligence—exists where the plaintiff delayed inexcusably or unreasonably in filing suit. An inexcusable or unreasonable delay may occur only after the plaintiff discovers or with reasonable diligence could have discovered the facts giving rise to his cause of action. The defendant may show lack of diligence either by proof that the action was not commenced within the period provided by the applicable statute of limitations or by facts otherwise indicating a lack of vigilance.

> The second element—prejudice to the defendant—is demonstrated by a disadvantage on the part of the defendant in asserting or establishing a claimed right or some other harm caused by detrimental reliance on the

> plaintiff's conduct. However, the defendant is aided by the inference of prejudice warranted by the plaintiff's delay. The plaintiff is then to be heard to excuse his apparent laggardness and to prove facts manifesting an absence of actual prejudice. Clearly the greater the delay, the less the prejudice required to show laches, and vice versa. But the defendant is ultimately required to prove prejudice (given the defendant's burden to plead and prove laches under Fed. R. Civ. P. 8(c)) and may either rest on the inference alone or introduce additional evidence.

*White*, 909 F.2d at 102 (quotation marks and citations omitted). "The equitable balancing of a plaintiff's delay with prejudice to a defendant is primarily left to the sound discretion of the trial court." *Id.*

## B. Standing

### i. Article III Standing

To plead constitutional standing, a plaintiff must plausibly allege that they have "(1) suffered an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (punctuation omitted); *Fed. Trade Comm'n v. Ross*, 74 F.4th 186, 192 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024).

For a plaintiff's injury to be fairly traceable to the defendant, it must "not [be] the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (alterations accepted); *Frank Krasner Enterprises, Ltd. v. Montgomery Cnty., MD*, 401 F.3d 230, 234 (4th Cir. 2005); *see GBA Assocs. v. Gen. Servs. Admin.*, 32 F.3d 898, 901 (4th Cir. 1994) (an

"independent justification" for the plaintiff's harm "breaks the chain of causation" and defeats standing).

While traceability requires that the defendant be "at least in part responsible" for the plaintiff's harm, "the presence of another proximate cause" is not inherently fatal. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013); *see Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (dispelling an argument that "wrongly equate[d] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation").

### ii.   *Statutory Standing (Count III)*

The statutory standing inquiry under the Lanham Act determines whether the "cause of action in [15 U.S.C.] § 1125(a) extend[s] to" litigants like the plaintiff. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). "To invoke the Lanham Act's cause of action for false advertising," a plaintiff must plead an injury that falls within the Act's zone of interest and plausibly allege that injury was "proximately caused by the defendant's misrepresentations." *Id.* at 140. The statement at issue must also be a "commercial advertising or promotion"—that is, "commercial speech for the purpose of influencing consumers to buy goods or services." *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 532 (4th Cir. 2022) (cleaned up).

### C.    Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). In other words, a plaintiff must plead sufficient "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering a motion to dismiss, the court "must take all the factual allegations in the complaint as true," but the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papsan v. Allain*, 478 U.S. 265, 286 (1986).

## III.    ANALYSIS

### A.    Timeliness

#### i.    *Count I: Injurious Falsehood / Product Disparagement*

Count I is styled "Injurious Falsehood / Product Disparagement," ECF No. 1 at 33, but the parties appear to agree that the Complaint intends to plead the New Jersey tort of trade libel.[2] *See* ECF No. 15 at 20 n.11; ECF No. 17 at 14. Trade libel, injurious falsehood, and product disparagement are all common law causes of action. *See Dairy Stores, Inc. v. Sentinel Publishing Co., Inc.*, 516 A.2d 220, 224–25 (N.J. 1986) (discussing history). Therefore, there is no statute that "created [the] right"

---

[2] The defendants attempt to "reserve their rights to argue" that another state's substantive law applies, "should this case proceed past the pleadings stage." ECF No. 15 at 20 n.11. The Court finds that New Jersey substantive law does apply, *see Jones*, 431 S.E.2d at 34, so it will not revisit the issue later.

that might include a time bar as a substantive limitation. *See Roller*, 384 S.E.2d 325. Accordingly, Count I is governed by a procedural statute of limitations, and Virginia's must apply. *See Jones*, 431 S.E.2d at 35.

Virginia law does not directly define a statute of limitations for trade libel, injurious falsehood, or product disparagement. When the relevant state's highest court has issued no decision on point, the federal court must "predict" the law the state's highest court would apply. *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022) (citation omitted).

Virginia statutes of limitations fall into three categories. Which limitations period applies may be determined by (1) the specific cause of action, *e.g.*, Va. Code §§ 8.01-243.1 (medical malpractice), 8.01-244 (wrongful death); (2) the type of wrong alleged, *e.g.*, Va. Code § 8.01-250 ("defective and unsafe condition of an improvement to real property"); or (3) the type of injury alleged, *e.g.*, Va. Code §§ 8.01-246 (contract injuries), 8.01-243(A) (injury to the person); 8.01-243(B) (injury to property). If no other limitations period applies, Va. Code § 8.01-248 prescribes a two-year deadline.

The defendants argue the limitation period for defamation should apply to Count I. ECF No. 23 at 10 (citing Va. Code § 8.01-247.1).[3] By its terms, § 8.01-247.1

---

[3] The defendants claim "the majority rule across jurisdictions [] is to apply the limitations period applicable to libel, defamation, and other similar torts." ECF No. 23. at 10. But the correct answer is dictated by the way *Virginia* courts interpret the Virginia statutory scheme. Other states' outcomes, based on their own statutory schemes, are not informative.

