**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

| | |
|---|---|
| LLT MANAGEMENT LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 4:24-cv-75 |
| DR. THERESA SWAIN EMORY, DR. RICHARD LAWRENCE KRADIN, AND DR. JOHN COULTER MADDOX, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
RECONSIDERATION AND FOR ORDER TO SHOW CAUSE**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

   A.   The Challenged Statements Are Not "About The Plaintiff's Product." ........................... 2

   B.   The Doctors Are Entitled To The Act's Additional Protections. ........................................ 6

    1.   Good Cause Exists For The Court To Apply The Act's Additional Protections. ............ 6

    2.   The Act Protects The Doctors' Speech. ....................................................................... 10

    3.   This Proceeding Should Be Stayed Until This Motion Is Resolved. ............................ 15

CONCLUSION ................................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Adelson v. Harris*, 973 F. Supp. 2d 467 (S.D.N.Y. 2013) ........................................................... 10

*Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505 (4th Cir. 2003) ........................................ 2

*Arthur v. Offit*, No. 1:09-cv-1398, 2010 WL 883745 (E.D. Va. Mar. 10, 2010) .......................... 11

*Atlantic Machinery & Equipment, Inc. v. Tigercat Industries, Inc.*,
    419 F. Supp. 2d 856 (E.D. Va. 2006) ..................................................................................... 7

*Auvil v. CBS 60 Minutes*, 67 F.3d 816 (9th Cir. 1995) ................................................................. 4

*Auvil v. CBS 60 Minutes*, 800 F. Supp. 928 (E.D. Wash. 1992) (*"Auvil I"*) .............................. 3, 4

*Auvil v. CBS 60 Minutes*, 800 F. Supp. 941 (E.D. Wash. 1992) (*"Auvil II"*) ............................. 4, 5

*Barger v. Playboy Enterprises, Inc.*, 564 F.Supp. 1151 (N.D.Cal.1983) ...................................... 4

*Burns v. Belafsky*, 741 A.2d 649 (N.J. Super. Ct. 1999) ............................................................... 8

*Clifford v. Trump*, 339 F. Supp. 3d 915 (C.D. Cal. 2018) ............................................................ 8

*Dialysis of Des Moines, LLC v. Smithfield Foods Healthcare Plan*,
    No. 2:18-cv-653, 2019 WL 8892581 (E.D. Va. Aug. 5, 2019) .............................................. 8

*Doe v. Am. Red Cross Blood Servs., S.C. Region*, 125 F.R.D. 646 (D.S.C. 1989) ...................... 16

*Dow Chemical Co. v. Allen*, 672 F.2d 1262 (7th Cir. 1982) ........................................................ 16

*Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545 (11th Cir. 1985) ...................................... 15

*Fields v. Eli Lilly & Co.*,
    No. 2:13-CV-35, 2015 WL 13609685 (M.D. Ala. Mar. 26, 2015) ........................................ 15

*Geomatrix, LLC v. NSF Int'l*, 629 F. Supp. 3d 691 (E.D. Mich. 2022) ........................................ 5

*Gillon v. Bernstein*, 218 F. Supp. 3d 285 (D.N.J. 2016) ....................................................... 2, 3, 4

*Hipsaver, Inc. v. Kiel*, 984 N.E.2d 755 (Mass. 2013) ................................................................... 5

*In re Fosamax Prod. Liab. Litig.*,
    No. 1:06-MD-1789, 2009 WL 2395899 (S.D.N.Y. Aug. 4, 2009) ........................................ 16

*In re Schaefer*, 331 F.R.D. 603 (W.D. Pa. 2019)..............................................................16

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & Prod. Liab. Litig.*,
No. 3:09-MD-02100, 2011 WL 5547133 (S.D. Ill. Nov. 15, 2011) ...........................15

*JB Assocs., Inc. v. Neb. Cancer Coal.*, 932 N.W.2d 71 (Neb. 2019) ................................5

*Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967) ...............11

*KJR Mgmt. Co., LLC v. First Web Search, LLC*,
2008 WL 7907954 (Nev. Dist. Ct. Nov. 19, 2008)......................................................10

*LoBiondo v. Schwartz*, 970 A.2d 1007 (N.J. 2009)............................................................7

*Malone v. WP Company, LLC*,
No. 3:22-cv-00046, 2023 WL 6447311 (W.D. Va. Sept. 29, 2023) ............................11

*Martindell v. Martindell*, 122 A.2d 352 (N.J. 1956) ........................................................7

*Nat'l Black Chamber of Commerce v. Busby*, 795 F. Supp. 2d 1 (D.D.C. 2011).............8

*New Jersey Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388 (D.N.J. 1998)....................2

*New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090 (C.D. Cal. 2004)..................................8

