## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### Newport News Division

PECOS RIVER TALC LLC,

       Plaintiff,

v.                                   Action No. 4:24cv75

DR. THERESA SWAIN EMORY, *et al.*,

       Defendants.

### <u>MEMORANDUM OPINION & ORDER</u>

Pecos River Talc LLC ("Pecos River") sued defendants, Drs. Theresa Emory, John Maddox, and Richard Kradin, alleging that certain statements they made in an article published in a scientific journal about cosmetic talc, asbestos, and malignant mesothelioma were false. The Court granted in part and denied in part defendants' motion to dismiss, allowing the case to proceed on the trade libel claim (count one). Mem. Op. & Order 25–34, ECF No. 27 ("MTD Op.").

Pending before the Court is Pecos River's motion to compel the identities of the article's subjects. ECF No. 44. The only question the Court must decide is whether the names of the subjects in the article are within the scope of discovery. For the reasons discussed below, the Court answers that question in the affirmative; therefore, the motion to compel is **GRANTED**.

### I.      <u>BACKGROUND</u>

#### A.    **Factual Background**

Pecos River was formed as part of Johnson & Johnson's effort to resolve talc-related claims through bankruptcy.[1] *See* ECF No. 32 ¶¶ 1–3.

---

[1] LLT Management LLC ("LLT")—"a wholly-owned indirect subsidiary of Johnson & Johnson"—filed the complaint. Compl. ¶¶ 10–12. At that time, LLT owned "all rights, causes of action and privileges, and is responsible for all claims related to Johnson's Baby Powder and

Defendants, Drs. Theresa Emory, John Maddox, and Richard Kradin, serve as plaintiff-side expert witnesses in litigation between individuals with mesothelioma and manufacturers of cosmetic talc. ECF No. 27, at 2 (citing Compl. ¶¶ 13–15, 20–28); *see also* ECF No. 31 ¶ 20. In March 2020, defendants published an article titled "Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients" in the *American Journal of Industrial Medicine* (the "article"). Compl ¶ 3; ECF No. 46-1. The article stated that it "present[s] 75 . . . subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc[,]" who were "additional" to the 33 subjects reported in an earlier study by Dr. Jacqueline Moline (the "Moline study").[2] ECF No. 46-1, at 3 ("Recently, [the Moline study] reported a series of 33 subjects with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc. We present 75 additional subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc.").

Defendants identified and selected the 75 subjects "from medical-legal consultation practice." *Id.* at 7. To determine asbestos exposures, defendants relied on records obtained when they served as expert witnesses for asbestos plaintiffs—many times in cases against Pecos River—and examined "sworn deposition testimonies and answers to sworn interrogatories provided from subjects, parents, and spouses." *Id.* at 3; Compl. ¶ 70 (alleging that defendants "were intimately familiar with the case histories of the 75 individuals referenced in the [a]rticle based on their role

---

Shower to Shower products, including liabilities arising from all claims[.]" *Id.* ¶ 12. In August 2024, LLT underwent a corporate restructuring "in preparation to pursue its previously-announced consensual prepackaged bankruptcy plan as to certain talc-related claims." ECF No. 32 ¶ 1. As part of that restructuring, "Pecos River was allocated both the liabilities and assets of the mesothelioma-related litigation in which LLT was involved, including this case." *Id.* ¶ 4.

[2] Jacqueline Moline, *et al.*, *Mesothelioma Associated with the Use of Cosmetic Talc*, 62 J. Occupational & Env't Med., no. 1, Jan. 2020.

as plaintiffs' experts in the underlying tort cases in which those individuals had asserted claims against [Pecos River] and others"). Tissue samples were tested for the presence of asbestiform fibers in nine subjects. ECF No. 46-1, at 3, 6.

The article does not include the subjects' names but refers to them by an assigned case number and presents information about each subject in two tables. *Id.* at 4–6. The first provides for each subject: their sex, the year they were diagnosed with mesothelioma, their age at diagnosis, the mesothelioma site, histology, the estimated number of years they used talcum powder, and the estimated number of years of the latency period. *Id.* at 4–5. The second details the results of the tissue examination for nine subjects, including the mesothelioma site, the type of asbestos, the tissues examined, the concentration of fibers detected in the tissue, the limit of detection, and the tissue digest weight. *Id.* at 6.

## B.    Procedural History

Pecos River sued defendants on May 9, 2024, alleging injurious trade libel/product disparagement (count one), fraud (count two), and false advertising under the Lanham Act, 15 U.S.C. § 1125(a) (count three). Compl. ¶¶ 149–180. The heart of Pecos River's complaint is that two statements in the article are false: (1) that the 75 subjects of the article are individuals whose "only known exposure to asbestos was cosmetic talc" (the "only known exposure statement"); and (2) that the 75 subjects of the article are "additional" to the 33 subjects in the Moline study. *Id.* ¶ 150. The complaint alleges that at least six subjects of defendants' study had non-talc asbestos exposures, *id.* ¶¶ 72–132, and at least one subject was also included in the Moline study, *id.* ¶ 6. Pecos River maintains that defendants made these statements with actual malice and that, by publishing the article, "defendants intended to contribute to a body of literature manufactured to be presented in court." ECF No. 27, at 3 (citing Compl. ¶ 8).

