**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

PECOS RIVER TALC LLC,

     Plaintiff,

     v.

DR. THERESA SWAIN EMORY, DR.
RICHARD LAWRENCE KRADIN, AND
DR. JOHN COULTER MADDOX,

     Defendants.

Civil Action No. 4:24-cv-75-JKW-RJK

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS .................................... 2

ARGUMENT ................................................................................................................ 21

I.      J&J HAS NOT MET ITS BURDEN TO SHOW THAT THE CHALLENGED
        STATEMENTS ARE FALSE STATEMENTS OF FACT.................................................. 21

        A.      Whether a Subject Has an "Exposure" to Asbestos Is a Matter of Scientific
                Opinion. ................................................................................................ 21

        B.      Even if it Were a Statement of Fact, the "Known Exposures" Statement Is Not
                False. ..................................................................................................... 25

        C.      J&J Has Also Not Met its Burden to Show Any Other At-Issue Statements Are
                False. ..................................................................................................... 28

II.     NO REASONABLE JURY COULD FIND THE DOCTORS ACTED WITH
        MALICE. ............................................................................................................. 29

        A.      No Jury Could Find the Doctors Knew the "Only Known Exposure" Statement
                was False. ............................................................................................... 31

        B.      No Reasonable Jury Could Find That the Doctors Acted with Reckless
                Disregard................................................................................................ 34

III.    NONE OF THE STATEMENTS IS ABOUT J&J'S PRODUCTS................................... 36

CONCLUSION.............................................................................................................. 40

i

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 21

*Auvil v. CBS 60 Minutes*, 800 F. Supp. 928 (E.D. Wash. 1992) ............................................... 37, 40

*Aviation Charter, Inc. v. Aviation Rsch. Grp./U.S.*,
    416 F.3d 864 (8th Cir. 2005) ..................................................................................................... 23

*Bank v. Lee*, 334 A.3d 1258 (N.J. App. Div. 2025) .................................................................. 25, 26

*Blankenship v. NBC Universal, LLC*, 60 F.4th 744 (4th Cir. 2023) ........................... 29, 30, 31, 35

*Blatty v. New York Times Co.*, 728 P.2d 1177 (Cal. 1986) .......................................................... 40

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984) ........................................... 34

*Brown & Williamson Tobacco Corp. v. Jacobson*,
    713 F.2d 262 (7th Cir. 1983) ..................................................................................................... 37

*Cannon v. Peck*, 36 F.4th 547 (4th Cir. 2022) ...................................................................... 29, 30

*Care One Mgmt., LLC v. United Healthcare Workers E.*,
    43 F.4th 126 (3d Cir. 2022) ....................................................................................................... 31

*Care One Mgmt., LLC v. United Healthcare Workers E.*,
    No. 12-6371, 2024 WL 1327972 (D.N.J. Mar. 28, 2024) ......................................................... 31

*Carr v. Forbes, Inc.*, 259 F.3d 273 (4th Cir. 2001) ..................................................................... 30

*Carrabba v. Morgat*,
    No. 2:12-6342, 2014 WL 229280 (D.N.J. Jan. 17, 2014) ......................................................... 29

*Compuware Corp. v. Moody's Invs. Servs., Inc.*,
    499 F.3d 520 (6th Cir. 2007) ............................................................................................... 23, 35

*Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517 (1st Cir. 2023) ...................................................... 38

*Costello v. Ocean Cnty. Observer*, 643 A.2d 1012 (N.J. 1994) ....................................... 29, 30, 31

*Dairy Stores, Inc. v. Sentinel Pub. Co.*, 516 A.2d 220 (N.J. 1986) ....................................... 36, 40

*DeGroat v. Cooper*,
    No. 2:13-cv-7779, 2014 WL 1922831 (D.N.J. May 14, 2014) ............................................ 36, 37, 40

*Dijkstra v. Westerink*, 168 N.J. Super. 128 (App. Div. 1979) ................................................ 38, 39

*Durando v. Nutley Sun*, 37 A.3d 449 (N.J. 2012) ................................................................. *passim*

*Eng. Sales LLC v. RealStuff, Inc.*,
   No. 23-4663, 2024 WL 2207559 (D.N.J. May 14, 2024) ................................................. 25

*Fairfax v. CBS Corp.*, 2 F.4th 286 (4th Cir. 2021) ............................................................ 30, 31

*Foxtons, Inc. v. Cirri Germain Realty*,
   No. A-61210-05T3, 2008 WL 465653
   (N.J. Super. Ct. App. Div. Feb. 22, 2008) ................................................................. *passim*

*G.D. v. Kenny*, 15 A.3d 300 (N.J. 2011) ............................................................................ 25

*Graves v. Lioi*, 930 F.3d 307 (4th Cir. 2019) ................................................................... 22

*Harvey v. Cable News Network, Inc.*, 520 F. Supp. 3d 693 (D. Md. 2021) .......................... 21, 22

*Herrmann v. Newark Morning Ledger Co.*,
   138 A.2d 61 (N.J. Super. Ct. App. Div. 1958) ............................................................. 28

*Hill v. Evening News Co.*, 715 A.2d 999 (N.J. Super. Ct. App. Div. 1998) .......................... 29

*HipSaver, Inc. v. Kiel*, 984 N.E.2d 755 (Mass. 2013) ....................................................... 37, 38

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016) ............................................ 31, 35

*JB & Assocs., Inc. v. Nebraska Cancer Coal.*,
   932 N.W.2d 71 (Neb. 2019) ..................................................................................... 37, 38

*La Rocca v. N.Y. News, Inc.*,
   383 A.2d 451 (N.J. Super. Ct. App. Div. 1978) ........................................................... 29

*Lynch v. New Jersey Educ. Ass'n*, 735 A.2d 1129 (N.J. 1999) ............................... 23, 29, 30, 31

*Maressa v. N.J. Monthly*, 89 N.J. 176 (1989) .................................................................. 30

*Masson v. New Yorker Mag., Inc.*, 501 U.S. 496 (1991) .................................................... 25

*Mick v. Am. Dental Ass'n*, 49 N.J. Super. 262 (App. Div. 1958) ....................................... 37

*N.Y Times Co. v. Sullivan*, 376 U.S. 254 (1964) ..................................................... 29, 31, 39

*NXIVM Corp. v. Sutton*,
   No. 06-01051, 2007 WL 1876496 (D.N.J. June 27, 2007) ............................................. 23

*Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432 (10th Cir. 1983) .................................... 39

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013) ............................................................... 22, 23, 24, 25

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
    63 F.4th 240 (3d Cir. 2023) ...................................................................... 21, 23, 24

*Patel v. Soriano*, 848 A.2d 803 (N.J. App. Div. 2004) .................................................. 36

*Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341 (S.D.N.Y. 1977) ................................... 30

*Reuber v. Food Chem. News, Inc.*, 925 F.2d 703 (4th Cir. 1991) .................................... 33

*Ryan v. Brooks*, 634 F.2d 726 (4th Cir. 1980) ............................................................ 35

*Sanderson v. Culligan Int'l Co.*, 415 F.3d 620 (7th Cir. 2005) ...................................... 37

*Sanderson v. Indiana Soft Water Servs., Inc.*,
    No. 00-0459, 2004 WL 1784755 (S.D. Ind. July 23, 2004) ........................................ 37, 38

*Scelfo v. Rutgers Univ.*, 282 A.2d 445 (N.J. Law. Div. 1971) ....................................... 40

*Senna v. Florimont*, 958 A.2d 427 (N.J. 2008) ........................................................... 31

*ShotSpotter Inc. v. VICE Media, LLC*,
    2022 WL 2373418 (Del. Super. Ct. June 30, 2022) ................................................... 30

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ............................................................ 29

*Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir. 1980) .................................... 31

*Syngenta Seeds, Inc. v. Bunge North America, Inc.*,
    773 F.3d 58 (8th Cir. 2014) ................................................................................... 23

*Thomas M. Cooley L. Sch. v. Kurson Strauss, LLP*,
    759 F.3d 522 (6th Cir. 2014) ................................................................................. 35

*Ward v. Zelikovsky*, 643 A.2d 972 (N.J. 1994) .......................................................... 23

*Wolfe v. Gooding & Co., Inc.*,
    No. 14-cv-4728, 2017 WL 3977920 (D.N.J. Sept. 11, 2017) ....................................... 29

**Rules**

Fed. R. Civ. P. 56 .................................................................................................... 21

**Other Authorities**

Gatley, Libel and Slander 485 (4th ed. 1953) ................................................................. 29

Restatement (Second) of Torts § 564A ......................................................................... 36

# INTRODUCTION

J&J's trade libel claim rests on the notion that the Article at the heart of this case is rife with false statements of fact. Discovery has debunked this. Whether something amounts to an "exposure" to asbestos is a subjective scientific opinion about which experts routinely reach different conclusions based on their analysis of the same data. And mesothelioma patient case files are full of stray references to and guesses about exposures, that are then explored and either substantiated or not. Even after an exhaustive investigation, J&J has raised challenges to fewer than a third of the Article's 75 subjects. For the vast majority of these, J&J offers only unsubstantiated hypotheses that experts—not just the Doctors and plaintiff-side experts but often defense experts, too—*rejected* before the Article was published. The Doctors' Article referred to "known" exposures, making clear the statement reflected the Doctors' subjective assessment of where there were actual, substantiated exposures based on the available evidence, and therefore is not a verifiable statement of fact at all—let alone a false one. And although the Doctors learned in discovery and now agree that three of their 75 subjects were mistakenly included in the Article, such trivial inaccuracies are inadequate to prove falsity as a matter of law. J&J's challenges to the Doctors' other statements fail for similar reasons. As the many scientists in this case—J&J's own expert included—acknowledged, science is not perfect, errors happen in the scientific process, and the key question is whether they affect the ultimate conclusions (here, they do not).

J&J also has not carried its burden to show actual malice, which it must do through clear and convincing evidence that the Doctors *knew* their statements were false, or actually entertained serious doubts they were false at the time of publication. Once again, the evidentiary record roundly refutes this. The voluminous contemporaneous record produced in discovery—which includes dozens of emails back and forth among the Doctors as they compiled their list of subjects and drafted the Article—uniformly reflects both a good faith scientific process and that the Doctors

believed their statements were accurate when they made them. This is dispositive, and a separate basis to grant summary judgement to the Doctors.

There is a third, independent reason why this case cannot get to a jury: J&J has failed to show that any of the Doctors' statements are about its products. None of these statements ever mention J&J, so J&J tries to meet this element through evidence of market share and consumer perceptions. But its market share expert analyzed the wrong market (baby and body powder, not talcum powder). And its consumer survey revealed that an overwhelming majority of consumers (~80%) did not think of J&J at all when shown excerpts of the Article.

J&J's failure to satisfy any of these three elements means its claim cannot go forward, and this Court should grant summary judgment to Defendants.

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Drs. John Maddox, Richard Kradin, and Theresa Emory (together, the "Doctors") have devoted their careers to patient care, with each maintaining a full-time pathology practice for many decades. Ex. 1; Ex. 2; Ex. 3. They have extensive experience in the science of mesothelioma, and have published many peer-reviewed articles, including on asbestos-related cancers. Ex. 1; Ex. 2; Ex. 3.

2. Around 2017, Maddox and Emory attended a Harvard symposium on asbestos-related disease where Kradin presented. Ex. 4 at 144:22–145:3; Ex. 5 at 49:1–50:23. Maddox suggested to Kradin they might co-author an article about patients who developed mesothelioma after using cosmetic talc. Ex. 4 at 145:4–8; Ex. 6 at 92:12–25. Kradin expressed interest. Ex. 4 at 145:8–9.

3. Maddox and Kradin's interest in the topic stemmed from several unexplained trends they had observed in mesothelioma cases and wanted to document before they retired, including apparent gender disparities in the data. Ex. 6 at 320:17–321:3; Ex. 5 at 52:3–12.

