**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| PECOS RIVER TALC LLC<br><br>       Plaintiff,<br><br>v.<br><br>DR. THERESA SWAIN EMORY, DR. RICHARD LAWRENCE KRADIN, AND DR JOHN COULTER MADDOX<br><br>       Defendants. | Civil Action No. 4:24-cv-75 |

**PLAINTIFF PECOS RIVER TALC LLC'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................... 5

    I.      The Authors And Their Article ................................................................ 5

    II.    The Article Makes Three Material Factual Statements ........................... 7

    III.   Defendants Knew That The Exposure Claim And The Review Claim Were False, Or At Minimum Recklessly Disregarded The Truth. .................................. 10

    IV.   Defendants Expressly Doubted That The No Overlap Claim Was True. ............. 24

LEGAL STANDARD ........................................................................................................ 28

ARGUMENT .................................................................................................................... 28

    I.      Pecos River Is Entitled To Summary Judgment On The "Falsity" Element. ....... 28

    II.    Pecos River Is Entitled To Summary Judgment On The "Actual Malice" Element. ............................................................................................ 32

    III.   Pecos River Is Entitled To Summary Judgment On The "Publication" Element. ............................................................................................ 38

CONCLUSION .................................................................................................................. 38

APPENDIX A .................................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................29

*Bell v. Am. Int'l Indus.*,
    627 F. Supp. 3d 520 (M.D.N.C. 2022) ................................................................10

*Betz v. Pneumo Abex, LLC*,
    615 Pa. 504 (2012) ................................................................................................13

*Brown & Williamson Tobacco Corp. v. Jacobson*,
    827 F.2d 1119 (7th Cir. 1987) ..............................................................................35

*Butler v. Union Carbide Corp.*,
    310 Ga. App. 21 (2011) ........................................................................................13

*Costello v. Ocean Cnty. Observer*,
    136 N.J. 594 (1994) .........................................................................................33, 39

*Fowler v. Stolle*,
    697 F. Supp. 3d 457 (E.D. Va. 2023) ..................................................................28

*Gillon v. Bernstein*,
    218 F. Supp. 3d 285 (D.N.J. 2016) ......................................................................39

*Harte Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989).....................................................................................5, 33, 37

*Krik v. Exxon Mobil Corp.*,
    870 F.3d 669 (7th Cir. 2017) ................................................................................13

*Leang v. Jersey City Bd. of Educ.*,
    198 N.J. 557 (2009) ..............................................................................................29

*LLT Mgmt. LLC v. Emory*,
    766 F. Supp. 3d 576 (E.D. Va. 2025) .............................................................29, 33

*Lynch v. New Jersey Educ. Ass'n*,
    161 N.J. 152 (1999) ..........................................................4, 5, 33, 35, 36, 38

*Mack Trucks, Inc. v. Coates*,
    2018 WL 2175932 (Md. Ct. Spec. App. May 11, 2018) ........................................6

*Masson v. New Yorker Mag., Inc.*,
    501 U.S. 496 (1991) ..............................................................................................29

*Moline v. Pecos River Talc LLC*,
   2025 WL 2898086 (S.D.N.Y. Oct. 10, 2025) ........................................................10

*Pecos River Talc LLC v. Emory*,
   2025 WL 1888565 (E.D. Va. July 8, 2025) ............................................................33

*Sedar v. Reston Town Ctr. Prop., LLC*,
   988 F.3d 756 (4th Cir. 2021) .................................................................................28

*St. Amant v. Thompson*,
   390 U.S. 727 (1968)................................................................................4, 5, 33, 35

*Stern v. Cosby*,
   645 F. Supp. 2d 258 (S.D.N.Y. 2009)....................................................................35

*Wai Man Tom v. Hosp. Ventures LLC*,
   980 F.3d 1027 (4th Cir. 2020) ...............................................................................29

*Ward v. Zelikovsky*,
   136 N.J. 516 (1994) ...............................................................................................29

Plaintiff Pecos River Talc LLC ("Pecos River") submits this memorandum of law in support of its Motion For Partial Summary Judgment.

## INTRODUCTION

There is no legitimate dispute that Defendants authored and published "junk science" on cosmetic talc predicated on knowingly false factual statements. More specifically, the discovery record irrefutably and unequivocally shows that Defendants Dr. Theresa Emory, Dr. John Maddox, and Dr. Richard Kradin (i) made false statements, (ii) knew their statements were false when they made them—or at the bare minimum that they recklessly disregarded the truth, and (iii) published those statements to third parties. This Court should grant summary judgment on Pecos River's trade libel claim on the elements of "falsity," "actual malice," and "publication."

All three Defendants are plaintiffs' experts in cosmetic talc litigation who authored an article regarding cosmetic talc entitled *Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients* (the "Emory Article" or the "Article").

The Article concerns 75 subjects—all plaintiffs in talc litigation—who developed mesothelioma. The Article's central factual premise is that all 75 subjects' "only known exposure" to asbestos was cosmetic talc powder. Ex. 1, Article at 1, 2. The Article states that, having been engaged in a "medical-legal consultation," the authors reviewed "deposition testimonies and answers to sworn interrogatories" to assess exposures, and that they excluded subjects with "recalled occupational or paraoccupational exposures to other sources of asbestos." *Id.* at 2. The Article also claims that all 75 subjects are "additional" to the subjects of a similar paper authored by plaintiffs' expert Dr. Jaqueline Moline. *Id.*

These statements convey that after a rigorous review of the evidence in the subjects' cases, Defendants found 75 new individuals with mesothelioma never before identified in the scientific literature with no exposures to asbestos other than (supposedly) cosmetic talc. The problem for

1

Defendants: All of those statements are indisputably false, individually and collectively.

Defendants now *admit*—as they must—that multiple individuals in the Article were exposed to asbestos from non-talc sources. After all, Defendants' own expert reports in many of the subjects' underlying cases stated that those subjects had non-talc asbestos exposures.

Defendants now *admit* that, contrary to the Article's claims, they did not review interrogatory responses and deposition testimony. Dr. Emory reviewed nothing. Dr. Kradin himself reviewed nothing, but instructed his wife with no experience in talc, asbestos, or mesothelioma to review just his expert reports. Even then, she reviewed only portions of his reports. Dr. Maddox reviewed his expert reports, but would look at the actual underlying materials only if there were some ambiguity on the face of his report. But many of his reports are based entirely on exposure summaries from plaintiffs' counsel and not on any actual evidence.

While purporting to present new evidence to both build off of and bolster Dr. Moline's paper, Defendants in fact included some of Dr. Moline's subjects in their own Article—in addition to adopting Dr. Moline's paper's false premise. Defendants now *admit* that eight subjects of their Article in fact overlap with the subjects of Dr. Moline's paper, contrary to the claims in the Article. Summary judgment is warranted on the "falsity" element of Pecos River's trade libel claim.

Worse, Defendants knew the statements were false, or at least recklessly disregarded the truth. Dr. Maddox testified that even if a subject had non-talc asbestos exposures, he would still include them in the Article if he thought the exposure was not "significant enough." Ex. 3, Maddox Dep. 40:9-18. But the Article states the subjects had no *known* exposures at all—not that they had no *significant* exposures. In other words, Dr. Maddox admitted to knowingly including subjects in the Article even when they had known non-talc asbestos exposures. Dr. Emory took the same tack, admitting that for inclusion in the Article she would assess whether other asbestos exposures were

sufficient to cause mesothelioma—which directly contravenes the unqualified and unconditional exclusive-exposure assertion made in the Article. Tellingly, Dr. Emory could not even say that her review process would exclude from the Article someone who indisputably inhaled asbestos from changing a brake. This is quintessential actual malice.

Defendants' contemporaneous documents affirm they knew that the statements they were making to the public were false—and different in kind from what their confidential reviews of the subjects' cases revealed. Shortly before publication, Dr. Emory sent an email to Dr. Maddox and Dr. Kradin with a draft of the public-facing, anonymized table of the Article's subjects along with an internal, de-anonymized spreadsheet of the subjects. The table Defendants planned to show the world stated that the subjects had no other "***known***" exposures. But their internal spreadsheet identified the subjects as having no other "***significant***" exposures to asbestos:

### Draft Public Table

| | Age | Sex | DoB | Site | Subtype | Exposure | Duration | Latency |
|---|---|---|---|---|---|---|---|---|
| Subjects chronically exposed to asbestos-containing cosmetic talc, without other known exposures. | | | | | | | | |
| 1 | 72 | F | ▉ | Plu | Epith | 1960-1980 | 20 | 57 |
| 2 | 51 | F | ▉ | Perit | Epith | child -- adult | 30 | 50 |

### Internal Spreadsheet

| 8g  Patients accepted for study:  Talcum powder and no other significant exposures (to asbestos, other than talc) | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1-▉ | 72 F | ▉ | Plu | Epith | 1960-1980 | 20 | 57 | |
| 2-▉ | 51 F | ▉ | Perit | Epith | child -- adult | 30 | 50 | Lynch syn |
| 3-▉ | 50 F | ▉ | Plu | LH/DS | 1967-2008 | 41 | 50 | Husb: part.board |

After publishing their libelous Article, Defendants then took extraordinary steps to conceal the falsity. They refused to disclose the subjects' identities in the underlying talc litigation—variously claiming HIPAA, privacy, or medical ethics concerns. Yet, Dr. Emory had sent the names of *all* subjects to the plaintiffs' firm Simon Greenstone Panatier, despite testifying she had never done so. When defense counsel noticed a deposition of Dr. Maddox, Defendants conspired to have Dr. Maddox claim at the deposition that he did not have the identities of the subjects—

when in fact he did. And before the subjects were disclosed to Pecos River, Dr. Kradin stated in a response to a request for admission that he lacked sufficient information to admit that any subject was exposed to asbestos from a non-talc source, though he was later forced to admit that he was in fact aware of at least one subject's non-talc asbestos exposure at the time.

At a bare minimum, Defendants recklessly disregarded the truth. Dr. Emory did nothing to evaluate whether the subjects were actually exposed to asbestos from non-talc sources before claiming they were not. Dr. Maddox reviewed his litigation reports (many of which are based entirely on summaries from plaintiffs' attorneys), and only if a report was ambiguous would he look at further materials. Dr. Kradin did nothing himself, but instructed his wife—who has no relevant experience—to review his reports. And when she sent him a chart of the subjects she reviewed, Dr. Kradin forwarded it to Dr. Maddox a mere *six minutes* later. That chart detailed actual and potential non-talc exposures, but it went entirely ignored.

