# EXHIBIT 1

```
                                                              Page 1
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    NEWPORT NEWS DIVISION
 3
 4      PECOS RIVER TALC LLC,            )
             Plaintiff                   )
 5                                       )
             vs.                         )   Civil Action No.
 6                                       )   4:24-cv-75
        DR. THERESA SWAIN EMORY, DR.     )
 7      RICHARD LAWRENCE KRADIN, AND     )
        DR. JOHN COULTER MADDOX,         )
 8           Defendants.                 )
 9
10
11
12      DEPOSITION OF: DR. RICHARD KRADIN
13
14
15
16
17              Taken before Heather M. Williams, Court
18
19      Reporter, at the Bedford Village Inn, 2 Olde Bedford
20
21      Way, Bedford, New Hampshire, on Wednesday,
22
23      September 17, 2025, commencing at 9:19 A.M., pursuant
24
25      to notice given.
```

Page 10

1  Williams, and will now swear the witness.
2      (The witness was administered the oath by
3  the reporter.)
4  RICHARD L. KRADIN, having been duly sworn by the
5  Court Reporter, was examined and deposed as follows:
6          EXAMINATION
7  BY MR. BUSH:
8  Q  Good morning, Dr. Kradin. My name is Matthew Bush.
9      Is there any reason you can't give true and
10  accurate testimony today?
11  A  No.
12  Q  What did you to do -- well, let me strike that.
13      I think you know the drill, that I'm not asking
14  you for the contents of your conversations with your
15  lawyers. But what did you do to prepare for your
16  deposition today?
17  A  I've reviewed a series of documents and I've had
18  several conversations with my counsel.
19  Q  And what documents did you review?
20      MS. LOCKWOOD: Objection.
21      I instruct you not to answer. That's work
22  product.
23  Q  Okay. When did you have these conversations with
24  your lawyers?
25  A  I've had ongoing conversations, but we met for

Page 11

1  several hours on Monday afternoon.
2  Q  And did you have any other meetings in preparation
3  for your deposition other than that meeting?
4  A  No.
5  Q  Without counsel present, did you ever talk to
6  Dr. Emory or Dr. Maddox about your deposition?
7  A  No.
8  Q  And without counsel present, did you ever talk to
9  Dr. Cashman about your deposition?
10  A  I speak with Dr. Cashman frequently, but not
11  specifically about the content of the deposition.
12  Q  And without counsel present, did you speak with
13  Dr. Cashman about her deposition yesterday?
14  A  No, I did not.
15  Q  Other than you, Dr. Maddox, and Dr. Emory, is anyone
16  paying for your attorneys in this case?
17  A  Not to my knowledge.
18  Q  Is there any reason somebody would be paying your
19  attorneys without your knowledge?
20  A  There could be.
21  Q  And why is that?
22      MS. LOCKWOOD: Objection.
23      To the extent you can answer without revealing
24  privileged communications, you can answer.
25  Otherwise, I instruct you not to answer.

Page 12

1  A  I really just don't know. I don't know the answer.
2  BY MR. BUSH:
3  Q  Okay. I'm going to mark as Exhibit 1 your article
4  entitled: Malignant Mesothelioma Following Repeated
5  Exposures to Cosmetic Talc: A Case Series of 75
6  Patients, authored by Dr. Emory, Dr. Maddox, and Dr.
7  Kradin.
8  A  Mm-hmm.
9  Q  And Dr. Kradin, you are one of the authors of this
10  article, correct?
11  A  Yes, sir.
12  Q  And if we turn to page 6, the last page on the back,
13  there's a section of -- called Author Contributions.
14      Do you see that?
15  A  Yes.
16  Q  And where it says RLK, that's you, right?
17  A  Yes, it is.
18  Q  And it says here that you revised and gave final
19  approval of the version to be published.
20      Do you see that?
21  A  Yes.
22  Q  And so you've reviewed every word of this article and
23  gave approval for it to be published, correct?
24  A  I read the article and gave approval, yes.
25  Q  Okay. Let's look at the Abstract on the first page.

