# **EXHIBIT 2**

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF VIRGINIA
3                  NEWPORT NEWS DIVISION
4     ---------------------------
5     PECOS RIVER TALC LLC,
6              Plaintiff
7     V.                         Civil Action No.
                                  4:24-cv-75
8     DR. THERESA SWAIN EMORY,
9     DR. RICHARD LAWRENCE
10    KRADIN, AND DR. JOHN
11    COULTER MADDOX
12             Defendants
13    ---------------------------
14
15           VIDEO-RECORDED DEPOSITION OF
16               THERESA SWAIN EMORY, MD
17
18             Friday, October 3, 2025
19                   8:54 AM EST
20
21
22
23    JOB NO.: 7630327
24    Reported by:  Denise Dobner Vickery, CRR, RMR

Page 18

1  that point, it wasn't as bad, but now it's really
2  bad.  So.
3      Q.    And so somebody -- there's a source
4  of funding that's paying a portion of your
5  attorney's fees, but you don't know the source?
6      A.    Right.  That's right.
7      Q.    And do you -- other than this
8  unknown source, do you have any information at all
9  that somebody may at any point in the future
10 reimburse you for some or all of your attorney's
11 fees?
12     A.    No.
13     Q.    Do you have any information at all
14 that somebody may in the future pay your attorneys
15 directly some or all their attorney's fees?
16     A.    No.
17     Q.    And what about the damages in the
18 event that you're found liable?  Do you have any
19 information that someone other than you and your
20 codefendants might compensate you in any way or
21 for any portion of damages in the event that
22 you're found liable?
23     A.    No, not in any way.
24           In fact, my husband and I have

Page 19

1  already planned that we're going to be bankrupt
2  and, in fact, we this spring about my cemetery
3  plots so that my son wouldn't be left with.
4           We're prepared and I'm okay with it
5  really because I have a lot of faith that, you
6  know, we'll be -- I'll be okay even with nothing.
7  I'm okay.
8      Q.    And have you -- do you have any
9  information that anybody at Simon Greenstone or
10 the Simon Greenstone firm itself might contribute
11 financially to you or your codefendants or your
12 attorneys in any way in connection with this
13 lawsuit?
14     A.    No.
15     Q.    And do you have any agreements
16 regarding allocating damages among you and your
17 codefendants in the event that you are found
18 liable?
19     A.    I haven't thought about that.  I
20 just assumed then that I'll just bankrupt.  I
21 mean, there's no way that me, that I can pay half
22 a trillion dollar company for whatever damages
23 there are.  So to me, it's -- it's kind of moot
24 and, you know, it is what it is.  I'll carry on

Page 20

1  however that is, but no.
2      Q.    And is it -- is it possible that
3  this unknown source of funding would be Simon
4  Greenstone or attorneys at Simon Greenstone?
5      A.    So I don't know what's possible, but
6  if there's funding sources like foundations or
7  academic companies or attorneys, I have no
8  information about that.  But if there -- if there
9  was, I mean, that would be -- it could be anybody.
10          MR. BUSH:  Okay.  Let's mark
11      as Exhibit 1 the article "Malignant
12      mesothelioma following repeated exposure
13      to cosmetic talc:  A case series of 75
14      patients" by Dr. Emory, Dr. Maddox, and
15      Dr. Kradin.
16          (Document marked for
17      identification as Emory Exhibit 1.)
18 BY MR. BUSH:
19     Q.    And you're, of course, one of the
20 authors of this article along with Dr. Kradin and
21 Dr. Maddox, correct?
22     A.    Yes, sir.
23     Q.    And do you consider yourself the
24 lead author of this article?

Page 21

1      A.    No, sir.
2      Q.    Who's the -- who is the lead author
3  of the article?
4      A.    So there's three authors.  We're
5  coauthors.  So not -- at least in my experience in
6  writing papers that you usually just -- it depends
7  where you are but usually, and particularly in a
8  case like this, and I've written other papers
9  where oftentimes the senior -- most senior person
10 is last, and the one that actually drafts it with
11 the pen to the paper is first.
12          And so that's what we did here, but
13 we were all coauthors and -- and that's how it's
14 been throughout my career and how I've had other
15 papers written in the past, which are on my CV.
16     Q.    And you reviewed the final version
17 of the article before it was published, right?
18     A.    We all reviewed the final version of
19 the article before it was published.
20     Q.    And you approved the article before
21 it was published, correct?
22     A.    So the paper was reviewed by
23 everyone, and Dr. Kradin and I were working
24 back-and-forth until the very last day and

6 (Pages 18 - 21)

