# **EXHIBIT 3**

```
                                                          Page 1

 1              UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF VIRGINIA
 3                  NEWPORT NEWS DIVISION
 4
 5
 6   - - - - - - - - - - - - - - -x
 7   PECOS RIVER TALC LLC,          :
 8            Plaintiff,            :   Civil Action Number
 9       vs.                        :   4:24-cv-75
10   DR. THERESA SWAIN EMORY, DR.   :
11   RICHARD LAWRENCE KRADIN, AND   :
12   DR. JOHN COULTER MADDOX,       :
13            Defendants.           :
14   - - - - - - - - - - - - - - -x
15
16              DEPOSITION OF JOHN C. MADDOX
17
18
19                           Washington, DC
20                           Friday, September 19, 2025
21
22
23   REPORTED BY:
24       CARMEN SMITH
25
```

Page 14

1  you might say.
2      BY MR. BUSH:
3   Q   Understood.  And other than the meetings
4  that you described, did you have any other meetings
5  with your attorneys in preparation for this
6  deposition?
7   A   Well, not in preparation for the
8  deposition.
9      However, you know, there's --
10     MS. LOCKWOOD:  Dr. Maddox, I'll just
11 remind you to not reveal the contents of our
12 communications.  I think that's probably responsive.
13 I just don't want to have an inadvertent disclosure.
14     BY MR. BUSH:
15  Q   I guess let me just ask you, Dr. Maddox, I
16 am not asking you to reveal any of the contents of
17 the communications with your counsel.  But is there
18 anything more you can say that you were going to say
19 in your answer with those restrictions in mind?
20  A   Technically, I don't think so.
21  Q   Okay.  Did you talk to Dr. Emory about
22 this deposition without your counsel present?
23  A   No, sir, I did not.  I have not spoken
24 with Dr. Emory in quite a while, months.
25  Q   And when was the last time you spoke to

Page 15

1  Dr. Kradin?
2      MS. LOCKWOOD:  Without counsel present?
3      BY MR. BUSH:
4   Q   Sure, without counsel present.
5   A   I really long time ago.
6   Q   So I take it --
7   A   Years possibly.  I'm a little conflicted
8  here because I'm trying to say that there have been
9  some group meetings on Zoom to discuss the course of
10 the litigation over the last several months.  And
11 the other doctors have been present at that as well.
12  Q   And were those Zoom meetings meetings
13 where your attorneys were present on the Zoom?
14  A   Yes.  And they were all privileged
15 communications.
16  Q   And have you talked to Dr. Cashman about
17 your deposition without counsel present?
18  A   No, I've never spoken to Dr. Cashman in my
19 life, as far as I know.
20  Q   Okay.  And I assume, then, you did not
21 talk to Dr. Kradin about his deposition without
22 counsel present?
23  A   I did not talk to Dr. Kradin about his
24 deposition at all.
25  Q   Okay.  Is anybody other than you,

Page 16

1  Dr. Kradin and Dr. Emory paying for your attorneys
2  in this case?
3      MS. LOCKWOOD:  And I'll just remind you,
4  Dr. Maddox, not to reveal the contents of any of our
5  privileged communications.
6      THE WITNESS:  I have no comment.
7      BY MR. BUSH:
8   Q   So you can't answer whether anyone is
9  paying for your attorneys other than Dr. Kradin, you
10 and Dr. Emory without revealing the contents of your
11 communications with attorneys?
12  A   I have been so instructed.
13  Q   Are you splitting the fees with your
14 attorneys evenly between you, Dr. Emory and
15 Dr. Kradin?
16     MS. LOCKWOOD:  Same instruction.
17     BY MR. BUSH:
18  Q   And you're not going to answer that
19 question based on your counsel's instruction?
20  A   I've been advised not to answer that
21 question.  And really, I don't know the answer to it
22 anyhow.  I don't know how that's been apportioned.
23  Q   When you are paying for your attorneys, is
24 the money you're sending less than one-third of the
25 amount of their fees?