In an unpublished case, the Fourth Circuit reasoned that North Carolina product disparagement was analogous to slander of title. *Livingston Chemicals, Inc. v. Permviro Systems, Inc.*, No. 92-1063, 1992 WL 374024, at *3 (4th Cir. Dec. 21, 1992)

applies to four enumerated common law causes of action ("libel, slander, insulting words, or defamation"), and it does not include a phrase like "such as" that might indicate the list is non-exhaustive. Therefore, the statute must apply only to the torts listed therein. None of the names LLT gives to the tort alleged in Count I is included within Va. Code § 8.01-247.1, and the defendants do not argue that the Complaint actually attempts to plead "libel, slander, insulting words, or defamation." *Id.*; *see* ECF No. 15 at 19; ECF No. 23 at 10. Therefore, the Court finds that Va. Code § 8.01-247.1 does not apply.

The defamation statute of limitations does address torts that involve the same type of wrong LLT alleges—*i.e.*, "false . . . assertions of fact." ECF No. 1 ¶ 150; *see Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 750 (Va. 2009) (elements of libel, including "false factual statement"); *Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013) (same, for defamation). However, because § 8.01-247.1 applies only to the torts named in the statute, similarity based on the type of the wrong does not matter.[4]

---

(unpublished). But *Livingston Chemicals* is not helpful here, because the court was only looking to the elements of slander of title to determine North Carolina's definition of "defamatory"—a term common to both causes of action. *Id.* For the reasons explained above, in Virginia, commonality of elements does not dictate that two causes of action are governed by the same statute of limitations.

[4] Section 8.01-247.1 cannot apply based on the type of the wrong alleged, because a separate statute prescribes a different limitation period for fraud, even though fraud—like the torts enumerated in § 8.01-247.1—is also based on the same type of wrong: a "false representation of . . . fact." *Sales v. Kecoughtan Hous. Co.*, 690 S.E.2d 91, 94 (Va. 2010); *see* Va. Code § 8.01-243(A) (statute of limitations for civil fraud claims).

Count I alleges harm from lost business profits and increased litigation costs. *See* ECF No. 1 ¶ 164. That is an injury to property under Virginia law. *See Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 321 (Va. 2014) (applying Va. Code § 8.01-243(B) to a claim for tortious interference with business expectancy because interference with "expected future . . . business relationships" "is directed at and injures a property right"); *see also Dairy Stores*, 516 A.2d at 224 (explaining that, no matter how it is styled, a claim that alleges lost business due to false statements about a product is a "an offshoot of the cause of action for interference with contractual relations, such as sales to a prospective buyer"). Va. Code § 8.01-243(B) applies to injuries to property. Therefore, this Court concludes the Virginia Supreme Court would apply the five-year statute of limitations in Va. Code § 8.01-243(B) to Count I.

LLT's first cause of action accrued no earlier than the date the defendants' article was published. Since that date was less than five years before the date LLT filed its Complaint, Count I is not barred by the statute of limitations.

### ii.    *Count II: Fraud*

Virginia has a two-year statute of limitations for civil fraud claims. Va. Code § 8.01-243(A). The limitation period begins to run when the fraud "is discovered or by the exercise of due diligence reasonably should have been discovered." Va. Code § 8.01-249(1). When a plaintiff discovered or reasonably should have discovered alleged fraud is a question of fact. *See Oden v. Salch*, 379 S.E.2d 346, 350 (Va. 1989) *Gilmore v. Basic Indus., Inc.*, 357 S.E.2d 514, 517 (Va. 1987). But a court may dismiss

a claim based on a statute of limitations when it is clear on the face of the complaint that the claim is time-barred. *See* 5B Fed. Prac. & Proc. Civ. § 1357 (4th ed.) ("The most common situation in which the affirmative defense appears on the face of the pleading and provides a basis for a motion to dismiss under Rule 12(b)(6) is a complaint showing that the governing statute of limitations has run on the plaintiff's claim for relief.") (quoted in *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 181 (4th Cir. 1996)) (quotation marks omitted); *see also Phillips v. Wells Fargo Bank, N.A.*, No. 3:17-cv-519, 2018 WL 1946925, at *2 (E.D. Va. Apr. 25, 2018) ("When the Court confronts a statute of limitations argument in a 12(b)(6) motion to dismiss, all facts necessary for the Court to conclude that the statute bars the claims must appear on the face of the complaint.") (citation omitted).

The Complaint alleges LLT "could not have known of the [defendants'] fraud until recently." ECF No. 1 ¶ 171. But that conclusory allegation is due no deference in the Fed. R. Civ. P. 12(b)(6) analysis. *See Iqbal*, 556 U.S. at 681. Instead, the Court looks to the facts LLT asserts about how it discovered the claimed fraud and asks whether the Complaint plausibly alleges those facts were not reasonably discoverable within the statutory period.

LLT states that it discovered the defendants' fraud by "match[ing] . . . the [a]rticle's subjects to [] litigation plaintiff[s]." ECF No. 1 ¶ 71. Through this process, LLT identified "at least six individuals in the [a]rticle" to be "plaintiffs" whose "documented alternative exposures to asbestos" were known to the defendants because of the defendants' roles as expert witnesses in the subjects' "underlying tort

cases." *Id.* ¶¶ 70–71. The Complaint admits that of those six subjects, five were plaintiffs in lawsuits against LLT. *Id.* ¶¶ 78 (Case # 72 / Stephen Lanzo), 91 (Case # 67 / Pauline Citizen), 99 (Case #65 / Robert Blinkinsop), 115 (Case #8 / Ilene Brick), 125 (Case #33 / Rosalind Henry); *but see id.* ¶ 107 (Sharon Hanson, alleged to be Case #75, "filed a claim against another cosmetic talc defendant"); *see also id.* ¶ 70 (alleging the defendants were expert witnesses in cases where the study subjects "had asserted claims against LLT and others").