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ...........................................................................4

*Sejman v. Warner-Lambert Co., Inc.*, 845 F.2d 66 (4th Cir. 1988) ..................................2

*Senna v. Florimont*, 958 A.2d 427 (N.J. 2008) ..............................................................10

*State in Interest of A.G.*,
No. A-2549-20, 2021 WL 5441316 (N.J. Super. Ct. Nov. 22, 2021) ...........................7

*Studio 010 Inc. v. Digital Cashflow LLC*,
No. 2:20-CV-01018, 2023 WL 6793974, at *8 (W.D. Wash. Oct. 13, 2023),
*reconsideration denied,* No. 2:20-CV-01018, 2024 WL 2274320
(W.D. Wash. May 20, 2024)...........................................................................................4

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ...........................................................16

**Statutes**

New Jersey Statue § 2A:53A-50........................................................................10, 11, 13

New Jersey Statute § 2A:53A-51 .................................................................................1, 6

New Jersey Statute Ann. § 2A:53A-52 ................................................................ 15

New Jersey Statute § 2A:53A-54 ...................................................................... 12

New Jersey Statute § 2A:53A-59 ................................................................. 6, 9, 15

**Rules**

Federal Rule of Civil Procedure 54(b) ................................................................ 1

Federal Rule of Civil Procedure 7(b) ................................................................. 1

Local Rule 7 ........................................................................................ 1

**Constitutional Provisions**

First Amendment to the U.S. Constitution ................................................ 6, 8, 10, 11

**Other Authorities**

*About MedicalResearch.com*, https://medicalresearch.com/about-us/ ......................................... 14

American Journal of Industrial Medicine, "About," *available at* https://bit.ly/AJIMAbout ........ 14

*Governor Murphy Signs Bipartisan Bill Protecting Against Lawsuits Designed to Suppress Free Speech* (Sept. 7, 2023), https://www.nj.gov/governor/news/news/562023/20230907d.shtml ..................................... 6, 9

## INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 7(b) and 54(b), Local Rule 7, and New Jersey Statute § 2A:53A-51, Defendants Drs. Theresa Emory, John Maddox, and Richard Kradin (together, the "Doctors") hereby move the Court to reconsider its denial of their motion to dismiss LLT Management LLC's ("LLT") trade libel claim, and for an order to show cause why the Court should not invoke the additional protections afforded by New Jersey's Anti-SLAPP law (the "Act") and dismiss that claim with prejudice. That recently enacted law was passed to provide additional protections to defendants, like the Doctors, who are sued in connection with their speech on matters of public concern.

The Doctors respectfully request that the Court specifically reconsider its conclusion that LLT's trade libel claim adequately alleged that the Doctors' challenged statements are "about the plaintiff's product," as required to plead trade libel under New Jersey law. Memorandum Opinion and Order at 30–32, ECF No. 27 ("Order"). The Doctors also ask the Court to invoke the Act and its protections now despite the fact that undersigned counsel are raising it on the heels of the Court's motion to dismiss decision, and as discovery is set to begin. As discussed below, there is good cause to allow the Doctors to avail themselves of the Act's additional protections now, particularly given the New Jersey Legislature's command that the law be construed broadly to protect free speech rights. And the Act is squarely applicable here, where LLT's trade libel claim targets speech on issues of public concern, made in a peer-reviewed medical journal and on a medical research website. For all of these reasons, the Doctors respectfully request that this Court reconsider its denial of the Doctors' motion to dismiss the trade libel claim, apply the Act, and issue a temporary stay of proceedings—consistent with the Act's presumption—while it considers the Doctors' Motion.

1

## ARGUMENT

### A.  The Challenged Statements Are Not "About The Plaintiff's Product."

This Court "retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003). This latitude is committed to the court's discretion and may be exercised if, among other reasons, "the prior decision was clearly erroneous and would work manifest injustice." *Id.* (quoting *Sejman v. Warner-Lambert Co., Inc.*, 845 F.2d 66, 69 (4th Cir. 1988)). The Doctors respectfully ask the Court to reconsider its conclusion that LLT adequately alleged that the challenged statements were "about the plaintiff's product," because that conclusion both misapplied New Jersey law and construed LLT's allegations too broadly.

Courts interpreting New Jersey's trade libel requirement have been clear: the tort requires that a statement "*explicitly* impute[] to the corporation fraud, deceit, dishonesty, or reprehensible conduct *in relation to the product*" at issue. *Gillon v. Bernstein*, 218 F. Supp. 3d 285, 295–96 (D.N.J. 2016) (emphases added). This "most basic element" is missing where, as here, there are no "false allegations *about the plaintiff's product*." *New Jersey Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388, 409 (D.N.J. 1998) (emphasis in original).