3

The Court granted defendants' motion to dismiss in part—concluding that the statute of limitations barred count two and count three failed to state a claim—and permitted the case to proceed on the trade libel claim.  ECF No. 27.  In their answer, defendants refused to admit or deny any allegations relating to the subjects' identities pending "the Court's decision on whether or how those identities should be revealed."  *See, e.g.*, Answer ¶ 71, ECF No. 31.  The Court has bifurcated discovery into two phases.  ECF No. 39.  Phase one is limited to the substantive elements of the trade libel claim—publication, with malice, of a false statement of fact, about Pecos River's product or property.  ECF No. 36, at 1.  After dispositive motions practice on the issues in phase one, phase two of discovery will proceed with causation and damages.  *Id.* at 1, 4.

## C.   Pecos River's Discovery Requests

The parties are in the midst of phase one discovery.  In April 2025, Pecos River served defendants with discovery requests, including interrogatories and requests for production of documents ("RFPs").  Interrogatory one asks each doctor to "[i]dentify each of the 75 participants in the Article."  ECF No. 46-5, at 5.[3]  Pecos River also served the following RFPs on defendants:

> [RFP 1]: A Document sufficient to Identify the 75 Study Participants in the Article *Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients* by Dr. Theresa Emory, Dr. John Maddox, and Dr. Richard Kradin.
> . . .
> [RFP 2]: Any Documents or other materials included in the Litigation Files of the Study Participants.
> . . .
> [RFP 3]: All Documents and communications relating to the Article.  Production should include, but should not be limited to, communications with the American Journal of Industrial Medicine relating to the Article, communications relating to the Article's peer review process, communications among Defendants relating to the Article, communications with employees of Peninsula Pathology Associates

---

[3] Pecos River served each defendant with interrogatories.  ECF No. 46-5 (Emory); ECF No. 46-6 (Kradin); ECF No. 46-7 (Maddox).  Because interrogatory one and the objections thereto are the same, the Court will cite the Emory interrogatories, ECF No. 46-5, for ease of reference.

relating to the Article, and communications with attorneys and law firms that represent plaintiffs in Cosmetic Talc Cases relating to the Article.

ECF No. 46-8, at 5–7. Relevant here, defendants objected to these discovery requests as "unduly burdensome" and that each "improperly seeks information protected from disclosure by various privacy and confidentiality standards and medical ethics requirements that protect the identify and anonymity of human research subjects[.]" *Id.*; ECF No. 46-5, at 5

After the parties met and conferred, defendants stood on their objection to interrogatory one and RFP one, and proposed producing: (a) non-privileged documents responsive to RFP two "with numbered redactions" for personally identifying information related to each subject, rather than the name, ECF No. 46-8, at 7; and (b) non-privileged documents and communications responsive to RFP three "related to the development, research, drafting, and publication of the [a]rticle . . . so long as those documents do not implicate the 75 Study Participants' identities, and/or can be redacted to protect those identities," *id.* at 8.

\* \* \*

On April 22, 2025, Pecos Rived moved to compel defendants to produce the identities of the subjects and to amend their answer, ECF No. 44, and filed a memorandum in support, Pecos River Talc LLC's Mem. of Law in Supp. of Mot. to Compel Identities of Article's Subjects & Am. Answer, ECF No. 45 ("Pl.'s Mem."). Defendants opposed the motion, Defs.' Mem. in Opp. to Pecos River Talc LLC's Mot. to Compel Identities of the Article's Subjects and for an Am. Answer, ECF No. 53 ("Defs.' Mem."), and Pecos River replied in support, ECF No. 61 ("Pl.'s Reply). The Court held a hearing on June 26, 2025, and took the matter under advisement.[4]

---

[4] Benjamin Hatch, Esq., and Matthew Bush, Esq., appeared on behalf of Pecos River. Kathryn Ali, Esq., Elizabeth Lockwood, Esq., and Meghan Palmer, Esq., appeared on behalf of defendants. Jody Stewart was the official court reporter

## II.    LEGAL STANDARDS

### A.    Scope of Discovery

Under Federal Rule of Civil Procedure 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  Although Rule 26 does not define "relevant," relevance in the discovery context has been "'broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party.'" *EEOC v. Sheffield Fin., LLC*, No. 1:06cv889, 2007 WL 1726560, at *3 (M.D.N.C. June 13, 2007) (quoting *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 473 (N.D. Tex. 2005)); *see Tucker v. Momentive Performance Materials USA, Inc.*, No. 2:13cv4480, 2016 WL 8252929, at *3 (S.D.W. Va. Nov. 23, 2016) (noting that the discovery standard for relevance is broader than relevance in the Federal Rules of Evidence).  The Court has wide discretion in determining relevance for discovery purposes. *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 489 (4th Cir. 1992).

When evaluating proportionality in this context, the Court looks to "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Tucker*, 2016 WL 3252929, at *3; *see also Walsh v. Kynd Hearts Home Healthcare, LLC*, No. 2:20cv630, 2022 WL 18108388, at *1 (E.D. Va. Sept. 1, 2022) (citing Fed. R. Civ. P. 26(b)(1)).