4. In 2019, when Maddox and Kradin were both nearing retirement, Ex. 6 at 162–63, 319–21;

2

Ex. 5 at 249, Maddox suggested again to Kradin that they could write up a case series of 6 to 8 subjects. Ex. 7 at 1–2. Kradin agreed. *Id.*; Ex. 6 at 88–89; Ex. 4 at 145:10–18.

5. Maddox initially proposed focusing on users of Cashmere Bouquet (a non-J&J product) because it contained a "fairly unique" type of asbestos (anthophyllite). Ex. 6 at 95:23–96:8. *See also* Ex. 7 at 2; Ex. 4 at 145:18–146:1. Maddox asked a contact at Simon Greenstone Panatier ("SGP"), a law firm he had worked with, to provide material on plaintiffs with "substantial Cashmere Bouquet exposure histories" where the files contained tissue digestion reports. Ex. 8 at 2; *see also* Ex. 9 at 1. Maddox and Kradin later decided to broaden their research to include subjects with exposure to any type of talc. Ex. 8 at 1; *see also* Ex. 5 at 51–54; Ex. 6 at 100:22–101:1.

6. Maddox and Kradin each worked to identify potential subjects. *See* Ex. 7 at 1–2; Ex. 10. Kradin asked his assistant, Dr. Siobhan Cashman, to review his expert reports from asbestos litigations, which contain a summary of the subject's exposure history based on Kradin's review of available deposition testimony and interrogatories. Ex. 5 at 21–25, 61:10–24, 199:10–15; Ex. 11 at 50:14–21. Cashman reviewed the reports' exposure history sections and prepared a table of subjects. Ex. 5 at 58:24–59:15; Ex. 11 at 51:16–52:6, 63:4–7; Ex. 12 at 1. The table identified potential subjects with a "'clean' talcum powder exposure history" and those who were potentially exposed "to non-talc asbestos." Ex. 13 at 1–2.

7. Kradin sent Maddox his initial subject list, noting that he had "excluded subjects who described *any* occupational or paraoccupational exposures," and suggesting Maddox "do the same" to produce a "'pure' cohort." Ex. 14 at 1. Maddox agreed. *Id.*; *see also* Ex. 15 at 1 (Kradin stating it was "essential to exclude subjects with ANY other known exposures and limit to those with talc only"); Ex. 16 at 7 (agreeing to"[e]xclude anyone with other exposures").

8. Maddox spent 100+ hours over many months refining his list of subjects. *See* Ex. 17 at 1;

3

Ex. 4 at 147–53. To determine each subject's exposure history, Maddox reviewed his subject files—typically a combination of deposition transcripts, interrogatories (or summaries of those materials), medical records, his own expert reports, and, occasionally, other expert reports. Ex. 6 at 50:21–51:14, 334:2–12. Patients with "a clear cut, well known, definitive additional exposure" were excluded "right away," and Maddox "dug deeper" into the others. Ex. 6 at 50:23–51:14. If something was unclear from the documents he had, Maddox would request additional material from whichever law firm he worked with on the particular underlying case. Ex. 6 at 60:19–61:9; *see, e.g.*, Ex. 18; Ex. 19; Ex. 20; Ex. 21. Many of his determinations about whether to include or exclude a particular subject are reflected in his contemporaneous handwritten notes. Ex. 22; Ex. 23; Ex. 24 at 1 (Case #7); Ex. 25 at 1 (Case #69); Ex. 26 at 2 (Case #71); Ex. 6 at 323:1–325:22.

9. In fall 2019, Maddox and Kradin learned that Dr. Jacqueline Moline planned to publish an article concerning mesothelioma and cosmetic talc and discussed whether that would "moot" their work. Ex. 27 at 1; Ex. 28 at 1. Maddox and Kradin decided to press on, believing that "it's important in the medical literature to confirm initial reports" because "that strengthens . . . the observation and its credibility." Ex. 5 at 90:16–20. But they recognized they would need to assess if any of their cases overlapped with Moline's subjects, to try to eliminate duplication. Ex. 28 at 1; Ex. 29 at 1; *see also* Ex. 5 at 100:25–102:12; 113:17–21; Ex. 6 at 177:12–19.

10. While reviewing a November 2019 draft of the Article, Maddox identified three potentially overlapping subjects. Ex. 30 at 1. Kradin wrote back: "I would not republish Moline's cases knowingly." *Id.* Maddox later removed these subjects. *Compare* Ex. 31 at 3, *with* Ex. 32 at 7.

11. As Kradin and Maddox continued to whittle down their list of potential subjects, Kradin asked Dr. Cashman to supplement missing data ("age at diagnosis, site, epi vs sarc, etc."), and she prepared a revised table. Ex. 33; Ex. 34; Ex. 35. Kradin forwarded it to Maddox, explaining that

4

subjects highlighted yellow had only talc exposure, while subjects in red also had non-talc exposures. Ex. 36; Ex. 37. Kradin suggested that if they used any "red" subjects, they should note potential non-talc exposures in the Article. Ex. 36. Maddox sought clarification, relaying his understanding that their plan was to "NOT report[] those with other exposures," and asking whether Kradin was suggesting a change, or if "'potential' = 'no other proven' exposure." Ex. 38. Kradin responded, "I would report on those with only talc but also note those with other potential minimal non occupational or domestic spousal exposures. I would mark them by an asterisk in a table with description of potential exposure." *Id.*

12. Maddox then sent Kradin a revised draft, which included a few additional subjects and language stating: "[n]o subject reported additional definite occupational, paraoccupational, or environmental exposures to asbestos . . . ." Ex. 39; Ex. 32 at 4.

13. Maddox and Kradin continued to refine their process and revise their subject lists, with Maddox suggesting the following "exclusion criteria: 1) any primary occup exp to either chry or amph; 2) any secondary exp to amph; 3) secondary exps to chrysotile more than 2-3 months. Alternatively, more than 1 year. Keepers will include: 1) Unproven, unlikely, unknown (ie potential) 'exposures'; 2) ???." Ex. 40 at 1. Kradin responded: "Like all but number 3. Would exclude those." *Id.* To ensure they were aligned on methodology, Maddox described four examples of close calls, which Kradin said he would exclude or "list with asterisk." *Id.*; Ex. 41 at 1.

14. Maddox then sent Kradin a revised list of 85 subjects, explaining that he "removed all others with exposures to some other source of asbestos," where those exposures were "certain," "probable," or "likely," but *not* where "history was vague, uncertain, or unlikely." Ex. 42. In an email sending further revisions, Maddox repeated: "I have excluded everyone with certain or probable, primary or secondary, household or environmental exposures. There are a few

doubtful[/]dubious left in; only in the exposure history (uncounted) group. Four folks[]with barber/hairdresser histories, who as far as I can tell are NOT Moline's reported patients." Ex. 43. Kradin provided feedback, writing "1) we need to be absolutely confident about the exposures" and "2) don't duplicate what has []already been published," Ex. 44; Ex. 45 at 10.

15. Maddox then sent Kradin a list of 43 subjects he had excluded based on reported exposures to asbestos in addition to talc. Ex. 46 at 1; Ex. 47. Ex. 17 at 1. After further analysis, he updated this tally: "81 pure talc exposures and 64 talc plus something else." Ex. 17 at 1.

16. Maddox retired in January 2020, so he recruited Dr. Emory, his partner at Peninsula Pathology Associates, to help compile the final data set and get the substance of the Article over the finish line. Ex. 17 at 1; Ex. 48 at 64:10–12 ("I begged her to become involved . . . she is a much better writer. She has written textbooks on pathology"); Ex. 49 at 38:24–43:18, 332:6–18.

17. Maddox sent Emory the draft and subject tables, explaining: "Accepted8g spreadsheet is the good talc-only cases. aExcluded8g spreadsheet is those with other primary and/or secondary exposures." Ex. 50 at 1; Ex. 51 at 1; Ex. 52 (Excluded Cases-8g table showing 65 names); Ex. 53.

18. Emory began rewriting the Article, Ex. 54; Ex. 55 at 1. Meanwhile, Maddox removed another case due to a non-talc exposure, and stated he would remove any references to "brand names," which were not of interest to the Doctors. Ex. 56 at 1; Ex. 57 at 17:15–25 (testifying in March 2020 that "the purpose of the study wasn't to determine or to report on particular brands"); Ex. 5 at 54:15–19 (emphasizing interest in cosmetic talc generally, not brands).

19. Emory circulated a revised draft. Ex. 58 at 1. She expressed pride in the project, calling it "an important paper" that addressed "a true women's health issue." Ex. 59.

20. Kradin suggested that the methods section note the number of subjects "rejected for having other exposures" and reiterated the need to avoid duplication with Moline, stating:

"EVERYTHING in this paper must be ABSOLUTELY ACCURATE." Ex. 60. Emory replied that she would "go through the data again to confirm." Ex. 61 at 1.

21. Emory tried to identify duplicates by comparing the Article's draft Table I to the anonymized data reported in Moline's Table I. Ex. 49 at 190:22–191:12, 207–11, 338–40; Ex. 60; Ex. 182; Moline Article at 15, *LTL Mgmt. v. Moline*, No. 3:23-cv-02290 (D.N.J. May 31, 2023), ECF No. 1-2. Using this method, she found six potential overlaps. Ex. 60; Ex. 62; Ex. 63.

22. She also sought assistance from a paralegal at SGP, reasoning that if she could figure out whether Moline had been an expert in any of the potential subjects' cases, that might be another way to identify additional potential overlaps. Ex. 62; Ex. 49 at 201:17–204:16; Ex. 64 at 2.

23. Emory also wrote to Moline directly. Ex. 65 at 1; Ex. 49 at 224:18–226:18. They spoke by phone, and agreed they could not share subject names. *Id.* Emory asked if Moline could think of other ways to avoid duplication, but the conversation generated no new ideas. *Id.* Emory returned to scrutinizing the data in Moline's published table, removing four more subjects "that looked close," leaving the Article's final subject tally at 75. Ex. 49 at 226–30; Ex. 66.

24. The Doctors all testified that they would have published with fewer subjects. Ex. 6 at 322:3–10; Ex. 49 at 334:16–335:17; Ex. 5 at 253:16–18. Early drafts and emails contemplated reporting on as few as 20 subjects. Ex. 67 at 1, 4; Ex. 68.

25. Emory submitted the Article and Table I to the American Journal of Industrial Medicine, *See* Ex. 69; Ex. 70 at 1, whose "readership" is "epidemiologists, toxicologists, oncologists," and other doctors and scientists. Ex. 183; Ex. 71 at 87–91. Peer reviewers recommended the manuscript for publication with minor revisions. Ex. 72. In response to their feedback, Emory and Kradin prepared and added Table II, which included tissue digestion data for nine of the 75 subjects. *See* Ex. 73; Ex. 74 at 4, 17.

26. The Article was published online on March 16, 2020. Ex. 75 at 1; Ex. 76.

27. The Article disclosed in three places that subjects were identified from medical-legal consultation, noting this could "introduce bias." Article, ECF No. 1-2 at 5. *See also id.* at 2, 7. It disclosed that the Doctors had "testified in asbestos litigation, primarily for plaintiffs." *Id.* at 7. The Article described the Doctors' "Methods" and tentatively concluded that "cosmetic talc may be a cause of malignant mesothelioma," while noting that "[l]arge-scale controlled studies" were needed. *Id.* at 2–3, 7.