Defendants knew that a review of their expert reports alone would not sufficiently capture the relevant exposures. They admitted that their role when preparing those reports was *not* to go out and seek information about the plaintiff's exposures. Defendants also knew that their reports are often issued early in the discovery process and that exposures come to light after they submit their expert reports. So there were "obvious reasons to doubt the veracity" of the information gleaned from those reports. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). At a minimum, Defendants had a "high degree of awareness of [the] probable falsity" of their statements. *Lynch v. New Jersey Educ. Ass'n*, 161 N.J. 152, 165 (1999).

So not only did Defendants ignore sworn interrogatory responses and deposition transcripts, contrary to the Article's claims, Defendants also ignored other obvious sources of information, including complaints, medical records, trial transcripts, expert reports, and verdicts.

Nothing would have stopped Defendants from acquiring this material from the plaintiffs' counsel who hired them to review these cases in the first place. They made "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of their statements. *Harte Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989).

When attempting to determine if the Article's subjects overlapped with Dr. Moline's, their process was no less reckless. Dr. Emory inexplicably did not look at critical information presented on the face of Dr. Moline's paper, such as the subjects' occupations, brands of talc used, and tissue digestion metrics. And in private emails, she expressly admitted that she suspected certain subjects overlapped—including Case No. 52 who stood out because of her diagnosis at an unusually young age. But Defendants nevertheless stated in the Article, without qualification, that all of their subjects were "additional" to those in Dr. Moline's paper. In other words, Defendants entertained "serious doubts" as to the truth of their statement. *Id.* They ignored those doubts and then spent years concealing their deliberately false statements.

Finally, there is no dispute the Article was made available to third parties, as it was published online in "open access" format. Defendants concede that they expected to use the Article in litigation against Pecos River, and to this day refuse to correct the statements therein that they admit are false. This Court should accordingly grant summary judgment to Pecos River on the elements of falsity, "actual malice," and publication.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    The Authors And Their Article

1.    In March 2020, Defendants published their Article entitled, *Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients* (the "Emory Article" or the "Article"). Ex. 1, Article.

2.    The three authors of the Article were Defendants Dr. Theresa S. Emory, Dr. John

C. Maddox, and Dr. Richard L. Kradin, and all three Defendants approved the final version of the Article. Ex. 3, Maddox Dep. 27:13-18; Ex. 4, Kradin Dep. 12:22-24; Ex. 5, Emory Dep. 23:19-24.

3.     The Article disclosed that the three authors "testified in asbestos litigation, *primarily* for plaintiffs." Ex. 1, Article at 6 (emphasis added).

4.     In fact, ***all*** of Dr. Emory's work as an expert in asbestos litigation has been for plaintiffs' lawyers. Ex. 104, Emory *Zimmerman* Dep. (Vol. 1) 23:9-23.

5.     And since 2007, 100% of Dr. Maddox's asbestos cases have been on behalf of plaintiffs. Ex. 3, Maddox Dep. 74:1-6.

6.     When Defendants were preparing the Article, they expected to rely on it in litigation. Ex. 3, Maddox Dep. 163:3-167:18.; Ex. 4, Kradin Dep. 134:3-7; Ex. 5, Emory Dep. 254:10-15, 255:6-20.

7.     Dr. Emory had never previously published anything in the peer-reviewed literature about asbestos or mesothelioma. Ex. 104, Emory *Zimmerman* Dep. (Vol. 1) 44:4-45:5.

8.     A Maryland court ruled that Dr. Maddox's "expertise was limited to diagnosing mesothelioma, not determining whether exposure to particular sources of asbestos had caused an individual to develop that disease." *Mack Trucks, Inc. v. Coates*, 2018 WL 2175932, at *20 n.20 (Md. Ct. Spec. App. May 11, 2018).

9.     Dr. Kradin delegated the entire process of reviewing the subjects to his wife (also his administrative assistant) who is not a medical doctor, has no experience related to asbestos, no experience related to mesothelioma, no experience related to evaluating whether talc contains asbestos, no experience related to determining whether exposure to talc causes disease, and who has never served as an expert in litigation or in a consulting capacity. Ex. 6, Cashman Dep. at 12:2-24-13:1-19, 106:1-13.

## II.    The Article Makes Three Material Factual Statements

10.    The Article concerns 75 individuals with mesothelioma (all of whom are litigation plaintiffs). And for the vast majority of the subjects, one of the Defendants served as the expert witness in the subjects' underlying case. Ex. 3, Maddox Dep. 24:3-10; Ex. 4, Kradin Dep. 13:11-14; Ex. 5, Emory Dep. 86:23-87:7.

11.    The Article was published online in the American Journal of Industrial Medicine, and Dr. Emory paid $3,800 for the Article to be "open access" so that anyone could view it for free. Ex. 5, Emory Dep. 24:7-24; Ex. 77; Ex. 78, Journal Website.

### A.    The Exposure Claim: Defendants stated the subjects' "only known exposure" to asbestos was cosmetic talc.

12.    In their Article, Defendants repeatedly state that the subjects' "only known exposure" to asbestos was cosmetic talc (the "Exposure Claim"). Ex. 1, Article at 1, 2.

13.    The statement was absolute, unqualified, and unconditional. *Id.*

14.    The necessary corollary of that absolute statement is that the authors undertook the requisite investigation to ascertain the validity of the assertion—indeed, they stated as much in their Article. *Id.*

15.    "Only known exposure" means, according to Defendants' own testimony, that "[b]ased on the deposition testimony and whatever testimony was available in this case, those were the *only exposures that could be documented*." Ex. 8, Kradin *Palumbo* Dep. 34:14-23 (emphasis added); Ex. 4, Kradin Dep. 191:15-19; Ex. 5, Emory Dep. 304:11-21.

16.    The Article also states: "Sixty-five subjects were excluded due to recalled occupational or paraoccupational exposures to other sources of asbestos." Ex. 1, Article at 2.

17.    Dr. Emory testified that this statement means that if a subject "recalled working with clutches or brakes or joint compound, or something like that," then "those would have been

the ones that would be excluded." Ex. 5, Emory Dep. 38:2-9.

18.    And she similarly testified that what the authors "say in the very beginning" of the Article is that "we excluded anyone of those people where history of other asbestos exposure *may have been present*." Ex. 9, Emory *Zimmerman* (Vol. 2) Dep. 280:17-281:17 (emphasis added).

19.    Defendants reiterated these statements in subsequent publications and in testimony. Ex. 2, Ltr. to Editor Resp. (stating Defendants excluded subjects "where a history of other asbestos exposures were present"); Ex. 7, MedicalResearch.com article.

20.    Dr. Kradin swore that if there was "*any question* of an additional exposure to asbestos, those cases were to be deleted." Ex. 8, Kradin *Palumbo* Dep. 50:10-12 (emphasis added); Ex. 4, Kradin Dep. 196:20-25.

21.    Dr. Maddox agreed to exclude "subjects who described *any* occupational or paraoccupational exposures" to asbestos so as to have a "'pure' cohort." Ex. 10.

22.    Dr. Emory testified: "[W]e took all the people that had *no other evidence of exposure to asbestos* except for their use of cosmetic talc and we had 75 people left." Ex. 11, Emory *Zimmerman* Tr. 1623:3-12 (emphasis added); *see also*, Ex. 5, Emory Dep. 297:5-17.

23.    She similarly testified: "[W]e presented 75 people whose only exposure after *controlling for anything else that they could have been exposed to*" was talc. Ex. 12, Emory *Wiersema* Dep. 162:1-17 (emphasis added); *see also* Ex. 5, Emory Dep. 309:11-310:21.

24.    The Exposure Claim was material, as it was the central "factual premise" of the Article from which Defendants drew their conclusions. *See* Ex. 4, Kradin Dep. 13:25-14:4.

25.    Dr. Kradin testified that "if the individuals were exposed to asbestos from sources other than talc, then that would not be adding anything new to the literature." *Id.* at 84:4-7; *see also* Ex. 1, Article at 4 (noting strength of the Article includes its "size").

26.    Defendants did not submit to the journal any of the subject's underlying materials, so the Article's peer reviewers had no way to evaluate the veracity of Defendants' Exposure Claim. Ex. 3, Maddox Dep. 181:18-25, Ex. 4, Kradin Dep. 118:10-23; Ex. 5, Emory Dep. 158:15-20.

**B.    The Review Claim: Defendants' stated exposures were identified through deposition transcripts and interrogatory responses.**

27.    The Article states its cases were "submitted in medico-legal consultation." *Id.* at 5.

28.    The Article further states that "[e]xposures were identified through sworn deposition testimonies and answers to sworn interrogatories provided from subjects, parents, and spouses" (the "Review Claim"). *Id.* at 2.

29.    Having represented that they were plaintiff experts in asbestos litigation, these representations were material in that they informed the reader that they had access to and availed themselves of the significant evidentiary record available in the litigation context.

**C.    The No Overlap Claim: Defendants stated their subjects were "additional" to Dr. Moline's paper.**

30.    The Article makes repeated reference to a previously published paper of 33 subjects by plaintiffs' expert Dr. Jacqueline Moline, which similarly was predicated on the factual assertion that the subjects had "no known asbestos exposure other than cosmetic talcum powder" (the "Moline Paper"). Ex. 101, Moline Paper at 1.[1]

31.    The authors repeatedly construe their Article as building off the Moline Paper,

---

[1] In *Bell v. Am. Int'l Indus.*, the court stated that a single subject's assertion of a non-talc exposure had "direct bearing on the study's credibility." 627 F. Supp. 3d 520, 530 (M.D.N.C. 2022). The court identified that subject publicly given the "influence the article has had on cosmetic talc litigation" and its "groundbreaking nature" *Id.* Pecos River is pursuing a trade libel claim against Dr. Moline, having determined Dr. Moline's exposure statement was false. And a New York federal court recently allowed discovery of the connection between Dr. Moline's and Defendants' articles. *Moline v. Pecos River Talc LLC*, 2025 WL 2898086 (S.D.N.Y. Oct. 10, 2025).

including: "We present 75 *additional* subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc" (the "No Overlap Claim"). Ex. 1 at 2 (emphasis added).

32.     The factual representation was material in that it sought to add credibility by tethering it to an existing study, and to increase the universe of mesothelioma patients whose sole exposure to asbestos was supposedly cosmetic talc powder.

### III.    Defendants Knew That The Exposure Claim And The Review Claim Were False, Or At Minimum Recklessly Disregarded The Truth.