Page 13

1  So under Methods, it says: Seventy-five individuals,
2  64 females, 11 males, with malignant mesothelioma
3  whose only known exposure to asbestos was repeated
4  exposures to cosmetic talcum powders, were reviewed
5  in medical-legal consultation.
6      Do you see that?
7  A  Yes.
8  Q  And all of these subjects were plaintiffs in cosmetic
9  talc litigation, correct?
10  A  To my knowledge, yes.
11  Q  And for almost all the subjects, they came from cases
12  where either you or one of your co-authors served as
13  an expert witness for the plaintiffs, correct?
14  A  I believe that's correct.
15  Q  And of the 75, some came from you, some came from
16  Dr. Maddox, some came from Dr. Emory, and some came
17  from others, correct?
18  A  I don't know about the others. It's possible, I
19  don't know.
20  Q  But -- alright. So let -- let me rephrase that.
21      You do know at least that some of the cases came
22  from you, some came from Dr. Maddox, and some came
23  from Dr. Emory, correct?
24  A  That's correct.
25  Q  And the factual premise of the article is that for

Page 94

1   for wanting to do this sort of work.
2 Q  And did you know anything about the content of this
3   article before it was published?
4 A  Not a thing.
5 Q  And I'll ask the same questions, I'll try to do it
6   broadly to -- to cut to the chase.
7 A  Mm-hmm.
8 Q  But you didn't have any conversations with any
9   attorneys regarding this Steffen article before it
10  was published, correct?
11 A  No.  I don't have those types of conversations.
12 Q  And can you, Dr. Kradin, would you mind pulling back
13  up Dr. Moline's article?
14 A  Yes.
15 Q  If you look at the very bottom of the first page,
16  it's in -- you can see that this article is in the
17  Journ -- JOEM, if you remind me, is the Journal of
18  Occupational and --
19 A  Environmental Medicine.
20 Q  Environmental Medicine.  Thank you.
21     And you see that this is -- this article is
22  published in Volume 62 of JOEM, article number 1?
23 A  Yes.
24 Q  And if we look at the Steffen article where Dr. Longo
25  is a -- one of the authors, do you see it's published

Page 95

1   in that same Volume 62 of JOEM and it's article
2   number 2?
3 A  I see that, but I'm not sure what any of this has to
4   do with me.
5 Q  Well, I -- I want to know if you have any
6   understanding of how it came to be that these
7   articles --
8 A  No.
9 Q  -- were --
10 A  Absolutely -- absolutely none.
11     MS. LOCKWOOD:  Wait a minute.  Let's just have a
12  clean record and have -- let him get his question
13  out.
14  BY MR. BUSH:
15 Q  We've been pretty good about waiting for each other
16  to finish.  I just need to -- I know you know where
17  I'm going, but I just need to finish my question.
18     Do you have any understanding of how
19  Dr. Moline's article and Dr. -- the Steffen article,
20  which -- where Dr. Longo is one of the co-authors,
21  ended up in volume 1 and volume 2 of the same volume
22  of the same journal?
23 A  I have absolutely no idea.
24 Q  And you see that -- and -- and -- and know that
25  Dr. Moline's article is a case series, right?

Page 96

1 A  Correct.
2 Q  And it came out in 2020, correct, the published
3   version?
4 A  Yes.
5 Q  And the Steffen article where Dr. Longo is a -- is a
6   co-author is also a case series, it says in the
7   title?
8 A  Yes.
9 Q  And that also came out in 2020?
10 A  Yes.
11 Q  And your article was published in 2020, as well,
12  correct?
13 A  I believe so.
14 Q  And that's also a case series?
15 A  Yes.
16 Q  And do you think it's just a coincidence that three
17  articles that are all case series all about cosmetic
18  talcum powder all authored by experts for the
19  plaintiffs in cosmetic talc litigation came out in a
20  close period of time in the same year?
21 A  Yes, I think it's a coincidence.
22 Q  Okay.
23 A  And it's not unusual in this initial observation to
24  have a series of articles follow that short order in
25  all -- all of the medical literature.  So once

Page 97

1   something becomes an area of interest for -- for
2   medical researchers, it's not unusual to see papers
3   follow one after the other.
4 Q  But for -- for these articles, they were so close in
5   time, there wasn't time for someone to see the
6   article and then begin preparing a new article after
7   that, correct?
8 A  No.  I -- I -- I think we all were becoming aware
9   that there was an issue with respect to cosmetic talc
10  and individuals developing mesothelioma.  I mean, it
11  was -- it was a zeitgeist, it was in the -- it was in
12  the air.
13 Q  Right.  But -- but you -- you decided to publish your
14  article before Dr. Moline's article came out --
15 A  Yes.
16 Q  -- correct?
17     So you're not saying you saw Dr. Moline's
18  article --
19 A  No.
20 Q  -- and that's what prompted your decision to publish?
21 A  Absolutely not.
22 Q  Right.  And -- and do you think that -- that the
23  article -- the authors of the Steffen article had
24  time between when their article came out and when
25  Dr. Moline's article came out to start the article