Page 130

1  A.  So I could call the board and meet
2  with them and tell them that I did that and see,
3  you know, and explain that I didn't realize I had
4  done that.
5  Q.  And do you think that would be
6  appropriate to do that?
7  A.  It would be fine to do it. Maybe I
8  will.
9  Q.  And did -- and do you remember that
10 the declaration said it would be a violation of
11 your medical ethics to disclose the names?
12 A.  Yes.
13 Q.  And do you think that what the table
14 you sent to Ms. Dutton was a violation of your
15 medical ethics?
16 A.  Personally I didn't because I was
17 sending it within the confines of a law firm, but
18 potentially it is. Potentially it is, and I --
19 and I feel really bad about that.
20 Q.  And when you -- is it your position
21 that when you were preparing your article that it
22 had nothing to do with litigation?
23 A.  Yes.
24 Q.  And so when you were sending these

Page 131

1  names to Simon Greenstone, you're saying that
2  that -- who is a law firm -- that that had nothing
3  to do with litigation?
4  A.  Not to my mind.
5  Q.  And so what confidentiality
6  obligations did they have if this was outside of
7  litigation?
8       MS. LOCKWOOD:  Objection.
9    Mischaracterizes prior testimony.
10      THE WITNESS:  I don't
11   understand the question.
12 BY MR. BUSH:
13 Q.  What confidentiality obligations
14 does Simon Greenstone have with respect to the
15 names that you sent them?
16 A.  So I'm not an expert on that sort of
17 thing. I'm not a lawyer. I don't know.
18      I only can know about my own self
19 and my own responsibilities as a physician.
20      MR. BUSH:  This has been an
21   about an hour.
22      MS. LOCKWOOD:  Yeah.
23      MR. BUSH:  If we want to take
24   a break.

Page 132

1       MS. LOCKWOOD:  Yep.
2       THE VIDEOGRAPHER:  Stand by.
3    We are off the record at
4    11:10.
5       (A recess was taken.)
6       THE VIDEOGRAPHER:  We are on
7    the record at 11:17.
8       MR. BUSH:  Sorry. Just give
9    us one moment.
10      (Pause).
11      MS. LOCKWOOD:  While we're
12   waiting, can you just confirm how long
13   we've been on the record? Thank you.
14      MR. BUSH:  The charts didn't
15   print in color. So it's going to make it
16   hard to fix that.
17      MS. LOCKWOOD:  Okay. Do you
18   want to -- do you need to do that to have
19   a better record?
20      MR. BUSH:  Yeah. Sure. Why
21   don't we -- it will take us just a minute
22   if you don't mind.
23      MS. LOCKWOOD:  Okay. Yeah,
24   I'd rather have a good record.

Page 133

1       MR. BUSH:  Yeah. Let's go
2    off.
3       THE VIDEOGRAPHER:  Stand by.
4    We are off the record at
5    11:19.
6       (A recess was taken.)
7       THE VIDEOGRAPHER:  We are on
8    the record at 11:24.
9       MR. BUSH:  Okay. Thank you
10   for everyone's patience while we got
11   documents sorted out.
12      I'm going to mark as
13   Exhibit 12 an e-mail from Dr. Kradin to
14   Dr. Emory dated February 13, 2020. It's
15   Bates stamp Emory 1204.
16      (Document marked for
17   identification as Emory Exhibit 12.)
18      MR. BUSH:  And then I'm going
19   to mark as Exhibit 13, which is the
20   attachment to that e-mail, which is Bates
21   stamp Emory ending 1205.
22      (Document marked for
23   identification as Emory Exhibit 13.)
24 BY MR. BUSH:

34 (Pages 130 - 133)

Page 222

1    So, so you think most likely
2 somebody at Simon Greenstone suggested to you that
3 you reach out to Dr. Moline directly about this
4 issue?
5         MS. LOCKWOOD: Objection.
6    Mischaracterizes testimony.
7         THE WITNESS: So, again, I'm
8    not -- I don't have evidence of that, but
9    I did e-mail her the next day.
10 BY MR. BUSH:
11   Q.   Right.
12   A.   And I don't remember. I mean, I
13 don't remember that, but I'm clearly sending an
14 e-mail to a person that I haven't communicated
15 with before.
16   Q.   And you --
17   A.   And I introduced myself because,
18 obviously, I put my whole name and my -- all the
19 things. So I obviously don't know this person.
20   Q.   Right.
21        And do you recall how you got
22 Dr. Moline's e-mail?
23   A.   No. That's what I'm saying, I
24 don't.