Page 17

1      MS. LOCKWOOD:  Same instruction.
2      THE WITNESS:  Sorry, I've been instructed
3  not to answer.
4      BY MR. BUSH:
5   Q   Well, you know how much you're paying
6  without any conversations -- not relying on any
7  conversations you have with counsel.  I mean, you
8  know what checks or however the money is being
9  transferred.  You know what's leaving your bank
10 account; right?
11  A   That's right.
12  Q   So when the money is leaving your account
13 for paying your attorneys, is it less than one-third
14 of the fees that they charge?
15  A   I doubt it.  I mean, I don't know exactly
16 how it's been apportioned amongst the doctors,
17 particularly with Dr. Cashman entering the picture
18 as well.  But I know that I have had to write
19 several -- several checks.
20  Q   And when you write the checks, do you send
21 them directly to your attorneys or do you send them
22 to Dr. Kradin or Dr. Emory or anybody else?
23  A   I send directly to the attorneys.
24  Q   And do you know if any plaintiffs law firm
25 is agreeing to pay for your defense in this case?

5 (Pages 14 - 17)

Page 18

```
 1        MS. LOCKWOOD:  Same instruction as
 2   earlier.
 3        THE WITNESS:  I've been instructed not to
 4   answer, and I don't know the answer to that anyhow.
 5        BY MR. BUSH:
 6     Q   Okay.  Do you have any agreement among the
 7   defendants in this case regarding allocating damages
 8   or indemnification in the event that the defendants
 9   are found liable?
10     A   I have no such agreement, written or
11   spoken, either one.
12     Q   Do you have any form of agreement with
13   anybody or any entity where someone other than you,
14   Dr. Emory or Dr. Kradin will pay any portion of the
15   damages assessed against you in the event that
16   you're found liable?
17     A   I have no written or verbal agreement to
18   that effect.
19     Q   And do you have any understanding of
20   whether -- without a formal or oral agreement, do
21   you have any expectation that that would happen?  Do
22   you have any expectation that there would be anybody
23   else that would be paying any of the damages in the
24   event that you were found liable even without any
25   sort of agreement?
```

Page 19

```
 1     A   Maybe.
 2     Q   And why do you say maybe?
 3     A   Because I'm at the end of my career.  I'm
 4   going into retirement.  The funds that I have are
 5   retirement funds.  I'm not going to have a chance to
 6   make much more in my life.  I'm 75 years old, and
 7   I'm basically ready to move to a house in the woods.
 8     Q   And I understand, Dr. Maddox.  I think my
 9   question was a little different, which is do you
10   have any expectation that someone other than you or
11   your co-defendants would pay any or all of damages
12   that may be assessed against you in the event that
13   you're found liable?
14     A   I have no agreements, either written or
15   verbal, to that effect.
16     Q   But if you were found liable, do you have
17   any expectation that someone other than you or your
18   co-defendants would come in and pay for the damages
19   assessed against you?
20        MS. LOCKWOOD:  Objection; asked and
21   answered, third time.
22        THE WITNESS:  Well, I mean, I also have
23   expectations or hopes that I win the Powerball.  But
24   as far as written or verbal agreements with any
25   entity, no, I don't have any.
```

Page 20

```
 1        BY MR. BUSH:
 2     Q   You don't actually have an expectation
 3   you're going to win the Powerball, though; correct?
 4     A   Well, we can always hope.
 5     Q   Right.  And hope is different from having
 6   an expectation; right?
 7     A   Yes, sir.
 8     Q   Right.  And so putting aside what you hope
 9   might happen, do you have any expectations that
10   someone other than you or your codefendants would
11   come and pay some portion or all of the damages
12   assessed against you in the event that you're found
13   liable?
14        MS. LOCKWOOD:  Objection.  This is the
15   fourth time you've asked this question.
16        MR. BUSH:  He didn't answer last time.
17        MS. LOCKWOOD:  Asked and answered.  He's
18   answered it again in a way that you don't
19   appreciate.  He's answered it in the way that he
20   believes he can answer the question.  He can answer
21   it one last time.
22        THE WITNESS:  Okay.  I -- I can hope that
23   if there was a bad outcome for me, that others would
24   help me.  But I have no written or verbal agreements
25   to that effect.
```