The Complaint contains no facts that give rise to a reasonable inference that LLT required any additional information, outside of what it already possessed because of its role in earlier litigation, in order to match the alleged study subjects to the testimony of the expert witnesses in their respective trials or to spot the non-talc asbestos exposures the experts identified in each case. And if the matching process itself took years, LLT should have said that, but it did not. Thus, it appears on the face of the Complaint that the study subjects' alleged non-talc asbestos exposures were discoverable, given the exercise of due diligence, at the time the study was published.

The Complaint alleges that the defendants "concealed and thwarted LLT's efforts to discover the truth." ECF No. 1 ¶ 171. Though LLT does not argue it explicitly, *see* ECF No. 17 at 15, the Court considers whether the Complaint plausibly alleges that the statute of limitations was tolled under Va. Code § 8.01-229(D) ("When the filing of an action is obstructed by a defendant's . . . using any [] direct or indirect means to obstruct the filing of an action, then the time that such obstruction has

continued shall not be counted as any part of the period within which the action must be brought.").

The Complaint does allege that the defendants attempted to conceal the falsity of their statements in the article. *See* ECF No. 1 ¶ 168 ("the Authors have repeatedly sought to conceal evidence undermining the falsity of their statements"). However, this assertion does not make out a plausible claim that the defendants' concealment tolled the statute of limitations. For Va. Code § 8.01-229(D) to apply at this stage, a plaintiff must plausibly allege that "the defendant undertook an affirmative act designed or intended . . . to obstruct the plaintiff's right to file [the] action." *Grimes v. Suzukawa*, 551 S.E.2d 644, 646 (Va. 2001).

The Complaint alleges three acts by the defendants that allegedly concealed the fact that their statements in the article were false: (1) "statements reaffirming the false statements in the [a]rticle," ECF No. 1 ¶ 154; (2) "refus[al] to disclose the identity of the 75 subjects of the [a]rticle," *id.; see id.* ¶¶ 136 ("On at least nine separate occasions, the [defendants] refused to testify at their depositions in cases against LLT regarding the identities of the individuals in their [a]rticle."), 140 (alleging each of the defendants claimed "they did not retain any documentation showing [the study subjects'] identit[ies]"); and (3) "omit[ing] from their publication that their statements regarding the lack of alternative exposures were false and that they knew they were false," ECF No. 1 ¶ 171.

The Court assumes without deciding that either failing to retain information required to identify the study subjects, or merely repeating a false statement—*i.e.,*

continuing to represent it as true—could constitute an "affirmative act" under Va. Code § 8.01-229(D). But LLT still has a problem: The defendants' affirmative act must actually "have the *effect* of debarring or deterring the plaintiff from his action." *Newman*, 618 S.E.2d at 339 (emphasis added); *see Evans v. Trinity Indus., Inc.*, 137 F. Supp. 3d 877, 882 (E.D. Va. 2015) ("must [actually] have the effect") (quoting *Newman*). The Complaint does not allege that the defendants have ever backed away from their claims that all 75 subjects were new, that none of the 75 study participants had known non-talc asbestos exposure, or that the defendants have ever revealed the study subjects' identities. *See also* ECF No. 15 at 29 n.15 (defendants' brief, asserting they "do not concede that any of the alleged statements are false"). But LLT was able to bring its fraud claim anyway. That makes it facially implausible that the defendants' repetition of the alleged falsehood or nondisclosure of the study subjects' names "had the effect" of deterring filing of the claim. *Newman*, 618 S.E.2d at 339.

The defendants' failure to disclaim their alleged falsehoods in writing is also insufficient to invoke Va. Code § 8.01-229(D), because concealment requires something more than silence. *See Newman*, 618 S.E.2d at 338 ("Concealment of a cause of action preventing the running of limitations must consist of some trick or artifice preventing inquiry, or calculated to hinder a discovery of the cause of action by the use of ordinary diligence, and mere silence is insufficient.").

Even though the Complaint asserts that the defendants prevented LLT from filing their fraud claim within two years after the article was published, that allegation is not "plausible on its face." *Iqbal*, 556 U.S. at 678. Accordingly, the statute

14

of limitations is not tolled, and Count II will be dismissed as untimely. *Cf. Cruz v. Maypa*, 773 F.3d 138, 147 (4th Cir. 2014) (affirming a Fed. R. Civ. P. 12(b)(6) dismissal under a Virginia statute of limitations where the complaint did not allege facts sufficient to satisfy Va. Code § 8.01–229).[5]

### iii.    *Count III: False Advertising under the Lanham Act*

"[T]he Lanham Act does not expressly incorporate a limitations period for § 43(a) claims." *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 293 (4th Cir. 2021). "In the absence of an express limitations period, [courts] typically hold that Congress intended that the courts apply the most closely analogous statute of limitations under state law." *Id.* (quotation marks and citation omitted). But "a state statute of limitations would be an unsatisfactory vehicle for enforcement" of § 43(a). *Id.* Instead, courts apply the affirmative defense of laches, which "provides a closer analogy than available state statutes." *Id.* (quoting *DelCostello v. Int'l B'hood of Teamsters*, 462 U.S. 151, 162 (1983)) (quotation marks omitted).

For the reasons explained in Part III.A.ii., *supra*, the Court concludes that LLT "could have discovered the facts giving rise to" its Lanham Act claim as early as the date the defendants published their article, if it had acted "with reasonable diligence." *White*, 909 F.2d at 102. Therefore, LLT's failure to discover those facts indicates a "lack of vigilance" that satisfies the first element of laches. *Id.*

---

[5] LLT has not argued that the doctrine of equitable tolling applies to Count II. Assuming without deciding that the doctrine does apply, given the lack of diligence the Court has previously outlined, equitable tolling would afford no relief.

15

However, the defendants have not shown that they were "disadvantage[d] . . . in asserting or establishing a claimed right" because they detrimentally relied on LLT's failure to bring their claim earlier, and they fail to show any other specific harm. *White,* 909 F.2d at 102. In fact, the defendants do not mention the prejudice prong of laches at all.[6] Although the Court assumes some prejudice inherent in the delay, the defendants' failure to identify a specific harm results in failure to meet their burden to prove laches. *See* ECF No. 15 at 19–20; ECF No. 23 at 13; *White,* 909 F.2d at 102; Fed. R. Civ. P. 8(c). Accordingly, laches does not bar Count III.