Here, the only allegedly false statements LLT relies on in connection with its trade libel claim are that: (i) the study's 75 subjects' "only known exposure to asbestos was cosmetic talc" and (ii) the study "excluded those where a history of other asbestos exposures were present."[1] Complaint ¶ 150–51, ECF No. 1 ("Compl."). The relevant inquiry therefore is whether *these* two statements—not other statements in the Article, which LLT does not challenge in any event—

---

[1] The Court did not specifically discuss this second statement—featured in the Letter to the Editor—but it is undoubtedly about "the study" and "their data set," and not about the "safety of *any* talc-based product." Order at 31.

2

"explicitly" imputed LLT and its product. *Gillon*, 218 F. Supp. 3d at 295–96. They did not. These statements were made as part of the Doctors' description of their methodology, *see* ECF No. 1-2 at 2, to support the Article's ultimate conclusion—which LLT *does not challenge as false or disparaging*—that "cosmetic talc may be a cause of malignant mesothelioma" but that "[l]arge-scale controlled studies will be required to assess the prospective risk of developing mesothelioma following repeated exposures to talc." ECF No. 1-2 at 7 (emphasis added).

It does not matter that LLT alleged that its talc-based products were "the leading brands . . . in the market" and "maintained well over a majority of the market share for talc powder products." Compl. ¶¶ 156–157. These allegations are irrelevant absent a finding that the statements themselves referenced LTL and its products, as New Jersey law requires. There also is no basis to make any "reasonable inference that a consumer who learned of" the statements would "understand" the Doctors "to be calling into question the safety of Johnson & Johnson's products." Order at 30–31. The Complaint is devoid of any plausible allegation that consumers (as opposed to the medical community, who were the intended audience for the Article) knew of the Article at all, much less that they understood it to reference LLT or its products. *See* Defendants' Reply Memorandum in Support of Motion to Dismiss at 14, ECF No. 23 ("Reply").

*Auvil v. CBS 60 Minutes*, 800 F. Supp. 928 (E.D. Wash. 1992) ("*Auvil I*") does not support a different result. *See* Order at 31–32 (citing to *Auvil I* to support the conclusion that LLT adequately alleged a trade libel claim). The district court in that case found that plaintiffs, a class of Washington red apple growers, adequately pled a disparagement claim against CBS based on a "60 Minutes" segment suggesting that apples treated with a particular chemical were a health hazard. *Auvil I*, 800 F. Supp. at 930, 932–35. The court discussed and applied a broad "of and concerning" test that has its root in defamation (not product disparagement) claims, and while

3

interpreting a trade libel claim under Washington law, *see id*,[2] which does not have the same requirement that a statement explicitly impute a corporation and its product.[3] And the court placed great weight on the fact that CBS' segment—broadcast to millions of viewers (many of whom were presumably consumers of red apples)—opened with a "lengthy shot of a red delicious apple emblazoned with a skull and crossbones." *Auvil I*, 800 F. Supp. at 930 n.2.

That is nothing like the Article, which is more akin to the type of speech that the same district court found—just weeks later—could *not* support a trade libel claim against another defendant that had published a study that was featured in the same 60 Minutes segment. *Auvil v. CBS 60 Minutes*, 800 F. Supp. 941, 942 (E.D. Wash. 1992) ("*Auvil II*"). The chemical which was the focus of the "60 Minutes" segment was also a "focal point" in this study, which was otherwise a "dry compilation of asserted facts, data and extrapolations" about agricultural crops and chemicals applied to them. *Id.* at 942. And as the *Auvil II* court found, the study was not about plaintiffs' products, nor was there any "hint" (unlike the segment itself) that "every apple in the country is dangerous." *Id.* at 944. That is similar to what the Doctors concluded in the Article here: that "[t]he findings of the present and other recent studies suggest that cosmetic talc *may be a*

---

[2] The *Auvil I* court cited to several defamation cases in its description of the "of and concerning" principle. *See Auvil I*, 800 F. Supp. at 934 (citing *Rosenblatt v. Baer*, 383 U.S. 75, 81–82 (1966), *Barger v. Playboy Enterprises, Inc.*, 564 F.Supp. 1151, 1153 (N.D.Cal.1983)). Under New Jersey law, however, trade libel has "much more stringent" elements of proof, including the requirement that the challenged statement "explicitly" impute to LLT "fraud, deceit, dishonesty, or reprehensible conduct in relation to" its product. *Gillon*, 218 F. Supp. 3d at 295–96.