### B.    Motion to Compel

A party may move the Court to compel a party to answer interrogatories or produce documents if the nonmoving party objects to or does not respond to propounded discovery. Fed. R. Civ. P. 37(a)(3)(B).  Once a party moves to compel, "the burden of proof is with the party

objecting to the discovery to establish that the challenged production should not be permitted." *Singletary v. Sterling Transp. Co.*, 289 F.R.D. 237, 241 (E.D. Va. 2012).

## III.    DISCUSSION

The only question the Court must answer is whether the names[5] are within the scope of discovery outlined in Rule 26(b)(1). Because the Court concludes that the names are relevant, proportional to the needs of the case, and are not privileged,[6] the names are discoverable, and defendants must produce them to Pecos River subject to the protective order discussed here.

### A.    Relevance

#### 1.    The names are relevant.

The first question is whether the requested discovery is relevant "to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). For Pecos River to prove its trade libel claim, New Jersey law requires it to establish: (a) publication; (b) with malice; (c) of a false statement of fact; (d) about its product or property; and (e) that causes special damages. *Dairy Stores, Inc. v. Sentinel Publ'g Co.*, 516 A.2d 220, 224–25 (N.J. 1986) (Garibaldi, J., concurring). The parties' arguments focus on the second and third elements. Pecos River seeks the names of the article's subjects so that it can prove that two statements—that the 75 subjects' "only known exposure to asbestos was cosmetic talc" and the 75 subjects are "additional" to the subjects of the Moline study—are false and defendants made those statements knowing that they were false or with reckless disregard of their falsity (that is, with actual malice). Pl.'s Mem. 11–16. Pecos River maintains that the names

---

[5] "Names" as used herein encompasses the names of the subjects and any personally identifying information sufficient to identify the subjects of the article.

[6] Rule 26(b) permits discovery into "any nonprivileged matter" that is relevant to any claim or defense and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). Defendants do not contend that production of the requested discovery implicates any privilege. Defs.' Mem. 23. Rather, defendants invoke "the more general principles of research ethics[.]" *Id.*

will allow it to investigate "three critical sources of information" not in defendants' possession: (a) defendants' deposition testimony, trial testimony, and expert reports for the subjects' underlying cases; (b) evidence of the subjects' non-talc exposures to asbestos "in plain sight"; and (c) "to demonstrate that individuals were subjects of both [d]efendants' [a]rticle and Dr. Moline's paper[.]" *Id.* at 6–8.

Pecos River compared the contents of its asbestos litigation files from cases where it was a defendant to the information reported in the article. Pl.'s Mem. 13. From that comparison, Pecos River alleges that "at least six individuals in the [a]rticle are plaintiffs with documented alternative exposures to asbestos." Compl. ¶ 71. As one example, Pecos River alleges that I.B.[7] is a "possible match" for the subject identified as "case eight," Compl. ¶¶ 116, 118, as its records from I.B.'s asbestos case show information nearly identical to that reported in the article. Pl.'s Mem. 12; *see also* Compl. ¶¶ 115–24. Moreover, in the section of defendant Kradin's 2017 expert report from I.B.'s case titled "Exposure History," he stated that I.B. was exposed to asbestos by "smoking as much as a package a day" of Kent cigarettes in the 1950s and 1960s.[8] ECF No. 46-11, at 4. And defendant Kradin concluded that I.B.'s "cumulative exposures to asbestos from cosmetic talc and the inhalation of crocidolite asbestos in Kent cigarettes[]" caused her malignant mesothelioma. *Id.*

As another example, Pecos River alleges that, based on its investigation (including a comparison of tissue sample results), case 67 is P.C., a plaintiff who alleged that asbestos in

---

[7] The Court will refer to the individuals named in Pecos River's complaint by their initials in this memorandum opinion.

[8] From 1952 to early 1957, Kent cigarettes, according to defendant Kradin, "were sold with 'Micronite' filters containing crocidolite asbestos. A pack-per-day smoker has been estimated to have inhaled >100 million asbestos fibers per year. . . . Crocidolite asbestos is recognized as the most carcinogenic type of asbestos on a per fiber basis, and individuals exposed to crocidolite show an increased incidence of malignant mesothelioma." ECF No. 46-11, at 3.

cosmetic talc products and from her parents' workplaces caused her mesothelioma. Pl.'s Mem. 12; Compl. ¶¶ 91–94. One of P.C.'s interrogatory answers stated that, in addition to Pecos River's talc-based products, she "was exposed to asbestos and/or asbestos-containing products from asbestos fibers brought home on the clothes and person of her father [and] mother[.]" ECF No. 46-12, at 5. Defendant Maddox served as an expert in P.C.'s case, Compl. ¶ 92, and it is plausible that he had access to P.C.'s interrogatory answers. In the article, defendants also stated that they identified the subjects' asbestos exposures "through sworn deposition testimonies and *answers to sworn interrogatories provided from subjects*[.]" ECF No. 46-1, at 3 (emphasis added). So, Pecos River's theory is that case 67 had a non-talc asbestos exposure (which would tend to suggest falsity) and that defendants were aware of this (which would tend to suggest actual malice). But this theory holds water only if Pecos River can confirm that case 67 is P.C.