28. The Article states that it presents 75 subjects whose "only known exposure to asbestos was repeated exposures to cosmetic talcum powders." Article, ECF No. 1-2 at 2. The phrase "known exposure" was intended to mean something that the Doctors concluded was a significant exposure, confirmed by evidence, and known to them. Ex. 6 at 30:15–31:2, 40:9–41:11, 160:14–161:25, 204:6–9, 217:2–3; Ex. 5 at 71–73, 77:13–15, 253:4–9, 256:22–257:11; Ex. 49 at 154–56. The Doctors' definition is consistent with the way exposure history is typically discussed by plaintiff and defense experts alike. *See, e.g.*, Ex. 114 at 27–29, 35–42 (discussing possible exposures that the subject speculated at deposition, but concluding "[t]he most I can say is that it's possible;" "I don't have evidence that he was [exposed]," and finding no "established exposures"); Ex. 112 at 270 (discussing a possible exposure described by the subject but finding "no evidence" to support it); Ex. 140 at 51:24–52:7. In determining whether a possible exposure meets this bar, the Doctors consider a range of factors such as whether it is real (meaning not speculative or hypothetical), documented, repetitive, routine, or regular, and significantly above the background levels of asbestos in the ambient air we all breathe. Ex. 6 at 30:15–31:2, 40:9–41:11; Ex. 5 at 71–73, 256:22–257:11; Ex. 49 at 154–56.

29. The Article also states that 65 subjects "were excluded due to recalled occupational or

paraoccupational exposures to other sources of asbestos," based on Maddox's final list of excluded subjects. Article, ECF No. 1-2 at 3; Ex. 52; *see also* Ex. 96, Emory Am. Resp. to Rog. 15.

30. Determining whether something is a "known exposure" to asbestos is a matter of scientific judgment. *See* Ex. 6 at 30:19–31:4, 37–41, 217–20, 247:10–16, 251:5–8 (explaining "it depends upon subjective interpretations of patient history"); Ex. 5 at 72:17–73:5, 191:15–192:3; Ex. 49 at 151:4–152:9, 299:18–300:6.

31. Scientists and physicians regularly disagree about whether a hypothesized exposure is a genuine or known exposure. Ex. 5 at 200:4–10; *see also infra* ¶¶ 32–33, 44–45 & nn.2–3 (providing examples). J&J has admitted in this litigation that experts may disagree on whether a plaintiff had "non-talc exposures." Ex. 78, J&J Resp. to RFA 7; *see also* Ex. 6 at 298:16–21 (J&J's attorney in this case stating that "everybody, in my experience, has different levels that they use for background"). As just one example, J&J argues Case #68 had a "known exposure" because she lived near industrial plants, citing the report of defense expert Daly. Ex. 79, J&J Resp. to Rog. 15; Ex. 185 at 34–41, 66. Maddox reviewed the air sampling data in Daly's report and testified at his 2019 deposition that it was unlikely there was any exposure. Ex. 80 at 92–98. Another plaintiff's expert agreed. Ex. 81 at 9–11, 38–40, 103–14. There are 20+ pages of closing arguments alone of plaintiff and defense counsel disputing whether this was an exposure. Ex. 82 at 5914–28; Ex. 83 at 6054–59.

32. Scientists also debate whether use of talcum powder is capable of causing an asbestos exposure. In one of the subjects' cases, an expert "developed a model" to calculate the dosage of asbestos fibers that the subject would have inhaled when she applied talc powder, and concluded that "lifetime talc-based asbestos dose value" was "well below . . . background" (meaning well below the amount the typical person inhales from the ambient air). Ex. 84 at 55–59. Another expert

considering the same subject cited pages of data and literature on the airborne concentrations of asbestos fibers while applying talc, and reached the opposite conclusion, finding the subject "would have had asbestos exposure based on her descriptions of her use." Ex. 85 at 16–18.

33. To assess exposure history in their work serving as expert witnesses, the Doctors review material provided by the attorneys who retained them, which typically includes deposition transcripts and interrogatory responses. Ex. 6 at 50:21–51:14, 144–48, 291–92; Ex. 5 at 20–24, 192–93; Ex. 49 at 332–33. In the Doctors' view, deposition testimony of the subject or their immediate family members is the most reliable source of exposure history. Ex. 5 at 192:9–12; 233–34; Ex. 6 at 212:11–213:3; Ex. 49 at 152:17–20, 302–04. The Doctors often are not provided with complaints, defense expert reports, or deposition testimony of non-family witnesses, and, in their view, these are less useful for assessing exposure history. Ex. 6 at 238:25–239:25, 242:22–243:3, 312–13, 338:20–22; Ex. 49 at 152–153; Ex. 5 at 193–95, 199:16–201:6.

34. The Article states that "[e]xposures were identified through sworn deposition testimonies and answers to sworn interrogatories provided from subjects, parents, and spouses." Article, ECF No. 1-2 at 3. The purpose of this sentence was to give readers a general idea of the documents the Doctors consulted. Ex. 49 at 57:16–58:12. This statement does not assert that this was an exhaustive or an exclusive list of materials that they reviewed for every case, and the Doctors did not intend to convey that. Ex. 49 at 57–58; Ex. 6 at 138:2–141:23.

35. The Doctors' process for assessing exposure history for this Article is the same process they use in their medico-legal consultations. Ex. 6 at 53:23–54:6, 250–253; Ex. 5 at 195:3–14, 198:17–24, 238:6–19; Ex. 49 at 161:1–9.

36. The Doctors each testified that they believed that their "only known exposure" statement was true when they made it, and that it reflected the exposures "known" to them at the time. Ex. 5

at 13–15, 253:4–12; Ex. 6 at 29–32; Ex. 49 at 27:4–23, 333:20–334:6.

37. During this litigation, the Doctors learned that three subjects with mixed (talc + non-talc) exposures were inadvertently included in their study: Case #8, Case #11, and Case #15. Ex. 95, Kradin Resp. to Rog. 8; Ex. 5 at 207–209, 214, 219–22, 256:17–21; Ex. 6 at 321; Ex. 49 at 334. The Doctors were surprised and upset to learn that their Article had any mistakes. Ex. 5 at 177–79; Ex. 11 at 109–11; Ex. 49 at 209.

38. Case #8 was contributed by Dr. Kradin. Ex. 35 at 1. The "Exposure History" section of his report stated that Case #8 was a "regular user" of cosmetic talc, and "a former smoker." Ex. 87 at 19–20. In her tables, Dr. Cashman listed Case #8 as a "smoker" with a "'clean' talcum powder exposure history." Ex. 13 at 1–2; Ex. 35 at 1, 5. Smoking generally is not associated with mesothelioma. *See* Ex. 86 at 1604:8–12. Another section of Kradin's report, which Cashman did not review, noted that Kent cigarettes (which Case #8 smoked) contained asbestos in the 1950s. Ex. 87 at 19–20; Ex. 5 at 208:21–209:4; Ex. 11 at 51–52, 77:5–78:1. This is the only time Cashman missed something in Kradin's reports—she otherwise accurately transcribed their exposure history to the table Kradin requested. Ex. 5 at 62–63, 168, 196; Ex. 11 at 54:13–55:11, 124.

39. Kradin also contributed Case #11. Ex. 35 at 2. His expert report stated that the subject was a regular user of cosmetic talc and was also exposed to asbestos via laundering her husband's work clothes. Ex. 88 at 20. Cashman highlighted Case #11's name in red in her table. Ex. 35 at 2. Unlike every other subject highlighted in red, the "Notes" column for Case #11 lacked any description of any additional exposure source. *See id.* While Maddox was sorting through the cases, he emailed himself a version of Cashman's table without any highlighting. Ex. 89; Ex. 90. Maddox testified that Case #11 may have been inadvertently included in error "because the exposure column was empty." Ex. 6 at 122:8–123:5, 127:6–13.

11

40. Kradin's expert report in Case #15 was dated December 2018 and stated that Case #15 was exposed to asbestos via many years of using talcum powder. Ex. 91 at 1, 19–20. Cashman accordingly listed Case #15 in her table as having a "clean" (talc only) exposure history in the table sent to Maddox in November 2019. Ex. 36; Ex. 37 at 2, 5. The following month, Case #15's attorneys sent Kradin additional documents to review, Ex. 92, and he then issued a supplemental expert report identifying an additional asbestos exposure from construction materials, Ex. 93 at 1, 19. At that later date, "it didn't dawn on [him] that perhaps this was a case that had gone into the table." Ex. 5 at 221:14–16; Ex. 11 at 79–84.

41. The Doctors have all testified that the difference between 75 and 72 subjects does not change their conclusions in the Article in any way. Ex. 49 at 28–32, 334–35, 357:10–17; Ex. 6 at 284:13–16; 321:10–25; Ex. 5 at 47:6–16; 186:16–25, 253:19–254:7, 257–58.

42. J&J contends that 20 more subjects (of the 75 reported) had non-talc exposures and should have been excluded. *See* Ex. 79, J&J Resp. to Rog. 14–15. The Doctors re-reviewed these cases and explained in discovery responses and at their depositions why, in their scientific judgment, none had a "known exposure." *See* Ex. 94, Maddox Resp. to Rog. #8–14; Ex. 95, Kradin Resp. to Rog. #8–14; Ex. 96, Emory Resp. to Rog. #8–14; Ex. 6 at 263–70 (discussing Case #43), 287–90, 326–30 (Case #68), 51–53, 253–62 (Case #24), 303–05 (Case #33), 316 (Case #65); 279–83 (Case #58); Ex. 5 at 225–34 (Case #3); 237–44 (Case #75).

43. In Case Nos. 3, 5, 7, 33, 55, 67, 68, 75, the Doctors concluded that the non-talc exposure theory J&J now cites was not a known exposure while serving as expert witnesses in the underlying litigation.[1] In Case #33, for example, the subject's interrogatory responses alleged exposure to talc

---

[1] **Case #3.** Ex. 98 at 107:21–113:11 (Kradin testifying in 2018 that he reviewed depositions of the subject and her husband, considered whether she was exposed to asbestos through her husband's work clothes, and concluded insufficient evidence of exposure). **Case #5.** Ex. 99 at 36–42, 49–50;

alone. Ex. 77 at 8. Her medical records referenced asbestos exposure from when she worked for a company which cleaned Navy ships, and "possible" exposure "when she did office work in an old building." Ex. 79, J&J Resp. to Rog. 15. At the 2018 trial, Dr. Maddox testified that these theories were "unconfirmed," Ex. 102 at 1043–45, and lacking any "factual basis" other than "speculation that she shared with the doctor." Ex. 103 at 1118–22. As to the Navy-related exposure, Maddox noted his understanding that the subject was not "actually working on the ships herself," and that this work "was in the 1980s, ten years or so after the Navy tried to abate asbestos from their ships." *Id.* at 1122:10–15; *see also* Ex. 102 at 1044:19–24; Ex. 6 at 302:4–305:18. Maddox also testified that, in general, if there is any conflict between medical records and deposition testimony, he would "depend upon the deposition testimony," because medical records often memorialize "a suggestion or a speculation about a possible exposure, because they're searching." Ex. 6 at 212:11–213:3; *see also* Ex. 49 at 152–53 ("Physicians oftentimes would be trying to solve a puzzle . . . I see things in medical records all [the] time that don't correlate with what actually is true.").