#### A.    The record shows that at least 19 subjects had other exposures to asbestos.

33.     The evidence demonstrates that (at least) 19 subjects had exposures to asbestos from sources other than talc.

34.     That evidence was readily available from the legal record in the subjects' cases. Defendants had litigation materials for the subjects' cases, and nothing would have stopped Defendants from obtaining additional materials from plaintiffs' counsel. Ex. 3, Maddox Dep. 61:10-16; Ex. 5, Emory Dep. 160:2-161:9; Ex. 6, Cashman Dep. 56:9-15, 60:3-12.

35.     In many cases, the subjects *themselves* asserted in their underlying case that they were exposed to asbestos from other sources. App'x A.

36.     Some cases resulted in defense verdicts. For example, Dr. Maddox testified in Case No. 33's trial which resulted in a defense verdict with the jury unanimously determining that the plaintiff had not shown "by a preponderance of the evidence that [Case No. 33] was exposed to asbestos from Johnson & Johnson's Baby Powder." Ex. 47, *Case No. 33* Tr. 3059:10-17; Ex. 46.

37.     Case No. 65's case similarly resulted in a full defense verdict. Ex. 53, *Case No. 65* Day 27 Tr. 32:11-20, 34:12-19.

38.     The evidence of the subjects' exposures to asbestos from sources other than cosmetic talcum powder is summarized in the table annexed as Appendix A.

10

**B. Defendants squarely admit that the Exposure Claim was false as to certain subjects.**

39.     Defendants have admitted that Case Nos. 8, 11, 15, and 58 were exposed to asbestos from non-talc sources. Ex. 13, Kradin Amended Interrogatory Responses (Set 3) at 4; Ex. 4, Kradin Dep. 213:15-20 (Case No. 8), 214:12-17 (Case No. 11), 222:19-24 (Case No. 15); Ex. 3, Maddox Dep. 282:25-283:5, 285:23-286:9 (Case No. 58).

40.     For all four of these subjects, Dr. Kradin or Dr. Maddox *personally* issued an expert report in the subject's underlying case stating that the subject was exposed to asbestos from non-talc sources. Ex. 14, Kradin *Case No. 8* Rpt. at 19-20; Ex. 15, Kradin *Case No. 11* Rpt. at 20; Ex. 16, Kradin *Case No. 15* Rpt. at 19; Ex. 3, Maddox Dep. 282:25-283:4.

41.     Additionally, Dr. Maddox testified in Case No. 24's case that the subject "also had personal exposure while performing political campaign work and assistant to Mayor of [LA] to asbestos containing in joint compounds." Ex. 18, Maddox *Case No. 24* Dep. 54:22-55:1.

42.     Dr. Kradin testified that he "really do[es]n't know" if Case No. 75 "should have been included" in the Article, Ex. 4, Kradin Dep. 243:4-7; Dr. Maddox testified he would "would be willing to reconsider" inclusion of Case No. 68, Ex. 3, Maddox Dep. 301:6-19; and Dr. Kradin testified that he "couldn't determine whether or not" Case No. 3 "was exposed to asbestos from [a] take home exposure from her husband based on his work," Ex. 4, Kradin Dep. 229:24-230:3.

43.     Dr. Cashman—Dr. Kradin's administrative assistant and wife who was responsible for reviewing Dr. Kradin's expert reports to ascertain exposures—testified that "the statement that all 75 individuals, that their only known exposure to asbestos was cosmetic talc" was "untrue." Ex. 6, Cashman Dep 48:5-14.

**C. Defendants knew the Exposure Claim was false because they intentionally included subjects with non-talc asbestos exposures.**

44.     Dr. Maddox intentionally included individuals with known exposures to asbestos

from non-talc sources when he deemed those exposures not "significant."

45.     Dr. Maddox testified that "there were instances where there were other exposures to asbestos from non-talc sources noted in the materials that [he] reviewed but [he] decided to nevertheless include them in the article because [he] made the determination that the exposure was not significant enough." Ex. 3, Maddox Dep. 40:9-18.

46.     Dr. Maddox similarly testified that "when identifying individuals to include in [his] article, if they had -- if there were exposures to asbestos that were noted in their interrogatories or deposition testimonies or medical records," he "would make a determination whether that exposure was significant enough to include in [his] article." *Id.* at 38:18-25.

47.     And Dr. Maddox testified that "a known exposure would have to be significant" to warrant exclusion. *Id.* at 160:14-18.

48.     The Article does not state that its subjects were in fact exposed to asbestos from non-talc sources, but that the Authors determined the exposure was not "significant." It says there were no known exposures at all. Ex. 1, Article.

49.     Dr. Maddox assessed whether an exposure was "significant" based on six factors that appear in his *expert reports*, but appear nowhere in the Article. Ex. 3, Maddox Dep. 30:19-31:4; Ex. 76, Maddox *Case No. 33* Rpt. at 4 (listing six factors).

50.     The Article states that its exclusion criteria were "recalled occupational or paraoccupational exposures to other sources of asbestos." Ex. 1, Article at 2.

51.     But in fact, Dr. Maddox's "exclusion criteria was if there was an exposure to asbestos that meets the factors that [he] consider[s] in the six bullets in [his] expert reports" in order to assess whether an exposure is "significant." Ex. 3, Maddox Dep. 42:6-17.

52.     According to Dr. Maddox, these factors for determining a "significant" exposure

are those which would "help to satisfy the Helsinki criteria." *Id.* at 30:19-31:2, 41:1-6.

53.    Dr. Emory similarly testified that she relied on the "Helsinki Criteria" in order "to determine whether there's a known exposures to asbestos." Ex. 5, Emory Dep. 333:10-19.

54.    The "Helsinki criteria are a set of factors that some people use in order to assess whether asbestos exposure was the *cause* of somebody's mesothelioma." Ex. 3, Maddox Dep at 44:22-45:1 (emphasis added); *see also* Ex. 106 at 313, *Asbestos, asbestosis, and cancer: the Helsinki criteria for diagnosis and attribution.*

55.    The Article does not mention the Helsinki criteria. *See generally* Ex. 1, Article.

56.    Nowhere does the Article state that its subjects *had* exposures to asbestos, but Defendants determined those exposures were too low to *cause* the subject's mesothelioma. *Id.*

57.    Failing to inform readers that the Helsinki criteria were used is important, as those criteria are controversial, and courts have excluded expert causation opinions that are based on the Helsinki criteria, including those of Dr. Maddox himself.[2]

58.    Dr. Emory testified that if it was "[u]ndisputed that someone inhaled asbestos from changing a brake once" that she still could "not say if that person would be included or excluded" from her Article." Ex. 5, Emory Dep at 157:6-14.

59.    Dr. Emory circulated a draft of the Article to Dr. Maddox and Dr. Kradin along with a draft of the public table of anonymized subjects and an internal, de-anonymized spreadsheet of the subjects. Ex. 79 (email); Ex. 80 (draft article); Ex. 82 (draft table); Ex. 81 (spreadsheet).

60.    The draft article states that the subjects' "only known exposures to asbestos was

---

[2] *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 678 (7th Cir. 2017) (collecting cases); *Betz v. Pneumo Abex, LLC*, 615 Pa. 504, 550 n.35 (2012) (reinstating trial court's exclusion of Dr. Maddox's specific causation opinion); *Butler v. Union Carbide Corp.*, 310 Ga. App. 21, 25–31 (2011) (affirming exclusion of Dr. Maddox's specific causation opinion).

through chronic exposures to cosmetic talcum powder." Ex. 80.

61.    The public-facing table lists the subjects as "***without other known exposures.***" Ex. 82 (emphasis added).

62.    The internal spreadsheet lists the subjects as having "***no other significant exposures***" to asbestos. Ex. 81 (emphasis added).

63.    Defendants therefore knew that they included subjects in their Article who did, in fact, have exposures to asbestos from non-talc sources.

**D.    Defendants' own internal chart identified non-talc exposures to asbestos.**

**1.    Defendants' chart stated Case No. 11 had non-talc asbestos exposures.**

64.    Dr. Cashman reviewed sections of Dr. Kradin's reports and prepared a table of potential subjects for the Article. Ex. 6, Cashman Dep. 69:12-70:12.

65.    On the chart, Case No. 11's name was highlighted in red, Ex. 91, which "indicates that, based on [Dr. Cashman's] review of Dr. Kradin's reports, [Case No. 11] was exposed to asbestos from a non talc source." Ex. 6, Cashman Dep. 73:6-9.

66.    Neither Dr. Cashman, nor Dr. Kradin, nor Dr. Maddox, nor Dr. Emory claimed to know how Case No. 11 still ended up as a subject of the Article. Ex. 6, Cashman Dep. 73:10-12; Ex. 4, Kradin Dep. 74:15-17; Ex. 3, Maddox Dep. 122:25-123:5; Ex. 5, Emory Dep. 139:1-3.

67.    As noted above, Dr. Kradin now admits that Case No. 11 was exposed to asbestos from a non-talc source and should not have been included in the Article. Ex. 13, Kradin Amended Interrogatory Responses (Set 3) at 4; Ex. 4, Kradin Dep. 214:12-14.

**2.    Defendants' chart questioned whether Case No. 3 was exposed to asbestos from a non-talc source.**

68.    On the same chart, the notes column for Case No. 3 states: "*husband's work clothes – engineer at particle board plant (asbestos??)." Ex. 91; Ex. 6, Cashman Dep. 74:16-20.

14

69.     The note with "(asbestos??)" meant that Dr. Cashman was "not sure whether [Case No. 3] was or was not exposed to asbestos from . . . her husband's work at the particle board plant." Ex. 6, Cashman Dep. 74:16-20.

70.     Other than adding the note, Dr. Cashman did not do anything to "try to confirm whether or not [Case No. 3] was exposed to asbestos from her husband's work at a particle board plant." *Id.* at 74:21-75:1.

71.     Despite the notes column stating, "(asbestos??)," Dr. Kradin does not recall speaking to Dr. Cashman about Case No. 3 or asking her to send additional materials related to Case No. 3. Ex. 4, Kradin Dep. 71:3-12; *see also* Ex. 6, Cashman Dep. 96:12-20 (similar).

72.     In fact, Dr. Kradin sent the chart that Dr. Cashman prepared to Dr. Maddox a mere six minutes after receiving it from Dr. Cashman. Ex. 4, Kradin Dep. 69:25-70:11.