25 (Pages 94 - 97)

| | Page 130 | | Page 132 |
|---|---|---|---|
| 1 | to be used for? | 1 | bottom of the last page that you declared under |
| 2 |     MS. LOCKWOOD: Objection; mischaracterizes the | 2 | penalty of perjury that the foregoing is true and |
| 3 | testimony. | 3 | correct, executed on February 18, 2025? |
| 4 |     And also caution you not to reveal the contents | 4 A | Yes. |
| 5 | of our privileged communications. | 5 Q | And that's your signature on the -- on the last page? |
| 6 | BY MR. BUSH: | 6 A | Yes, it is. |
| 7 Q | Did -- did -- when you signed this Declaration, did | 7 Q | And in -- if you look at paragraph 9 -- |
| 8 | you have an understanding of what it was to be used | 8 A | Mm-hmm. |
| 9 | for? | 9 Q | -- the last sentence, you wrote: I did not write the |
| 10 A | I don't recall. I don't -- I don't remember. | 10 | article in order to further my expert witness |
| 11 Q | Okay. I am going to attach as Exhibit 37 Defendants' | 11 | services or to make money and would never publish an |
| 12 | Memorandum in Support of Motion to Dismiss, which | 12 | article like this for any purpose other than |
| 13 | is -- in this case, which is docket number 15 dated | 13 | advancing medicine or patient care. |
| 14 | June 21, 2024. | 14 | Do you see that? |
| 15 A | Mm-hmm. | 15 A | I do. |
| 16 Q | So as you know, I'm not going to ask you to review | 16 Q | Do you recall the circumstances of why you would have |
| 17 | the -- to reveal the contents of any communications | 17 | been submitting this Declaration in this case? |
| 18 | you had with your lawyer. So I'm going to be asking | 18 A | It was submitted by -- by counsel. I -- I -- I read |
| 19 | the questions at a very high level, which is in | 19 | it and signed it as everything in it is accurate. |
| 20 | general for the filings in this case, have you been | 20 Q | Do you recall filing a Motion for Reconsideration of |
| 21 | reviewing them before they are filed with the Court? | 21 | the Motion to Dismiss? |
| 22 A | I think some of them, I have. I'm not sure if I've | 22 A | I don't recall. |
| 23 | reviewed all of them. I think my counsel has been | 23 Q | Would you have had any understanding of the purpose |
| 24 | very good about sending us all -- all these | 24 | for which you were -- you were signing this |
| 25 | documents. But some of it is just gibberish to me. | 25 | Declaration -- |
| | Page 131 | | Page 133 |
| 1 Q | Okay. And do you recall that you and your | 1 | MS. LOCKWOOD: Objection. |
| 2 | codefendants moved to dismiss this case? | 2 | BY MR. BUSH: |
| 3 A | Yes. | 3 Q | -- at the time that you signed it? |
| 4 Q | And do you recall if you at the time reviewed this | 4 | MS. LOCKWOOD: Objection. I instruct you not to |
| 5 | Memorandum in Support of the Motion to Dismiss? | 5 | answer. |
| 6 | MS. LOCKWOOD: Objection. | 6 | Can we try to not veer into privileged |
| 7 | I instruct you not to answer. Seeking | 7 | communications. You can ask him about the document, |
| 8 | privileged communications. | 8 | what he says in it. I don't -- you know, we're |
| 9 | MR. BUSH: Alright. | 9 | really -- I'm not going to risk him revealing |
| 10 | MS. LOCKWOOD: You can try to ask it a different | 10 | privileged communications or work product. |
| 11 | way, Matt. But I'm not quite sure why you're -- | 11 | MR. BUSH: Okay. I'm not -- I'm not -- and I |
| 12 | MR. BUSH: I'm not sure how to -- I was just | 12 | understand. I understand it -- it's -- |
| 13 | trying to think if there's a different way to ask it | 13 | MS. LOCKWOOD: I'm not trying to be |
| 14 | to get -- | 14 | obstructionary, but let's just try to find -- |
| 15 | BY MR. BUSH: | 15 | MR. BUSH: I understand we're toeing the line. |
| 16 Q | Well, let me ask you this. Did you -- have you seen | 16 | I'm not saying I -- I agree with the instructions. I |
| 17 | this document before; to the best of your | 17 | understand why we're -- we're running a close call |
| 18 | recollection? | 18 | on -- on these topics. |
| 19 A | I don't recall. | 19 Q | So I -- I just want to ask you, is -- is it your -- |
| 20 Q | Alright. Let me just -- okay. | 20 | is it your testimony that writing the article that |
| 21 | I'm going to mark as Exhibit 38 a Declaration of | 21 | you -- your decision to write this article had |
| 22 | Dr. Richard L. Kradin, M.D. in this case dated | 22 | nothing to do with the cosmetic talc litigation? |
| 23 | February 18, 2025. | 23 | MS. LOCKWOOD: Objection; vague. |
| 24 A | (Witness is examining document.) | 24 A | Yes. That -- that's my -- that's my position. |
| 25 Q | Okay. And do you see, Dr. Kradin, if we turn to the | 25 Q | Okay. Okay. And if we could pull Exhibit 33 again, |