Page 223

1    Q.   And so given the records that we
2 have available, do you think the most likely
3 explanation for what occurred in this gap is that
4 somebody at Simon Greenstone suggested to you that
5 you reach out directly to Dr. Moline about this
6 overlap issue?
7         MS. LOCKWOOD: Object to the
8    form.
9         THE WITNESS: So I can't make
10   that assumption because Maddox could have
11   told me. I don't remember. So I just
12   -- I can't make it up. I mean, I'm
13   not -- I'm guessing. I mean, I don't
14   want to make up something that I don't
15   know.
16 BY MR. BUSH:
17   Q.   And you don't recall Dr. Maddox ever
18 suggesting to reach out to Dr. Moline directly?
19   A.   I don't recall. Like I said, I'm
20 working full time. I'm just kind of trying to
21 follow up, get this paper written, and move on.
22   Q.   All right. And then on
23 February 13th, after you e-mail Dr. Moline, she
24 says:

Page 224

1         "Please give me a ring tomorrow."
2         Correct?
3    A.   Yes.
4    Q.   And then she says -- she follows up
5 and says:
6         "Will be available more in the
7 morning but also later afternoon - just not
8 between 12 to 3."
9         Right?
10   A.   That's what the e-mail says.
11   Q.   And did you call Dr. Moline the next
12 morning?
13   A.   So I'm sorry. Can we go back again?
14   Q.   Yeah.
15   A.   Oh, yeah. "Please give me a ring"
16 and then -- right.
17        So did I call her?
18        I called her that next day or
19 what -- I must have called her the next day at
20 some point.
21   Q.   And do you remember what you spoke
22 about?
23   A.   Yes. I was just -- so as I recall,
24 the conversation was: I didn't know her. She

Page 225

1 didn't know me. I said, "I'm trying to figure out
2 if there's overlap between the papers. Is there
3 any way. I know we can't share names," you know.
4         She said, "We can't share names." I
5 said, "So, okay, I'll just go back to the tables
6 and do the best I can."
7         That's how I remember the
8 conversation. I went back to the tables after I
9 got off the phone, as best I can recall, and tried
10 to eliminate some more. Because I hadn't studied
11 the tables hard, you know, I hadn't finished doing
12 what I was trying to do and I wasn't -- I felt
13 like -- looking at these e-mails, it looks like
14 I'm trying three or four different ways to figure
15 it out.
16        And when I called her, she said,
17 "Yes, we can't share the names." And I said, "I
18 understand that. I know that, but is there -- can
19 you think of another way?"
20        I was trying to figure out is there
21 a way without some sort of serous problem that I
22 could at least have a list of all the cases Moline
23 had ever done that I know that side of it. Then
24 I'd be able -- just all her cases, not her cases

57 (Pages 222 - 225)

Page 366

1  ERRATA SHEET
2
3  Page No._____Line No._____Change to:_____
4  _____
5  Page No._____Line No._____Change to:_____
6  _____
7  Page No._____Line No._____Change to:_____
8  _____
9  Page No._____Line No._____Change to:_____
10 _____
11 Page No._____Line No._____Change to:_____
12 _____
13 Page No._____Line No._____Change to:_____
14 _____
15 Page No._____Line No._____Change to:_____
16 _____
17 Page No._____Line No._____Change to:_____
18 _____
19 Page No._____Line No._____Change to:_____
20 _____
21 Page No._____Line No._____Change to:_____
22 _____
23 Page No._____Line No._____Change to:_____
24 _____

Page 367

1  DECLARATION UNDER PENALTY OF PERJURY
2
3
4       I declare under penalty of
5  perjury that I have read the entire transcript of
6  my Deposition taken in the captioned matter
7  or the same has been read to me, and
8  the same is true and accurate, save and
9  except for changes and/or corrections, if
10 any, as indicated by me on the DEPOSITION
11 ERRATA SHEET hereof, with the understanding
12 that I offer these changes as if still under
13 oath.
14
15      Signed on the _____ day of
16 _____, 2025.
17
18 _____
19      THERESA SWAIN EMORY, MD
20
21
22
23
24

Page 368

1  CERTIFICATE OF REPORTER
2  DISTRICT OF COLUMBIA    )
3       I, Denise Dobner Vickery, a
4  Registered Court Reporter and Notary Public of
5  the District of Columbia, do hereby certify that
6  the witness was first duly sworn by me.
7       I do further certify that the
8  foregoing is a verbatim transcript of the
9  testimony as taken stenographically by me at the
10 time, place and on the date herein set forth, to
11 the best of my ability.
12      I do further certify that I am
13 neither a relative nor employee nor counsel of
14 any of the parties to this action, and that I am
15 neither a relative nor employee of such counsel,
16 and that I am not financially interested in the
17 outcome of this action.
18
19
20      *Denise D. Vickery*
21      DENISE DOBNER VICKERY, CRR,RMR
         Notary Public in and for the
22       District of Columbia
23
24 My Commission expires:  March 14, 2028