Page 21

```
 1        BY MR. BUSH:
 2     Q   Who are those others?
 3     A   People with whom I've worked, other
 4   doctors, other attorneys perhaps.
 5     Q   And the other attorneys, does that include
 6   attorneys from the Simon and Greenstone law firm?
 7     A   Well, I have worked with attorneys at
 8   Simon Greenstone, yes.  I don't know what the
 9   outcome will be for them or with them or whether
10   they will contribute or not.
11     Q   Do you have any hope that they would be
12   among the others that would contribute to paying
13   some or all of the damages assessed against you in
14   the event that you are found liable?
15     A   I'm not sure how to answer that.  I mean,
16   I have no written or verbal agreement to that
17   effect.  But if it did happen, if the worst
18   happened, I hope that they would take notice and act
19   accordingly.
20     Q   And have you had any conversations with
21   any attorneys about Simon and Greenstone about
22   paying some or all of the damages assessed against
23   you in the event that you're found liable?
24     A   I've not had any conversation to that
25   effect.
```

6 (Pages 18 - 21)

Page 22

1  I have had conversations with attorneys at
2  Simon Greenstone Panatier over the last couple of
3  years limited to cases that were being worked on at
4  the time, not on the global issues that you've been
5  asking questions about.
6   Q   And do you think that it would be
7  appropriate for Simon and Greenstone to contribute
8  some or all of the damages assessed against you in
9  the event that you're found liable?
10  A   Well, there's two answers to that
11  question.  Number one, I have no formal opinion on
12  that.  Number two, it would be nice if they would.
13  Q   And do you think that it would -- are you
14  hoping that any other law firms other than Simon and
15  Greenstone -- strike that.
16      Do you have any hope or expectation that
17  law firms other than Simon and Greenstone would
18  contribute to pay some or all of the damages
19  assessed against you in the event that you're found
20  liable?
21  A   Well, again, there's two answers to that
22  question.  Hope, yes.  Expectation, neutral, no.
23  Q   And who would those other law firms be?
24  A   Well, I guess it would be other members of
25  the plaintiffs bar.  By plaintiffs bar, I'm talking

Page 23

1  about with reference to asbestos litigation.
2   Q   And because Simon and Greenstone -- strike
3  that.
4      You communicated with Simon and Greenstone
5  regarding your article over the course of its
6  preparation; correct?
7      MS. LOCKWOOD:  Objection; lack of
8  foundation.
9      THE WITNESS:  Well, yes and no.
10     I mean, there were a few cases where I
11 needed further information and I contacted people at
12 that firm to see if I could obtain further
13 information.  But there were no conversations about
14 reimbursements.
15     BY MR. BUSH:
16  Q   I understand.  Just putting reimbursements
17 aside for a minute, just over the course of your
18 preparation and drafting of the article, you had
19 communications with Simon and Greenstone regarding
20 your article; correct?
21     MS. LOCKWOOD:  Same objection.
22     THE WITNESS:  Well, individuals that were
23 in the -- in the article.  Not about the article
24 itself but about the history, the exposure history,
25 of people that either were or were not included in

Page 24

1  the article.
2      BY MR. BUSH:
3   Q   And they gave you some of the initial
4  subjects to put in the article from both cases where
5  you served as the pathologist and cases where others
6  served as the pathologist; correct?
7      MS. LOCKWOOD:  Objection; lack of
8  foundation.
9      THE WITNESS:  They sent me such cases for
10 review, that is correct.
11     BY MR. BUSH:
12  Q   And they sent you such cases with the
13 understanding that they were going to be subjects of
14 the article that you were drafting; correct?
15     MS. LOCKWOOD:  Objection; calls for
16 speculation, lack of foundation, misstates the
17 entire record in the case.
18     THE WITNESS:  Well, the understanding all
19 along was that I would be the one that selected
20 which patients would go in the article and which
21 would not, not -- they were not sending them to me
22 with an understanding that they would be in the
23 article.
24     BY MR. BUSH:
25  Q   But they were -- lawyers from Simon and