## B.    Standing

### i.    Article III Standing

The Complaint alleges two categories of harm: (1) lost "sales volume and profits," ECF No. 1 ¶ 145, and (2) costs incurred to "respond to, defend against, and otherwise counteract the [defendants] false statements," *id.* ¶ 147. The Court will address standing as to each type of alleged injury in turn.[7]

---

[6] Instead, relying on *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 121 (4th Cir. 2011), the defendants assert that "[l]aches is presumed to bar claims outside" Virginia's "two-year [limitations] period for fraud." ECF No. 15 at 19–20. That is incorrect. The Fourth Circuit has explicitly declined to follow *PBM*, finding that it irreconcilably conflicts with the controlling decision in *What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi, Tx.*, 357 F.3d 441, 449 (4th Cir. 2004). *Belmora*, 987 F.3d at 294 n.7.

[7] LLT originally filed a complaint in the District of New Jersey. That court found that LLT had constitutional standing but dismissed the action for lack of personal jurisdiction. *LTL Mgmt. LLC v. Emory*, No. 2:33-cv-649, 2024 WL 1928825, at *5, 11 (D.N.J. Apr. 30, 2024). LLT contends that collateral estoppel bars the defendants from relitigating standing in this Court.

16

### a.    *Lost Sales Volume & Profits*

The Complaint plausibly alleges that the defendants' false statements were "at least in part responsible" for lost sales of Johnson & Johnson's talc baby powder. *Libertarian Party of Va.*, 718 F.3d at 316. While factors outside publication of the article—including a "lengthy and well [] publicized history of . . . tort liability, high-profile media exposes, decades of scientific studies, and an FDA recall," ECF No. 23 at 9—may have also contributed to the claimed damages, none of those things "breaks the chain of causation" between publication of the defendants' statement and the alleged business losses. *GBA Assocs.*, 32 F.3d at 901.

The defendants first published their statements in March 2020, and Johnson & Johnson discontinued its talc-based baby powder in the United States and Canada

---

Collateral estoppel forecloses the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate. For collateral estoppel to apply, the proponent must establish that: (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue must have been actually determined in the prior proceeding; (3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment must be final and valid; and (5) the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum.

*Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 224 (4th Cir. 1998) (quotation marks and citation omitted). Collateral estoppel does not bar litigation of the standing question in the present case, because, since the District of New Jersey dismissed the complaint on personal jurisdiction grounds, standing was not "a critical and necessary part of [its] decision." *Id.*

in May of the same year. ECF No. 1 ¶ 145–46. The defendants argue that "the [a]rticle could [not] have caused changes in consumer habits quickly or forcefully enough to cause [Johnson & Johnson] to pull a signature product from the market within mere weeks." ECF No. 15 at 17. But even if "demand for [the product] had been declining" before the defendants released their article, the Court can—and therefore must— reasonably infer that the article made the problem worse. ECF No. 1 ¶ 146. So while the evidence might ultimately show that the portion of LLT's losses attributable to the defendants' statements is small, or even that the article did not change Johnson & Johnson's financial position at all, LLT's allegations are sufficient to establish standing to sue.

The defendants' contention that the article was distributed in a publication "whose audience is doctors, not consumers" does not change this outcome. ECF No. 15 at 17. LLT plausibly alleges that the defendants' intended and actual audience was the plaintiffs' bar, rather than the scientific community. ECF No. 1 ¶ 8. The Complaint alleges in detail how the defendants "publish [] litigation opinions in scientific journals" about "products that are the target of the plaintiffs' bar," and "cit[e] each other's work" in order to "manufacture[] a body of literature" they can present in court, so that plaintiffs' lawyers will hire the defendants as expert witnesses. *Id.* (quotation marks omitted). This theory is supported by the plausible allegation that "[t]he plaintiffs' asbestos bar [] promoted" the defendants' article on websites that target people with cancer. *Id.* ¶ 49; *see id.* ¶¶ 50–55. Assuming these facts are true, the Court can easily trace the defendants' conduct to the "barrage of

litigation advertising" that allegedly contributed to the "changes in consumer habits" and precipitated discontinuation of Johnson & Johnson's talc-based baby powder. *Id.* ¶ 146. And while actions by the plaintiffs' bar allegedly contributed to consumer behavior, they were not "independent" of the defendants' conduct, so they do not defeat traceability. *Lujan*, 504 U.S. at 560.

The defendants also assert that no change in consumer behavior is fairly traceable to their conduct because before the article was published, the public was already aware that talc might be linked to cancer. *See* ECF No. 15 at 17–18; ECF No. 23 at 8. Given "billions of dollars in tort liability, high-profile media exposes, decades of scientific studies, and an FDA recall," the defendants argue, their article could not have made a difference. ECF No. 23 at 8. But the Court cannot assume that negative publicity had already influenced 100% of Johnson & Johnson's customers before the article came out. *See* ECF No. 1 ¶ 145 (alleging sales of an alternative product were "ever [] increasing"). Instead, it is reasonable to infer that news of the defendants' statements reached at least some people who still used Johnson & Johnson's baby powder and did not already know about its alleged risks, and that some of those people stopped buying the product. The defendants' conduct is fairly traceable to that harm.

### a.    *Increased Litigation Costs*

LLT also alleges it was forced to incur "millions of dollars in fees paid to attorneys, expert witnesses, and other professionals to investigate, respond to, defend against, and otherwise counteract the [defendants'] false statements." ECF No. 1

¶ 147. These harms are fairly traceable to the defendants' alleged conduct in two ways.