[3] The Ninth Circuit went on to define the test for a Washington trade libel claim by looking to the Restatement, which requires a plaintiff "allege that the defendant published a knowingly false statement harmful to the interests of another and intended such publication to harm the plaintiff's pecuniary interests." *Auvil v. CBS 60 Minutes*, 67 F.3d 816, 820 (9th Cir. 1995) (affirming summary judgment for CBS on falsity prong, without addressing whether broadcast adequately referenced plaintiffs or their products). However, courts have recently "questioned whether Washington state law recognizes a cause of action for trade libel[.]" *Studio 010 Inc. v. Digital Cashflow LLC*, No. 2:20-CV-01018, 2023 WL 6793974, at *8 (W.D. Wash. Oct. 13, 2023), *reconsideration denied*, No. 2:20-CV-01018, 2024 WL 2274320 (W.D. Wash. May 20, 2024).

*cause* of malignant mesothelioma," but that "[l]arge scale controlled studies will be required to assess the prospective risk of developing mesothelioma following repeated exposures to talc." ECF No. 1-2 at 7 (emphasis added). And although the *Auvil II* court acknowledged that the study provided "fodder for an assault on Washington apples," it declined to conclude "that a publication not 'of and concerning' an identifiable target can be converted into an 'of and concerning' attack due to the actions of third parties," and granted the study publisher's motion to dismiss plaintiffs' trade libel claim. *Id.* at 944.[4]

This makes sense: It cannot be that anytime an academic publication discusses potential dangers associated with an industry's practices or products—whether that be greenhouse gases, lawncare products, or flavored e-cigarettes, as just a few examples—the academic must fear a trade libel claim from some unnamed manufacturer in that industry. Courts across the country agree. *See Hipsaver, Inc. v. Kiel*, 984 N.E.2d 755, 765–67 (Mass. 2013) (holding, where scientific article referred to "hip protectors" generally and where at least 22 other companies make similar products, that a manufacturer could not satisfy the "of and concerning" element of product disparagement); *Geomatrix, LLC v. NSF Int'l*, 629 F. Supp. 3d 691, 712 (E.D. Mich. 2022) (dismissing business disparagement claim because the statements in question "referred to all treatment and disposal systems, not just Plaintiff's . . . product"); *JB Assocs., Inc. v. Neb. Cancer Coal.*, 932 N.W.2d 71, 80–82 (Neb. 2019) ("Determining whether a statement is 'of and concerning' a claimant's goods or services . . . requires more than general, industry-wide allegations."). The Doctors therefore

---

[4] The court made this conclusion despite suggestions that the "assumptions, data and methodology employed by [the study] may be flawed," that the "conclusions reached may or may not be erroneous," and that the "underlying studies may or may not have been discredited." *Auvil II*, 800 F. Supp. at 944.

respectfully request that the Court reconsider its denial of the Doctors' motion to dismiss LLT's trade libel claim.

### B. The Doctors Are Entitled To The Act's Additional Protections.

1. <u>Good Cause Exists For The Court To Apply The Act's Additional Protections.</u>

Joining a number of other states, New Jersey recently enacted an Anti-SLAPP law to protect people exercising their First Amendment rights by "publicly criticizing or bringing legitimate issues to light about an entity with greater power and resources."[5] The law is designed to be "broadly construed" to safeguard these interests—and prevent people speaking on controversial issues from being cowed into silence—by providing a mechanism for weeding out suits that target First Amendment-protected speech, and protecting individuals from being bogged down in expensive and time-consuming lawsuits. *See* N.J. Stat. § 2A:53A-59 (The Act "shall be broadly construed and applied to protect the exercise of the right of freedom of speech. . . guaranteed by the United States Constitution or the New Jersey Constitution"). To that end, the statute provides that a party may file an application for an order to show cause as to why the Act's protections should not apply "[n]ot later than 60 days after a party is served with a . . . complaint . . . or at a later time on a showing of good cause." N.J. Stat. § 2A:53A-51. In light of the important First Amendment interests at stake, the Doctors' good faith defense of this lawsuit, and the lack of prejudice—where the case has not advanced beyond preliminary stages—there is good cause to consider the Act's application at this stage.

---

[5] *Governor Murphy Signs Bipartisan Bill Protecting Against Lawsuits Designed to Suppress Free Speech* (Sept. 7, 2023), https://www.nj.gov/governor/news/news/562023/20230907d.shtml.

To the Doctors' knowledge, no court has interpreted New Jersey's Anti-SLAPP law—or its good cause provision—since its recent enactment.[6] In other contexts, however, New Jersey courts look to the following factors in order to determine whether good cause exists for a late filing: the party's good faith, the nature and foreseeability of the delay, prejudice to the adverse party, and whether granting a good cause exception comports with the overall purpose of the applicable statute. *State in Interest of A.G.*, No. A-2549-20, 2021 WL 5441316 (N.J. Super. Ct. Nov. 22, 2021); *see also Martindell v. Martindell*, 122 A.2d 352, 356 (N.J. 1956) (finding higher standard of "clear showing of a good cause" met despite inadvertence of counsel based on "fair recognition of the fact that justice to the litigants is always the polestar").