Without further discovery, Pecos River's ability to prove its case is hamstrung by its limited information and the article's anonymized information about the subjects. At best, it can make an educated guess that, for example, cases 8 and 67 are I.B. and P.C., and that defendants knew that they had non-talc asbestos exposures based on its litigation files. Hypothetically, the names would enable Pecos River to say: "I.B., who is case 8 in the article, was partly exposed to asbestos by smoking Kent cigarettes. Defendant Kradin concluded that I.B.'s smoking of Kent cigarettes *and* her use of cosmetic talc caused her mesothelioma. Thus, she had another known asbestos exposure (falsity), and defendants acted with malice when saying that she did not."

Similarly, Pecos River alleges that at least one subject was included in both the Moline study and defendants' article, and therefore, the "additional" statement is also false. *Id.* ¶¶ 74, 89. Because the identities of the subjects of the Moline study are public, *see* ECF No. 46-28, their names are relevant to determining whether there is overlap and whether defendants acted with

actual malice when they claimed there is none. Again, Pecos River has been able to make educated guesses. But the Rules of Civil Procedure authorize discovery—subject to proportionality and privilege—on "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *United States v. $115,430.00 in U.S. Currency*, No. 5:20cv539, 2023 WL 6164401, at *1 (E.D.N.C. Sept. 21, 2023) (citation omitted). The names meet that standard and thus are relevant to Pecos River's trade libel claim.

### 2.    The Court rejects defendants' arguments that the names are not relevant.

Defendants' relevance arguments do not withstand scrutiny. They argue that the veracity of the only known exposure statement "turns on 'whether the defendants subjectively knew about the non-talc asbestos exposures among the study subjects' when they published the [a]rticle." Defs.' Mem. 10 (quoting MTD Op. 27–28). Defendants also make this same argument about whether the additional statement is false. *Id.* at 20–21. These arguments miss the mark.

Pecos River must prove, among other things, that the statements were fact rather than opinion. This "threshold question of law" requires the Court to consider their content, verifiability, and context. MTD Op. 26–27 (citations omitted). When ruling on the motion to dismiss, the Court found that Pecos River plausibly alleged that both statements were ones of fact. Now, in the middle of discovery, defendants ask the Court to rule as a matter of law that the only known exposure statement can only be one of fact if it is interpreted to convey that *defendants* did not know of any other exposure to asbestos that the subjects had aside from cosmetic talc. Defs.' Mem. 10. The consequence of such a finding, according to defendants, is that the only relevant discovery is what they knew about the subjects' non-talc asbestos exposures when they published the article. *Id.* In other words, defendants want to demarcate the universe of Pecos River's discovery based on their preferred outcome of this key legal question. And anything outside of that universe is not relevant.

The Court disagrees and need not determine at this time whether Pecos River can prove that the statements are fact rather than opinions. The relevance (or lack thereof) of information that Pecos River may locate through its investigation into whether the statements are actionable—a question of law that the Court has yet to decide—does not affect whether the names are relevant at this phase. Accordingly, the Court declines to limit discovery on that basis.

Similarly, defendants contend that the names are not relevant to actual malice. Instead, only their "contemporaneous files and communications" (which they have agreed to produce in redacted form)—not "a brand-new investigation into the underlying cosmetic talc cases"—are relevant. *Id.* at 18, 21. Like before, defendants' argument impermissibly seeks to demarcate the universe of discovery in the name of relevance. On top of that, the downfall of this argument is its failure to acknowledge that two things can be true simultaneously. Defendants summarize their files to show that they did not act with actual malice. *Id.* at 18–20. No doubt, these materials may be relevant to actual malice. But that does not mean that the *names* are not. Pecos River can prove actual malice by showing that defendants made the statements "'with knowledge that [they were] false or with reckless disregard of whether [they were] false or not.'" *Cannon v. Peck*, 36 F.4th 547, 566 (4th Cir. 2022) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). Although failure to investigate "*will not alone* support a finding of actual malice[,]" evidence of "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" can. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (emphasis added).

Pecos River is entitled to the names to independently determine whether defendants acted with actual malice, including by "purposeful[ly] avoid[ing] the truth." *Id.*; *see also Costello v. Ocean Cnty. Observer*, 643 A.2d 1012, 1023 (N.J. 1994) ("[A] failure to pursue the most obvious available sources for corroboration may be clear and convincing evidence of actual malice."). This

conclusion is consistent with the liberal construction afforded to discovery rules, two purposes of which are to "disclose fully the nature and scope of the controversy . . . and to enable a party to obtain the information needed to prepare for trial." 8 Wright & Miller's Federal Practice & Procedure § 2001 (3d. ed. 1998) (noting that the discovery rules sought to end the "'sporting theory of justice,' by which the result depends on the fortuitous availability of evidence or the skill and strategy of counsel").