44. In Case Nos. 3, 9, 16, 33, and 65, even *defense experts*—including sometimes J&J's own—expressly refused to credit the non-talc exposure theory J&J now relies on.[2] In Case Nos. 4, 67,

---

Ex. 100 at 498:20–500:18 (Emory testifying in 2020 that there "was no evidence that [Case #5] was exposed to asbestos at any worksite"). **Case #7.** Ex. 101 at 34–38 (Maddox concluding in 2018 deposition that as to possible additional exposure theories, "there was not any really specific evidence" and "nothing was supported by facts"). **Case #55.** Ex. 104 at 19–20 (Kradin's 2019 report acknowledging that subject's father was a stonemason but rejecting this as an exposure pathway). **Case #67.** Ex. 105 at 36–40, 43–44 (Maddox testifying in 2019 that he "could not say with reasonable medical certainty" that Case #67 had a take-home exposure from her father and that "other possible routes of exposure" came up "pretty much negative"). **Case #68.** Ex. 80 at 92–98 (Maddox testifying in 2019 that, after reviewing relevant data, his opinion was that Case #68 did not have an environmental exposure). **Case #75.** Ex. 106 at 23–24; Ex. 107 at 76:22–77:6, 104:15–105:3 (Kradin testifying in 2017 that he "saw no information in the deposition testimonies" that Case #75 was exposed through husband's work clothes); *see also* Ex. 108 at 19–20, 31; Ex. 109 at 93:18–95:8 (similar, from another plaintiff's expert).
[2] **Case #3.** Ex. 110 at 7:5–9, 32:22–33:15 (J&J expert in Case #3 finding "no credible source of exposure to asbestos"). **Case #9.** Ex. 111 at 1–2, 18, 20 (defense expert finding "no evidence that

and 71, neither J&J nor the Doctors identified any expert who credits the non-talc exposure theory J&J now relies on.[3] In Case #7—a case where J&J now asserts the subject had a known exposure to asbestos from brakes, *see* Ex. 79, J&J Resp. to Rog. 14 & 15—J&J's theory at trial was not any alternate exposure to asbestos, but rather that there was no evidence Case #7's cancer "had anything to do with asbestos." Ex. 125 at 30:7–11; *see also* Ex. 125 at 8:19–25 (plaintiff's counsel stating that "no expert for the defendants throughout the course of this entire process has ever said that there was any source of asbestos exposure that caused [Case #7]'s mesothelioma").

45. In Case Nos. 3, 16, 31, 33, 55, 65, 68, 69, 72, and 74, experts reached conflicting opinions regarding whether the subject had a non-talc exposure, with one or more experts concluding they did not. For example, at least five experts assessed whether Case #16 was exposed to asbestos through her father's work as a mechanic, with three rejecting the theory—including a defense expert, who found "no reliable or convincing evidence" of exposure to asbestos "at any point during her entire lifetime." Ex. 112 at 270, 335–36, 340; *compare also* Ex. 126 at 2, 69–73 (another defense expert finding no non-talc exposure), *and* Ex. 85 at 5–6, 18, *with* Ex. 127 at 1, 9, *and* Ex. 84 at 31–33. In Case #74, experts debated whether the subject had an environmental exposure from living near certain industrial plants: one expert considered studies, wind direction, and a map of the subject's homes and schools and concluded there was no chance of exposure, Ex. 160 at 192;

---

[Case #9] would have been exposed to amphibole asbestos related to her husbands' occupations"). **Case #16.** Ex. 112 at 270. **Case #33.** Ex. 113 at 7, 169–70. **Case #65.** Ex. 114 at 27:15–29:22, 35:13–41:20, 42:10–17.

[3] **Case #4.** Ex. 115 at 27 (defense expert concluding Case #4's cancer was spontaneous and unrelated to asbestos); Ex. 116 at 7 (similar); Ex. 117 at 36 (similar). **Case #67.** Ex. 118 at 28 (J&J's expert testifying that he "ha[d] no idea" if Case #67 was exposed or not because there was "no real specific information provided"); Ex. 119 at 16 (finding "details . . . too nebulous to provide any meaningful opinion"); Ex. 120 at 36; Ex. 121 at 21; Ex. 122 at 21–22. **Case #71.** Ex. 123 at 35 (defense expert finding "no evidence in this case that [Case #71] had significant asbestos exposure from any source"); Ex. 124 at 7:15–16, 78:13–79:10 (J&J expert concluding that she "did not see any exposures").

another considered many of the same inputs, but concluded Case #74 "undoubtedly" had environmental exposure. Ex. 188 at 69, 120–22; Ex. 161 at 205:2–206:6. Experts also disagreed about the types of asbestos fibers found in Case #72's tissue. One reported only anthophyllite and tremolite. Ex. 162 at 2. Another noted "possible crocidolite" with anomalies. Ex. 163 at 25:2–21. A third deemed the same fiber crocidolite. Ex. 164 at 3. And experts disagreed about J&J's exposure theories with respect to other subjects, too.[4]

46. The Doctors also stated that the Article presents 75 "additional subjects" to those in Moline's article, which the Doctors believed to be true at the time the statements were made. Article, ECF No. 1-2 at 2; *see also* Ex. 6 at 47:8–24; Ex. 49 at 336:2–337:12; Ex. 5 at 116:12–13.

47. During discovery in this case, the Doctors learned that eight of their subjects overlapped with Moline's. *See* Ex. 165, Emory's Supp. Resp. to RFA 16; Ex. 49 at 190:19–191:12, 196:13–18, 229–32, 286–90, 336–37; Ex. AB to Plf.'s Mot. to Compel (Apr. 22, 2025), Dkt. 46-28.

---

[4] **Case #3**. *Compare* Ex. 110 at 7:5–9, 32:22–33:15 (J&J expert in Case #3 finding "no credible source of exposure to asbestos"), Ex. 128 at 19 (defense expert finding it "unlikely" that Case #3 had take-home exposure), *and* Ex. 129 at 2879:17–24 (similar, from plaintiff's expert), *with* Ex. 130 at 37:7–38:22 (defense expert crediting workplace exposure); *see also* Ex. 131 at 80:6–9; Ex. 5 at 225:22–226:25, 229:13–23, 232:3–7 (defense expert testifying he could not "say to a reasonable degree of medical and scientific certainty" if Case #3 was exposed this way). **Case #31**. *Compare* Ex. 187 at 6 (defense expert noting that "asbestos exposure was suspected" from Case #31's previous jobs based on deposition testimony but not opining any of these were actual of known exposures) *with* Ex. 133 at 17 (plaintiff's expert reviewing same materials and concluding "[Case #31] has no other potential exposure to asbestos") *and* Ex. 132 at 1–2. **Case #33**. *Compare* Ex. 113 at 7, 169–70, Ex. 134 at 7, Ex. 136 at 7, *and* Ex. 135 at 28:5–10, *with* Ex. 137 at 24. **Case #55**. *Compare* Ex. 104 at 19–20, *and* Ex. 138 at 2, *with* Ex. 139 at 47. **Case #65**. *Compare* Ex. 114 at 27:15–29:22, 35:13–41:20, 42:10–17, Ex. 140 at 51–56, 63:2–64:13, Ex. 141 at 35:10–36:10, Ex. 142 at 25–43, *and* Ex. 143 at 169–70, *with* Ex. 141 at 33:7–34:14, Ex. 144 at 41–60, Ex. 145 at 210:16–214:2, *and* Ex. 186 at 49. **Case #68**. *Compare* Ex. 80 at 92–93, *with* Ex. 185 at 66. **Case #69.** *Compare* Ex. 147 at 2–3 & Ex. 146 at 5, Ex. 148 at 81:5–8, 127:3–128:23, Ex. 149 at 29, Ex. 150 at 57:11–58:12, 78:5–79:22, 90:11–91:17, 93:23–94:14, 120:20–122:14, *and* Ex. 151 at 32–39, *with* Ex. 152 at 68:6–71:6. **Case #72**. *Compare* Ex. 153 at 52:22–53:5, Ex. 154 at 96:3–8, *and* Ex. 155 at 14, 26, *with* Ex. 156 at 10–11, 14, *and* Ex. 157 at 32:5–33:18. **Case #74**. *Compare* Ex. 158 at 84:22–25, 144:8–20, 163:16–164:12, Ex. 159 at 41–42, *and* Ex. 160 at 192:11–20, *with* Ex. 161 at 205:2–206:12.

48. Emory "thought [she] had done a good job" of trying to eliminate overlap, and was surprised to learn the Article included subjects from Moline's article. Ex. 49 at 196:13–18, 200:9–11, 209:7–19, 228–229. At the time of publication, however, she harbored no doubts about the paper's accuracy. Ex. 49 at 201:5–202:12, 230:3–20, 336–37.

49. Even before this litigation, Kradin testified that a small amount of overlap with Moline's subjects would likely not affect the article's "overall opinion and conclusions." Ex. 166 at 78:10–16; *see also* Ex. 5 at 113:14–24.

50. As J&J's own expert testified, errors happen in scientific research. Ex. 71 at 186–96, 342–45; *see also* Ex. 5 at 47:6–16; 256–258; Ex. 49 at 360:16–22; Ex 11 at 122:8–12. The normal process is to bring it to the publisher's attention, and for the journal to then raise it with the authors and evaluate whether a correction is appropriate. Ex. 49 at 121:8–16; Ex. 5 at 184–88.

51. The Doctors' process was typical of scientific journal writing. *See* Ex. 5 at 62:14–21, 115:18–116:1, 247:10–14; Ex. 49 at 42:18–43:2, 162:14–19. Maddox and Kradin were responsible for reviewing the cases they contributed, and had no expectation that anyone else would review their work. *See* Ex. 5 at 57:15–21, 115:18–116:1, 198; Ex. 4 at 154–55; *see also* Ex. 49 at 42:12–43:18. Kradin enlisted the help of his assistant—a PhD scientist who has published her own peer-reviewed papers—which is also commonplace. Ex. 5 at 62:11–63:20, 64:17–25, 247:3–248:21.

52. Shortly after the Article was published, Dr. Stanley Geyer wrote a letter to the editor criticizing the Article's methodology, including the Doctors' reliance on deposition testimony and interrogatory responses to determine asbestos-exposure history. Ex. 167 at 1; Ex. 184 at 2–4.

53. In their published response, the Doctors acknowledged the limitation of relying on patients' histories but explained that even if "an odd case or two" had slipped by, "there would still be an abundance of cases to support [their] findings." Ex. 168 at 1.

16

54. MedicalResearch.com contacted Emory requesting a written interview about the article. Ex. 169 at 1–2. Emory and Kradin prepared answers that were "essentially . . . a summary of the major findings." *Id.* at 1. The interview again disclosed that the subjects came from "medical-legal consultation," and repeated the Article's methodology and conclusions. Ex. 170 at 1.

55. None of the publications that J&J challenges names J&J or its products. Article, ECF No. 1-2; Ex. 168; Ex. 170; Ex. 171, J&J Resp. to Rog. 4.

56. J&J was unable to locate data showing Johnson's Baby Powder's share of the talc powder market in 2020, or any market-share data for Shower to Shower post-2012. Ex. 172, J&J Supp. Resp. to Rog. 2; Ex. 173, J&J Resp. to RFAs 8–10.[5]

57. Although J&J's market share expert, Makeda Murray, understood her assignment to be to evaluate J&J's "historical share" of the "cosmetic talcum powder" market, Ex. 174 ¶ 7, she instead evaluated J&J's share of the *baby and/or body powder* sub-market(s), *see id.* ¶¶ 10–11; Ex. 175 at 83:9–25 (agreeing she only "offers an opinion on J&J's market share of the market for baby and body powder"); *see also id.* 41–50; 78:5–81:9.

58. The cosmetic talcum powder products market includes not just baby/body powder but also products like powder blush, powder foundation, and eyeshadow. *See, e.g.*, Ex. 171, J&J Resp. to Rog. 10. J&J listed 27+ such products in response to a request for "all of the 'cosmetic talc products in the market'" referenced in its Complaint. *Id.*; *see also* Ex. 176, J&J Supp. Resp. to Rog. 1. Its experts identified several more (*e.g.*, Caldesene, Equate, Up&Up). Ex. 174 ¶ 27; Ex. 177 ¶¶ 55–56. And the FDA and other sources list many more.[6]

---

[5] J&J discontinued sales of talc-based baby powder in May 2020. Ex. 175 at 113:10–13.

[6] *See, e.g.*, U.S. Food & Drug Admin., *FDA Summary of Results from Testing of Official Samples of Talc-Containing Cosmetics for Asbestiform Fibers Completed by AMA Laboratories in 2023*, https://www.fda.gov/cosmetics/cosmetic-ingredients/fda-summary-results-testing-official-

59. Murray did not know that the "cosmetic talcum powder product market is broader than the baby and body powder markets," Ex. 175 at 78:17–23, or that J&J had defined the talc powder market to include products other than baby/body powder, *see id.* at 77:8–105:2, 222:22–224:10, or whether this case "involves cosmetic talcum products outside of baby and body powder products," *id.* at 59:25–61:20. She did no research to try to learn this information. *See id.* at 88:6–17, 104:17–105:2, 155:19–157:20, 246:24–255:12.