73.     Dr. Maddox and Dr. Emory do not recall asking Dr. Kradin to clarify the "(asbestos??)" note or doing anything else based on the note. Ex. 3, Maddox Dep. 124:10-13; Ex. 5, Emory Dep. 139:20-23.

74.     Dr. Kradin testified that he "couldn't determine whether or not" Case No. 3 "was exposed to asbestos from [a] take-home exposure from her husband based on his work at Louisiana-Pacific," Ex. 4, Kradin Dep. 229:24-230:3.

**E.     Defendants' process for determining whether non-talc exposures existed recklessly disregarded the truth.**

**1.     Dr. Kradin**

75.     In Dr. Kradin's capacity as an expert witness, "product identification is -- is really not [his] area of expertise, nor is it [his] interest." Ex. 4, Kradin Dep. 234:18-19.

76.     Rather, his role is to "indicate whether [he] think[s] asbestos in *some form* was the cause of that mesothelioma." *Id.* at 233:24-234:3 (emphasis added).

77.    In other words, Dr. Kradin's opinion is generally concerned with whether asbestos caused the plaintiff's mesothelioma, as opposed to which source of asbestos the plaintiff was exposed to or which source caused the plaintiff's mesothelioma. *See id.* at 234:12-21.

78.    Dr. Kradin is a pathologist and pulmonologist, but "industrial hygienists generally get more into the weeds about exposures than other witnesses." *Id.* at 194:11-12.

79.    Industrial hygienists "evaluate a lot more sources of information than [Dr. Kradin] look[s] at in order to evaluate what are the different sources of exposure." *Id.* at 194:18-22.

80.    Dr. Kradin is "not an industrial hygienist" and "not testifying really specifically about that aspect of the case." *Id.* at 194:2-3.

81.    For purposes of exposure, Dr. Kradin relies on whatever documents plaintiffs' counsel gives him—primarily on the deposition testimony of the plaintiff. *Id.* at 192:5-21.

82.    When he serves as an expert, he therefore does not make "any effort to go out and look at other documents beyond what the plaintiff's attorneys provide [him] to evaluate whether a plaintiff was exposed to asbestos from a source other than talc" unless "there's something in the individual's testimony that would direct [him] to – to seek that information." *Id.* at 192:22-193:41; *see also id.* at 233:13-22.

83.    As a result, there are times when "after [he] issued [his] expert report at a deposition, the defense lawyer presents [him] some sort of evidence of exposure to asbestos from a source that [he] weren't aware of at the time [he] wrote [his] report." *Id.* at 193:5-10.

84.    That is particularly true because he sometimes issues his reports when discovery is still ongoing. Ex. 92, Kradin Case No. 75 Rpt. at 23.

85.    Dr. Kradin knows that "[t]here's always a possibility that someone is going to come in either to the proceedings or at extra proceedings and indicate that there was potentially some

exposures." Ex. 4, Kradin Dep. 243:21-25.

86.     Yet he did not do "anything to determine for the cases that [he] added to [the] article whether any new information had become available since [he] issued [his] report." *Id.* at 244:1-5.

87.     So he was not aware, for example, of the deposition of the co-worker in Case No. 75, who testified that there was "no doubt" her husband was exposed to asbestos. Ex. 24, Coworker *Case No. 75* Dep. 47:8-10.

88.     Nevertheless, his process for verifying the truth of the Article's statements was to direct Dr. Cashman (his wife and administrative assistant) to review his expert reports and nothing else. Ex. 4, Kradin Dep. 61:16-24; Ex. 6, Cashman Dep. 51:21-52:6, 124:4-8.

89.     Dr. Cashman is not a medical doctor, does not treat patients, and has no experience evaluating whether someone has been exposed to asbestos. Ex. 6, Cashman Dep. at 12:2-8.

90.     She has no experience related to asbestos, no experience related to mesothelioma, no experience related to evaluating whether talc contains asbestos, no experience related to determining whether exposure to talc causes disease, and has never served as an expert in litigation or in a consulting capacity. *Id.* at 13:1-19, 106:1-13.

91.     The only instructions Dr. Kradin gave Dr. Cashman was to review his expert reports, and he did not discuss with her particular products or occupations that are known to lead to asbestos exposures. *Id.* at 51:21-52:6, 124:16-125:15.

92.     Dr. Cashman in fact reviewed only the Exposure History sections of Dr. Kradin's report and not any other section, including the Conclusion section. *Id.* at 52:10-18.

93.     When Dr. Cashman prepared a chart based on her review of portions of Dr. Kradin's reports, Dr. Kradin sent it to Dr. Maddox only six minutes after receiving it. Ex. 4, Kradin Dep. 69:25-70:11.

94.    Dr. Kradin acknowledged: "[U]ltimately it has to be my responsibility" to "determine that the individuals had no exposures to asbestos from sources other than talc" for the subjects he contributed to the Article. *Id.* at 166:4-15.

95.    But when "preparing this article, [Dr. Kradin] did not personally re-review any deposition testimony or Interrogatory Responses." *Id.* at 21:21-24.

96.    Nor did Dr. Kradin even review his own reports when preparing his Article. Ex. 74, Kradin 9/12/25 Amended Rog Resp. #2; *see also* Ex. 4, Kradin Dep. 23:13-18.

### 2.    Dr. Maddox

97.    To determine whether subjects were exposed to asbestos from non-talc sources, Dr. Maddox reviewed his expert reports (which Dr. Maddox calls "consultation reports") and "only when a consultation report was unclear, then [he] would attempt to review documents that were available to [him] from the patient's litigation case files." Ex. 3, Maddox Dep. 64:17-21; *see also id.* at 61:22-65:1; Ex. 70, Maddox 4/14/25 Rog Resp. #3.

98.    In other words: "something in [his] expert report would have had to be unclear about whether there was an exposure to asbestos or not to prompt [him] to then evaluate the underlying case files from the plaintiff's case." Ex. 3, Maddox Dep. 70:18-23.

99.    But when Dr. Maddox serves as an expert witness, it is "not [his] job to go out and gather exposure information." *Id.* at 148:14-17.

100.    Dr. Maddox is a pathologist and by his own admission is not "not an exposure witness." *Id.* at 84:2-23, 146:12-16.

101.    Dr. Maddox is "not an industrial hygienist" and does not "have the training to do the kind of exposure assessment an industrial hygienist would." *Id.* at 85:11-17.

102.    Dr. Maddox does not "go out and make an attempt to try to investigate sources of exposure to a plaintiff beyond the materials that the plaintiffs' attorneys provide [him]." *Id.* at

148:5-9; *see id.* at 147:5-6. As Dr. Maddox put it: "[W]e're not private detectives." *Id.* at 53:25.

103.    In many instances, Dr. Maddox's reports rely exclusively on summaries sent from plaintiffs' attorneys for purposes of the plaintiff's exposure history, and not any underlying evidence. Ex. 3, Maddox Dep. 139:11-140:8, 251:15-252:8.

104.    As just some examples, Dr. Maddox's reports in Case Nos. 24, 43, and 67 rely exclusively on summaries from plaintiffs' attorneys and not any actual evidence for purposes of the plaintiff's exposure history. *See, e.g.*, Ex. 17, Maddox *Case No. 24* Rpt. at 1; Ex. 57, Maddox *Case No. 43* Rpt. at 1; Ex. 72, Maddox *Case No. 67* Rpt. at 1.

105.    Dr. Maddox accepts these plaintiffs' attorney summaries as true at "face value." Ex. 3, Maddox Dep. 147:23-148:9.

106.    Dr. Maddox also understands that when he "prepare[s] [his] reports, that they're generally early in the investigative process so that often more evidence and more facts come out after [he] prepare[s] [his] report, including evidence of exposures to asbestos from other sources that were not in [his] report at the time." *Id.* at 152:16-23.

107.    The reason Dr. Maddox reviewed his expert reports to determine which subjects to include in the Article despite this glaring flaw was because it was "a quick way to cover grounds that's already been covered." *Id.* at 155:13-18.

108.    Only when a report was unclear on its face would Dr. Maddox attempt to review documents available to him from the subject's litigation case files. Ex. 3, Maddox Dep. 64:17-21.

109.    So for example, Dr. Maddox's Case No. 67 report relies entirely on an exposure history sheet received from the plaintiffs' law firm Simon Greenstone, and the report does not mention exposures to asbestos from non-talc sources. Ex. 72, Maddox *Case No. 67* Rpt. at 1.

110.    Since there was "no ambiguity about the exposure on the face of [his] report that

would have prompted [him] to investigate any underlying case materials," Dr. Maddox does "not recall" any "examination of other documents in this case." Ex. 3, Maddox Dep. 275:5-16.

111.    That means Dr. Maddox did not review Case No. 67's complaint or interrogatory responses that asserted that she was exposed to asbestos from her parents' clothes, despite the Article stating that interrogatory responses were reviewed to assess exposures. *Id.* at 278:17-20.

112.    "[N]othing would have stopped [Dr. Maddox] from reaching out to one of the plaintiffs' firms who represented the subject's case for additional evidence or documentation from that subject's case file." *Id.* at 61:10-16.

113.    Moreover, Dr. Maddox agreed that in order to assess exposures to asbestos, it would be "appropriate to review *both reports*"—i.e., plaintiff and defense-side reports. Ex. 3, Maddox Dep. 331:5-10 (emphasis added). Yet Dr. Maddox does not recall reviewing any defense expert reports for *any* case, which he does not do as a general rule even though nothing would have stopped him from obtaining them. *Id.* at 338:6-9, 338:16-20.

### 3.    Dr. Emory

114.    Dr. Emory was the "primary author of the manuscript." Ex. 1, Article at 6.

115.    The Emory Article states that Dr. Emory "reviewed the materials." *Id.*

116.    The month after the Article came out, Dr. Emory was asked whether she "look[ed] at the underlying data that Dr. Maddox had obtained, whether that was deposition testimony or medical records or something else" and she responded: "Again, I had all the data, I reviewed the· data, I formulated the paper, I wrote the paper, so -- and all that data was available." Ex. 9, Emory *Zimmerman* (Vol. 2) Dep. 320:3-10.

117.    Dr. Emory wrote that she was "painstakingly going through the data that Dr. Maddox provided as well as the records to confirm everything is accurate." Ex. 93.

118.    Dr. Emory signed a licensing agreement with the journal's publisher, representing

that the Article "contain[s] no libelous or unlawful statements." Ex. 94.