Page 134

1  please, which is the -- your email to Dr. Emory.
2  A  Yes.
3  Q  Well, let me ask you this. Did you expect when you
4     were preparing this article that you would then be
5     relying on it when you served as an expert
6     litigation -- an expert witness in talc litigation?
7  A  Yes.
8  Q  And if we look at number 6 of that email, you wrote
9     to Dr. Emory, which we looked at earlier: As we are
10    all actively engaged in litigation, you can be sure
11    that defense counsels will ask to see the data.
12    Right?
13 A  I did.
14 Q  So -- so you knew that you and your co-authors were
15    all actively involved in cosmetic talc litigation at
16    the time you were preparing the article, right?
17 A  That's correct.
18 Q  Alright. Let's mark as Exhibit 39 an email from
19    Dr. Kradin to Dr. Emory and Dr. Maddox dated
20    February 23, 2020, which is Bates stamped Emory
21    ending 1217.
22       And if we look at the -- the top email, the last
23    sentence in your email, you wrote to Dr. Emory and
24    Dr. -- it was addressed to Dr. Emory, you wrote: I
25    think that it is a major contribution to the field,

Page 135

1     but get ready for the J & J lawyers.
2        Do you see that?
3  A  I do.
4  Q  And can you explain what you meant by that?
5  A  I meant by that that in my depositions related to
6     some of these talc cases, I was being asked very
7     incisive and aggressive questions by the J & J
8     lawyers concerning the -- the subjects in the paper.
9  Q  And -- and it was your understanding that the J & J
10    lawyers would understand that your article implicated
11    Johnson's Baby Powder, correct?
12       MS. LOCKWOOD: Objection; misstates the
13    document, lack of foundation.
14 A  Again, J -- Johnson & Johnson was never mentioned in
15    the paper. But certainly there were depositions that
16    I was attending where the J & J lawyers were taking
17    the lead. And some of them were very aggressive.
18    BY MR. BUSH:
19 Q  And you thought based on your experience that the
20    J & J lawyers would understand your article to
21    implicate the safety of Johnson's Baby Powder,
22    correct?
23       MS. LOCKWOOD: Same objection.
24 A  I assumed they thought that because they were part of
25    the -- they were one of the defendants. So I assume

Page 136

1     that's where they were coming from. But again, I
2     wasn't expecting the current form of litigation, but
3     I was expecting there would be questions at
4     depositions.
5     BY MR. BUSH:
6  Q  Okay. I'm going to mark as Exhibit 40 an email from
7     Dr. Kradin to Dr. Emory dated April 22, 2020, which
8     is Bates stamped Emory 1340.
9        And I want to first direct your attention to the
10    middle email in this chain written by Dr. Emory on
11    April 22, 2020 at 12:55. She writes: By the way,
12    had my first talc deposition after the publication of
13    our paper. It was quite intense, but I refused to
14    share any information more than what was in the
15    paper, HIPAA.
16       Do you see that?
17 A  Yes.
18 Q  What was your understanding of what she meant when
19    she said HIPAA after I refused to share any
20    information more than what was in the paper?
21 A  I think she meant that to share the details of the
22    subjects in the paper would be infringement on -- on
23    their personal privacy. That's the nature of HIPAA.
24 Q  And do you think that it was her view that it would
25    be a -- and HIPAA is a -- is a -- is a federal