Page 25

1  Greenstone were sending you subjects with the
2  understanding that the reason they were sending them
3  to you was for you to determine whether to include
4  them as subjects in an article that you were
5  drafting, correct?
6      MS. LOCKWOOD:  Same set of objections.
7      THE WITNESS:  Well, I understood that the
8  articles that were sent to me were for the purposes
9  of seeking my opinions on the diagnosis and/or the
10 causation of the mesotheliomas in those patients,
11 for use in further litigation, which -- and which
12 was also permitted that I use them in a scholarly
13 article if I were to draft them.
14     BY MR. BUSH:
15  Q   And we can look at the e-mails in a
16 moment, but one of the things that happened was that
17 Simon and Greenstone sent you subjects for at least
18 potential inclusion in the article that were not --
19 that were plaintiffs in other cases where you were
20 not serving as their expert witness, but there were
21 other pathologists in the case; correct?
22  A   Well, yes, but it's not uncommon that
23 multiple pathologists will be consulted on
24 individual cases.
25     And the reasons for that are several.

7 (Pages 22 - 25)

Page 26

1  There could be a disagreement on the diagnosis,
2  there could be an inability to serve at a particular
3  time so a stand-in would be needed.
4         It could be that certain stains or
5  procedures were not available from one pathologist,
6  but they were available from another.
7         So all of those various reasons.
8      Q   And separate from that, Simon and
9  Greenstone sent you cases for none of those purposes
10 but for the sole purpose for you to make a
11 determination whether to include them in the
12 article; correct?
13         MS. LOCKWOOD: Objection; calls for
14 speculation, misstates the record.
15         THE WITNESS: I don't see it that way. I
16 don't think that that's true.
17         BY MR. BUSH:
18     Q   I'm going to mark -- and Simon and
19 Greenstone is a law firm that represents plaintiffs
20 in asbestos litigation; correct?
21     A   Yes, sir, that's right.
22     Q   And they have retained you as an expert
23 witness in numerous cases for -- where they're
24 representing plaintiffs in asbestos litigation;
25 correct?

Page 27

1      A   That's correct.
2         (Maddox Exhibit 1 identified.)
3         BY MR. BUSH:
4      Q   I'm going to mark as Exhibit 1 the article
5  authored by Dr. Emory, Dr. Maddox and Dr. Kradin
6  entitled "Malignant mesothelioma following repeated
7  exposures to cosmetic talc: A case series of 75
8  patients."
9         And you are one of the three authors of
10 this article, along with Dr. Emory and Dr. Kradin;
11 correct, Dr. Maddox?
12     A   Correct.
13     Q   And did you review the final version of
14 this article before it was published?
15     A   Well, I think I did.
16     Q   And did you approve the article being
17 published?
18     A   Yes.
19     Q   How much did you need to pay the journal
20 in order to have this article published?
21     A   I don't know. I'm not privy to the
22 conversation between Dr. Emory and the publishers on
23 that.
24         Now, this is an open access article so
25 that's what she would be -- what she would have

Page 28

1  negotiated a payment for, was the open access, not
2  for the publication of the article itself.
3      Q   And that means -- can you just described
4  what that means?
5      A   Well, with many or most medical journals,
6  not all, but with many medical journals, there is
7  what's called a paywall. In order to obtain a copy
8  of the article, you have to pay a fee, anywhere from
9  a few dollars to $100, in order to have the legal
10 permission to get a copy of the article to pull it
11 down from the Internet.
12     Q   So do you recall ever contributing any
13 money, for example reimbursing Dr. Emory or any
14 other way, that you paid some portion of a fee for
15 open access of the article?
16     A   I don't remember specifically.
17     Q   So that would be a question for Dr. Emory?
18     A   I can't answer it. I don't know the
19 answer to that.
20     Q   And can we look at the abstract of your
21 article, Dr. Maddox, on the first page.
22     A   Yes, sir.
23     Q   I'm going to direct your attention to the
24 "Methods" section where the first sentence says,
25 "Seventy-five individuals (64 females; 11 males)