First, some people who learned of the defendants' allegedly false statements chose to sue LLT. Again, there were certainly other causes of those tort plaintiffs' decisions to file suit—most importantly that they presumably had used Johnson & Johnson's baby powder and had developed cancer. But it is facially plausible that for some people who developed cancer after using Johnson & Johnson's product and decided to sue, the defendants' allegedly false statements of fact played some role in that decision. That makes the harm of new lawsuits fairly traceable to the defendants' conduct.

Second, the Complaint alleges the defendants "were disclosed in dozens of cosmetic talc/mesothelioma cases against LLT, and they routinely relied on their [a]rticle in those cases . . . ." ECF No. 1 ¶ 56. And "in at least 41 cosmetic talc/mesothelioma cases against LLT, a combined [nine] other plaintiff experts have relied on the [a]rticle in either their testimony or court disclosures." *Id.* ¶ 61. Every time LLT has to defend against an expert witness who relies on the defendants' allegedly false statements in litigation, it costs money LLT would not otherwise have to spend. That too is a fairly traceable injury.[8]

---

[8] The Complaint also alleges the defendants' statements "had the effect of increasing settlement values." ECF No. 1 ¶ 147. Because the Court has found that other alleged harms are fairly traceable to the defendants' conduct, it declines at this juncture to decide whether increased settlement values would pass muster for purposes of Article III standing.

### ii.    *Statutory Standing (Count III)*

#### a.    *Zone of Interests*

"[T]o come within the zone of interests in a suit for false advertising under [15 U.S.C.] § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 131–32. The Complaint plausibly alleges injuries to Johnson & Johnson's reputation and the sales of its talc-based products. Specifically, the Complaint asserts that Johnson & Johnson was forced to remove its talc-based products from the market because "demand . . . decline[d] due in large part to changes in consumer habits [] fueled by misinformation around the safety of the product and a constant barrage of litigation advertising" to which the defendants' article contributed. ECF No. 1 ¶ 146; *see id.* ¶ 8.

#### b.    *Proximate Causation*

"[A] plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark*, 572 U.S. at 133. "[T]hat occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133–34. Here, the defendants' false statements allegedly deceived consumers by "impugn[ing] the safety of all cosmetic talc products"—a market Johnson & Johnson dominated.[9] ECF No. 1 ¶ 156;

---

[9] Proximate causation does not require the defendants to have named Johnson & Johnson or its products. *See Lexmark*, 572 U.S. at 122–23 (plaintiff who manufactured microchips that allowed companies to refurbish the defendant's printer cartridges alleged the defendant harmed its business by "purposefully mislead[ing] end-users to believe that they [were] . . . required to return [toner] cartridge[s] to [the defendant] after a single use") (quotation marks omitted); *id.* at 139 (acknowledging

*see id.* ¶ 157. Specifically, the Complaint plausibly alleges that by falsely claiming their study identified 75 new people who developed cancer after using cosmetic talc but had no other known exposure to asbestos, the defendants led consumers to believe exactly what they later claimed that meant: that "cosmetic talc should be considered a probable cause of mesothelioma." ECF No. 1 ¶¶ 39, 150.

The defendants point to the principle that an "independent justification" for an alleged injury "breaks the chain of causation and divests [the plaintiff] of standing." *GBA Associates*, 32 F.3d at 901. While the Complaint acknowledges that one prior study came to the same conclusion as the defendants' article, it is at least plausible that the earlier article was not an 'independent' case of consumer decisionmaking regarding Johnson & Johnson's products, since LLT alleges the two publications were designed in concert, to create the impression that a "body of literature" supported the defendants' claims. ECF No. 1 ¶ 8; *see id.* ¶¶ 2–9 (describing a relationship between the two articles).

The defendants also challenge traceability on the basis that "the potential link between cosmetic talc and cancer has long been known to consumers." ECF No. 15 at 17–18 (citing *Salt Institute v. Thompson*, 345 F. Supp. 2d 589, 599–600 (E.D. Va. 2004) (finding no standing where "[n]umerous other scientific studies ha[d] reached the [same] conclusion" as the defendants' clinical trial)). But the defendants' article did not merely cement the link to cancer in general—it purported to tie cosmetic talc

---

that "the causal chain linking [the plaintiff's] injuries to consumer confusion is not direct, but includes the intervening link of injury to the remanufacturers").

to "mesothelioma," which the defendants admit had not been the focus of earlier publicity around the dangers of Johnson & Johnson's baby powder. ECF No. 15 at 18. So it is plausible that, despite "[n]umerous . . . scientific studies" that earlier came to a more general conclusion, the defendants' statements were "new or unique" in that they focused on a cadre of consumers not previously singled out as victims of harm from cosmetic talc. *Salt Institute*, 345 F. Supp. 2d at 599. And the defendants seem to admit as much, when they assert that their article—and the 33-person study that came before it—were "geared towards filling a gap in the medical community's scholarship." ECF No. 23 at 15.[10]

LLT plausibly alleges that consumers "withhold[ing] trade from" Johnson & Johnson was a foreseeable consequence of the defendants' conduct. *Lexmark*, 572 U.S. at 133. Though the Complaint asserts that the defendants' primary goal was to "manufacture[] a body of literature to present to judges and juries with the veneer of scientific legitimacy" in order to increase their value as expert witnesses for the plaintiffs' bar, ECF No. 1 ¶ 8, it also plausibly alleges the defendants intended their message to reach consumers, *see id.* ¶ 151 (alleging the defendants distributed "the false statements . . . to others, including through electronic and hard-copy publication," and the statements were "read and otherwise received by the public at

---

[10] The defendants direct this argument to a different legal issue (whether their statements were nonactionable scientific opinions), but it is misplaced there, because novelty is not a factor in determining whether a statement is factual. *See Lynch v. N.J. Educ. Ass'n*, 735 A.2d 1129, 1137 (N.J. 1999) (discussed in Part III.C.ii.a., *infra*).

large [and] consumers . . . of cosmetic talc products" in addition to "attorneys and expert witnesses involved in talcum powder litigation").