Here, the Doctors have acted in good faith in defending this lawsuit. When Plaintiff filed its first two lawsuits in the District of New Jersey in January and July 2023, respectively, New Jersey did not have an anti-SLAPP law on the books. *See LoBiondo v. Schwartz*, 970 A.2d 1007, 1022 (N.J. 2009). The law was not enacted until September 2023, and applied only to suits filed after October 7, 2023. Plaintiff subsequently filed a copycat complaint in this District in May 2024, which Defendants again moved to dismiss. *See* Compl.; Motion to Dismiss, ECF No. 14. The briefing of this subsequent Virginia action was similar to the first go-round, and Defendants' attorneys did not revisit the question whether New Jersey had an available anti-SLAPP law. The Doctors have faced a barrage of expensive legal actions related to their publication of the Article, and have had to be judicious in managing litigation resources. Complicating matters, the analysis of whether an anti-SLAPP law applies in a federal diversity action is complex and implicates

---

[6] Where a question of law turns on the interpretation of a state statute, a court "must either interpret the law in accordance with the state's highest court or, in the absence of such judicial construction, opine how the Supreme Court of [the state] would construe the provision." *Atlantic Machinery & Equipment, Inc. v. Tigercat Industries, Inc.*, 419 F. Supp. 2d 856, 859 (E.D. Va. 2006).

difficult choice-of-law questions. After re-briefing the motion to dismiss, Defendants sought a stay of discovery, which this Court granted, and this action has been on hold since July 2024. ECF Nos. 19, 21, 26. After this Court granted the Doctors' motion to dismiss LLT's Lanham Act and fraud claim—and found "that New Jersey substantive law does apply" to LLT's state law claims, Order at 7—counsel reassessed whether New Jersey had an available anti-SLAPP law, and now promptly bring this Motion.

Given that the case is still in its early stages and discovery has not yet begun, Plaintiff will face little, if any, prejudice by the Court considering this motion now. *See Clifford v. Trump*, 339 F. Supp. 3d 915, 924 (C.D. Cal. 2018) (finding no prejudice from untimely anti-SLAPP motion and permitting filing because "the instant case did not proceed in any material respect after Plaintiff's initial filing of the Complaint"); *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090 (C.D. Cal. 2004) (similar); *cf. Dialysis of Des Moines, LLC v. Smithfield Foods Healthcare Plan*, No. 2:18-cv-653, 2019 WL 8892581, at *5 (E.D. Va. Aug. 5, 2019) (finding "no prejudice because of the early stage of litigation"); *Nat'l Black Chamber of Commerce v. Busby*, 795 F. Supp. 2d 1, 6 (D.D.C. 2011) (finding no prejudice in allowing complaint amendment at "early stage in the litigation" where "[d]iscovery has not yet begun").

The procedures under the Act are "expeditious," and the Doctors are merely asking that the Court apply it now in connection with its Motion for Reconsideration, so that the Doctors may avail themselves of the Act's additional protections. The immediate impact of this request, as discussed below, is that the Court may impose a limited stay of discovery while considering the Doctors' Motion. Any additional prejudice to LLT from this brief stay would be minimal, particularly when balanced against the need to safeguard the Doctors' First Amendment rights. *See Burns v. Belafsky*, 741 A.2d 649, 654 (N.J. Super. Ct. 1999) ("[I]nadvertence of counsel may justly

be deemed to constitute good cause where the delay does not prejudice the adverse party and a rational application under the circumstances present favors a determination that provides justice to the litigant").

Additionally, granting a good cause exception here comports with the overall purpose of the Anti-SLAPP statute, which the New Jersey legislature deemed so indispensable to protecting First Amendment interests that it expressly instructed the Act should be "broadly construed and applied." N.J. Stat. § 2A:53A-59. As the Governor explained when he signed the law, the Act is meant to deter "powerful parties [that] aim to silence their critics by making it impossible for those with fewer resources to spend the time and money necessary to legally defend themselves."[7] As another legislator said, the anti-SLAPP law is meant to "insulate [defendants] from the financial hardships these cases can produce." *Id.*

This case squarely implicates those interests: the parties here—three individual doctors (two of whom are retired) up against a multinational powerhouse represented by three global law firms—are extremely lopsided in their resources, and the Doctors spoke out—by publishing a peer-reviewed academic article—on an important and controversial issue. And the stakes couldn't be higher for them: the doctors face a threat to their livelihood from LLT's persistent and multi-front attempts to extract protected patient data, which would require the Doctors to violate medical ethics rules and could jeopardize their medical licenses. *See* Emory Decl. ¶ 10–11, *In re Subpoena for Documents Issued to Peninsula Pathology Associates*, No. 4:22-mc-00001, ECF No. 2-2 (E.D. Va. Nov. 18, 2022). It would frustrate the purposes of the statute to deprive them of this crucial and newly-enacted protection.