One more flaw of defendants' argument warrants discussion. Defendants represent that they will produce their expert reports in the subjects' underlying cases and the "transcripts, records, and files *they do have*." Defs.' Mem. 16 (emphasis added). However, they also acknowledge that they "*may not have* certain deposition or trial transcripts in their possession" and "they have never had, and never reviewed, every single document from each subject's litigation file." *Id.* (emphasis added). Pecos River alleges case 33 is R.H., an individual who brought a claim alleging exposure to asbestos from cosmetic talc. Compl. ¶¶ 125, 128. At R.H.'s trial, defendant Maddox—R.H.'s expert witness—was cross-examined with medical records that documented R.H.'s non-talc asbestos exposures.[9] *Id.* ¶¶ 129–131. Based on this, Pecos River alleges that case 33 is R.H., that R.H. had non-talc asbestos exposure, and that defendants acted with actual malice when they stated that the subjects, including R.H., did not. Pecos River does not ground malice in defendant Maddox's expert report, but in its litigation file from R.H.'s case—specifically the trial transcript. Assume that defendants do not have that transcript (or any document from any subject's case). In such a circumstance, Pecos River need not be, and is not, bound by defendants' self-declared

---

[9] R.H.'s medical records stated: "Notes she did have asbestos exposure through her job in the past, worked for a company which cleaned Navy ships" and "[s]he recalls a possible asbestos exposure when she did office work in an old building." Compl. ¶¶ 129–130. In response to these allegations, defendants answered that they "purport[] to quote medical records" and "that the medical records speak for themselves." Answer ¶¶ 129–130.

universe of relevant discovery. *See Kline v. Martin*, 345 F. Supp. 31, 32 (E.D. Va. 1972) ("[The] Federal Rules contemplate the broadest discovery possible in the search for the truth."). Lastly, even assuming defendants are correct that the only relevant inquiry is what they subjectively knew, that universe is not limited to the documents they propose producing. Perhaps evidence of defendants' knowledge is outside those documents, such as in a trial transcript.

In the end, Pecos River is entitled to discovery on "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *$115,430.00 in U.S. Currency*, 2023 WL 6164401, at *1 (citation omitted). Discovery of the names meets that standard.

## B.    Proportionality

Discovery of the names must also be "proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). In deciding whether they are, the Court must consider, among other things, "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* Defendants bear the burden of establishing that the names are not proportional. *Singletary*, 289 F.R.D. at 241. They do not argue that the physical act of producing the names and requested records would be burdensome. Rather, they maintain the opposite, offering to produce responsive documents from the subjects' litigation files, with one caveat—they will redact all personally identifiable information for each subject. ECF No. 46-8, at 7–8. So, the Court's inquiry focuses on the burden of producing the responsive documents with names redacted versus the same documents with names unredacted.

According to defendants, the burden of disclosing the names of the article's subjects is grounded not in any law or regulation, but "the more general principles of research ethics." Defs.' Mem. 23. As medical researchers, they "must minimize the risks of research, including those

related to privacy and confidentiality, and endeavor to safeguard the subjects of their work." *Id.* at 24 (citing Expert Report of Seema K. Shah Decl. ¶ 10, ECF No. 53-20 ("Shah Report"). And defendants contend that information from the subjects' litigation files is not public, and the subjects' identities are confidential regardless of their status as plaintiffs in other litigation. According to defendants, the burden of disclosing the subjects' names outweighs the likely benefit, as doing so would violate research ethics and chill medical research. The Court disagrees. In the context of this case, defendants' concerns are no reason to preclude discovery of the names.

## 1.    Research Ethics Concerns

Each subject retained at least one of the defendants as an expert witness in a lawsuit relating to asbestos and mesothelioma. Defendants received substantial information from the subjects, including their name, medical records, and personal history, not in aid of scientific research, but to opine on what caused the subjects' mesothelioma. And each subject arguably had every expectation that the expert witnesses would write a report documenting the bases of that opinion and publicly testify, if necessary, at the subject's trial about the same. Against this backdrop, it is safe to conclude that the subjects did not provide confidential information to defendants, expecting it to remain confidential for all purposes. *See* Expert Report of Lisa S. Lehmann, M.D., Ph.D. ¶ 11, ECF No. 46-22 ("Lehmann Report") ("Since the individuals in the case series published by [defendants] in their article were plaintiffs in publicly discoverable legal cases, the individuals in the case series should not have any expectation of medical confidentiality."). Thus, the manner defendants received and intended to use the subjects' personal information diminishes any concern that disclosing their names would be so violative of research ethics as to preclude discovery.

The context of the study is also important. Defendants did not obtain the names of the subjects (or information about them) in the context of a patient-physician relationship or a medical

14

research study. They learned of information relevant to the study through "medical-legal consultation practice," relying on a subject's "sworn deposition testimonies and answers to sworn interrogatories"—which they had received as an expert in the asbestos case—to identify the pool of potential subjects for the study. ECF No. 46-1, at 3, 7. Dr. Lehman states in her expert report that the subjects' "identities as individuals with mesothelioma constitute information that was generated for a legal purpose and not for the provision of health care or for research purposes." Lehmann Report ¶ 10. Defendants did not solicit the subjects to participate in a medical research study, obtain written consent from them, or even notify them that they were included in the study. This may very well be the usual course for "archival" disease studies, as defendants contend. *See* Shah Report ¶ 16. And the Court does not question that the confidentiality concerns are "particularly weighty in the context of rare diseases like mesothelioma, which is challenging to research because it is difficult to identify a sufficient sample of cases to study." Defs.' Mem. 27– 28. However, these considerations also diminish any burden caused by disclosing the names, especially when weighed against the benefits to the needs of this case.