60. Murray testified that the sole reason she limited her analysis to the baby/body powder submarket is that she was unable to find market-share data for the broader cosmetic talc powder market. *Id.* at 77:18–81:9, 84:1–11, 110:21–112:4, 245:11–253:12.

61. Murray didn't know what percentage of the broader cosmetic talc market baby/body powder comprises. *Id.* at 49:1–50:7; 88:6–17, 248:12–250:13. J&J offered no other evidence on this question, and given the sheer number of products in the talc powder market, there is good reason to believe that baby/body powder make up only a fraction. *See supra* ¶ 58 & n.6.

62. Murray also did not analyze J&J's share of the *talc-based* baby/body powder market. *See* Ex. 175 at 59:25–61:1. The data she "relied upon did not distinguish between talc and cornstarch," *id.* at 42:15–18, and "included baby and body powders that do not contain talcum powder," *id.* at 112:15–19. *Accord* Ex. 173, J&J Resp. to RFA 11.

63. Murray confirmed that by 2013, talc-based powder comprised less than 50% of J&J's baby powder sales; by 2020, that number had plummeted to ~20%. *See* Ex. 175 at 143:14–148:20, 196:2–202:7; Ex. 178 at 5 (Fig. 2).

64. Murray had no information about Shower-to-Shower's market share post-2012. Ex 175 at

---

samples-talc-containing-cosmetics-asbestiform-fibers-completed;    Env't    Working    Group, *Products    Containing    Talc*,    https://www.ewg.org/skindeep/browse/ingredients/706427-talc/?ingredient_id=706427-talc (last visited Oct. 17, 2025).

50:16–51:5; Ex. 174 at 8 n.10.

65. Murray discussed "consumer use" and "brand awareness" of Johnson's Baby Powder but offered no opinion on either. *See* Ex. 174 ¶¶ 32–38; Ex. 175 at 267:4–15; 268:23–269:1. Three of the four consumer-use studies she cited were decades old. Ex. 174 ¶ 34; Ex. 175 at 255:17–266:19. On brand awareness, Murray relied on three J&J-sponsored studies from the 1990s, all of which tested J&J Baby Powder only against other baby powders (not, say, Maybelline, or Covergirl, or Chanel). Ex. 174 ¶¶ 37–38; Ex. 175 at 266:20–274:18. She had no opinion as to the soundness of any of these surveys' methodologies. Ex. 175 at 237:20–238:7.

66. J&J's consumer survey expert, Dr. Gal Zauberman, administered a survey that "asked respondents whether any products came to mind" after reviewing "an excerpt of the article's abstract." Ex. 177 ¶ 11. Zauberman's survey was not designed to test whether anyone thought the tested statement was about, referred to, or described J&J. Ex. 71 at 143:18–146:9, 227–36. *See also* Ex. 179 ¶¶ 35–58 & Table 1; Ex. 180 at 151:6–158:3, 191:19–192:11, 265:14–272:15. His survey also did not test whether readers believed the statement "exclusively describ[ed]" or was "intended to describe" J&J products. Ex. 71 at 36:19–37:2, 145:21–146:9; *see also id.* at 202:24–203:4, 228:8–23, 231:19–23; Ex. 181 ¶ 4.

67. Instead, Zauberman's opinions are limited to whether "J&J products *were among the products* that came to mind *at all*" when shown excerpts of the abstract, Ex. 181 ¶ 4 (emphasis in original), without any "kind of weighting or . . . strength of associations." Ex. 71 at 275:9–276:7. *See also id.* at 33:17–42:14.

68. Zauberman's survey also did not test what associations anyone might make after reading the entire Article. *See id.* at 122:2–11, 157:4–8. In Zauberman's opinion, consumers reading the full Article—or even just the full abstract—would be so confused they likely would suffer

19

"cognitive overload" and be unable to make reliable associations. Ex. 181 ¶ 44; *see also* Ex. 71 at 71:10–21, 119–41, 169:11–171:1.

69. Zauberman tested only one of the nine statements J&J has challenged in this litigation. *Compare* Ex. 171, J&J Resp. to Rog. 4, *with* Ex. 177 ¶ 47 & App'x D. *See also* Ex. 179 ¶¶ 23–34; Ex. 71 at 149–63. He opined that six of these are "substantially similar" to the one he did test, Ex. 181 ¶ 22 & Fig. 2, but he didn't test these other six statements verbatim, *see id.*, and agreed that wording changes can affect outcomes, Ex. 71 at 215–24. He has no opinion about associations people might have with statements he did not test. *Id.* at 157:4–8 ("[T]he only conclusions I can draw [are] from the statements that [I] presented . . . ."). He also could not say if respondents' associations derived from the challenged statement vs. other material in the article summary he showed survey respondents. *Id.* at 237–38; Ex. 179 ¶ 31.

70. Zauberman offered no opinion on the likelihood that any consumer would have actually encountered or read the Article. Ex. 71 at 59:9–15, 70:20–71:9, 84:11–93:14, 164:12–23. In his experience, most people who read scientific articles read only the abstract, and most consumers do not understand what an article "abstract" is. *See id.* at 70:20–72:13.

71. Zauberman's opinions were limited to associations consumers made in 2025, not what associations they might have made when the Article was published. *Id.* at 79:5–82:15.

72. Zauberman administered his survey the same week a book entitled *No More Tears: The Dark Secrets of Johnson & Johnson* hit the New York Times bestseller list. Ex 71 at 100–10. Zauberman wasn't aware of the book and did not test for exposure to it in his effort to identify people whose responses were contaminated by exposure to recent information. *See id.* at 103:18–22, 297:8–25. Instead, his "robustness" check was narrowly framed as asking if respondents had "read anything or heard anything about **talc**" "in the news." Ex. 177 at 67 (emphasis in original);

*see also* Ex. 71 at 285:16–286:6. He didn't ask about books, podcasts, documentaries, or sources like friends or family. *Id.* at 285–307, 321:4–324:14; Ex. 180 at 228:2–243:9.

73. Zauberman's survey showed that J&J's products "came to mind" for just 20.4% of people after being shown the abstract excerpts and prompted to identify specific products—with just 12.5% specifically mentioning Johnson's Baby Powder and 1.8% mentioning Shower to Shower. Ex. 179 ¶¶ 45, 71–72; *see also* Ex. 177 ¶ 66 & Fig. 4.

## ARGUMENT

Summary judgment is appropriate if the record shows "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). To prove trade libel under New Jersey law, J&J must prove: "(1) publication (2) with malice (3) of false allegations concerning plaintiff's property or product (4) causing special damages, i.e., pecuniary harm." *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.,* 63 F.4th 240, 244 n.8 (3d Cir. 2023) (internal citations omitted). J&J has not carried its burden during Phase I of this case to show (i) any false statements of fact (ii) made with malice (iii) about its products. Each of these failures is an independent basis to grant summary judgment to the Doctors.

## I.  J&J HAS NOT MET ITS BURDEN TO SHOW THAT THE CHALLENGED STATEMENTS ARE FALSE STATEMENTS OF FACT.

### A.  Whether a Subject Has an "Exposure" to Asbestos Is A Matter of Scientific Opinion.

"To be actionable, a statement must [be] provably false—it cannot be an opinion." *Harvey v. Cable News Network, Inc.*, 520 F. Supp. 3d 693, 718 (D. Md. 2021); *see also Pacira BioSciences, Inc.*, 63 at 245 (similar). To determine whether a statement is one of fact or opinion, courts consider

the statement's (1) content, (2) verifiability, and (3) context.[7] *Id.* Statements about "contested and contestable scientific hypotheses," especially those made in academic journals "as part of an ongoing scientific discourse" are "more closely akin to matters of opinion, and are so understood by the relevant scientific communities." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013). "In a sufficiently novel area of research, propositions of empirical 'fact' advanced in the literature may be highly controversial and subject to rigorous debate by qualified experts. Needless to say, courts are ill-equipped . . . to referee such controversies." *Id.*

The main statement J&J challenges—that the Article reports 75 subjects whose "only known exposure to asbestos was repeated exposures to cosmetic talcum powders"—reflects 75 underlying scientific opinions, and is not a statement of fact at all. As all the Doctors testified, and as the subjects' litigation files demonstrate, determining what constitutes an "exposure" is a fact-intensive judgment call involving interpretation of evidence and application of scientific principles and assumptions. *See* SUMF ¶¶ 30–33. The record is rife with examples of divergent methodologies, assumptions, and conclusions about each subject, demonstrating the subjective scientific analysis involved in each exposure analysis. SUMF ¶¶ 42–45.

The Doctors' "known exposure" statement, therefore, encompasses not just one, but 75 subjective interpretations of the evidence in the underlying cases, rendering their scientific conclusions about exposure history non-actionable. *See Harvey*, 520 F. Supp. 3d at 718 ("Where a defendant states a subjective view" or "interpretation" "rather than a claim to be in possession of objectively verifiable false fact, the statement is not actionable." (internal quotation marks

---

[7] This Court is not bound by its earlier determination that the challenged statements are statements of fact vs. non-actionable opinions. *See* Mem. Opinion and Order at 26–30 (Feb. 7, 2025), ECF No. 27; *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (law of the case doctrine "poses no bar to the assessment of past holdings" at the summary judgment stage, when the "review expands the court's inquiry based on development of actual facts underlying a plaintiff's claims").

omitted)); *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) (finding credit rating not a provably false statement because it is "dependent on a subjective and discretionary weighing of complex factors"); *Aviation Charter, Inc. v. Aviation Rsch. Grp./U.S.*, 416 F.3d 864, 871 (8th Cir. 2005), *overruled on other grounds as recognized in Syngenta Seeds, Inc. v. Bunge North America, Inc.*, 773 F.3d 58, 64 (8th Cir. 2014) (similar).[8]

For similar reasons, the statement is not verifiable. Terms without a "universal or concrete" or "settled" meaning cannot be proved true or false. *NXIVM Corp. v. Sutton*, 2007 WL 1876496, at *11 (D.N.J. June 27, 2007); *Lynch v. New Jersey Educ. Ass'n*, 735 A.2d 1129, 1137 (N.J. 1999). *See also Ward v. Zelikovsky*, 643 A.2d 972, 979 (N.J. 1994). Likewise, where statements "are tentative scientific conclusions" and "expressly disclosed as such," they are not verifiable. *Pacira BioSciences, Inc.*, 63 F.4th at 246 (collecting cases).

There is no "universal or concrete meaning" of exposure, nor an objective way to determine whether the existence of an exposure is "true" or "false." As J&J admits, experts may disagree on whether something is an exposure, and it's often a hotly disputed issue in these litigations. *See* SUMF ¶ 31. For example, whether Case #68 or Case #74 had environmental exposures, *see* SUMF ¶¶ 31, 45, or whether Case #16 was exposed through her father's work as a mechanic, SUMF ¶ 45, is not an objectively verifiable fact, it is a matter of scientific debate. *See ONY, Inc.*, 720 F.3d at 497 (statement non-actionable where plaintiff "allege[d] that the inferences drawn from th[e] data were the wrong ones"). In all of these cases where experts diverged on the exposure question, a trier of fact would have no way to decide which of these scientific conclusions to accept as the

---

[8] As the Court previously acknowledged, the Article's tissue analysis data reflects a scientific opinion. *See* Mem. Opinion and Order at 29–30 (Feb. 7, 2025), ECF No. 27. This makes sense: Different scientists use different fiber counting methods, and sometimes differ in their conclusions about the fibers present. *See* Maddox Dep. Tr. 102:22–103:19; SUMF ¶ 45 & n.4.