119.    Yet Dr. Emory swore that, in fact, the sum total of the "efforts [she] undertook to ensure the Study Participants had no non-talc exposures to asbestos" was: "I received the list of Study Participants from Dr. Maddox and Dr. Kradin, who were responsible for compiling that information for inclusion in the Article." Ex. 75, Emory 4/14/25 Rog Resp. #3.

120.    She testified that it was "not my role" to determine "whether any of the individuals had exposures to asbestos from sources other than talc." Ex. 5, Emory Dep. 38:24-39:3.

**F.    Defendants conducted minimal review of the subjects where Defendants did not serve as their experts.**

121.    Simon Greenstone Panatier is a law firm that represents plaintiffs in asbestos litigation and in cosmetic talc litigation. Ex. 3, Maddox Dep. 172:20-22.

122.    Leah Kagan, an attorney at Simon Greenstone, sent Dr. Maddox a list of subjects where experts other than Dr. Kradin, Dr. Maddox, or Dr. Emory analyzed the plaintiffs' tissue. Ex. 95 at 1. That list of subjects included Case Nos. 65, 69, 70, 71, 72, 73, and 74 (the "Other Expert Cases"). *Id.*; *see also* Ex. 89 (second column denotes final case number).

123.    None of the Defendants issued an expert report in the Other Expert Cases.

124.    For the Other Expert Cases, the only information Defendants received regarding exposure history was expert reports (or sometimes only portions of expert reports) from *other plaintiffs'* experts. *See, e.g.*, Ex. 96.

125.    So, for example, for Case No. 65, the only information on exposure history Defendants reviewed was a single excerpted page of Dr. Moline's expert declaration. Ex. 96.

126.    Defendants did not have the subject's deposition transcripts or interrogatory responses from the Other Expert Cases, so they could not have reviewed them as the Article states.

127.    Defendants did not attempt to investigate Case No. 65's medical records that

identify a non-talc exposure to asbestos, even though nothing would have stopped them from asking plaintiffs' counsel for more information. Ex. 3, Maddox Dep. 316:24-8, 61:10-16.

128.    As another example, Defendants did not even have the interrogatory responses for Case No. 69 that asserted asbestos exposures from a non-talc source. *Id.* at 233:22-236:2.

**G.    Defendants knew the Review Claim was false.**

129.    The Article states: "Exposures were identified through sworn deposition testimonies and answers to sworn interrogatories provided from subjects, parents, and spouses" (the "Review Claim"). Ex. 1, Article.

130.    But as outlined above, that representation is false, and Defendants knew their own review process did not include deposition transcripts or interrogatories.

131.    In fact, Dr. Maddox stated in an email that the Article should state: "Clinical info obtained from: deposition review OR answers to interrogatories ***OR concise statements of exposure received from attorneys.***" Ex. 73 (emphasis added).

132.    Yet "concise statements of exposure received from attorneys" was omitted from the final version of the Article as among the sources Defendants reviewed. Ex. 1, Article at 2.

**H.    Defendants perpetuated the falsity after publication.**

133.    Defendants repeatedly refused to disclose the identities of their subjects to talc manufacturer defendants in cosmetic talc litigation, citing HIPAA, medical ethics, and/or privacy concerns. Ex. 84, Emory *Bell* Dep. 153:22-156:6; Ex. 90, Maddox *Lopez* Dep. 179:16-18; Ex. 8, Kradin *Palumbo* Dep. 26:14-23.

134.    Dr. Emory testified that she never disclosed the subjects to anyone outside her co-authors. Ex. 83, Emory *Anderson* Dep. 63:13-17.

135.    When a defense attorney asked Dr. Emory at a deposition about the identities of the subjects, she questioned whether "the state bar would have a problem" with his questions and said

she would "find out" where he was licensed. Ex. 84, Emory *Bell* Dep. 153:22-156:6, 185:5-189:1.

136.    Contrary to these protestations that the information was private, Dr. Emory in fact sent the names of *all* the subjects of the Article to Christi Dutton at the plaintiffs' asbestos law firm at Simon Greenstone. Ex. 85; Ex. 86.

137.    Before a deposition in the *Lopez* case, when Dr. Maddox was inclined to disclose the subjects' materials to the defense, Dr. Emory wrote: "Release nothing. This is just a depo subpoena. Don't do anything the lawyers will argue and then if they press they would have to get a specific court order. For you, it's easy, just say Emory has the master list." Ex. 87.

138.    The statement that Dr. Emory told Dr. Maddox to make under oath was false. In fact, Dr. Maddox had the list of the 75 subjects' names and corresponding case numbers because Dr. Emory had emailed it to him a month and a half earlier. Ex. 88; Ex. 89.

139.    But Dr. Maddox nevertheless testified in the *Lopez* deposition: "When I delivered the data to Dr. Emory, I relinquished the key to case number with descriptors of the case." Ex. 90, Maddox *Lopez* Dep. 178:16-22. That testimony was not true.

140.    Despite admitting that subjects had exposures to other sources of asbestos, all three Defendants will not issue a correction to inform the public while litigation against them is pending. Ex. 3, Maddox Dep. 283:6-21; Ex. 4, Kradin Dep. 185:21-24; Ex. 5, Emory Dep. 356:6-16.

141.    Defendants admit that when preparing the Article, they expected to rely on it in litigation. Ex. 3, Maddox Dep. 163:3-167:18.; Ex. 4, Kradin Dep. 134:3-7; Ex. 5, Emory Dep. 254:10-15, 255:6-20.

142.    To oppose discovery efforts seeking the identities of the Article's subjects, Dr. Emory and Dr. Maddox's lab falsely stated in an appellate brief that "several of the supposed case matches" in Pecos River's complaint were "not even plausible matches." Appellee Resp. Br.,

23

*Peninsula Pathology Assocs. v. Am. Int'l Indus.*, No. 23-1971 at 30 (4th Cir. Feb. 12, 2024); *compare* ECF No. 81 at ¶¶ 69-132 (amended answer).

143.    When moving to dismiss Pecos River's complaint in this case, Defendants falsely stated that one of Pecos River's case matches was "implausible on its face." *Compare* ECF No. 15 at 19 n.17 (motion to dismiss) *with* ECF No. 81 at ¶¶ 69-132 (amended answer).

144.    Before this Court ordered the names to be provided to Pecos River, Dr. Kradin stated in response to a request for admission that he "lack[ed] sufficient knowledge" to admit or deny that at least one subject was exposed to asbestos from a source or sources other than talc. Ex. 105, Kradin 4/14/25 Request for Admission Resp. #2.

145.    In fact, Dr. Kradin was aware at the time that: Case No. 8 was a subject of the Article; that his own report stated Case No. 8 was exposed to asbestos from Kent cigarettes; and that Case No. 8 in fact was exposed to asbestos from a source other than talc. Ex. 108, Kradin 8.18.25 Request for Admission Resp. #17-18; Ex. 4, Kradin Dep. 170:1-8.

146.    A mystery benefactor is funding the defense here. Ex. 5, Emory Dep. 18:3-6. But Defendants have claimed not to know or refused to disclose the identity of this funder—including whether it is Simon Greenstone. They have also refused to disclose whether Simon Greenstone or anyone else has suggested they might cover Defendants' damages in this case. Ex. 3, Maddox Dep. 15:25-16:12, 18:19-21:4; Ex. 4, Kradin Dep. 11:23-12:1; Ex. 5, Emory Dep. 18:3-6.

## IV.    Defendants Expressly Doubted That The No Overlap Claim Was True.

147.    The Article states: "Recently, Moline et al., reported a series of 33 subjects with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc. We present 75 *additional* subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc." (the "No Overlap Claim"). Ex. 1, Article at 2 (emphasis added).

148.    In fact, 8 subjects (more than 10% of the Article's subjects) overlap between the

two papers: Case Nos. 4, 5, 9, 16, 42, 52, 72, and 75. Ex. 5, Emory Dep. 190:19-21.

149.    Despite admitting that some of their subjects overlap with Dr. Moline's, Defendants will not issue a correction to inform the public while litigation is pending. Ex. 3, Maddox Dep. 283:6-21; Ex. 4, Kradin Dep. 185:21-24; Ex. 5, Emory Dep. 356:6-16.

150.    Before publication, Dr. Kradin "emphasized to [his] co-authors that [Defendants] should be absolutely sure that there was no overlap between the patients in the Article and in Dr. Moline's publication." Ex. 97, Kradin 4/14/25 Rog Resp. #4.

151.    He emailed Dr. Maddox and Dr. Emory: "PLEASE be sure that we are not duplicating cases reported by Moline and Gordon. That's a no no." Ex. 98; *see* Ex. 99 (similar).

152.    Dr. Emory attempted to compare Table 1 of Dr. Moline's paper to Table 1 of the Emory Article. Ex. 5, Emory Dep. 182:24-193:1.

153.    The version of Table 1 of the Emory Article that Dr. Emory used for her comparison to Dr. Moline's Table 1 had data missing for Defendants' subjects, yet Dr. Emory does not recall any attempt to fill in the data gaps during her comparison. *Id.* at 342:6-14, 343:13-22, 344:17-21.

154.    Although Dr. Moline's Table 1 identifies the brand of talc used and the subject's occupation, Dr. Emory made no attempt to evaluate those attributes when attempting to determine an overlap. Ex. 101, Moline Paper at 15; *id.* at 12 (key to brand names provided in App'x 3); Ex. 5, Emory Dep. 195:15-196:8, 196:19-197:3.

155.    Dr. Emory also did not compare the tissue digestion metrics that were presented in both papers in Table 2. Ex. 5, Emory Dep. 193:24-194:5.

156.    The tissue digestion results that Dr. Emory never reviewed make clear that Case No. 72 in the Emory Article is Case No. 6 in Dr. Moline's paper:

| Case | Mesothelioma Site | Asbestos Type | Tissues Examined | Concentration (f/g) | Detection Limit (f/g) |
|------|-------------------|---------------|------------------|---------------------|----------------------|
| Emory #72 | Pleural | Anthophyllite, tremolite | Lymph Node | 17,250 | 3,450 |
| Moline #6 | Pleural | Anthophyllite, tremolite | Lymph Node | 17,250 | 3,450 |

Ex. 1, Emory Article at 5; Ex. 101, Moline Paper at 15.

157.    Case No. 52 is another example of an obvious overlap between the two papers:

| Case | Sex | Year of Diagnosis | Age at Diagnosis | Mesothelioma Site | Histology | Estimated Years of Use |
|------|-----|-------------------|------------------|-------------------|-----------|------------------------|
| Emory #52 | F | 2015 | 30 | Pleural | Epithelioid | 20 |
| Moline #16 | F | 2015 | 30 | Pleural | Epithelial | 19 |

Ex. 1, Emory Article at 4; Ex. 101, Moline Paper at 15.