Page 137

1     statute, correct?
2  A  Yes.
3  Q  And it concerns patient privacy, correct?
4  A  It does.
5  Q  And do you -- do you think that Dr. Emory -- strike
6     that.
7        Was it your understanding from reading this
8     email that Dr. Emory was stating that it would be a
9     HIPAA -- that she was going to contend that it would
10    be a HIPAA violation to reveal the identities of the
11    subjects?
12 A  I think she thought it would be a HIPAA violation. I
13    thought it would be a HIPAA violation. I assume
14    Dr. Maddox may have thought the same. And -- and we
15    still think that.
16 Q  Okay. And if you go up to the top email, it says --
17    you wrote back to Dr. Emory: Good for you. I hope
18    that John does the same, because there is a crack,
19    there goes the dam.
20       Do you see that?
21 A  Yes.
22 Q  What did you mean by that?
23 A  I meant that I thought it was a HIPAA violation and
24    that we should all three be on the same page with
25    respect to not sharing that type of information at

Page 258

1  A  I mean --
2     MS. LOCKWOOD: Objection; misstates the
3  document.
4  A  Based on -- based on my knowledge when we drafted
5  this paper, that was my opinion. That was what I
6  believed to be the case.
7  BY MR. BUSH:
8  Q  And -- and as written, that's not completely
9  accurate, correct?
10 A  It may not be completely accurate. But it is -- the
11 bulk of it, more than, you know, probably 75 to 80 to
12 90 percent is accurate.
13    I don't know exactly, you know, what inadvertent
14 errors may be in the other cases; but in my cases,
15 it's a small number. And again, I think the overall
16 position of the paper, the conclusion of the paper is
17 accurate. And -- and that's really the important
18 point to me at least.
19 Q  And -- and the conclusion of the paper is that talc
20 can cause -- exposure to talc can cause mesothelioma;
21 is that right?
22 A  The conclusion is that talc has now been associated
23 with individuals who have developed malignant
24 mesothelioma and people need to be aware of that
25 fact.

Page 259

1  Q  Because as a case series, a -- your article cannot
2  establish that exposure to talc does cause
3  mesothelioma, correct?
4  A  It can cause mesothelioma. But the problem being
5  that since virtually everybody that I'm aware of has
6  been exposed at some point in time, often in infancy,
7  but some point in time to cosmetic talc, the ability
8  to produce an epidemiological study that's what we
9  call powered properly would be almost impossible to
10 perform.
11 Q  And -- and I -- I didn't hear you at the beginning of
12 your answer. Did you say it can cause or can't cause
13 mesothelioma at the beginning of your answer?
14 A  I didn't say it can cause; I said there's a concern
15 that it can cause.
16 Q  But that as a -- as a case series, your article on
17 its own cannot establish causation that exposure to
18 cosmetic talc does cause mesothelioma, correct?
19 A  Exactly right. We never made that statement, so I'm
20 not sure why we're here.
21 Q  Okay. Thank you, Dr. Kradin. That's all of the
22 questions I have.
23 A  You're welcome.
24    MR. BUSH: Unless there's any further redirect.
25    MS. LOCKWOOD: I don't have further questions.

Page 260

1     THE VIDEOGRAPHER: Thank you, counsel.
2  This concludes the deposition of Richard --
3  Dr. Richard Kradin. Going off the record 3:52 P.M.
4     (End of video recording.)
5     MS. LOCKWOOD: Do you -- do you need transcript
6  orders?
7     THE REPORTER: Yes, I do.
8     MR. BUSH: On the record. On the record.
9     (Off the record briefly.)
10    MR. BUSH: So for my transcript order, I'd like
11 digital copies, all the forms, PTX, PDF, TXT,
12 condensed and full. If possible, we'd like a rough
13 by Friday and the final by Monday or Tuesday.
14    MS. LOCKWOOD: And we'll just take standard
15 delivery. No rough needed.
16 Thank you.
17    (Off the record briefly.)
18    MR. BUSH: I'll -- I'll just put on the record
19 if that's okay. And I'd like an -- an expedited
20 video whenever that could be done, please.
21    (The deposition was concluded at
22 3:54 P.M.)
23    *********
24
25

Page 261

1  CERTIFICATE
2
3     I, Heather M. Williams, Court Reporter,
4  hereby certify that on the 17th day of September,
5  2025, personally appeared before me the within-named
6  deponent, DR. RICHARD KRADIN, who was sworn to
7  testify the truth, the whole truth, and nothing but
8  the truth in the aforenamed cause of action, and that
9  the foregoing is a true and accurate record of the
10 evidence as taken by me by means of computer-aided
11 machine shorthand.
12    I further certify that I am a
13 disinterested person in the event or outcome of the
14 aforenamed cause of action.
15    IN WITNESS WHEREOF, I subscribe my hand
16 this 23rd day of September, 2025.
17
18
19
20       Heather M. Williams
         Notary Public
21
22
23 My commission expires:
24    June 1, 2028
25

66 (Pages 258 - 261)