Page 29

1  with malignant mesothelioma whose only known
2  exposure to asbestos was repeated exposures to
3  cosmetic talcum powders, were reviewed in
4  medical-legal consultation."
5         Do you see that?
6      A   Yes, sir.
7      Q   I'm not asking you what you knew at the
8  time. But sitting here today, you know that there
9  are individuals in your article who, in fact, had
10 exposures to asbestos from non-talc sources;
11 correct?
12     A   Well, you know, I think that that
13 statement is mostly correct right now, that the only
14 significant exposures that the people in this study
15 had were to the cosmetic talcum powders.
16        Now, over time, there are some smaller
17 inaccuracies that have turned up. But I think that
18 the significance of that group of patients is still
19 the same, that it's -- the big exposures that they
20 had were to talcum powder and the group of patients
21 that had this had more females than with the usual
22 industrial exposure pleural mesotheliomas. There
23 were no peritoneal mesotheliomas, and there's some
24 interesting observations on the latency periods as
25 well.

8 (Pages 26 - 29)

Page 102

1  Dr. Gordon, Dr. Abraham and Dr. Dodson?
2    A   Well, I had seen their work over several
3  years, particularly -- particularly Dr. Gordon and
4  Dr. Longo.  At one point Dr. Abraham and I talked
5  about doing some fiber counting together.  That was
6  back about 1990.
7        So I'm -- I had been aware of these fiber
8  counters for some time, and they had a good
9  reputation.  I mean, I did not try to look over
10 their shoulder on these individual cases, but I was
11 aware of their reputation as fiber counters at that
12 time.
13   Q   So for these cases that Ms. Kagan sends
14 you where someone other than you did the tissue
15 digestion analysis, you did not do anything to
16 specifically determine the accuracy of these
17 particular cases, but you relied on your
18 understanding of their reputation, of the
19 individuals doing the fiber analyses?
20       MS. LOCKWOOD:  Objection; mischaracterizes
21 testimony and misstates the record.
22       THE WITNESS:  As always, I looked at all
23 the evidence that was available to me.  If there was
24 information that they sent down on the methods,
25 materials and so forth of their fiber counts, I

Page 103

1  would have looked at it.
2        But as I sit here right now, I don't
3  remember exactly what that might have been.
4        Also, can I add that when other attorneys
5  like Patten, Wornom, Hatten & Diamonstein determined
6  that they wanted to get fiber counts, I would
7  recommend Dr. Gordon, because his method is slightly
8  different than the method used by other fiber
9  counters.
10       Other fiber counters use a filtration
11 method, but he uses an ashing and then
12 reconstitution, resuspension and serial dilutions,
13 so you avoid some of the artifacts that a filtration
14 method will create.
15       In other words, with a filtration method
16 you have holes in a filter that are so small --
17 well, that are big enough so that they don't stop
18 some of the fibers from going right through the
19 holes in the filter and being lost.
20       BY MR. BUSH:
21   Q   So you have an understanding of the work
22 of Dr. Gordon when he does his tissue analyses
23 generally?
24   A   Yes, yes.
25   Q   But when Ms. Kagan sent you these cases,

Page 104

1  you didn't go in and double-check to make sure --
2  the accuracy of his or anybody else's work other
3  than yourself for the tissue digestions you received
4  when somebody else performed them?
5        MS. LOCKWOOD:  Same objection as before.
6        THE WITNESS:  Yeah, I don't remember
7  exactly what was sent to me, but I certainly would
8  have considered everything that was sent to me.  If
9  he had sent methods and calculations and so forth, I
10 would have looked them over.  But I don't remember
11 whether he did or not.
12       MR. BUSH:  Let's mark as --
13       MS. LOCKWOOD:  Matt, is this an okay time
14 for a break?
15       MR. BUSH:  Of course.
16       MS. LOCKWOOD:  We've been going over an
17 hour.
18       VIDEO OPERATOR:  We are off the record at
19 12:23.
20       (Whereupon, at 12:23 p.m., the deposition
21 was recessed, to be reconvened at 1:00 p.m. this
22 same day.)