###### c.    *Commercial Advertising or Promotion*

An "advertising or promotion" is "commercial speech [made] for the purpose of influencing consumers to buy goods or services." *De Simone*, F.4th at 532 (cleaned up). "Speech is [] likely commercial when the declarant hoped to realize an economic gain when disseminating its message." *Id.* (quotation marks and citation omitted).

LLT does not allege the defendants falsely disparaged Johnson & Johnson's products in order to "influenc[e] consumers to buy" those products, and that would not make sense. *De Simone*, F.4th at 532. However, the Complaint *does* plausibly allege the defendants made their statements in order to influence their *own* customers—plaintiffs' attorneys—to hire them to provide expert opinions in tort litigation. *See* ECF No. 1 ¶ 8. The meaning of the defendants' statements allegedly *implied*—something like '*we will testify* that we have identified 75 more people with mesothelioma who have no known asbestos exposure except to talc'—plausibly made those statements commercial advertisements or promotions for the defendants' services. Therefore, the third requirement for statutory standing is met, but only if the statements are construed to be about the defendants' own litigation services. However, that creates a problem for LLT as the Court turns to the analysis under Fed. R. Civ. P. 12(b)(6).

### C.    Fed. R. Civ. P. 12(b)(6)

The Complaint adequately pleads a claim in Count I, but Count III fails as a matter of law. For the sake of narrative clarity following the statutory standing analysis, the Court will address the Lanham Act claim in Count III first.

#### i.    Count III: False Advertising under the Lanham Act

"[A] plaintiff asserting a false advertising claim must establish each of five elements," including that "the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product." *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 298–99 (4th Cir. 2017) (citation omitted). In Part III.B.ii, *infra*, the Court concluded LLT has statutory standing to bring its Lanham Act claim only if the defendants' statements "are construed to be about the defendants' own litigation services." But in that context, the Complaint fails to allege that the statements were false.

As alleged, the article advertised to the plaintiffs' bar that the defendants would testify to "judges and juries" that they had identified 75 new people with mesothelioma whose only known asbestos exposure was to cosmetic talc. ECF No. 1 ¶ 8. That was true–the defendants "routinely relied on their [a]rticle" in cases against LLT and "other talc defendants." *Id.* ¶ 56. Therefore, if the Complaint is construed to clear the statutory standing bar, then it fails to state a claim for false advertising.

#### ii.    Count I: Injurious Falsehood / Product Disparagement

To plead a claim for product disparagement or trade libel under New Jersey law, a plaintiff must allege (1) publication (2) with malice (3) of a false statement of

fact (4) about the plaintiff's product or property (5) that causes special damages. *See Dairy Stores*, 516 A.2d at 238 (Garibaldi, J., concurring) (listing the elements of product disparagement); *see Sylvan Dental, P.A. v. Chen*, No. A-4544-18, 2021 WL 3671164, at *7 (N.J. Super. Ct. App. Div. Aug. 19, 2021) (same elements for trade libel). The defendants do not dispute that the Complaint adequately pleads publication and malice, *see* ECF No. 15 at 20–27, and the Court finds that those requirements are met.[11]

### a.    Statement of Fact

The defendants contend that Count I fails as a matter of law because the statements on which it is based are scientific opinions, not statements of fact. That is incorrect. Opinion statements are generally privileged and nonactionable in New Jersey trade libel cases. *Lynch v. N.J. Educ. Ass'n*, 735 A.2d 1129, 1137 (N.J. 1999) (describing qualified privilege in defamation actions); *see Dairy Stores*, 516 A.2d at

---

[11] The Complaint adequately pleads publication at least by alleging the article was distributed in electronic and hard copies of a journal. ECF No. 1 ¶¶ 7, 151.

"The actual-malice standard requires proof that the defamatory statement was published with knowledge that it was false or with reckless disregard of its truth or falsity." *G.D. v. Kenny*, 15 A.3d 300, 310 n.7 (N.J. 2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)) (quotation marks omitted). LLT plausibly alleges this element as to Defendants Kradin and Maddox because it asserts they were informed in litigation about individual study subjects' non-talc asbestos exposures. *See* ECF No. 1 ¶¶ 123 (Defendant Kradin previously opined that a non-talc asbestos exposure was a cause of one study subject's mesothelioma), 131 (Defendant Maddox knew about another study subject's non-talc asbestos exposures "because he was cross examined about them at trial"). The Complaint alleges actual malice as to Defendant Emory because it asserts she had access to the same information LLT used to demonstrate the alleged falsity of the defendants' statements. *See id.* ¶ 140 (Defendant Emory was given the key that would match cases in the article to litigation plaintiffs).

226 (qualified privilege exists for product disparagement "wherever it would exist in a defamation action"). Whether a statement is a nonactionable opinion is a threshold question of law. *Kotlikoff v. Cmty. News*, 444 A.2d 1086, 1090 (N.J. 1982). To determine whether a statement is a nonactionable opinion, courts consider "its content, verifiability, and context." *Lynch*, 735 A.2d at 1136.

The content factor distinguishes between "genuinely defamatory communications," and figurative speech or rhetorical hyperbole, like name-calling, "which cannot reasonably be understood to be meant literally," *Ward v. Zelikovsky*, 643 A.2d 972, 979 (N.J. 1994). The defendants' statements are obviously the former. The claim that the defendants "present[ed] 75 [] subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc" is not an "exaggeration." ECF No. 1-2 at 3; *Lynch*, 735 A.2d at 1141 (citation omitted). Instead, the content of what the defendants wrote suggests it is a statement of fact.