---

[7] *Governor Murphy Signs Bipartisan Bill Protecting Against Lawsuits Designed to Suppress Free Speech* (Sept. 7, 2023), https://www.nj.gov/governor/news/news/562023/20230907d.shtml.

Courts around the country considering late anti-SLAPP motions have found good cause in similar circumstances. *See, e.g.*, *Adelson v. Harris*, 973 F. Supp. 2d 467, 496 (S.D.N.Y. 2013) ("The Court sees no reason to punish Defendants based on timeliness alone, given the complexities of this case, the purposes of Nevada's Anti-SLAPP statute, and Defendants' prompt filing of their motion after the Court concluded that Nevada law would apply."); *see also id.* (quoting *KJR Mgmt. Co., LLC v. First Web Search, LLC*, 2008 WL 7907954 (Nev. Dist. Ct. Nov. 19, 2008), and noting that in that case, a Nevada state court had "found good cause to extend the Anti-SLAPP motion deadline in a case where . . . 'it was not readily apparent' at the outset that the Nevada Anti-SLAPP statute would apply, and the defendant 'acted with the appropriate diligence and haste' once the statute's application became clear").

Accordingly, good cause exists to consider the Act's application now.

2.  The Act Protects The Doctors' Speech.

The Act provides additional protections "to a cause of action asserted in a civil action against a person based on the person's . . . exercise of the right of freedom of speech . . . guaranteed by the United States Constitution or the New Jersey Constitution, on a matter of public concern." N.J. Stat. § 2A:53A-50(b)(3).

That provision squarely applies to the Doctors' statements in the Article, Letter to the Editor, and MedicalResearch.com article.[8] The New Jersey Supreme Court has held that "speech concerning significant risks to public health and safety" is a matter of public concern that falls within the core of First Amendment-protected speech. *See Senna v. Florimont*, 958 A.2d 427, 444 (N.J. 2008). Whether a widely used consumer product is linked to a deadly cancer plainly satisfies

---

[8] These are the only statements at issue with respect to LLT's trade libel claim. *See* Compl. ¶ 150. Although LLT makes other vague (and unsubstantiated) allegations about the Doctors' motives, *see* Compl. ¶ 8, the Act focuses on the Doctors' actual speech, not LLT's characterization of it.

that standard. It "advance[s] the public's vital interests" to have access to an abundance of research about consumer product safety, and a free flow of information. *See also Malone v. WP Company, LLC*, No. 3:22-cv-00046, 2023 WL 6447311, at *8 (W.D. Va. Sept. 29, 2023) (statements about matter with "significant public health ramifications"—the COVID-19 pandemic and efficacy of vaccines—were "clearly a matter of public concern"); *Arthur v. Offit*, No. 1:09-cv-1398, 2010 WL 883745, at *4 (E.D. Va. Mar. 10, 2010) (holding First Amendment protections were "at their zenith" in lawsuit challenging an article about matter of substantial public concern, the safety of vaccines); *see also Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (noting that "academic freedom" is "a special concern of the First Amendment").

This case falls in the heartland of cases that New Jersey intended to address with its Anti-SLAPP law: the Doctors published a study raising safety concerns with a consumer product, and a manufacturer of that product—a powerful corporation with vastly more resources than the Doctors—is now taking aim at that criticism and threatening them with financial, professional, and reputational ruin.

LLT may complain that the Act does not apply to actions asserted "against a person primarily engaged in the business of selling or leasing goods or services," where the "cause of action arises out of a communication related to the person's sale or lease of the goods or services." N.J. Stat. § 2A:53A-50. But, contrary to the baseless allegations in LLT's Complaint and as shown below and in the attached declarations, none of the Doctors is "primarily engaged in the business of selling or leasing" any relevant "service," nor did the communications at issue relate to their "sale or lease of the goods or services."