Further, the underlying principles of the Health Insurance Portability and Accountability Act ("HIPAA")[10] strongly support the Court assigning minimal weight to the burden that defendants claim disclosing the names will place on them. Defendants themselves concede that HIPAA does not prevent them from disclosing the names of subjects to Pecos River in discovery. Defs.' Mem. 23. And for good reasons. First, defendants are not covered entities, meaning that HIPAA protections do not apply to them. *See* 45 C.F.R. § 160.102(a). Second, even if they were covered entities, defendants would incur no burden by disclosing the names because HIPAA

---

[10] The Court's use of "HIPAA" refers to the Act and its implementing regulations.

allows them to disclose protected health information[11] in a judicial proceeding (such as this) in response to a court order compelling them to do so.[12] *Id.* § 164.512(e)(1)(i).  HIPAA, the primary federal law intended to govern "the dissemination of protected health information[,]" *Wade v. Vabnick-Wener*, 922 F. Supp. 2d 679, 685 (W.D. Tenn. 2010), would permit disclosure under these circumstances.

Despite the parties' reliance on *Bell v. American International Industries*, 627 F. Supp. 3d 520 (M.D.N.C. 2022), it is not persuasive. Pl.'s Mem. 17 (noting that the court found that HIPAA did not apply to the Moline study subjects' identities); Defs.' Mem. 25 (arguing that the court found it "critical" that the named plaintiff had supplied a HIPAA authorization, and the requested document "redacts all information on other individuals").   *Bell* did not address whether the identities were within the scope of discovery.  Rather, after discovery closed and the court granted the defendant's motion for summary judgment, the court analyzed whether to *modify a protective order* that provided a document identifying *the plaintiff* in *Bell* as *one* subject in the Moline study was "confidential and limited solely to [that case]."  627 F. Supp. 3d at 526.  The framework for this analysis examined the purpose of the modification, the existence of alternative means to acquire the information, the type of protective order at issue, and the type of materials sought through the modification.  *Id.* at 528–29.  Those considerations are not appropriate when determining whether material falls within the scope of discovery under Rule 26—the Court's task

---

[11] HIPAA defines "health information" as "any information, whether oral or recorded in any form or medium, that is created or received by a [covered entity]; and  relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual." 42 U.S.C. § 1320d(4); *see also* 45 C.F.R. § 160.103.

[12] HIPAA also permits the disclosure of protected health information in response to a discovery request if either (a) the subject is notified of the request; *or* (b) the disclosure is subject to a "qualified protective order" as defined by regulation.  45 C.F.R. § 164.512(e)(1)(ii).

here. Moreover, this is a trade libel case. The veracity of the statements in the article is directly at issue, shifting the calculus on the appropriateness of disclosing the subjects' names when balanced with ethical or confidentiality concerns.

Lastly, the Court cannot turn a blind eye to the elephant in the room. In response to an interrogatory asking her to describe the process used to ensure there was not overlap between the article and the Moline study, defendant Emory answered that she "called Dr. Moline to see if there was any way that we could ensure there was no overlap between our data sets." ECF No. 46-5, at 7. Dr. Moline "responded during this very brief phone call that it was inappropriate to discuss patients' names, and so we did not discuss it any further." *Id.* At that time, defendant Emory was seemingly content with discussing the same information she now claims the disclosure of which would violate research ethics with a third party.

For these reasons, the Court finds that the burden on defendants that disclosing the names would cause because it violates their sincerely held beliefs in privacy and confidentiality—the *only* burden they argue that disclosure would impose on them—does not outweigh the likely benefits.

### 2.    Risks of Chilling Medical Research

Defendants also make much of the risk that disclosing "confidential source material underlying a peer-reviewed medical publication" would have on "chilling critical scientific research." Defs.' Mem. 29. This, too, is insufficient to show that the burden of disclosing the names outweighs the likely benefit. As discussed above, defendants conducted the study, which has concluded, through "medical legal consultation practice." Defendants did not publicly solicit participation. The subjects did not volunteer to participate in the study or consent to be participants. They consented to sue a talc manufacturer. Therefore, disclosure of the names of the subjects would not upend any expectations that a subject may have had from knowing and

17

voluntary participation in a research study because those expectations never existed. These factors minimize any potential chilling effect on the willingness of people to participate in future medical research should the names here be disclosed.

Defendants also argue that researchers might be chilled, opting not to venture into this type of research out of fear that the data underlying their conclusions would be dug up in litigation. The Court is not insensitive to the optics of this case and the potential chilling effect that may result. Pecos River—closely associated with a large multinational corporation—has sued defendants to delve into their research to discredit their conclusions about the potential harmful effects of cosmetic talc. But the Court found in denying defendants' motion to dismiss that Pecos River has plausibly alleged trade libel, and it is entitled to discovery to prove that claim.

In an implicit admission of that fact, defendants have documented in detail the processes they used to determine whether any subjects had non-talc asbestos exposures or were included in the Moline Study in answers to interrogatories. ECF No. 46-6, at 5–7. Still more, defendants have agreed to produce numerous documents responsive to Pecos River's RFPs. They will produce all non-privileged documents responsive to RFP two—which requests "any documents or other materials included in the litigation files of the study participants"—only redacting the names of the subjects. ECF No. 46-8, at 6–7. They also agreed to produce "non-privileged *documents and communications* related to the *development, research, drafting, and publication of the [a]rticle* . . . so long as those documents do not implicate the 75 Study Participants' identities, and/or can be redacted to protect those identities." *Id.* at 8. These concessions cut against defendants' argument now that disclosing "confidential source material underlying a peer-reviewed medical publication" would chill critical medical research.