"truth."

The Doctors' reference to "known" exposures pushes the statement even farther from an objective statement of fact. The term "known" conveys the subjectivity of the statement: the Doctors reported on exposures known to them—meaning, based on the information they had at that time, they deemed it to be a genuine exposure. SUMF ¶ 28. It also makes clear that the exposure assessment in the Article reflects the Doctors' own judgment(s). They were not claiming perfect information or to be reporting on some objective truth of a subject's exposure history; rather, they were reporting what they personally observed in their review of these subjects' records.

The qualifier "known" also reflects the reality that—as the Doctors and other experts often state in their reports—sometimes new information about a person's exposure history comes out later in a case. It is always possible that there is unknown evidence out there that the Doctors do not have, or that hasn't yet been developed, but the Doctors can only comment on exposures known to them. This qualifier makes clear that the Doctors' statement reflects a "tentative scientific conclusion" based on the evidence available to them at the time. *See Pacira*, 63 F.4th at 246; *ONY, Inc.*, 720 F.3d at 496 ("[I]t is the essence of the scientific method that the conclusions of empirical research are tentative and subject to revision . . . .").

The context of the statement is also crucial: it appeared in a peer-reviewed medical journal, and was directed at physicians and scientists. SUMF ¶ 25. This audience would be well-equipped to understand the subjectivity inherent in a judgment about a subject's exposure history, and to evaluate the opinions the Doctors reached. *See Pacira*, 63 F.4th at 248. The Article and the Doctors' Letter to the Editor response also contained ample information about the Doctors' methodology, their potential conflicts of interest, and the limitations of their analysis, SUMF ¶¶ 27–29, 34, 53, which gave the Journal's readers a basis to evaluate the Article's tentative conclusions and decide

what weight to give them. *See ONY, Inc.*, 720 F.3d at 497–98 (no actionable statement of fact when conclusions "are presented alongside an accurate description" of data and methods).

For all these reasons, this statement is a protected scientific opinion, and J&J cannot make the question of exposure history—which it routinely assembles slates of experts to debate—a statement of fact in order to transform an academic paper that it deems damaging into trade libel.

## B. Even If It Were A Statement Of Fact, the "Known Exposures" Statement Is Not False.

That the question of whether something constitutes an "exposure" is a subjective scientific opinion should end the analysis. But even if the statement could be considered one of fact, it is not false. "[T]he truth is 'absolutely protected under the First Amendment' from defamation liability." *Bank v. Lee*, 334 A.3d 1258, 1271 (N.J. App. Div. 2025) (quoting *G.D. v. Kenny*, 15 A.3d 300, 310 (N.J. 2011)). This is so "even when a statement contains 'minor inaccuracies,' so long as it contains the 'substantial truth.'" *Id.* at 1269. A statement is not false "unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Id.* at 1270 (quoting *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991)); *see also G.D. v. Kenny*, 15 A.3d 300, 310–11 (N.J. 2011); *Eng Sales LLC v. RealStuff, Inc.*, 2024 WL 2207559, at *3 (D.N.J. May 14, 2024).

The Doctors' statement that the 75 subjects' only known exposure to asbestos was through cosmetic talc is substantially true. J&J concedes it has no evidence of a "known exposure" for two-thirds of the subjects. SUMF ¶ 42. And although the Doctors learned during discovery that three of the 75 subjects were inadvertently included despite having a non-talc exposure, SUMF ¶ 37, this is a minor inaccuracy that cannot support a claim for trade libel. The gist of the statement—that the Doctors observed a substantial number of subjects who had repeated exposures to cosmetic talc, developed mesothelioma, and had no other known possible causes for their disease—is true. *See* SUMF ¶ 41. Each of the three subjects was included due to different,

isolated lapses—not any systematic error. *See* SUMF ¶¶ 37–40. Cashman inaccurately reported Case #8's exposure history because she missed the section of the report where Kradin noted that Kent cigarettes contain asbestos. SUMF ¶ 38. This is the only time Cashman missed something in Kradin's reports—she otherwise accurately transcribed their exposure history to the table Kradin requested to summarize his prior judgments about asbestos exposures. SUMF ¶ 38. Case #11's name was highlighted in red in the table, correctly indicating that Kradin had concluded this subject had a non-talc exposure, but Cashman left the notes column empty, which seems to have led Maddox to inadvertently include her in the Article. SUMF ¶ 39. As for Case #15, Kradin received updated information in late 2019, *after* he and Cashman finalized the table, and it did not occur to either that Case #15 was an Article subject. SUMF ¶ 40.

Accounting for these errors leaves 72 subjects whose only known exposure was cosmetic talc. This is a minor difference. The statement contained the "substantial truth," and would not have had a "different effect on the mind of the reader" if it were a statement about 72, instead of 75, individuals. *See Bank*, 334 A.3d at 1270 (citation omitted). J&J has marshaled no evidence to the contrary. The point was that the Doctors had a meaningful number, and 75 vs. 72 (or even fewer) would not have impacted the Doctors' conclusions. SUMF ¶ 41. Science is not perfect, and minor errors like this are well within the norm and regularly happen without undermining an entire study—as the Doctors, and even one of J&J's experts in this litigation, testified. SUMF ¶ 50.

J&J claims the error rate is higher, pointing to 20 more subjects. SUMF ¶ 42. But, as discussed below, the Doctors have re-reviewed their work and stand by their conclusions that none of these subjects had a known exposure to asbestos besides talc. *See* SUMF ¶¶ 42–45 & nn.1–4. The contemporaneous record supports their judgment. *Id.* And the record in these 20 cases—where experts reviewed similar data inputs and yet reached a range of conclusions, SUMF ¶ 45—just

further shows that whether each subject had a "known exposure" is a subjective opinion. Given that the statement ("known" exposures) around which J&J is trying to build its trade libel claim was subjective and qualified, that is dispositive.

First, in many of the cases J&J challenges, the exposure question was hotly disputed by experts in the underlying cases—i.e., a subjective debate, with different opinions. *See* SUMF ¶ 45 (discussing Case #16, where three experts—including two defense experts—did not think she was exposed to asbestos under the theory J&J now cites as evidence of falsity). *Id.* Similarly, in another nine cases, experts split on the exposure theories that J&J now cites. SUMF ¶ 45. In some of these, a defense expert squarely considered and refused to credit J&J's exposure theory. SUMF ¶ 44. That the Doctors' chose one of several available conclusions does not render their statement "false."

In another three cases, the Doctors have been unable to find *any* expert in the underlying litigation who credited the exposure theory J&J now relies on.  SUMF ¶ 44. It cannot be "false" for the Doctors to have also rejected these fringe exposure theories. In one example, the sole document J&J cites to call the Doctors' statement a lie is a medical record stating "it is possible that Case #4 was exposed to asbestos from the house she grew up in." SUMF ¶ 42 (citing Ex. 79, J&J Resp. to Rog. 14). The Doctors are unaware of any expert investigating this theory, much less crediting it. SUMF ¶ 44. The Doctors did not say the subjects' files were devoid of any reference to speculated, hypothesized, or unsubstantiated exposures—they disclaimed any *known exposures*, in their scientific opinion. This was not a statement of fact, much less a false one.

Finally, as to many of the additional exposure theories that J&J now relies on to claim falsity, the Doctors already considered these theories in the underlying litigation—before they published the Article—and rejected them based on the evidence and their scientific judgment. SUMF ¶ 43. In Case #33, for example, J&J relies on medical records referring to possible

occupational exposures. *Id.* Maddox's 2018 testimony in Case #33's trial reflects that he reviewed these records and deemed them "unconfirmed" possibilities, not "definite exposures." *Id.* Given his contemporaneously-documented judgment that these were not known exposures, J&J cannot now claim it was a false statement of fact to say Case #33 had no other known exposures.

## C.  J&J Has Also Not Met Its Burden to Show Any Other At-Issue Statements Are False.

J&J's claim also fails with respect to the three remaining statements it challenges. *First,* the statement that 65 subjects were excluded due to "recalled occupational or paraoccupational exposures" is entirely accurate, as contemporaneous records—which include these subjects' 65 names—confirms. *See* SUMF ¶¶ 17, 29. *Second*, the statement that "[e]xposures were identified through sworn deposition testimonies and answers to sworn interrogatories" accurately reflects the two most common data sources the Doctors relied on to formulate their underlying opinions, which were the basis for their Article. SUMF ¶¶ 33–34. The point of this statement was "to give a general idea" of the documents they consulted—not exhaustively or exclusively list them—and it accurately does that. SUMF ¶ 34. *Third*, the Doctors' statement that their 75 subjects were "additional" to those reported by Moline contains a minor inaccuracy: discovery revealed that eight of the 75 overlapped. SUMF ¶ 47. The gist of the statement—that the Doctors had observed the same trend as Dr. Moline in a sizable set of subjects—remains true. *See* SUMF ¶ 49. Again, errors happen, and if every data mistake became a falsehood companies could sue over, scientific literature about the causes of diseases would be squashed. SUMF ¶ 50.

All three of these statements suffer from an additional problem, which is that they have nothing to do with the alleged libelous "sting" of the Article—namely, J&J's allegation that the Doctors misrepresented subjects' exposure histories in a way that impugns the safety of products J&J happens to sell. *See Herrmann v. Newark Morning Ledger Co.*, 138 A.2d 61, 67 (N.J. Super. Ct. App. Div. 1958) (libel defendants "need not justify immaterial details" that "do not add to [the

libel's] sting, or which would produce no effect on the mind of the reader different from that produced by the substantial part justified" (quoting Gatley, Libel and Slander 485 (4th ed. 1953)), *aff'd*, 140 A.2d 529 (N.J. Super. Ct. App. Div. 1958)).[9] These three other statements concern the methodology of the study but not its core premises, and are ultimately ancillary, immaterial details. Indeed, J&J's consumer survey expert deemed these three statements so immaterial to the overall premise of the Article he did not even test them. *See* SUMF ¶ 69.

## II.  NO REASONABLE JURY COULD FIND THE DOCTORS ACTED WITH MALICE.

J&J bears the heavy burden of proving, by clear and convincing evidence, that the Doctors' statements were made with actual malice—*i.e.*, "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *Cannon v. Peck*, 36 F.4th 547, 566 (4th Cir. 2022) (quoting *N.Y Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)); *see also Wolfe v. Gooding & Co., Inc.*, 2017 WL 3977920, at *3 (D.N.J. Sept. 11, 2017) (New Jersey trade libel claims require malice). This is a subjective (and difficult) standard: J&J must prove that each Doctor "in fact entertained serious doubts as to the truth of [their] publication" when they published it. *Cannon*, 36 F.4th at 566 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)); *see also Durando v. Nutley Sun*, 37 A.3d 449, 459 (N.J. 2012) ("To act with reckless disregard of the truth, a defendant must '*actually* doubt[],' the veracity of the article.") (emphasis in original); *Blankenship v. NBC Universal, LLC*, 60 F.4th 744, 763 (4th Cir. 2023) (similar). The evidence must "permit the conclusion that the defendant actually had a high degree of awareness of probable falsity." *Cannon*, 36 F.4th at 566 (citation omitted); *Lynch*, 735 A.2d at 1135–36 (similar).

---

[9] *See also Costello v. Ocean Cnty. Observer*, 643 A.2d 1012, 1027–28 (N.J. 1994); *Hill v. Evening News Co.*, 715 A.2d 999, 1003 (N.J. Super. Ct. App. Div. 1998); *La Rocca v. N.Y. News, Inc.*, 383 A.2d 451, 453 (N.J. Super. Ct. App. Div. 1978); *Carrabba v. Morgat*, 2014 WL 229280, at *13 (D.N.J. Jan. 17, 2014).