158.    Case No. 52 stands out because she was diagnosed at age 30. Dr. Emory testified that it usually "takes 30 to 40 to 50 years from the time somebody is exposed . . . to asbestos to the time they develop mesothelioma." Ex. 5, Emory Dep. 199:7-15.

159.    Dr. Emory agreed that it is "pretty stark that someone would be diagnosed with mesothelioma at age 30" and that age 30 is "very young among people who develop mesothelioma." *Id.* at 198:8-11, 345:5-8.

160.    The information Dr. Emory never looked at such as occupation and brand name also would have made it apparent that Case No. 52 overlaps between the two articles.

161.    Dr. Moline's paper describes Moline Case No. 16's occupation as "retail worker," and Emory Case No. 52 testified that she worked as a cashier at Kmart, Walmart, and Sears. Ex. 102, *Case No. 52* Dep. 118:22-120:24.

162.    Dr. Moline's paper lists that Moline Case No. 16 used the brands Johnson's (Brand D); Maybelline (Brand K); Cover Girl (Brand L); and Mary Kay (Brand M)—the same brands that Emory No. 52 testified using. Ex. 101, Moline Paper at 15; *id.* at 12 (key to brand names provided

in App'x 3); Ex. 102, *Case No. 52* Dep. 118:22-120:24, 137:11-22, 142:9-22.

163.    Dr. Emory believed Case No. 52 may be a subject in Dr. Moline's paper. Ex. 103.

164.    Dr. Emory wrote in an email: "Through careful evaluation of the data that Dr. Moline reported in her Table 1, I have identified 6 cases that **may be** the same as she reported. 5 were from here and one was from Dr. Kradin. ([Case No. 52])." Ex. 103 (emphasis in original).

165.    After writing this email, Dr. Emory did nothing to confirm that Case No. 52 was not an overlap beyond, at most, further comparing the tables. Ex. 5, Emory Dep. 210:6-211:4.

166.    Dr. Emory suspected other overlaps at the time she was preparing the Article. She wrote an email to Ms. Dutton at Simon Greenstone with the subject, "cases possibly duplicates," identifying 11 she "would like to know if they may have been reviewed by Dr. Moline." Ex. 93.

167.    Those individuals included not just Case No. 52 but also Case No. 4 and Case No. 9, who are in fact overlaps between the two papers. *Id.*

168.    Many of the overlaps between the subjects of the two papers are apparent on the face of the two papers, (Ex. 1, Emory Article at 3-5; Ex. 101, Moline Paper at 15):

| Emory 4 | Emory 9 | Emory 16 | Emory 42 | Emory 52 | Emory 72 | Emory 75 |
|---|---|---|---|---|---|---|
| Moline 12 | Moline 10 | Moline 22 | Moline 20 | Moline 16 | Moline 6 | Moline 19 |

169.    Dr. Maddox knew at the time that he "couldn't be completely sure that there was no overlap between the subjects" of the two papers. Ex. 3, Maddox Dep. 48:1-10.

170.    Nevertheless, Dr. Maddox told Dr. Emory that no overlap existed, though he does not remember what he did to evaluate that issue. Ex. 100; Ex. 3, Maddox Dep. 177:20-22.

171.    Dr. Kradin wrote internally of Dr. Moline's paper: "I don't know how many of our cases overlap with theirs." Ex. 107.

172.    Although Dr. Kradin suggested that Dr. Maddox attempt to identify any overlap, Dr. Kradin did not know how Dr. Maddox was supposed to make this determination given that Dr.

Moline's paper anonymizes its subjects. Ex. 4, Kradin Dep. 105:7-10.

173.    Dr. Kradin himself did nothing to personally evaluate whether any overlap between the two papers existed. Ex. 97, Kradin 4/14/25 Rog Resp. #4.

174.    Instead, he said it was Dr. Emory's responsibility to "ensure that there was no overlap between Dr. Moline's subjects and [his] subjects." Ex. 4, Kradin Dep. 112:21-113:2.

## LEGAL STANDARD

"The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact." *Fowler v. Stolle*, 697 F. Supp. 3d 457, 467 (E.D. Va. 2023) (Walker, J.) (quoting *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021)). "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law." *Id.* (quoting *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)). "[C]onclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." *Id.* "[A]ll justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## ARGUMENT

Pecos River is entitled to summary judgment on (I) falsity, (II) "actual malice," and (III) publication. *See LLT Mgmt. LLC v. Emory*, 766 F. Supp. 3d 576, 599 (E.D. Va. 2025) (detailing New Jersey trade libel elements).

## I.    Pecos River Is Entitled To Summary Judgment On The "Falsity" Element.

A court considers "the fair and natural meaning that will be given to the statement by reasonable persons of ordinary intelligence," as well as "the listener's reasonable interpretation, which will be based in part on the context in which the statement appears." *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 585 (2009) (defamation context). A statement can "explicitly or impliedly rest[] on false facts." *Ward v. Zelikovsky*, 136 N.J. 516, 531 (1994).

Defendants' Exposure Claim that the Article's subjects had no other exposures to asbestos was false. Their Review Claim describing their review process was false. And their No Overlap Claim that their subjects did not overlap with Dr. Moline's paper was false. These statements individually are each materially false. And when considered together, Defendants falsely conveyed that after a rigorous review of the evidence in the subjects' cases, they found 75 new individuals with mesothelioma—never before identified in the scientific literature—without any non-talc exposures to asbestos. These false statements are no "minor inaccuracies." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516 (1991).

### A.    The Exposure Claim is false.

Defendants repeatedly stated the subjects' "only known exposure" to asbestos was through cosmetic talc. Ex. 1, Article at 1, 2; SUMF § I. That is false. *See generally* SUMF § II.A; App'x A. Dr. Cashman admitted that the statements were "untrue." Ex. 6, Cashman Dep. 48:5-14.

The Article does not even use the "known" qualifier when stating subjects were excluded due to "recalled occupational or paraoccupational exposures." Ex. 1, Article at 2. Similarly, Defendants' letter to the editor response states that they "excluded those where *a history of other asbestos exposures were present*." Ex. 2, Ltr. to Editor Resp. (emphasis added).

There is no genuine dispute what these statements mean to a reasonable reader. Dr. Kradin and Dr. Emory testified that "only known exposures" means "[b]ased on the deposition testimony and whatever testimony was available in this case, those were the *only exposures that could be documented*." Ex. 8, Kradin *Palumbo* Dep. 34:14-23 (emphasis added); *see also* Ex. 4, Kradin Dep. 191:15-19; Ex. 5, Emory Dep. 304:11-21.

Dr. Emory testified the Article's statement that "subjects were excluded due to recalled occupational or paraoccupational exposures" means that if a subject "recalled working with clutches or brakes or joint compound, or something like that" then "those would have been the

ones that would be excluded." Ex. 5, Emory Dep. 38:3-9. She similarly testified that what the authors "say in the very beginning" of the Article is that "we excluded anyone of those people where history of other asbestos exposure *may have been present*." Ex. 9, Emory *Zimmerman* (Vol. 2) Dep. 280:17-281:17 (emphasis added).

Between them, Defendants additionally stated that they would exclude subjects (1) with "any question" of an additional exposure; (2) who "described any" other exposure; (3) unless there was "no other evidence of exposure to asbestos;" and (4) after "controlling for anything else that they could have been exposed to." *See* SUMF § II.A.

But it is not true that Defendants were even *attempting* to exclude subjects with exposures to asbestos from non-talc sources. As discussed below, Dr. Maddox knowingly included subjects *with exposures* if he determined those exposures were not "significant" based on factors that appear nowhere in the Article. Dr. Emory would include an individual with an undisputed exposure to asbestos from brakes. So the statement is false in its entirety.

This misrepresentation is critical to the Article. Stating that the subjects had no "known exposures" tells readers that, as a matter of fact, there is *no* possibility of another known source of asbestos exposure as a potential cause. Stating that exposures existed but the authors deemed them not "significant" would cause readers to question the authors' unqualified claim that cosmetic talc was truly the most likely source of asbestos exposure and truly the only potential cause of the subjects' mesotheliomas. That is even more true given that Defendants did not disclose that they used the controversial Helsinki Criteria to assess "significance." *See* SUMF § III.C.

Defendants fully understood what the Article conveyed and the importance of the difference between the Article's *stated* premise of the subjects having no "known" exposures and the authors' *actual* process of excluding those without "significant" exposures. When explaining

30

the Article to a jury, Dr. Emory testified that Defendants "took all the people that had *no other evidence of exposure to asbestos* except for their use of cosmetic talc and we had 75 people left." Ex. 11, Emory *Zimmerman* Tr. 1623:3-12 (emphasis added); *see also*, Ex. 5, Emory Dep. 297:5-17. She similarly testified: "[W]e presented 75 people whose only exposure after *controlling for anything else that they could have been exposed to*" was talc. Ex. 12, Emory *Wiersema* Dep. 162:1-17 (emphasis added).

Moreover, Defendants now admit that Case Nos. 8, 11, 15, and 58 were exposed to asbestos from non-talc sources. *See* SUMF § III.B. That admission alone demonstrates that Pecos River is entitled to summary judgment on the falsity element.

And there are many more subjects in the Article who indisputably were exposed to asbestos from non-talc sources, even if Defendants have not affirmatively conceded as much. For many cases, Defendants would not defend the subjects' inclusion in the Article. *See* App'x A. In still many more cases, the subjects themselves asserted (sometimes under oath) they had exposures to asbestos from non-talc sources. *Id.* And more cases' other records document exposures to asbestos from sources other than talc. *Id.* At a bare minimum, all these subjects "recalled" occupational or paraoccupational exposures to asbestos, had exposures that could be "documented," or at the very least had exposures that "may have been present."

Defendants' statements that the Article's subjects did not have any known exposures to asbestos other than (purportedly) via cosmetic talc are false.

### B.    The Review Claim is false.

The Article states that "[e]xposures were identified through sworn deposition testimonies and answers to sworn interrogatories provided from subjects, parents, and spouses." Ex. 1, Article at 2; *see also generally* SUMF § II.B. This, too, is false.