Page 105

1        AFTERNOON SESSION     (1:08 p.m.)
2  Whereupon,
3             JOHN C. MADDOX
4  resumed the stand and, having been previously duly
5  sworn, was examined and testified further as
6  follows:
7        VIDEO OPERATOR:  We are on the record at
8  13:08.
9        EXAMINATION (Continued)
10       BY MR. BUSH:
11   Q   Dr. Maddox, I forgot to ask you at the top
12 of the deposition, is there any reason you can't
13 give true and accurate testimony today?
14   A   Not that I'm aware of.
15   Q   If you could turn back to Exhibit 6, which
16 was the e-mail chain we were referring -- we were
17 discussing before the break, do you see that it was
18 on June 5, 2019, that you reported to Ms. Kagan that
19 Dr. Kradin seemed very interested in including other
20 brands beyond Cashmere Bouquet; right?
21   A   Yes.
22       (Maddox Exhibits 7 and 8 identified.)
23       BY MR. BUSH:
24   Q   I'm going to mark as Exhibit 7 an e-mail
25 chain between Dr. Maddox and Dr. Kradin dated June

27 (Pages 102 - 105)

Page 162

1    BY MR. BUSH:
2    Q   How is anyone supposed to know that?
3    A   I thought that the materials or the
4  methods section was explanation enough.
5    Q   And you know that this article is being
6  relied by other experts in cosmetic talc litigation;
7  right?
8    A   I don't know who is relying on it and who
9  is not. But I would not be surprised if someone
10 were.
11   Q   And when you were preparing this article,
12 you expected that you would be relying on it in your
13 work as an expert in cosmetic talc litigation on
14 behalf of plaintiffs; right?
15   A   Well, I expected that I'd be retiring, but
16 I was trying to write a reliable article
17 nonetheless. That it would be sort of like a
18 roadmap where I had been during the last 10 years
19 when I saw a number of talc cases.
20   Q   What do you mean by "a roadmap"?
21   A   Like a memoir, a guide to people who have
22 talc cases in the future, what to look for, what to
23 expect, the large number of female patients, the
24 predominance of peritoneal cases, the latency
25 periods, things like that, so that people could

Page 163

1  match up with new cases that they may have, similar
2  exposure group, to use the epidemiologist's term.
3    Q   And your article, if you could pull
4  Exhibit 1, on the top page, it states when it was
5  accepted for publication. What's that date?
6    A   6 March 20120.
7    Q   So March 6, 2020 the article was accepted
8  for publication; correct?
9    A   Yes.
10   Q   And I assume you may not remember the
11 exact date, but shortly thereafter, it was in fact
12 published; correct?
13   A   Yes.
14      (Maddox Exhibit 29 identified.)
15      BY MR. BUSH:
16   Q   I'm going to mark as Exhibit 29 "RELIANCE
17 ARTICLES -- DR. JC MADDOX" dated April 30, 2020,
18 which is Bates number Maddox 2421.
19   A   Okay. There was a typo when the article
20 first came out that was corrected very quickly
21 thereafter.
22   Q   There was a typo about the mean latency or
23 some mean usage, one of the means.
24   A   Yeah, one of the numbers wasn't right and
25 we had to straighten that out. So --

Page 164

1    Q   But the article was published sometime
2  early in March 2020, even if you don't remember the
3  exact date?
4    A   Correct.
5    Q   So this is your -- what we're looking at
6  here as Exhibit 29 is your reliance list dated April
7  30, 2020; right?
8    A   Yes.
9    Q   And your reliance list is the list of
10 materials that you rely on in order to form your
11 opinions in the cases where you serve as an expert
12 witness; correct?
13   A   Yes.
14   Q   And this is a master reliance list, so it
15 applies to cases involving pretty much any kind of
16 product that you have ever been involved in or might
17 expect to be involved in; correct?
18   A   Yes.
19   Q   And do you see section 33 in the table of
20 contents is entitled "TALC"?
21   A   Yes.
22   Q   Right. And so that section would have the
23 materials you're relying on for purposes of your
24 opinions in cosmetic talc cases; right?
25   A   Yes.