"A statement's verifiability refers to whether it can be proved true or false." *Lynch*, 735 A.2d at 1137. The defendants' statement is verifiable because a factfinder can determine, based on proof at trial, whether any of the 75 study subjects had non-talc asbestos exposures that were "known" to the defendants at the time they published the article, and whether any of the 75 subjects were common to the defendants' study and the earlier study. ECF No. 1-2 at 3.[12]

---

[12] The Court's decision on this point should not be taken to suggest that LLT will necessarily be permitted to obtain the identities of the study subjects through discovery. The Court is mindful of the tradeoffs there and will look to protect the individual subjects while also enabling LLT to access the information it needs to test the truthfulness of the defendants' statements.

The defendants propose that the word "known" as used in the article transforms their statements from facts to opinions, because it conveys that they—the authors—did not scientifically verify whether the subjects had been exposed to non-talc asbestos. *See* ECF No. 23 at 16 (arguing that the inquiry into verifiability improperly "challeng[es] the weight" of scientific evidence, because the defendants acknowledged the subjects' "only *known* exposure to asbestos was via cosmetic talc") (emphasis in original) (quotation marks and citation omitted). While the Court takes seriously the "risk [of] chilling the natural development of scientific research and discourse" that can arise from critiquing scientific opinions as though they were verifiable facts, *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 248 (3d Cir. 2023) (quotation marks omitted), it also has a duty to make all reasonable inferences in favor of the non-moving party at this stage of the litigation. And it is certainly reasonable to infer that "known" means 'known' in the usual sense. Therefore, the Court declines to construe "known exposure" as unverifiable. A jury could verify the statements by deciding whether the defendants subjectively knew about non-talc asbestos exposures among the study subjects.

Even if the qualifier "known" were to render the defendants' statements about the subjects' non-talc asbestos exposures unverifiable, the defendants' assertion that the subjects of their study were "additional" to the subjects in the previous study is certainly verifiable. Therefore, the Court finds that the Complaint adequately pleads the verifiability requirement under Count I.

The context of the defendants' statements also demonstrates that they are factual. In assessing this factor, New Jersey courts examine the "medium by which the statement is disseminated and the audience to which it is published." *Pacira*, 63 F.4th at 248 (applying New Jersey law and collecting cases). The defendants argue their statements are opinions because they were published in a scientific journal.[13] But "statements are not protected solely because they appear in a peer-reviewed journal." *Pacira*, 63 F.4th at 248. What matters is whether the facts are adduced through a scientific method, or whether they exist independent of the scientific process. *See id.* at 249 (context factor favored construing defendants' statements as an opinion where readers of the journal in which they were published "were provided with the data and methodology on which the statements were based"). Here, the defendants' statements are plausibly construed as assertions about their own knowledge of the study subjects' medical histories. Those facts pre-existed the scientific process the article describes—in fact, they were discovered through litigation, not through any scientific method. ECF No. 1-2 at 7 ("these cases were selected from medical-legal consultation practice").

For one of the cases LLT asserts it has identified among the anonymous study subjects—Case #6—the Complaint alleges the defendants knew the subject had been exposed to non-talc asbestos in part because the record from the individual's prior

---

[13] The defendants also argue that their statements must have been opinions because the journal later published a letter criticizing the article and highlighting "many of the same complaints LLT now raises." ECF No. 15 at 24. This argument assumes that opinions can be disputed but facts cannot. That is not so.

litigation revealed a type of asbestos in the tissue that is consistent with exposure to non-talc asbestos but inconsistent with exposure to the type of asbestos in talc. *See* ECF No. 1 ¶¶ 76–81. There were other reasons, observable by lay people, that LLT alleges gave the defendants reason to know the subject of Case #6 had non-talc asbestos exposures. *Id.* ¶¶ 82–83 (detailing exposures in the subject's basement and elementary school). But out of an abundance of caution, the Court assumes it is an opinion that this one study subject had no known non-talc asbestos exposures, since the assessment of his tissue was a scientific process. *Lynch*, 735 A.2d at 1137 ("If a statement could be construed as either fact or opinion," it should be construed as an opinion.). Still, that is not the case for the other subjects LLT identifies. Therefore, even if Case #6 is excluded, the Complaint plausibly alleges that the defendants' statement, claiming they identified 75 new subjects with no known non-talc asbestos exposures, is not an opinion.

Because all three factors favor construing the defendants' statements as facts, the Court finds that the Complaint adequately pleads the third element of trade libel. *See Dairy Stores*, 516 A.2d at 238.

b.    *About the Plaintiff's Product*

The defendants assert their statements are not "about the plaintiff's product" because they include no "specific references" to Johnson & Johnson or its baby powder. *Dairy Stores*, 516 A.2d at 238; ECF No. 15 at 21. However, the Complaint plausibly alleges Johnson & Johnson's talc-based products were "the leading brands among a discrete and limited number of cosmetic talc products in the market" and

"maintained well over a majority of the market share for talc powder products in the United States." ECF No. 1 ¶¶ 156–57. Based on those facts, the Court must make the reasonable inference that a consumer who learned of the defendants' statements would understand the defendants to be calling into question the safety of Johnson & Johnson's products.

The better argument might be that the defendants' statements about the facts underlying their study are about the *study*, not about the talc-based products the study targets—that is, in saying they had 75 new subjects with no known non-talc asbestos exposure, the defendants were merely describing their data set, not commenting on the safety of *any* talc-based product. This, admittedly, is a closer call. But as the Court reads the defendants' article (in the light most favorable to LLT), the assertion that the study subjects had no known non-talc asbestos exposures is front and center, overshadowing even the conclusion that cosmetic talc may be linked to mesothelioma. *See generally* ECF No. 1-2. Therefore, it is reasonable at this stage to construe the allegedly false statements not as statements about the defendants' method or assumptions, but as conveying the thrust of the whole publication—which is squarely about the safety of talc-based products like Johnson & Johnson's.