Dr. Emory maintains a "full-time medical practice" where she serves "upwards of 50 to 100 patients per day" and "spend[s] approximately ten hours per day, five days per week on patient

11

care." Ex. 1, Decl. of Dr. Theresa S. Emory ¶ 4 (Feb. 17, 2025) ("Emory Decl.").[9] She also serves as the Medical Director of an acute care laboratory at Riverside Doctors Hospital Williamsburg. *Id.* Her work providing "medical-legal consultation services" "account[s] for less than 10% of [her] professional duties and comprise[s] less than 10% of [her] overall income." *Id.* ¶ 6. She was not compensated for her work drafting the Article. *Id.* ¶ 7. She has attested that her "sole aim in conducting the study and writing and publishing the Article was to educate the public and the medical community, not to promote [her] expert witness services," that she "would never conduct a study or publish an article for personal gain or for any reason other than enhancing patient care and/or advancing scientific and medical research," and that "in fact, my co-authors and I chose not to include the names of the cosmetic talc products to which the subjects of the study had been exposed—which often is included in studies like the one we conducted—precisely because we did not want it to be focused on particular products, but rather patient care and treatment more generally." *Id.* ¶ 7.

Similarly, Dr. Maddox's primary professional activity over his more than 40-year career was direct patient care. Ex. 2, Decl. of Dr. John C. Maddox ¶ 4 (Feb. 18, 2025) ("Maddox Decl."). He is a board-certified physician in anatomic and clinical pathology as well as hematopathology. *Id.* ¶ 2. Dr. Maddox spent, at most, one-third of his time on expert witness services. *Id.* ¶ 5. He published the Article after he had retired, at a time when he was not planning on doing much expert witness work moving forward. *Id.* ¶ 9. His sole aim in researching and writing the Article was to contribute to the scientific literature, and "not . . . to further [his] expert witness services." *Id.*

---

[9] "In ruling on an order to show cause" under the Act, the Court may consider "any evidence that could be considered in ruling on a motion for summary judgment," including the Doctors' sworn declarations submitted with this Motion. N.J. Stat. § 2A:53A-54.

Dr. Kradin is an Honorary Pathologist and Honorary Associate Physician at Massachusetts General Hospital and an Associate Professor Emeritus at Harvard Medical School. Ex. 3, Decl. of Dr. Richard L. Kradin ¶¶ 2–3 (Feb. 18, 2025) ("Kradin Decl."). He has made enormous contributions to the scientific literature in his fields of Internal Medicine, Anatomic Pathology, and Pulmonary Medicine, publishing more than 140 articles, 14 books or textbooks, and more than 30 additional reviews, chapters, and editorials. *Id.* ¶ 4. As with all of those scholarly contributions, his goal in writing the Article was to contribute to the scientific literature. *Id.* ¶ 9. He did not write the Article in order to promote his expert witness services, which have "never accounted for the majority of [his] professional work responsibilities" and are now only provided on a "part-time basis." *Id.* ¶¶ 7, 9.

Nor are the statements LLT challenges "related to" the Doctors' "*sale . . . [of] services.*" N.J. Stat. § 2A:53A-50. The Doctors' disclosure at the end of the Article and Letter to the Editor that they had "testified in asbestos litigation, primarily for plaintiffs" (under the header "Conflicts of Interest") and that the "cases were selected from medical-legal consultation practice" (under the header "Ethics Approval and Informed Consent"),[10] ECF No. 1-2 at 7, ECF No. 1-3 at 2–3—in compliance with the Journal's conflict of interest and ethics approval disclosure requirements— cannot possibly transform their peer-reviewed article (including the specific statements therein targeted by LLT) into a communication "related to the[ir] *sale . . . [of] services.*" N.J. Stat. § 2A:53A-50. This is particularly true because the statements were made (i) in a peer-reviewed journal with the stated goal "to advance and disseminate knowledge, promote research and foster the prevention of disease and injury" among its audience of "[o]ccupational and environmental

---

[10] Dr. Emory's interview with MedicalResearch.com does not reference her expert witness services at all, and simply identifies her as a medical doctor in the Department of Pathology at Peninsula Pathology Associates. ECF No. 1-4.

health physicians, epidemiologists, toxicologists, oncologists, neuroscientists, biochemists, and pathologists,"[11] and (ii) on MedicalResearch.com, which "select[s] key journal articles and publish[es] interviews from the designated researchers in a standardized format familiar to members of the broad medical community." *See About MedicalResearch.com*, https://medicalresearch.com/about-us/; ECF No. 1-4.

Concluding that these statements do not "relate to" the Doctor's "sale" of their "services" is also consistent with this Court's motion to dismiss decision, for two reasons. *First*, the Court concluded with respect to the Lanham Act claim that to the extent the Doctors' statements "are construed to be about [their] own litigation services," "the Complaint fails to allege that the statements were false"—as LLT's trade libel claim requires. Order at 25–26 (also noting that the trade libel claim requires "false statement of fact"). *Second*, the Court construed the Doctors' statements as relating to *LLT's* products for the purpose of the trade libel claim, *see id.* at 30–32, not the Doctors' services.