18

This brings the Court to its final point. Recall that the Court's proportionality inquiry centers on the burden of disclosing the subjects' names. Defendants have effectively conceded that the documents Pecos River requested (with redacted names) are proportional. So the inquiry can be reformulated to ask whether the additional burden of disclosing the names alone outweighs the benefits. Defendants are willing to turn over documents—what one might consider to be the "confidential source material" underlying their study—"so long as those documents" do not implicate the subjects' identities. Thus, the most plausible understanding of defendants' arguments is that it is not the source material underlying the article, but the outside information Pecos River may find once it has the names and what Pecos River may do with any such information to discredit the publication, that would chill medical research. Any additional burden that may result from disclosing the names is at best speculative and is insufficient to conclude that the burden of disclosing the names outweighs the benefits.

### 3.    The cases defendants cite are inapplicable.

This case is unique in the world of asbestos litigation. It is not the traditional personal injury action about, for example, whether a person's asbestos exposure caused mesothelioma. In those cases, parties often test the veracity of an expert's opinions by seeking data underlying the studies that the expert relied on through third-party subpoenas. And many of the cases present fact-intensive inquiries. But this is a trade libel case, and the veracity of the statements in the article—reporting the findings of a completed study—are directly at issue. The information is also sought from a party in the case. These distinctions render inapposite the cases defendants cite to support their argument that the names are not discoverable. Defs.' Mem. 22–24.

Defendants cite portions of a pretrial hearing transcript from *Johnson/Lashley v. American International Industries, Inc.*, Nos. MID-L-6651-16, MID-L-7336-16 (N.J. Super. Ct. Law Div.

Mar. 11, 2020), in which the court "admonish[ed] talc manufacturer's counsel for attempting to disclose identities of the Moline study subjects as 'inappropriate' and 'improper,' and sustaining several objections to questioning on that topic." *Id.* (quoting ECF No. 53-17). But the court ordered subpoenas to be issued to Dr. Moline, which "ultimately led to the disclosure of the identities of the subjects of Dr. Moline's paper." Pl.'s Reply 22 (citing ECF No. 62-3).

Turning to some of the other cases defendants cite to support their argument that research ethics and confidentiality preclude discovery of the names in this case, the court in *In re Snyder* quashed a third-party subpoena under Rule 45, finding it unduly burdensome. 115 F.R.D. 211, 211, 216 (D. Ariz. 1987). In doing so, the court found the burden on the movant particularly troublesome since he was a third party.[13] *Id.* at 213–15; *see, e.g., id.* at 214 ("The series of legal skirmishes [defendant] has imposed on a researcher who is a stranger to each of [defendant]'s aforementioned lawsuits might suffice to establish the excessively burdensome nature of [defendant]'s discovery effort."). The court did find the "potential for a chilling effect on research appears great[,]" *id.* at 215, as defendants note. Defs.' Mem. 22. The court, however, grounded that concern in the consequences for that movant—the uncertainty in the law as to "whether discovery can go forward against experts who have no first hand knowledge about the injury suffered by a particular plaintiff, but who are well informed through their research on the general kind of injury." 115 F.R.D. at 216. Those concerns are not present here.

As another example, in *Richards of Rockford, Inc. v. Pacific Gas & Electric Co.*, a breach of contract action, the court quashed a third-party subpoena served on a research assistant to testify

---

[13] The first sentence of the opinion highlights that this was the court's primary concern. 115 F.R.D. at 211 ("This Order addresses the question whether a court can compel the author of a research report to serve as a witness in a lawsuit when the author is a stranger both to the events and to the parties involved in the suit.").

and produce documents and interviews related to a confidential research project. 71 F.R.D. 388, 389 (N.D. Cal. 1976). The court reasoned that the "information sought [was] largely supplementary[,]" and although plaintiff made allegations that the third-party defamed him in the interviews, "[t]here [was] absolutely no evidence" of defamation nor had plaintiff alleged defamation in the complaint.[14]  *Id.* at 390. Balancing important research-related considerations, the court refused to compel compliance with the third-party subpoena "absent at least a prima facie showing" of defamation.  *Id.* at 390–91. The Court has decided that Pecos River has plausibly alleged trade libel and thus *Richards of Rockford* is not persuasive.

 *Dow Chemical Co. v. Allen* is even farther afield. 672 F.2d 1262 (7th Cir. 1982). The issue was whether the court should enforce a third-party *administrative subpoena* seeking "all of the notes, reports, working papers, and raw data relating to *on-going, incomplete animal toxicity studies* so that it may evaluate that information."  *Id.* at 1266. And, in balancing relevance and burden, the court affirmed the lower court's finding that the probative value of the information sought was "minimal."  *Id.* at 1269. Similarly, defendants quote *In re Fosamax Products Liability Litigation,* for the proposition that courts "routinely" refuse to permit this type of discovery and the "serious danger" created by "permitting discovery in these situations," which "inevitably tend[s] to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor." Defs.' Mem. 22 (quoting *In re Fosamax Prods. Liab. Litig.*, No. 1:06-MD1789, 2009 WL 2395899, at *4 (S.D.N.Y. Aug. 4, 2009)). But the court found that the subpoenaed information was "tangentially related" to the case. 2009 WL 2395899, at *3. The study here is complete, and the relevance and probative value of the names contrast with the discovery sought through third-party subpoenas in *Dow* and *Fosamax*.