At summary judgment, "the 'clear and convincing'" evidentiary burden "adds an additional weight to the plaintiffs' usual 'preponderance of the evidence' burden." *Durando*, 37 A.3d at 460 (quoting *Costello v. Ocean Cnty. Observer*, 643 A.2d 1012, 1023 (N.J. 1994)). "[C]reating a jury question on actual malice is no easy task." *Blankenship*, 60 F.4th at 758 (quoting *Carr v. Forbes, Inc.,* 259 F.3d 273, 282 (4th Cir. 2001)). A plaintiff must produce "concrete" and "affirmative evidence" of a defendant's state of mind sufficient for a reasonable jury to "find that actual malice has been shown with convincing clarity." *Id.* at 757.

Courts have also been very clear about what is *not* actual malice: negligence, inaccuracy, or mistakes. "Actual malice 'requires much more than a failure to exercise ordinary care,'" *Cannon*, 36 F.4th at 572 (quoting *Fairfax v. CBS Corp.,* 2 F.4th 286, 293 (4th Cir. 2021)), or "failure to investigate all sources," *Lynch*, 735 A.2d at 1139. *See Costello*, 643 A.2d at 1024 (no malice where plaintiff argued "fuller investigation was required," absent proof defendant "actually doubted" statement's truth). "Only 'if the recklessness approaches the level of publishing a knowing, calculated falsehood,' based on the summary-judgment record, should the case go to the jury." *Durando*, 37 A.3d at 459 (quoting *Maressa v. N.J. Monthly,* 89 N.J. 176 (1989)). As such, "[e]ven if there were a dozen errors" in the Article, "mistakes or bad judgment will not substitute for knowing falsehood or reckless disregard as to falsity, when the uncontradicted testimony reveals that the author and publisher held the good faith belief that the article was correct and truthful." *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1350 (S.D.N.Y. 1977); *see also ShotSpotter Inc. v. VICE Media, LLC*, 2022 WL 2373418, at *12–14 (Del. Super. Ct. June 30, 2022) (neither "[s]loppy reporting" nor "inaccuracy" is malice).

This standard is demanding by design. It exists to safeguard important First Amendment interests by protecting "robust and unrestrained debate on matters of public concern." *Durando*,

37 A.3d at 457 (quoting *Senna v. Florimont*, 958 A.2d 427, 440 (N.J. 2008)); *see also Sullivan*, 376 U.S. at 270 (noting the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). Errors are bound to occur in the course of scientific research and public discourse, and "the First Amendment protects those errors as long as they are not recklessly or intentionally made." *Durando*, 37 A.3d at 460.

For all these reasons, libel claims often end at summary judgment for failure to raise a genuine issue on actual malice. *See, e.g.*, *Durando*, 37 A.3d at 462–63 (finding insufficient evidence of malice despite reporting error where defendant "admitted he made a mistake" and "believed [his statement] was accurate at the time of publication"); *Lynch*, 735 A.2d at 1141; *Costello*, 643 A.2d at 1024–25; *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 597 (D.C. Cir. 2016).

## A. No Jury Could Find the Doctors Knew the "Only Known Exposure" Statement was False.

Because "the actual malice standard requires that the defendant had a particular, subjective state of mind at the time the statements were made," *Fairfax,* 2 F.4th at 295 (internal citation omitted), contemporaneous evidence of good faith rebuts a claim of malice, *see Blankenship*, 60 F.4th at 762, 766. Claims "are dismissed at the summary judgment stage, where the record evidence shows that defendants were 'convinced of the truthfulness of their statements.'" *Care One Mgmt., LLC v. United Healthcare Workers E.*, 2024 WL 1327972, at *7 (D.N.J. Mar. 28, 2024) (quoting *Care One Mgmt., LLC v. United Healthcare Workers E.*, 43 F.4th 126, 137 (3d Cir. 2022)); *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 276 (3d Cir. 1980).

That is exactly what this voluminous record shows. All three Doctors testified unequivocally that they believed their statement regarding the subjects' "known exposures" was true when they published it. SUMF ¶ 36. They agreed early in the drafting process to include exclusively talc-only cases, devised and implemented a methodology to accomplish that, spent

31

months trying to get it right, and believed they had done so. SUMF ¶¶ 6–8, 11–15, 17–18, 20, 28–30, 35–36. And they were surprised and upset to learn they had made any mistakes. SUMF ¶ 37.

Their documents from the time of drafting fully corroborate these good-faith efforts and beliefs. Cashman and Kradin had a color-coded chart, with subjects in red who had additional exposures and needed to be excluded. SUMF ¶ 11. Maddox had a spreadsheet of subjects to exclude, with a column explaining why. SUMF ¶¶ 15, 17. He also had a stack of case reports with handwritten notes and highlighting that reflect his judgment calls. SUMF ¶ 8. All of these people—those in red in Cashman's chart, in Maddox's excluded cases spreadsheet, and with handwritten X's on their reports—were, in fact, excluded from the Article, with a lone exception where the Doctors seem to have had a miscommunication. SUMF ¶ 39; *see also id.* ¶¶ 8, 11, 14–15, 17, 29. These documents reflect a good-faith, scientific process to filter out additional exposure cases.

The Doctors' contemporaneous emails further corroborate that they were genuinely trying to exclude non-talc exposures. From the beginning of drafting, they expressed their shared views on the importance of accurately sorting cases and excluding "subjects with ANY other known exposures and limit[ing] to those with talc only." SUMF ¶ 7; *see also id.* ¶ 14 ("[W]e need to be absolutely confident about the exposures."). The Doctors employed a methodology that they believed then—and stand behind today—to be adequate to assess a subject's exposure history. *See* SUMF ¶¶ 28, 33, 35, 42, 53. They reviewed the materials they had available—typically a combination of deposition transcripts, interrogatory responses, and medical records—to reach a conclusion about sources of asbestos exposure. SUMF ¶¶ 6, 8, 33–35. They put the most weight on testimony by the subject and close family, which is their typical practice for assessing history when giving causation opinions. SUMF ¶ 33. As was his usual practice, Kradin enlisted the help of a research assistant to assist with data review. SUMF ¶¶ 6, 51. And when he asked Dr. Cashman

to review his past expert reports and identify the ones involving exposure to asbestos through cosmetic talc, he was not asking her to do the work of a pathologist—he had already done that analysis when he wrote those reports. *See* SUMF ¶ 6.

The Doctors' emails chronicle their efforts to wrestle with close calls and make careful judgments. At times they discussed whether a particular incident was enough to constitute an exposure. SUMF ¶ 13. They discussed hypothetical borderline cases, and whether those should stay in or out. *Id.* They also discussed at one point whether to keep in subjects with minimal non-talc exposures, but ultimately decided to exclude such cases. *See* SUMF ¶¶ 11–14, 17. When they spotted holes in the data, they tried to fill them. SUMF ¶¶ 8, 11. And all the way until publication, they were diligently reviewing subjects and trying to exclude those who did not meet their criteria. *See* SUMF ¶¶ 18, 20. This evidence shows diligence, not recklessness. And ultimately, as they sent subject tables and drafts back and forth, their emails reflect that they believed they had accurately culled the additional-exposure cases. *See* SUMF ¶¶ 7, 14–15, 17, 20.

Given this trove of contemporaneous evidence of the Doctors' subjective states of mind, there is no basis to find—much less by clear and convincing evidence—that any of them knowingly made a false statement. There also is not a shred of evidence that the Doctors actually harbored doubts about the truth of their statement or the adequacy of their process. Instead, as discussed above, contemporaneous documents reflect their genuine belief that they had accurately sorted their subjects. *See Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 717 (4th Cir. 1991) (en banc) (no malice where evidence of falsity is "murky" and evidence that defendant "was on notice of their probable falsity is even more remote"). And it would have made no sense for the Doctors to deliberately pad their numbers with subjects they knew should have been excluded. They all testified that they would have published the Article with many fewer than 75 subjects (which

33

makes sense—Moline's observation of 33 subjects was apparently publication-worthy). SUMF ¶ 24; *see also id.* ¶ 4. Their testimony is further corroborated by the fact that they continued to exclude subjects without hesitation or concern about the final subject tally all the way up until publication. SUMF ¶¶ 18, 23. If the Doctors had actually been aware of a mistake in their data set, they simply would have reported on fewer cases. *See* SUMF ¶ 24. And because what matters is whether the Doctors "realized the inaccuracy" of their statements "at the time of publication," their later-discovered mistakes are irrelevant as a matter of law. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 513 (1984); *see also* SUMF ¶ 37 (confirming the Doctors learned of the three errors they have admitted as a result of this litigation, after the Article was published).

The Article's low error rate also refutes a finding of reckless disregard. Even after re-reviewing the hundreds of thousands of pages of subjects files that J&J produced in discovery in this case, the Doctors concluded that only three (of 75) subjects should have been excluded under the criteria they used for the Article. SUMF ¶¶ 37, 42. If their process was so riddled with errors as to suggest "knowing, calculated falsehood," *Durando*, 37 A.3d at 459, one would expect a higher error rate. Even now, after J&J's own exhaustive review, it has raised issues about fewer than a third of the subjects, a grossly inflated error rate (which this Court can and should reject as subjective opinion, *see supra* § I.A & B) that still leaves plenty of subjects to substantiate the Doctors' tentative conclusions. *See* SUMF ¶¶ 41, 53. In any event, the First Amendment provides ironclad protection for such good-faith mistakes.

**B. No Reasonable Jury Could Find That the Doctors Acted with Reckless Disregard.**

J&J also cannot show actual malice with respect to the remaining statements it challenges. The undisputed evidence shows that the Doctors worked hard to eliminate overlap with Moline's article and believed that they had done so at the time they went to print. SUMF ¶¶ 9–10, 14, 20–23, 48. Emory did everything she could think of to identify overlapping cases. *See* SUMF ¶¶ 21–

34

23. She scrutinized the draft of Table I alongside Moline's published table, which had some common data points, and she was able to cut several overlapping subjects. She "thought [she] had done a good job," and had no doubt at the time that she had successfully eliminated duplicates. SUMF ¶¶ 47–48. That forecloses a finding of actual malice—especially since Emory was verifying a subsidiary assertion in the Article, not its core conclusions. *See Ryan v. Brooks*, 634 F.2d 726, 733 (4th Cir. 1980) (no malice where "sentence was such a small part of the whole work that the author might understandably feel three sources to be sufficient").

And even if there were overlaps the Doctors should have caught, that still is not enough. Mistakes in pre-publication investigation "rise to the level of actual malice only if they amount to a purposeful avoidance of the truth." *Blankenship*, 60 F.4th at 764 (cleaned up). Here we have the opposite: Emory pursued the truth as vigorously as possible within the constraints of lacking access to Moline's subject list. *See* SUMF ¶ 23. On those facts, no reasonable jury could find malice. *See Durando*, 37 A.3d at 459 (even "clumsy" mistakes "insufficient to meet the actual-malice threshold"); *Jankovic*, 822 F.3d at 594–95 ("insufficient investigation" not enough for malice); *Thomas M. Cooley L. Sch. v. Kurson Strauss, LLP*, 759 F.3d 522, 533 (6th Cir. 2014) ("Defendant's investigatory efforts, even if less than those of a reasonably prudent person, belie" malice finding (quoting *Compuware Corp.*, 499 F.3d at 528)).

The remaining statements J&J challenges fare no better. The statement about excluding 65 subjects is entirely true, SUMF ¶ 29, so there unsurprisingly is no evidence that any of the Doctors had *any* concerns about the statement's veracity. And the Article's reference to deposition testimony and interrogatory responses was intended to give a general idea of the types of documents the Doctors used to identify exposures, not to be an exclusive or exhaustive list, SUMF ¶ 34, and is therefore both true and lacking any indication that the Doctors doubted its accuracy.

## III. NONE OF THE STATEMENTS IS ABOUT J&J'S PRODUCTS.

J&J's claim fails for a third, independent reason: none of the statements it challenges are "about" its products. *Dairy Stores, Inc. v. Sentinel Pub. Co.*, 516 A.2d 220, 237 (N.J. 1986).