As discussed above, Dr. Maddox reviewed his *expert* reports. *See* SUMF § III.E.2. And

31

many of those rely only on attorney summaries, not deposition testimony, interrogatory responses, or any other actual evidence. *Id.* Dr. Maddox himself wrote the Article should state that "concise statements of exposure received from attorneys" were reviewed. Ex. 73 (emphasis added). Dr. Kradin did not personally review *anything*. He asked his wife to review *only his expert reports*. SUMF § III.E.1. Even though the Article states that Dr. Emory "reviewed the materials," she claimed to have done nothing to assess the exposures to asbestos. SUMF § III.E.3.

Defendants' review process is documented in their testimony and emails. There is no genuine dispute of material fact that the Article's Review Claim is false. The Article's false claim that its findings about cosmetic talc and mesothelioma were based on a rigorous review of underlying primary evidence was critical to the credibility of those purported findings.

### C. The No Overlap Claim is false.

The Article states that its subjects were "additional" to the subjects in Dr. Moline's paper. It is now undisputed that 8 subjects (more than 10%) overlap between the two papers: Ex. 5, Emory Dep. 190:19-20; *see generally* SUMF § II.C. The statement that all 75 subjects of the Emory Article are "additional" to the subjects of Dr. Moline's paper is indisputably false. SUMF § IV. As stated above, this false statement is also key to the perceived credibility and strength of the Article's findings, and Defendants themselves repeatedly emphasized its materiality.

## II. Pecos River Is Entitled To Summary Judgment On The "Actual Malice" Element.

There can also be no genuine dispute that Pecos River satisfied the "actual malice" element. That element "requires proof that the defamatory statement was published with knowledge that it was false or with reckless disregard of its truth or falsity." *Emory*, 766 F. Supp. 3d at 599 n.11.

"[R]ecklessness may be found where there are obvious reasons to doubt the veracity" of the information the statements are based on. *St. Amant*, 390 U.S. at 732. Actual malice can be shown if the defendant had a "high degree of awareness of [the statements'] probable falsity" or

had "'serious doubts' as to the truth of the publication." *Lynch*, 161 N.J. at 165 (citations omitted).

While a "failure to investigate *alone*" may not be sufficient for actual malice, a "deliberate decision

not to acquire knowledge of facts that might confirm the probable falsity" does represent actual

malice. *Harte Hanks*, 491 U.S. at 692 (emphasis added).

Similarly, "a failure to pursue the most obvious available sources for corroboration may be

clear and convincing evidence of actual malice." *Costello v. Ocean Cnty. Observer*, 136 N.J. 594,

615 (1994); *see also Pecos River Talc LLC v. Emory,* 2025 WL 1888565, at *6 (E.D. Va. July 8,

2025) (Krask, J.) (citing *Harte* and *Costello*).

### A. Defendants knew the subjects had other exposures to asbestos, or at minimum recklessly disregarded the truth.

#### 1. Defendants knew the subjects had other exposures to asbestos.

Defendants had *actual knowledge* that their statements were not true. *See generally* SUMF

§ III.C. Dr. Maddox intentionally included individuals who were exposed to asbestos from non-

talc sources if he deemed the exposures not "significant enough." Ex. 3, Maddox Dep. 38:18-25,

40:9-18. The Article does not say the subjects had no "significant exposures." It says they had no

"known exposures" *at all*. Ex. 1, Article at 1.

Defendants knew their public statements were not true. Dr. Emory circulated a draft of the

public-facing table of the Article's subjects along with an internal spreadsheet of the subjects. Ex.

79. The public-facing table lists the subjects as being "***without other known exposures.***" Ex. 82

(emphasis added). But the internal spreadsheet demonstrates Defendants knew the Article actually

contained subjects with "***no other significant exposures.***" Ex. 81 (emphasis added).

The Article states that its exclusion criteria were "recalled occupational or

paraoccupational exposures to other sources of asbestos." Ex. 1, Article at 2. But in fact, Dr.

Maddox's "exclusion criteria was if there was an exposure to asbestos that meets the factors that

[he] consider[s] in the six bullets in [his] expert reports." Ex. 3, Maddox Dep. 42:6-17. These factors appear nowhere in the Article. Ex. 1, Article.

The six factors Dr. Maddox evaluated were intended to demonstrate that the Helsinki Criteria are satisfied—criteria used to assess whether asbestos exposure was the *cause* of somebody's mesothelioma. *Id.* at 30:19-10, 41:5-6, 44:22-45:1. Dr. Emory similarly testified that she relied on the Helsinki Criteria in order "to determine whether there's a known exposures to asbestos." Ex. 5, Emory Dep. 333:10-19. But the Article does not mention the Helsinki Criteria. Nowhere does the Article state that its subjects *had* exposures to asbestos, but that Defendants determined those exposures were at too low levels to *cause* the subject's mesothelioma. *Id.*

Amazingly, Dr. Emory could not even say that someone who indisputably "inhaled asbestos from changing a brake" would be excluded from the Article. Ex. 5, Emory Dep 157:6-14. If Dr. Emory would intentionally include a subject with an undisputed exposure from a non-talc source, there can be no genuine dispute that she knew the statements in the Article were false. Defendants then concealed the falsity of the Article. SUMF § III.H; *see also Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1134 (7th Cir. 1987) (destroying documents evidence of actual malice); *Stern v. Cosby*, 645 F. Supp. 2d 258, 279–80 (S.D.N.Y. 2009) (concealing falsity evidence of actual malice).

Defendants knew that the statements in the Article that the subjects had no exposures to asbestos from non-talc sources were not true. Summary judgment is therefore warranted.

### 2. Defendants recklessly disregarded the truth regarding non-talc exposures to asbestos.

In addition to making the false statements knowingly, Defendants' process also constituted a reckless disregard for the truth. *See generally* SUMF § III.D-F. Dr. Emory did nothing to evaluate whether the subjects were exposed to asbestos from non-talc sources. Dr. Kradin did nothing

himself to evaluate the subjects' exposures. Instead, he instructed his wife with no experience in talc, asbestos, or mesothelioma to review his reports and not any underlying materials. *Id.*

Dr. Kradin knew reviewing the reports would not capture all the relevant exposures. Dr. Kradin's role as an expert witness is not to ascertain all the potential sources of exposure. *Id.* He also knew that exposures come to light after he issues his expert report, as they did in the case of Case No. 75. *Id.* So it was obvious that reviewing his expert reports would not be sufficient to identify the subjects' exposures. In other words, there were "obvious reasons to doubt the veracity" of the Exposure Claim based on a review of his reports. *St. Amant*, 390 U.S. at 732; *see also Lynch*, 161 N.J. at 165. Yet Dr. Kradin passed along Dr. Cashman's chart to Dr. Maddox *six minutes* after receiving it, without any time for meaningful review. Ex. 4, Kradin Dep. 69:25-70:11.

And that chart even *identified* non-talc exposures or potential exposures to asbestos for subjects of the Article. Defendants simply ignored that information. SUMF § III.D. Dr. Cashman identified Case No. 11 as having a non-talc exposure, yet no one could explain how Case No. 11 nevertheless ended up in the Article. *Id.* And Dr. Cashman noted "(asbestos??)" for Case No. 3, which meant she was "not sure whether [Case No. 3] was or was not exposed to asbestos." Ex. 6, Cashman Dep. 74:16-20. So the person responsible for evaluating Case No. 3 had "serious doubts" that she in fact had no talc exposures, yet no one investigated further. *See Lynch*, 161 N.J. at 165.

Dr. Maddox similarly understood that his role when preparing his reports was not to ascertain all of a plaintiff's exposures. *See* SUMF § III.E.2. He knew he was "not an exposure witness" and it is "not [his] job to go out and gather exposure information." Ex. 3, Maddox Dep. 146:12-16; 148:14-17. Yet he too primarily reviewed his expert reports and would only attempt to review documents if the report was unclear. *Id.* at 64:17-21; *see also id.* at 61:22-65:1; Ex. 70, Maddox 4/14/25 Rog Resp #3. Particularly egregious, Dr. Maddox's reports often rely exclusively

on summaries of exposures from plaintiffs' counsel and not any actual evidence. SUMF § III.E.2.

And like Dr. Kradin, Dr. Maddox understood that when he "prepare[s] [his] reports, that they're generally early in the investigative process so that often more evidence and more facts come out after [he] prepare [his] report, including evidence of exposures to asbestos from other sources that were not in [his] report at the time." Ex. 3, Maddox Dep. 152:17-23. So he too had a high degree of awareness that a review of his reports would not adequately capture exposures, but relied on his reports anyway because it was "quick way" to go about it. *Id.* at 155:13-18.

With respect to Dr. Emory: She served as the primary author; the Article stated that she reviewed the materials, she testified that she reviewed the data Dr. Maddox had, including deposition transcripts and medical records, and she signed an agreement representing that the Article did not contain libelous statements. *See* SUMF § III.E.3. Nevertheless, she admits she did nothing to ascertain the subjects' exposures to asbestos. Ex. 75, 4/14/25 Rog Resp. #3.

Together, Defendants ignored obvious sources of information (including information the Article *claimed* they reviewed)—like interrogatory responses, deposition transcripts, complaints, medical records, trial transcripts, expert reports, verdicts, and other documentation. *See* SUMF § III.E-F. Dr. Maddox even admitted that complaints would be a "reasonable starting point." Ex. 3, Maddox Dep. 238:25-239:7, 144:19-145:7. Dr. Maddox also testified it would be appropriate to review *both sides'* expert reports, but Defendants never reviewed any defense expert reports— where non-talc exposures to asbestos were most likely to be found *See* SUMF § III.E-F. One subject was even included in the Article even though a jury unanimously determined that the plaintiffs had not shown that the subject "was exposed to asbestos from Johnson & Johnson's Baby Powder." Ex. 47, *Case No. 33* Tr. 3059:10-17. Dr. Maddox testified at that trial. Ex. 46.

Nothing would have stopped Defendants from acquiring material from the underlying

plaintiffs' counsel if Defendants did not already have it in their possession. And as seasoned litigation experts, they plainly knew it existed. In other words, they made "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of their statements. *See Harte Hanks*, 491 U.S. at 692. Summary judgment is warranted.

**B.    Defendants' statements regarding their review process were made knowingly or with reckless disregard for the truth.**

Defendants knew their own review process. So they knew their Review Claim that they reviewed interrogatory responses and deposition transcripts was false. In fact, Dr. Maddox stated internally that the Article should report "[c]linical info obtained from: deposition review OR answers to interrogatories *OR concise statements of exposure received from attorneys."* Ex. 73 (emphasis added). There is no justification for Defendants' statement in the Article. It is a knowing falsehood. At a minimum, it reflects a reckless disregard for the truth.