Page 165

1    Q   All right. I would like to direct your
2  attention to page 72, please.
3    A   Yes.
4    Q   Do you see the last items in section 33 on
5  talc, the second-to-last item is your article with
6  Dr. Emory and Dr. Kradin entitled "Malignant
7  mesothelioma following repeated exposures to
8  cosmetic talc," which is at issue in this case that
9  we've been talking about?
10   A   Yes.
11   Q   So a month after your article came out,
12 you already added it to your list of reliance
13 materials for talc cases; right?
14   A   Yes.
15   Q   So are you really saying you weren't
16 expecting when preparing this article to be relying
17 on it in your capacity as an expert witness in
18 cosmetic talc litigation?
19   A   Well, initially I would. But I still
20 really would like to completely retire.
21   Q   Understood. But when you were preparing
22 your article, your expectation was that before your
23 retirement, while you were still serving as an
24 expert witness in talc cases, that you would be
25 relying on this article; correct?

Page 166

1  A  Well, my expectation was that it's the
2  proper thing to do to keep your reliance list up to
3  date, because whenever you give a deposition, you're
4  going to be asked for it.
5  Q  Right. So you were -- I apologize.
6  A  So if I present one that didn't have a
7  recently published article included on it, people
8  would say well, why didn't you do that so I avoided
9  that and just put it on the list.
10  Q  But the articles there isn't just sort of
11  any article that's recently published. They're
12  articles that you're planning to rely on for
13  purposes of your opinion in litigation; correct?
14  A  That's -- that's what that could be used
15  for, sure.
16  Q  Right. And so what this indicates is that
17  by April of 2020, you were relying on your article
18  for purposes of your -- of litigation in cosmetic
19  talc cases; correct?
20  A  Yes.
21  Q  And when you were preparing the article,
22  that's what you were expecting to happen after the
23  article was published, that you would be adding it
24  to your reliance list; correct?
25  A  Wait a minute. Are you a father?

Page 167

1  Q  Dr. Maddox --
2     MS. LOCKWOOD: Sorry, I don't think he
3  meant to be inappropriate, but let's just try to
4  stick to answering -- answering the question.
5     MR. BUSH: I didn't take it as
6  inappropriate, but I think that's a bad road to go
7  down.
8     THE WITNESS: The point that I'm trying to
9  make is, if you had a new baby, you'd probably take
10  a picture of it. Well, I had a new article and I
11  put it on my reliance list.
12     BY MR. BUSH:
13  Q  And that was what you expected to happen
14  when you were preparing the article, was that after
15  it was published, it would be added to your reliance
16  list, just like you take a picture of your new baby
17  after it's born?
18  A  Sure.
19  Q  Dr. Maddox, I'm going to mark as Exhibit
20  30 your -- it looks like -- we'll do this one
21  actually in a minute. It didn't print correctly.
22     (Maddox Exhibit 30 identified.)
23     BY MR. BUSH:
24  Q  I'm going to mark as Exhibit 30 where the
25  top e-mail is from Dr. Kradin to Dr. Maddox dated

Page 168

1  August 11, 2019, which is Maddox Bates number ending
2  3800.
3     Do you see in the first e-mail in the
4  chain on the bottom, Dr. Maddox, that you report to
5  Dr. Kradin that you "heard from Chris Panatier that
6  Longo, Gordon and Moline had just submitted their
7  paper regarding asbestos in talc. So, we may have
8  become moot"?
9     Do you see that?
10  A  I see that, yes.
11  Q  What did Chris Panatier tell you about the
12  article or articles regarding asbestos and talc that
13  had just been submitted?
14  A  I have no memory of it.
15  Q  Do you know if this refers to both
16  Dr. Moline and Dr. Gordon's article and also the
17  article coauthored by Dr. Longo where the first
18  author is Stefan?
19     MS. LOCKWOOD: Objection; lack of
20  foundation.
21     THE WITNESS: I am uncertain.
22     BY MR. BUSH:
23  Q  What do you think you meant by "we may
24  have become moot"?
25  A  Well, other people had already published