In sum, the Court finds that LLT has met its burden to plead the fourth element of trade libel. *Cf. Auvil v. CBS 60 Minutes*, 800 F. Supp. 928, 930 (E.D. Wash. 1992) (Washington state apple producers satisfied "of or concerning" requirement for standing in a defamation suit where the court found it was "commonly known

throughout the country, if not the world, that Washington is the prime producer of red apples.").

c.    *Special Damages*

Finally, the defendants assert that Count I fails because it does not sufficiently allege special damages, since it does not identify specific customers Johnson & Johnson lost as a result of the defendants' statements. ECF No. 15 at 25–26. But contrary to the defendants' apparent view, special damages are not *extra-specific* damages; they are simply "the loss of something having economic or pecuniary value." *Ward v. Zelikovsky*, 643 A.2d 972, 985 (N.J. 1994) (citing David A. Anderson, Reputation, Compensation, and Proof, 25 Wm. & Mary L. Rev. 747, 760 (1984) (advocating substitution of "actual injury" for the term "special damages")) (other citation omitted). The Complaint pleads such damages here, at least by alleging "loss of sales and customers" and "irreparable harm to its commercial reputation and goodwill." ECF No. 1 ¶ 180; *see Synergy Microwave Corp. v. Inst. of Elec. & Elecs. Eng'rs*, No. A-1317-21, 2023 WL 105708, at *6 (N.J. Super. Ct. App. Div. Jan. 5, 2023) ("loss of a . . . prospective advantage" qualifies as special damages); *see also Comm'r v. Bosch's Est.*, 387 U.S. 456, 465 (1967) (When an intermediate appellate state court decision addresses a question of state law, the federal court must not disregard it "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.").

At this stage, LLT has done enough by plausibly alleging that "sales volume and profits from Johnson's Baby Powder declined" during the year the defendants'

32

article was published and that the company had to withdraw its product from the market "due in large part to changes in consumer habits [] fueled by misinformation around the safety of the product," of which the defendants' article was a part. ECF No. 1 ¶¶ 145–46.[14] Therefore, it has successfully pleaded the final element of its claim in Count I.[15]

---

[14] The defendants cite three cases in which federal courts applying New Jersey law ruled against defamation plaintiffs on the issue of special damages. But two of those cases were decided at summary judgment, so their observations about plaintiffs' failure of proof is not helpful here. *See Bocobo v. Radiology Consultants of S. Jersey, P.A.*, 477 F. App'x 890, 901 (3d Cir. 2012) (unpublished); *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378–79 (D.N.J. 2004). The third case is even less instructive, because it dealt with a motion for preliminary injunction, where the plaintiff had to demonstrate not just that a reasonable jury *could* find in their favor but that they were *likely* to succeed on the merits at trial. *See Juliano v. ITT Corp.*, 1991 WL 10023, at *6 (D.N.J. Jan. 22, 1991).

[15] The defendants also contend that LLT's allegations with respect to increased litigation costs cannot satisfy the pleading requirement as to special damages. ECF No. 15 at 27. Because it finds the Complaint sufficient as to damages, the Court need not resolve this argument; however, the Court finds it prudent to explain the issue now, rather than wait for the dispute to arise again later.

The defendants state: "Legal expenditures to counteract the statements are not special damages[] and cannot support LLT's claim." ECF No. 15 at 27 (quotation marks omitted and alterations accepted). They draw this rule from *Juliano*, 1991 WL 10023, at *5–6, which decided that a product disparagement plaintiff "must plead and prove that, as a result of the [defendant's statements], others have failed to deal or contract with it," and "legal expenditures to counteract . . . [the defendants' allegedly false] allegations [did] not satisfy [the plaintiff's] burden." But this Court must not follow the District of New Jersey here, because the state's highest court would reach a different outcome. *See Knibbs*, 30 F.4th at 213.

The *Juliano* Court drew *its* rule from *Henry V. Vaccaro Const. Co. v. A. J. DePace, Inc.*, 349 A.2d 570, 573 (N.J. Super. Law. Div. 1975). However, that case decided only which statute of limitations applied to a product disparagement case: The court was never presented with the question of whether the plaintiff could recover the costs of litigation in which the plaintiffs had to defend against the defendants' allegedly false statements.

## IV.    CONCLUSION

The defendants' Motion to Dismiss (ECF No. 14) is **GRANTED IN PART** and

**DENIED IN PART.**

Count II is **DISMISSED** pursuant to Va. Code § 8.01-243(A).

Count III is **DISMISSED** pursuant to Fed. R. Civ. P. 12(b)(6).

The Motion is **DENIED** with respect to Count I.

The defendants are **ORDERED** to file an answer to Count I on or before

February 21, 2025.

The stay of discovery in this matter is **LIFTED.**

The Court will issue a new Fed. R. Civ. P. 26(f) Pretrial Order

contemporaneously with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

_____  /s/
                    Jamar K. Walker
                    United States District Judge

Norfolk, Virginia
February 7, 2025

---

The better indicator of how the New Jersey Supreme Court would decide the issue comes from *Feldmesser v. Lemberger*, 127 A. 815, 816 (N.J. 1925), where the court allowed the plaintiff in a slander of title case to recover costs of separate litigation against a third party. That case was followed as recently as 2001, to permit recovery of extrinsic litigation costs. *See In re Est. of Lash*, 776 A.2d 765, 769 (N.J. 2001); *see also Grunwald v. Bronkesh*, 621 A.2d 459, 467 (N.J. 1993) (stating, where the question was not presented directly, that the plaintiff "suffered further damages in the form of litigation costs in the underlying action"). Therefore, this Court concludes that New Jersey law would likely permit a trade libel plaintiff to recover the costs of litigation against a third party, that were proximately caused by the defendants' false statements.

34