Moreover, the Doctors' statements are exactly the type of speech that the Act was designed to protect. To find otherwise would create a significant chilling effect on physicians and scientists, who would have to think twice before ever publishing academic articles on issues that might someday be construed as relating to their service as expert witnesses. These concerns are particularly weighty here, given the fact that it is incredibly difficult to research mesothelioma outside of litigation case files.  Because this disease is so "rare—there are only approximately 3,000 to 4,000 cases in the United States per year"—it is "difficult to identify a large sample set of mesothelioma cases to study." Emory Decl. ¶ 8. "Mesothelioma litigation case files therefore

---

[11] *See* American Journal of Industrial Medicine, "About," *available at* https://bit.ly/AJIMAbout.

are an important source for research into this rare and lethal disease" and "typically provide a more robust clinical history" than "patient files." *Id.*

For all of these reasons, and consistent with the Act's command that it be "broadly construed and applied to protect the exercise of the right of freedom of speech," N.J. Stat. § 2A:53A-59, the Doctors are entitled to the Act's additional protections.

### 3.  This Proceeding Should Be Stayed Until This Motion Is Resolved.

New Jersey's Anti-SLAPP Act provides that "upon the filing of an application for an order to show cause under Section 3," a court "may order . . . all other proceedings between the moving party and responding party, including discovery and a pending hearing or motion, to be stayed." N.J. Stat. Ann. § 2A:53A-52(a). The Act further instructs that "[i]n determining whether to stay any proceedings, there shall be a presumption that such a stay shall be granted." *Id.*

That presumption makes particular sense here, where the information LLT will seek in discovery is unusually sensitive, where its production could have a broad chilling effect on important scientific research, and where Plaintiff has been transparent that one of its goals in filing this lawsuit was to extract this information for use in other litigation. *See, e.g.*, *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985) (cautioning that "the ability to conduct probing scientific and social research" may be "seriously damage[d]" absent a reliable expectation that information "given for the sake of medical research, [ ] will remain private"); *Fields v. Eli Lilly & Co.*, No. 2:13-CV-35, 2015 WL 13609685, at *1 (M.D. Ala. Mar. 26, 2015) (shielding discovery where disclosure would burden "the scientific and academic community"); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 3:09-MD-02100, 2011 WL 5547133, at *3 (S.D. Ill. Nov. 15, 2011) (protecting disclosure of confidential peer-review materials that threatened to chill researchers' participation in the peer-review process, and "undermine efforts to improve public health and safety"); *Doe v. Am. Red Cross Blood Servs., S.C.*

15

*Region*, 125 F.R.D. 646 (D.S.C. 1989) (similar).[12] Permitting discovery in these circumstances thus could permit an end-run around New Jersey's anti-SLAPP provisions. Any minimal prejudice to LLT is vastly outweighed by the harm to the Doctors and the public at large from the chilling of scientific discourse that discovery would entail. *See* ECF No. 26 at 4 (concluding that LLT had "not demonstrated that they will incur any significant harm or costs" from a brief stay of discovery).

## CONCLUSION

For the foregoing reasons, the Doctors respectfully request that this Court reconsider its Order denying in part the Doctors' Motion to Dismiss, grant the Motion to Dismiss in full, grant the Doctors' application for an Order to Show Cause as to why the Act should not apply, and stay proceedings while this Motion is pending.

Dated: February 19, 2025              Respectfully submitted,

                              By:      /s/ *Kathryn M. Ali*
                                       Kathryn M. Ali (VSB No. 97966)
                                       Elizabeth C. Lockwood (admitted *pro hac vice*)
                                       ALI & LOCKWOOD LLP
                                       501 H Street, Suite 200
                                       Washington, D.C. 20002
                                       Telephone: 202-651-2476
                                       katie.ali@alilockwood.com
                                       liz.lockwood@alilockwood.com

                                       *Attorneys for Defendants*

---

[12] *See also Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1276 (7th Cir. 1982) (finding that "burden of compliance" with subpoena seeking research data "could jeopardize both the studies and [the researchers'] careers"); *In re Schaefer*, 331 F.R.D. 603, 616 (W.D. Pa. 2019) (denying discovery where disclosure could "chill further research into sensitive and consequential issues"); *In re Fosamax Prod. Liab. Litig.,* No. 1:06-MD-1789, 2009 WL 2395899, at *4 (S.D.N.Y. Aug. 4, 2009) (denying discovery to avoid "chilling participation in beneficial public research . . . There is a serious danger that permitting discovery in these situations 'inevitably tend[s] to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.'" (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 262 (1957)).

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 19th day of February, 2025, a copy of the foregoing Motion has been filed electronically. Notice of this filing has been served upon counsel of record via the Court's electronic filing system.  Access to this filing can be obtained via the Court's electronic filing system.

*/s/ Kathryn Ali*
Kathryn Ali