---

[14] This was not a "defamation case" as defendants contend. Defs.' Mem. 22.

* * *

The names are relevant and proportional to the needs of the case and are not privileged. As a result, the Court concludes that the names are discoverable.

## C.    A protective order is appropriate.

Disclosure of the names of subjects of a medical research study, along with highly sensitive personal records, is, however, of great concern. As discussed above, the Court will mitigate the risks to the subjects posed by such a disclosure and concludes that defendants have shown good cause for a protective order under Rule 26(c). *See* Fed. R. Civ. P. 26(c)(1)(H) (providing that, on a showing of good cause, a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that . . . confidential research . . . information not be revealed or be revealed only in a specified way").

Although the parties seem to agree that a protective order is appropriate if the Court grants Pecos River's motion to compel, they sharply disagree on the governing terms. The Court has reviewed the proposed joint protective order that the parties filed, ECF No. 68, and their arguments on the disputed terms at the hearing and in their filings, ECF Nos. 66 (defendants), 67 (Pecos River). The Court agrees with defendants that the subjects' names—including those whose names are alleged in the complaint (if they are subjects)—and their medical records should be protected.

Therefore, the protective order shall include paragraphs 1 through 16, paragraph 17 as modified below, and the first sentence of paragraph 24. Paragraph 17 shall read as follows:

17.    The following procedures shall apply if a party seeks to disclose or make public any material containing a subject's identifying information:

    a.    The parties shall redact the subject's (or any of the subject's family members') name; date of birth; address; email address; phone number; litigation case number, jurisdiction, and caption; protected medical information as defined in subparagraph (b); and identification numbers (such as social security number, passport number,

driver's license number) from any public document. The redactions shall identify the subject of the Article by the subject's associated Case Number in the Article.

b.    "Protected medical information" as used in subparagraph (a) is defined as: [definition to be supplied by the parties].

c.    In no event shall the parties redact any reference to or mention of potential, possible, alleged, investigated, or known asbestos exposures.

d.    Notwithstanding any other provision of this Protective Order, material redacted in accordance with this Paragraph 17 is not Confidential and may be disclosed or made public.

e.    The parties reserve the right to challenge the confidentiality of any material.

The definition of "protected medical information" shall clarify that it includes medical information about any subject regardless of the nature of the document that contains such information.

Apart from the portions incorporated into paragraph 17 as modified above, the Court rejects paragraph 18. The Court also rejects paragraphs 19 through 22 because: (a) there is no need to distinguish between "confidential" and "highly confidential" materials (¶¶ 19–20); (b) a coded production is not appropriate for the reasons discussed above (¶ 21); and (c) the redaction of information about any subjects' family members renders moot the need to redact "any other identifying information provided counsel has a good faith reason to believe such information might be used to identify a subject" (¶ 22).

Lastly, the Court rejects paragraph 23 because "[a]bsent evidence of abuse, bad faith, or improper motive in the discovery process, the potential use of the fruits of discovery in other litigation is not, alone, a basis for a protective order." *Ohio Valley Env't Coal v. Elk Run Coal Co.*, 291 F.R.D. 114, 122 (S.D.W. Va. 2013); *United States v. Hooker Chemicals & Plastics Corp.*, 90 F.R.D. 421, 426 (W.D.N.Y. 1981) ("Use of the discovery fruits disclosed in one lawsuit in connection with other litigation, and even in collaboration among plaintiffs' attorneys, comes squarely within the purposes of the Federal Rules of Civil Procedure."). Defendants have not met

23

their burden to show abuse, misuse, or improper motivation, especially considering the Court's finding that Pecos River has plausibly alleged a trade libel claim. Although the protective order will not restrict Pecos River's ability to use material obtained in discovery here in other cases, if Pecos River chooses to do so, the terms of the protective order—including that any personally identifiable information must be redacted—will govern any such use.

### IV.    CONCLUSION

For the reasons discussed above, Pecos River's motion to compel, ECF No. 44, is **GRANTED**. The parties are **ORDERED** to meet and confer and file a joint protective order consistent with this memorandum opinion and order **on or before July 11, 2025**. Moreover, **on or before July 16, 2025**, defendants are **ORDERED** to: (a) provide complete responses to interrogatory one; (b) produce in an unredacted form all documents responsive to Pecos River's RFPs one, two, and three; and (c) file an amended answer to Pecos River's complaint.[15]

The Clerk is **DIRECTED** to send a copy of this memorandum opinion and order to all counsel of record.

**IT IS SO ORDERED.**

_____
Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
July 8, 2025

---

[15] Defendants have agreed to amend their answer if the Court granted the motion to compel. Defs.' Mem. 36 n.19 ("Should this Court require disclosure [of the identities defendants] agree to amend their Answer.").