**First**, none of the nine statements J&J challenges are *about* products at all. They instead are all aimed at describing the Doctors' data set and methodology. *See* SUMF ¶¶ 28–29, 34, 46, 53–55. And several of these statements have literally nothing to do with talc or any products, *see* SUMF ¶¶ 29, 34, 46, 55, so cannot possibly be deemed "derogatory to [J&J]'s property."[10] *Patel v. Soriano*, 848 A.2d 803, 834 (N.J. App. Div. 2004) (citations omitted).

**Second**, J&J faces another threshold problem: Where a statement references a group of products (here: "cosmetic talcum powders," SUMF ¶ 28), a libel claim fails as a matter of law unless (i) the group is small enough that it is reasonable to find that the statement concerns each member individually or (ii) the publication's circumstances "reasonably give rise to the conclusion that there is a *particular reference to* the plaintiff." *DeGroat v. Cooper*, 2014 WL 1922831, at *5 (D.N.J. May 14, 2014) (emphasis added)). *See also Foxtons, Inc. v. Cirri Germain Realty*, 2008 WL 465653, at *5 (N.J. Super. Ct. App. Div. Feb. 22, 2008); Restatement (Second) of Torts § 564A. J&J cannot shoehorn its claim under either exception to this "group libel" rule.

The group is not small. At the pleadings stage, the Court was required to accept J&J's allegation that its products were "*among a discrete and limited number* of cosmetic talc products in the market." *See* Mem. Opinion and Order at 30 (Feb. 7, 2025), ECF No. 27 ("MTD Order") (emphasis added). Discovery has disproved this. J&J itself lists 27+ products in the relevant

---

[10] These statements include: (a) "Sixty-five subjects were excluded due to recalled occupational or paraoccupational exposures . . ."; (b) "Exposures were identified through sworn deposition testimonies and answers to sworn interrogatories provided from subjects, parents, and spouses"; (c) "[W]e excluded those where a history of other asbestos exposures were present"; and (d) statements that the 75 subjects were "additional to" Moline's article subjects. *See* SUMF ¶ 55.

market, and its experts and public sources add many more to that tally. SUMF ¶¶ 58, 61. This class is far too large to reasonably conclude that the statements concerned each product in the market individually. *See DeGroat*, 2014 WL 1922831 at \*5; *Mick v. Am. Dental Ass'n*, 49 N.J. Super. 262, 285 (App. Div. 1958) (defining class of 25+ members as "large" in defamation context); *HipSaver, Inc. v. Kiel*, 984 N.E.2d 755, 766–67 (Mass. 2013) (similar, where class was 23+ products).

There is no particular reference to J&J. Nor can J&J show that the statements were "directed individually" at its products, *Mick*, 49 N.J. Super. at 285, or "could be interpreted as applying only to" them, *Foxtons, Inc.*, 2008 WL 465653, at \*5, as opposed to any of the many other talc powder products on the market. *See Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 274 (7th Cir. 1983) (no trade libel where statement didn't suggest plaintiff's product was uniquely dangerous as compared to other products in the market); *JB & Assocs., Inc. v. Nebraska Cancer Coal.*, 932 N.W.2d 71, 79 (Neb. 2019) (that statements led readers to question safety of plaintiff's product among other brands was not enough); *HipSaver, Inc.*, 984 N.E.2d at 766–67 (article referring to "hip protectors" was not *about* plaintiff even where plaintiff was "second largest manufacturer of hip protectors" because 22+ other companies made similar products); *Sanderson v. Indiana Soft Water Servs., Inc.*, 2004 WL 1784755, at \*7 (S.D. Ind. July 23, 2004), *aff'd sub nom. Sanderson v. Culligan Int'l Co.*, 415 F.3d 620 (7th Cir. 2005) (similar).

Although New Jersey courts have not specifically addressed whether the group libel rule applies in trade libel cases, the overwhelming consensus among courts that have considered the issue is that it does.[11] *See Jacobson*, 713 F.2d at 274 ("no product disparagement" where statement

---

[11] Undersigned counsel have identified only one case that has departed from this group libel rule to find that statements targeting a group of products are actionable by any member of the group. *See Auvil v. CBS 60 Minutes*, 800 F. Supp. 928, 935 (E.D. Wash. 1992) (*Auvil I*). This outlier case, which concerned statements in a news broadcast, is far afield from this case, which is instead more like *Auvil I*'s companion case, *Auvil v. CBS 60 Minutes*, 800 F. Supp. 941 (E.D. Wash. 1992) (*Auvil*

didn't suggest Viceroy cigarettes were "any more unhealthful than other brands"); *Sanderson*, 2004 WL 1784755, at *7 (assuming group libel is permitted for trade libel, "there are many sellers" of magnetic systems" and statements did not "singl[e] out [plaintiff's] products in particular.").[12] There is no basis to think the New Jersey Supreme Court would depart from this majority approach.

*Third*, even if J&J could get around the group libel rule, its evidence falls far short of showing that readers would "reasonably understand" J&J "to be the person intended." *Foxtons, Inc.*, 2008 WL 465653, at *4–5; *Dijkstra v. Westerink*, 168 N.J. Super. 128, 133 (App. Div. 1979).

Market Share. J&J pled that its products maintained "well over a majority" of market share, ECF No. 27 at 30–31 (citing Compl. ¶¶ 156–157 (May 9, 2024), ECF No. 1), but admitted in discovery it lacked data supporting this claim, and was unable to marshal any other evidence to prove it. SUMF ¶¶ 56–64. Consistent with the class of products discussed in the Article, J&J identified the relevant market as the "talc powder products market." Compl. ¶ 157. Its sole source of market share evidence was Makeda Murray, an expert who didn't even realize that the talc powder market includes products other than baby or body powder (or that this case concerns only talc products), SUMF ¶ 59, and so who mistakenly analyzed only the baby/body powder sub-market, and relied exclusively on data that did not distinguish between talc and non-talc (e.g. cornstarch-based) products. SUMF ¶¶ 57, 60–62. Accordingly, even if the Court were to accept

---

*II*), which addressed statements in the scientific paper that formed the basis for the broadcast. In *Auvil I*, the court found that the broadcast was about red apples largely because it included "a lengthy shot of a red delicious apple emblazoned with a skull and crossbones," which "left no doubt that red apples constituted the subject matter." *Id.* at 930 n.2. By contrast, in holding in *Auvil II* that the underlying article did *not* meet the "of and concerning requirement," the court found it "noteworthy" that "nowhere between the covers of [the study] is there a red delicious apple emblazoned with a skull and crossbones." *Auvil II*, 800 F. Supp. at 942. The *Auvil II* court also held the article was "not about apples," because the pesticide at issue is used on other fruits and vegetables (just as the Article here concerned products other than J&J's). *Id.* at 944 & n.5.

[12] *See also Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 529 (1st Cir. 2023); *JB & Assocs.*, 932 N.W.2d at 79 ("general, industry-wide allegations" not enough); *HipSaver, Inc.*, 984 N.E.2d at 766.

Murray's opinions in full—and there are many reasons not to, *see* SUMF ¶¶ 57–65—she at best provides evidence that J&J's baby powder[13] had a majority share of one sub-market, which is not evidence that it had a majority share of the talc powder market. *See, e.g.*, *JB & Assocs., Inc.*, 303 Neb. at 870 (rejecting market share argument where statements applied to products beyond those included in the market share analysis); *Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 437 (10th Cir. 1983) (evidence about "a subset of the relevant product market," is not "evidence of market share," especially where expert did not know what percent sub-market was of total market).

"Well Recognized." J&J also alleged that its products are so "well-recognized" that "anyone" "would have associated" the statements with J&J. Compl. ¶¶ 156, 162. But its evidence falls short of showing that consumers would reasonably believe J&J was the "intended target" of the Doctors' statements. *Foxtons, Inc.*, 2008 WL 465653, at \*4; *Dijkstra*, 168 N.J. Super. at 133. J&J's market share expert discussed brand awareness and consumer use but denied offering any opinion on either subject. SUMF ¶ 65. And J&J's consumer survey expert, Gal Zauberman, was crystal clear about the limitations of his survey, which he agreed does not show that *anyone* believed J&J is the intended target of the statements, or that the statements "exclusively" describe J&J's products, or that they refer to or are about J&J. SUMF ¶ 66. Instead, Zauberman's survey was limited to measuring "associations"—*i.e.* whether "J&J products *were among the products* that came to mind *at all*" when readers were shown portions of the Article's abstract. SUMF ¶ 67. As a matter of law, that is not enough. Readers' associations are not the same as their beliefs about what products (if any) the Doctors' statements intended to target. *Foxtons, Inc.*, 2008 WL 465653, at \*4; *Dijkstra*, 168 N.J. Super. at 133. *See also Sullivan*, 376 U.S. at 288–90 (1964) (evidence that witnesses "associated" statements with plaintiff did not show "[plaintiff] himself was attacked in

---

[13] As to Shower to Shower, J&J and Murray had no post-2012 market-share data. SUMF ¶ 64.

the advertisement"). *See also* SUMF ¶¶ 66–67.

Finding evidence of a mere "association" enough to meet this element would not just contravene case law requiring statements to be "about" a plaintiff, *Dairy Stores, Inc.*, 516 A.2d at 237, but also would run headlong into the First Amendment. *Scelfo v. Rutgers Univ.*, 282 A.2d 445, 448 (N.J. Law. Div. 1971) (of and concerning requirement derives from "societal interest in free speech"); *Blatty v. New York Times Co.*, 728 P.2d 1177, 1183 (Cal. 1986) (right of action limited to "direct object[s] of criticism"; to hold otherwise would pose "an unjustifiable threat to society"); *DeGroat*, 2014 WL 1922831, at *3–4 (quoting *Blatty* and noting New Jersey law is the same).

What's more, Zauberman's survey did not test any of the at-issue statements as readers would have seen them in real life. SUMF ¶ 68. He tested only a portion of the Article's abstract because, in his judgment, showing consumers the full Article would have confused them. SUMF ¶¶ 66, 68–69. But that is (part of) J&J's problem. That a "typical consumer" would not understand the complex terms in these broader statements suggests they would not have understood the statements as targeting J&J's products. *See Auvil II*, 800 F. Supp. at 944. Zauberman also offers no evidence about how "expected readers" of the Doctors' statements would interpret them. *Foxtons, Inc.*, 2008 WL 465653, at *5 (citation omitted). *See* SUMF ¶ 70. And because the survey did not adequately test whether respondents' associations were formed after 2020, there is no way to know how readers would have interpreted the statements in 2020 when they were published. *See* SUMF ¶¶ 71–72. At best, Zauberman's survey shows that less than a quarter (20.4%) of adults in the U.S. in 2025 would—after being prompted to think specifically about products—associate excerpts of the Article with J&J, in addition to all kinds of other things. SUMF ¶¶ 66, 73. That is not enough.

## CONCLUSION

The Doctors respectfully request that this Court grant summary judgment in their favor.

Dated: October 17, 2025                    Respectfully submitted,

                               By:    /s/ *Kathryn M. Ali*
                                      Kathryn M. Ali (VSB No. 97966)
                                      Elizabeth C. Lockwood (admitted *pro hac vice*)
                                      Meghan Palmer (admitted *pro hac vice*)
                                      ALI & LOCKWOOD LLP
                                      501 H Street, Suite 200
                                      Washington, D.C. 20002
                                      Telephone: 202-651-2476
                                      katie.ali@alilockwood.com
                                      liz.lockwood@alilockwood.com
                                      meghan.palmer@alilockwood.com

                                      *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of October, 2025, a copy of the foregoing has been filed electronically. Notice of this filing has been served upon counsel of record via the Court's electronic filing system.  Access to this filing can be obtained via the Court's electronic filing system.

*/s/ Kathryn Ali*_____
Kathryn Ali