**C.    Defendants recklessly disregarded whether their subjects were "additional" to the subjects of Dr. Moline's paper.**

Defendants entertained "serious doubts" as to the truth of their No Overlap Claim. *See Lynch*, 161 N.J. at 165; *see also generally* SUMF § IV.

Dr. Maddox admitted that he "couldn't be completely sure that there was no overlap" between the two papers. Ex. 3, Maddox Dep. 48:1-10. Worse, Dr. Emory expressly suspected in internal emails that Case Nos. 4, 9, and 52 overlapped between the papers, and they indeed do. Ex. 93. Of those, Case No. 52 is the most egregious because her diagnosis at age 30 is "very young among people who develop mesothelioma," which stood out as "pretty stark" and "pretty unique." Ex. 5, Emory Dep. 198:8-11, 199:12-14, 345:5-8. Dr. Emory wrote in an email stating that, after reviewing the tables, she believed Case No. 52 "**may be** the same" as a subject of Dr. Moline's paper. Ex. 103 (emphasis in original). Yet she did nothing to rule out this overlap. Ex. 5, Emory Dep. 210:6-211:4. That is a "serious doubt" as to the truth. *See Lynch*, 161 N.J. at 165.

Not only did Defendants express doubt the veracity of their assertions internally, but their process also recklessly disregarded the truth. *See generally* SUMF § IV. Dr. Kradin did nothing to personally evaluate whether any overlap exists between the two papers. Ex. 97, Kradin 4/14/25 Rog Resp. #4. But he implored his co-authors to "PLEASE be sure" that they were not duplicating cases—describing it as a "no no." Ex. 98; *see also* Ex. 99 (similar).

Despite knowing that a potential duplication of subjects was a concern, Dr. Maddox does not remember doing anything to determine that no overlap existed before telling Dr. Emory that it was so. Ex. 3, Maddox Dep. 177:20-22. And Dr. Emory did not look at obvious information that would help identify the subjects, such as the subjects' tissue digestion data, occupation, and brand used. *See* SUMF § IV. The tissue digestion data presented on the face of both papers alone makes clear that Emory Case No. 72 is the same person as Moline Case No. 6. *Id.* The table of Dr. Emory's subjects she used when making the comparison, even had gaps in the data that Dr. Emory made no attempt to fill. *Id.* Many of the overlap examples are obvious on the face of the Article. *Id.*

Dr. Emory ignored tissue digestion metrics, brand use information, and the subjects' occupation, and relied on a dataset of her subjects with gaps. There were "obvious reasons to doubt the veracity" of the outcome of this approach, and Defendants failed "to pursue the most obvious available sources for corroboration." *Costello*, 136 N.J. at 615. Defendants' statement that their subjects were "additional" to Dr. Moline's paper was made with reckless disregard for the truth.

### III.  Pecos River Is Entitled To Summary Judgment On The "Publication" Element.

The "publication" element is satisfied if statements are posted on the internet. *Gillon v. Bernstein*, 218 F. Supp. 3d 285, 297 (D.N.J. 2016). Here, the statements at issue were undisputedly published online. SUMF § I. Summary judgment is therefore warranted on this element.

### CONCLUSION

This Court should grant summary judgment for Pecos River on the trade libel claim on the

elements of falsity, publication, and actual malice.

## APPENDIX A

| No. | Summary Of Non-Talc Exposure | Exhibits |
|---|---|---|
| **Subjects Who Defendants Concede Had Non-Talc Exposures (SUMF ¶ 39)** | | |
| 8 | Dr. Kradin's **own expert report** acknowledged non-talc exposure. | Ex. 14 at 19-20. |
| 11 | Dr. Kradin's **own expert report** acknowledged non-talc exposure. | Ex. 15 at 20. |
| 15 | Dr. Kradin's **own expert report** acknowledged non-talc exposure. | Ex. 15 at 19. |
| 58 | Dr. Maddox's **own expert report** acknowledged non-talc exposure. | Ex. 3 at 282-83. |
| **Subject Dr. Maddox Testified Had Non-Talc Exposures** | | |
| 24 | Dr. Maddox's **own expert report and testimony** asserted non-talc exposures, as did the subject's interrogatory response, and deposition testimony. | Ex. 17; Ex. 18 at 54-55; Ex. 20 at 12-13; Ex. 21 at 232-35. |
| **Subjects Whose Inclusion Defendants Would Not Defend (SUMF ¶ 42)** | | |
| 75 | Subject did husband's laundry and co-worker testified he had "no doubt" husband was exposed to asbestos at work "[b]ecause, at that time, asbestos was everywhere." Dr. Kradin acknowledged laundering as a possible exposure route. | Ex. 22 at 81-82; Ex. 23 at 105-06; Ex. 24 at 46-47; Ex. 25 at 14, 38, 44. |
| 68 | Subject lived and worked in South Gate, CA, near plants that made asbestos products, where a CA Air Resources Board report recorded ambient asbestos concentrations 35 times greater than normal. | Ex. 26 at 36-37; Ex. 27 at 17; Ex. 3 at 298-99. |
| 3 | Complaint and integratory response assert take-home exposure from husband's work clothes. Dr. Kradin did not investigate the presence of asbestos at subject's husband's work. Defense expert testified that the subject's husband was "undoubtedly" exposed to asbestos, which he brought home for six years. | Ex. 28 at ¶35; Ex. 29 at 15-16; Ex. 30 at 106-07; Ex. 31 at 93; Ex. 32 at 5853-55. |
| **Subjects Who Personally Asserted Non-Talc Exposures** | | |
| 67 | Complaint and interrogatory responses asserted non-talc exposures from parents' work clothes. Dr. Moline's report detailed "two possible additional exposures to asbestos." | Ex. 34 at 4; Ex. 35 at ¶ 2; Ex. 36 at 21. |
| 7 | Complaints and a letter from plaintiffs' counsel assert non-talc exposures. Subject's own expert testified that home construction was "potential non-talc asbestos exposure," and that he "certainly couldn't exclude the possibility" that it contributed to her mesothelioma. | Ex. 37 at ¶ 1; Ex. 38 at ¶ 1; Ex. 39 at 1; Ex. 40 at 18. |
| 69 | Interrogatory responses asserted non-talc exposures. | Ex. 41 at 3. |
| 31 | Complaint asserted non-talc exposures. At his deposition, the subject raised several other occupational and para-occupational exposures to asbestos. | Ex. 42 at ¶ 3.1, 3.2; Ex. 43 at 63-64, 95-100, 112-15, 131-37. |
| **Subjects With Other Documented Non-Talc Exposures** | | |

| 33 | Medical records state: "asbestos exposure through her job in the past." Maddox testified at trial that absent contradicting records, he would accept this "as a possible exposure pending further clarification." | Ex. 44; Ex. 45; Ex. 46 at 1125-26. |
|---|---|---|
| 65 | Subject indicated on medical form that "construction work" exposed him to asbestos in the 1980s. Subject testified he was present in a school where he believed asbestos abatement work was conducted. His own expert (Dr. Moline) testified that medical records indicated other potential exposures to asbestos, which defense experts also discussed. | Ex. 48 at 279; Ex. 49 at 143-44; Ex. 50 at 15; Ex. 51 at 2-4; Ex. 52 at 49-50. |
| 5 | Asserted in a workers' compensation claim under criminal penalty for false statements that she was occupationally exposed to asbestos from the 1960s to 1990s. Industrial hygienist detailed the poor industrial hygiene practices related to asbestos at the relevant facility. | Ex. 54; Ex. 55 at 6. |
| 43 | Medical records detail asbestos exposure from tile removal with "no mask" for "three weeks" and "brief but significant asbestos exposure," while "pulling out floor, no mask." Dr. Maddox's report acknowledges the tile removal without a mask from the medical records, but omits that the medical records state the floor was an ***asbestos*** floor. | Ex. 56; Ex. 57 at 2. Ex. 58 |
| 72 | Both sides' experts identified a type of asbestos in the subject's tissue (crocidolite) not alleged to be present in cosmetic talc. Defendants did not perform, or check the accuracy of, the tissue digestion results reported in the Article, even including results they knew a court excluded. Medical records also mention "remote history of indirect asbestos exposure." Exposed pipe with asbestos insulation present in the basement that subject's brother would swing on. Case No. 72 attended high school at the time asbestos abatement was conducted. | Ex. 59 at 1; Ex. 60 at 91; Ex. 5 at 161, 163-64; Ex. 61; Ex. 62 at 30-33; Ex. 63 at 4357-59; Ex. 64; Ex. 65. |
| 16 | Subject testified that her father was a shade mechanic who repaired cars, including brake work, 6 days a week at home. She would sometimes be only a few feet away from the work. Brothers also helped; all would then wear clothes in the house. | Ex. 66 at 25-27, 30-33. |
| 74 | Plaintiff's expert testified this exposure from subject living near factory was possible. Defense expert stated, "of course" non-talc asbestos exposures. | Ex. 67 at 70, 74; Ex. 68 at 71, Ex. 69 at 13. |

Dated: October 17, 2025

Respectfully submitted,

*/s/ Benjamin L. Hatch*

**MCGUIRE WOODS**

Benjamin L. Hatch (VSB No. 70116)
Sylvia Macon Kastens (VSB No. 92375)
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510-1655
Telephone: (757) 640-3727
Facsimile: (757) 640-3947
bhatch@mcguirewoods.com
skastens@mcguirewoods.com

Samuel L. Tarry, Jr. (VSB No. 36850)
1750 Tysons Boulevard, Suite 1800
Tysons, VA 22102-4215
Telephone: (703) 712 5000
Facsimile: (703) 712 5050
starry@mcguirewoods.com

Kristen Fournier *(pro hac vice)*
Matthew Bush *(pro hac vice)*
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800
F: (212) 446-4800
kristen.fournier@kirkland.com
matthew.bush@kirkland.com

Akhil K. Gola *(pro hac vice)*
1301 Pennsylvania Ave NW
Washington, DC 20004
T: (202) 389-3256
F: (202) 736-1910
akhil.gola@kirkland.com

*Attorneys for Plaintiff Pecos River Talc LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing instrument to be served on all counsel of record on October 17, 2025. Additionally, the undersigned certifies that all documents filed under seal will be served via encrypted electronic communication.

*/s/ Benjamin L. Hatch]*
Benjamin L. Hatch