Page 169

1  on the subject, and their papers may therefore have
2  become the definitive papers on the subject.
3  Q  And would you have known at this time the
4  nature of the article written by Dr. Moline?
5  A  I don't think so. I don't think I had
6  seen the article at this point. Later I saw it, but
7  I mean, I don't think that I had seen it as of
8  August the 10th or August the 11th.
9  Q  Without seeing the article, how do you
10  know if the article you're preparing would have
11  something to contribute beyond Dr. Moline's article
12  or whether it would be duplicative of Dr. Moline's
13  article?
14  A  Well, since it was a controversial area,
15  since it was a relatively new area of publishing, I
16  think it would still be an appropriate article to
17  publish because it would -- it would broaden the
18  field, it would improve the statistics.
19  Q  But you were suggesting that -- even at
20  this time, you were suggesting that there may be
21  such a significant duplicativeness between your two
22  articles that the one you were preparing may have
23  become moot?
24     MS. LOCKWOOD: Objection; mischaracterizes
25  testimony.

43 (Pages 166 - 169)

Page 338

1  A  I do not recall.
2  Q  Do you recall reviewing any Defense expert
3 exhibits at any point when preparing your article
4 that's at issue in this case?
5  A  I'm sorry, can you ask that again, please?
6  Q  Do you remember reviewing any Defense
7 expert reports when preparing your article that's at
8 issue in this case?
9  A  I don't recall.
10  Q  Don't you think if you're going to be
11 reviewing Plaintiff expert reports, you should also
12 be reviewing defense expert reports to get both
13 sides of the story?
14  A  Sometimes they're available, sometimes
15 not.
16  Q  And is there anything that would have
17 stopped you from asking the Plaintiffs' attorneys
18 for Defense expert reports in any of the subjects in
19 your cases?
20  A  Well, I can't say.  I mean, as a general
21 rule, I don't usually review defense expert reports.
22 But occasionally I do.
23     MS. LOCKWOOD:  Are we at time?  I think
24 we're at time.
25     VIDEO OPERATOR:  I wasn't keeping track,

Page 339

1 but yeah, sounds about right.
2     MS. LOCKWOOD:  I think we're at time.
3     MR. BUSH:  We don't even know.
4     MS. LOCKWOOD:  We can go off the record if
5 you want.
6     MR. BUSH:  I have like -- I'm going to
7 take 30 seconds and then we'll finish.
8     MS. LOCKWOOD:  Well, can we go off the
9 record to get the time?
10     MR. BUSH:  I understand.  Sorry, I didn't
11 understand what you were asking.
12     VIDEO OPERATOR:  We are at 7:02.
13     MR. BUSH:  Does that include just my
14 questioning?
15     VIDEO OPERATOR:  Yes, your questioning.
16     (Whereupon, at 7:55 p.m., the deposition
17 was concluded.)

Page 340

1  I HEREBY CERTIFY that I have read this
2 transcript of my deposition and that this transcript
3 accurately states the testimony given by me, with
4 the changes or corrections, if any, as noted.

7           X

11 Subscribed and sworn to before me this     day of
12           , 20    .

16           X
17           Notary Public

21 My commission expires:              .

Page 341

1  CERTIFICATE OF NOTARY PUBLIC & REPORTER

3 I, CARMEN SMITH, the officer before whom the
4 foregoing deposition was taken, do hereby certify
5 that the witness whose testimony appears in the
6 foregoing deposition was duly sworn; that the
7 testimony of said witness was taken in shorthand and
8 thereafter reduced to typewriting by me or under my
9 direction; that said deposition is a true record of
10 the testimony given by said witness; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this
13 deposition was taken; and, further, that I am not a
14 relative or employee of any attorney or counsel
15 employed by the parties hereto, nor financially or
16 otherwise interested in the outcome of this action.

21           CARMEN SMITH
22      Notary Public in and for the
23      District of Columbia

25 My Commission Expires:  MARCH 31, 2028

86 (Pages 338 - 341)