**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

PECOS RIVER TALC LLC,

       Plaintiff,

       v.

DR. THERESA SWAIN EMORY, DR.
RICHARD LAWRENCE KRADIN, AND
DR. JOHN COULTER MADDOX,

       Defendants.

Civil Action No. 4:24-cv-75-JKW-RJK

## DR. KRADIN'S RESPONSE IN OPPOSITION TO PECOS RIVER TALC'S MOTION FOR SANCTIONS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

    A.    The Doctors' Communications About the Article & Discovery in this Case. ................. 3

    B.    J&J Fails to Develop Any Facts In Discovery Supporting Supposed Spoliation. .......... 5

    C.    J&J's "Evidence" of Supposed Spoliation. ................................................................... 7

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT ..................................................................................................................... 11

I.       THERE HAS BEEN NO SPOLIATION. ...................................................................... 11

    A.    Dr. Kradin Had No Duty to Preserve His Emails in 2019 & 2020. ............................ 11

    B.    J&J Has Not Carried its Burden, Much Less by Clear and Convincing Evidence, to Show that any ESI Was Lost, Or That It Could Not Have Been Recovered or Restored. ...................................................................................................................... 16

        1.    J&J has offered no evidence that any relevant evidence has been lost. ..................... 17

        2.    J&J also has not shown that whatever information may be missing is "lost." ......... 18

        3.    J&J also has not shown that any missing emails could not have been recovered. ... 21

II.     THERE IS NO BASIS FOR ANY SANCTION. ........................................................... 23

    A.    There Is Zero Evidence of Intent, Which Precludes Sanctions Under Rule 37(e)(2). ..................................................................................................................... 23

    B.    J&J Also Has Not Shown Prejudice, Much Less by Clear and Convincing Evidence. .................................................................................................................... 27

CONCLUSION .................................................................................................................. 30

# TABLE OF AUTHORITIES

**CASES**                                                                      **Page(s)**

*Ahern Rentals, Inc. v. Eure*,
    No. 2:20-cv-1680, 2022 WL 18670848 (D. Nev. Mar. 16, 2022)......................................23

*Air Prods. & Chemicals, Inc. v. Wiesemann*,
    No. 14-1425, 2017 WL 758417 (D. Del. Feb. 27, 2017)....................................................18

*AliveCor, Inc. v. Apple, Inc.,*
    No. 21-cv-3958, 2023 WL 4335293 (N.D. Cal. June 2, 2023)...........................................19

*Barnes v. Harling*, 368 F. Supp. 3d 573 (W.D.N.Y. 2019)...............................................................13

*Bhattacharya v. Murray*,
    No. 3:19-cv-54, 2022 WL 875032 (W.D. Va. Mar. 23, 2022)......................................11, 12

*Booker v. Mass. Dept. of Pub. Health*, 612 F.3d 34 (1st Cir. 2010)................................................25

*Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.,*
    No. 15-cv-2926, 2019 WL 5694256 (E.D.N.Y. July 22, 2019) ..............................26, 28, 29

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.,*
    No. 13-cv-2581, 2021 WL 4190628 (S.D.N.Y. Aug. 18, 2021)...........................................19

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    803 F. Supp. 2d 469 (E.D. Va. 2011) ..........................................................................13, 18

*Eller v. Prince George's Cnty. Pub. Sch.,*
    No. 18-cv-3649, 2020 WL 7336730 (D. Md. Dec. 14, 2020)..............................................15

*Ellis v. PB Ventilating Sys., Inc.,*
    No. 23-cv-4629, 2024 WL 4002798 (E.D.N.Y. Aug. 30, 2024) ...................................19, 23

*Envy Hawaii LLC v. Volvo Car USA LLC*,
    No. 17-00040, 2019 WL 1292288 (D. Haw. Mar. 20, 2019)................................19, 21, 22

*Equal Emp. Opportunity Comm'n v. Performance Food Grp., Inc.,*
    No. CCB-13-1712, 2019 WL 1057385 (D. Md. Mar. 6, 2019) ...........................................15

*Evans v. Medtronic, Inc.*,
    No. 3:04-cv-97, 2005 WL 3547240 (W.D. Va. Dec. 27, 2005)..........................................15

*FA ND CHEV, LLC v. Kupper*,
    No. 1:20-cv-138, 2022 WL 16699304 (D.N.D. Aug. 31, 2022) ...................................27, 27

*Fast v. GoDaddy.com LLC*, 340 F.R.D. 326 (D. Ariz. 2022) ........................................................ 26

*Fuhs v. McLachlan Drilling Co.*,
    No. CV 16-376, 2018 WL 5312760 (W.D. Pa. Oct. 26, 2018) ........................................... 29

*Gates Rubber Co. v. Bando Chemical Indus., Ltd.*,
    167 F.R.D. 90 (D. Colo. 1996) ........................................................................................... 29

*GMS Indus. Supply, Inc. v. G&S Supply, LLC*,
    No. 2:19-cv-324, 2022 WL 853626 (E.D. Va. Mar. 22, 2022) ........................................... 22

*Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd.*,
    343 F.R.D. 474 (D. Md. 2023) ........................................................................................... 26

*Haysbert v. Bloomin' Brands, Inc.*,
    No. 4:20-cv-121, 2021 WL 5003284, (E.D. Va. July 9, 2021) ................................ 11, 18, 24

*HighMark Digital, Inc. v. Casablanca Design Centers, Inc.*,
    No. 18-6105, 2019 WL 13038414 (C.D. Cal. Oct. 3, 2019) ............................................... 23

*Huggins v. Prince George's Cty.*, 750 F. Supp. 2d 549 (D. Md. 2010) ........................................ 12

*Hugler v. Sw. Fuel Mgmt., Inc.*,
    No. 16-CV-4547, 2017 WL 8941163 (C.D. Cal. May 2, 2017) ........................................... 21

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    No. MDL 2738, 2024 WL 111069 (D.N.J. Jan. 10, 2024) .................................................. 27

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    341 F.R.D. 474 (S.D.N.Y. 2022) ............................................................................... 18, 29, 30

*Indem. Ins. Co. of N. Am. v. Liebert Corp.*,
    No. 96-cv-6675, 1998 WL 363834 (S.D.N.Y. June 29, 1998) ........................................... 30

*Industria de Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*,
    No. 16-6576, 2022 WL 1683747 (D.N.J. May 26, 2022) ............................................. 17, 18

*Johns v. Gwinn*, 503 F. Supp. 3d 452 (W.D. Va. 2020) .................................................................. 14

*Kavanagh v. Refac Optical Grp.*,
    No 15-4886, 2017 WL 6395848 (D.N.J. Dec. 14, 2017) .................................................... 17

*Knight v. Boehringer Ingelheim Pharms., Inc.*,
    323 F. Supp. 3d 837 (S.D.W. Va. 2018) ...................................................................... 26, 30

*Lamb v. Liberty Univ.*,
    No. 6:21-cv-55, 2023 WL 2172729 (W.D. Va. Feb. 22, 2023) ................................. 2, 21, 22

*Micron Tech., Inc. v. Rambus, Inc.*, 645 F.3d 1311 (Fed. Cir. 2011) ...................................... 11, 12

*Mod. Remodeling, Inc. v. Tripod Holdings, LLC,*
    No. CCB-19-1397, 2021 WL 3852323 (D. Md. Aug. 27, 2021) .................................. 11, 16

*N. Am. Sci. Assocs., LLC v. Conforti*,
    No. 24-cv-287, 2024 WL 4903753 (D. Minn. Nov. 27, 2024) ..................................... 25, 26

*Painadath v. Good Shepherd Penn Partners*,
    348 F.R.D. 16 (E.D. Pa. 2024) ............................................................................................ 26

*Profit Point Tax Techs., Inc. v. DPAD Grp., LLP*,
    No. 2:19-cv-698, 2023 WL 11968310 (W.D. Pa. Apr. 26, 2023) ........................................ 18

*Rambus, Inc. v. Infineon Techs., AG*, 220 F.R.D. 264 (E.D. Va. 2004) ........................................ 15

*Rodo Inc. v. Guimaraes,*
    No. 22-cv-9736VSBF, 2023 WL 8520426 (S.D.N.Y. Dec. 8, 2023) ................................... 14

*Sampson v. City of Cambridge, Md.*, 251 F.R.D. 172 (D. Md. 2008) .......................................... 29

*Silvestri v. General Motors Corp.*, 271 F.3d 583 (4th Cir. 2001) .......................................... 10, 11

*Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*,
    75 F4th 1290 (11th Cir 2023) ........................................................................................... 16

*Snell v. Reid*, No. 22-1869, 2024 WL 2815061 (4th Cir. June 3, 2024) ..................................... 11

*Snell, No.*, 2022 WL 2812056 (2022) ........................................................................................ 12

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96 (E.D. Va. 2018) ............................. *passim*

*Taylor v. City of New York*, 293 F.R.D. 601 (S.D.N.Y. 2013) ...................................................... 13

*Title Cap. Mgmt., LLC v. Progress Residential, LLC*,
    No. 16-21882-CV, 2017 WL 5953428 (S.D. Fla. Sept. 29, 2017)................................. 14, 15

*Turner v. United States*, 736 F.3d 274 (4th Cir. 2013) ................................................................. 11

*Ward v. Schaefer*,
    No. 16-12543, 2019 WL 13196106 (D. Mass. Sept. 18, 2019) ........................................... 29

iv

*Webb v. Daymark Recovery Servs., Inc.*,
    No. 1:21-cv-424, 2022 WL 17832160 (M.D.N.C. July 26, 2022)....................................... 12

*Zbylski v. Douglas Cnty. Sch. Dist.*,
    154 F. Supp. 3d 1146 (D. Colo. 2015) ................................................................................ 15

**FEDERAL RULES**

Fed. R. Civ. P. 37................................................................................................................. *passim*

**OTHER AUTHORITIES**

Black's Law Dictionary (10th ed. 2014)...................................................................................... 19

## INTRODUCTION

The entire premise of J&J's claim of spoliation is that Dr. Kradin deleted emails in 2019 and 2020—3+ years before J&J named him in a lawsuit—as part of a routine, general practice that had nothing to do with this case, when he never expected to be sued for the Article, and in fact had never heard of any scientist being haled into court by a corporation over an academic publication. J&J's brief is heavy on innuendo and accusations that Dr. Kradin "intentionally" destroyed these emails. But repeating these pronouncements does not make them true, and a handful of cherry-picked, out-of-context soundbites does not substitute for evidence.

To prevail on its motion, J&J must prove, by clear and convincing evidence—a standard it never acknowledges in its brief—that: (i) Dr. Kradin anticipated being sued over the Article *before* he deleted emails that he knew might be relevant; (ii) whatever emails may be missing likely would have been relevant; (iii) those emails are actually, permanently lost; (iv) and could not have been recovered through some other mechanism. J&J took no steps to develop facts on any of these topics during discovery, and falls far short of its evidentiary burden on all four Rule 37(e) prerequisites.

Start with duty. J&J has offered no evidence that Dr. Kradin anticipated this lawsuit or one like it when he deleted his emails in 2019 and 2020. Cases like this are rare, and Dr. Kradin has affirmed under oath (including during his deposition in this case) that he had no idea he would be sued over the Article or that his emails would be relevant to any potential litigation. All of the "evidence" J&J cites shows only that Dr. Kradin understood that talc manufacturers might request the *data* underlying the Article in connection with his and his co-authors' ongoing work as expert witnesses in cosmetic talc personal injury litigation. It is undisputed that these data were preserved and produced, and the few documents that J&J cites establish no duty beyond that.

Nor has J&J offered anything more than speculation that any *relevant* emails were lost. Dr. Kradin testified that he did not communicate with plaintiffs' attorneys about the Article. And there

is nothing in the robust evidentiary record suggesting that he ever emailed with any other experts (or anyone else) about the Article, save for a single communication with Dr. Moline, which was produced in discovery.[1] It also is highly unlikely that Dr. Kradin would have been repeatedly emailing his co-authors to express his view that they needed "to be absolutely confident about the exposures" and that "EVERYTHING in this paper must be ABSOLUTELY ACCURATE," while clandestinely emailing with unknown third parties in ways that support J&J's theory of this case.

J&J also has done nothing to carry its burden to show that any ESI was "lost," or that Dr. Kradin's emails could not have been recovered through other sources. J&J did not take a single step in discovery to test this premise. It did not serve discovery on Dr. Kradin or his research assistant or his co-authors to try to ascertain who else Dr. Kradin might have emailed with. It did not subpoena any plaintiff's firms or other third parties (aside from Dr. Cashman and Dr. Moline/Dr. Moline's employer). It did not subpoena Dr. Kradin's email provider. Given that deleted emails are "not 'lost'" under Rule 37 if they can be obtained through other sources, *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 107 (E.D. Va. 2018), and that "[c]ourts within the Fourth Circuit have noted that 'spoliation sanctions motions often follow only where extensive ESI recovery efforts have failed,'" *Lamb v. Liberty Univ.*, No. 6:21-cv-55, 2023 WL 2172729, at *5 (W.D. Va. Feb. 22, 2023) (quoting *Steves & Sons, Inc.,* 327 F.R.D. at 109), this is dispositive.

The court can stop there; because J&J has not carried its burden to prove any of the four prerequisites for finding that spoliation has occurred, Rule 37(e) precludes imposition of any

---

[1] Dr. Moline testified at her deposition on October 30, 2025 that she did not recall responding to this email, or having any other communication with Dr. Kradin about the Article or her paper. *See* Ex. G at 61:11–62:8 (Moline Dep.) ("Q. Did you have any communication that follows up with Dr. Kradin communicating your thoughts? A. No, I did not. I don't recall responding. I don't recall this e-mail until it was shown to me. I think I was -- I did not respond.").

sanction. But even if the Court were to reach this step of the analysis, J&J falls far short of shouldering its evidentiary burden to justify the extreme sanction it seeks. J&J pushes for an adverse inference, which requires finding that Dr. Kradin deleted his emails "with the intent to deprive" J&J of being able to use them. But while J&J once again offers plenty of conjecture and overheated rhetoric, it offers no evidence supporting such a finding, which takes the harsh sanctions available under Rule 37(e)(2) off the table. And no lesser sanction under Rule 37(e)(1) is available, either, because J&J has not even tried to show prejudice. Nor could it: the Doctors produced hundreds of contemporaneous emails and a cache of other evidence that paints a vivid and consistent picture of the Doctors' good-faith scientific process, as well as their states of mind during the more than a year they spent researching and drafting the Article. J&J's conjecture that there might be some other emails out there not only lacks any concreteness, but also plausibility given the huge amount of evidence we do have and how consistently it points in one direction.

## BACKGROUND

### A. The Doctors' Communications About the Article & Discovery in this Case.

In early 2019, as they both approached retirement, Drs. Richard Kradin and John Maddox agreed to collaborate on an article about patients who developed mesothelioma after using cosmetic talc products, in part out of a desire to address what they viewed as an under-studied topic of apparent gender disparities in the data. Sept. 19, 2025 Maddox Dep. at 162–63, 319–21, ECF No. 95-3 ("Maddox Dep. Tr.").[2] Sept. 17, 2025 Kradin Dep. at 52:3–12, 249, ECF No. 95-4 ("Kradin Dep. Tr."); *see also id.* at 99:24–100:9.

Over the next 10+ months, Drs. Kradin and Maddox worked to compile a pool of potential

---

[2] In an effort to avoid burdening the Court when the record is already so voluminous, Defendants have, where possible, cited to exhibits previously filed with the parties' summary judgment briefing rather than re-attaching them as new exhibits here. Should the court prefer that Defendants submit these documents as separate exhibits to this brief, they would be happy to do so.

subjects, develop and refine their methodology for determining which subjects should be included in or excluded from their study, and review subject information to whittle down their initial pool to a group that met their agreed-upon criteria. Defs.' Mem. in Supp. of Their Mot. for Summ. J., SUMF ¶¶ 3–15 (Oct. 17, 2025), ECF No. 92 ("Defs.' SUMF"). Throughout this process, Drs. Kradin and Maddox regularly sent drafts and comments and Excel tables back and forth to each other by email. *See id.* Dr. Kradin also emailed with his research assistant, Dr. Siobhan Cashman (who later also became his wife) in connection with his work on the Article. *See id.*

When Dr. Maddox retired in January 2020, the project was ongoing, so he recruited Dr. Emory to help get the Article over the finish line. Defs.' SUMF ¶¶ 16–20. From then until the Doctors submitted it for publication in late February, *id.* ¶ 25, they continued to review the data and remove subjects due to non-talc exposures or overlap with an article recently published by another scientist, Dr. Jacqueline Moline. *See id.* ¶¶ 16–25. When the Doctors at long last submitted their manuscript, peer reviewers recommended it for publication while providing feedback, which Drs. Emory and Kradin implemented, including preparing and adding Table II, which reported tissue digestion data for nine subjects. *Id.* ¶ 25. The Article was published in March 2020. *Id.* ¶ 26.

Nearly three years later, J&J sued the Doctors as part of a bankruptcy case in New Jersey. Complaint, *LTL Mgmt LLC v. Emory, et al.*, No. 23-1022 (D.N.J. Bankr. Jan. 18, 2023), ECF No. 1. At this time, the Doctors' newly retained counsel advised them of their preservation obligations. E. Lockwood Decl. ¶ 1 (Oct. 31, 2025) ("Lockwood Decl."). The Doctors do not understand J&J to claim in its motion that Dr. Kradin deleted any potentially relevant ESI after this suit was filed.

Discovery began in this case in March 2025, at which point the Doctors undertook a significant document collection process of both ESI and hard copy files. By mid-July, Defendants produced nearly 1,000 of the Doctors' emails from the 2019–2020 period, which included "nearly

all of the documents responsive to Plaintiff's document requests," with the exception of a small set that required a privilege review. Ex. A (July 2025 email chain between counsel); Lockwood Decl ¶ 5. In addition to these emails, the Doctors produced ~150,000 pages of other kinds of ESI and hard copy materials. *Id*. In response to a third-party subpoena that J&J served on July 31, Dr. Kradin's research assistant, Dr. Siobhan Cashman produced all of her "non-privileged documents and communications related to the development, research, drafting and publication of the Article"—including any related "communications with attorneys or law firms." Ex. B at 5 (Aug. 14, 2025 S. Cashman Subpoena Objections); Lockwood Decl. ¶ 6.

J&J has known since mid-July 2025, when the Doctors substantially completed their document productions, that Dr. Kradin no longer had his emails from 2019–2020. The parties met and conferred on numerous occasions throughout the spring and summer about the scope of J&J's discovery requests and other discovery-related topics. At no point did J&J ever raise any concerns regarding supposed spoliation of any emails. *Id*. ¶ 7.

**B. J&J Fails to Develop Any Facts In Discovery Supporting Supposed Spoliation.**

J&J served extensive written discovery requests, including ten requests for production, four sets of interrogatories, and four sets of requests for admission. Lockwood Decl. ¶ 2–3. None of these many dozens of written requests—or the third-party subpoena to Dr. Cashman—was aimed at exploring who Dr. Kradin might have emailed with about the Article. *Id*. ¶ 3. And because J&J never raised any issues concerning any of the Doctors' collection of ESI from the relevant period, it never attempted to subpoena Google (his primary email provider) or do any kind of forensic analysis to ascertain whether his emails from 2019–2020 might have been recoverable. *Id*. ¶ 7.

During Dr. Kradin's September 17 deposition, he confirmed that he used his Kradin Consulting email address for his work as an expert witness, and his Gmail address to communicate with his co-authors regarding the article. Kradin Dep. Tr. 120:9–18. When asked if it was his

"common practice [] to delete emails shortly after receiving or sending them," Dr. Kradin testified that he "delete[s] *all [his] emails* as soon as [he's] read" or sent them. *Id.* 120:21–24; 122:17–20 (emphasis added)]. When asked why, Dr. Kradin explained he did so to "clear up the space on [his] computer." *Id.* 120:25–121:1. When asked if he did so because he believed his Gmail lacked sufficient space, Dr. Kradin clarified: "I don't know. But that's what I do. I do it for all my emails, not just these . . . That's my habit." *Id.* 121:6–10. When asked why he had not changed his practice despite "occasionally" wishing he had not deleted an email, Dr. Kradin explained that he doesn't "like having long chains of emails in [his] inbox." *Id.* 121:11–21. Dr. Kradin testified that this was his customary practice with respect to both his Gmail and Kradin Consulting email accounts, though he "virtually never" uses his Kradin Consulting email anymore. *Id.* 122:9–16. This was the entirety of J&J's counsel's questioning of Dr. Kradin about this topic. *See generally id.*

Dr. Cashman testified during her September 16 deposition that Dr. Kradin "deletes his emails all the time" right "after he reads them," "even personal emails." Sept. 16, 2025 Cashman Dep. at 61:15–23, ECF No. 95-6 ("Cashman Dep. Tr."). Dr. Cashman explained that Dr. Kradin does this likely because "he gets a lot of emails, and he figures that once he's read it, he's, you know, taken care of it." *Id.* 61:25–52:2. She noted that this has sometimes caused issues because "sometimes he's booked, you know, tickets, like airline tickets, and he's deleted the email confirmation of the tickets." *Id.* 62:8–11. Dr. Cashman testified that she does not "delete emails," and never asked any plaintiffs' lawyers to provide material in connection with the Article. *Id.* 56:9–12, 22–25. J&J's counsel did not ask her any other questions on this topic.

Several weeks later, the day before discovery closed, J&J supplemented its interrogatory responses to state, for the first time, that "Dr. Kradin deleted all his sent and received emails despite knowing those communications and information would be subject to litigation." Plf.'s Suppl.

Resps. to Defs.' Interrogs. Number 2, 5, 6, and 20 at 12 (Oct. 2, 2025), ECF No. 91-51. In response, counsel for the Doctors raised concerns that this accusation was unsupported by evidence, and in fact was contradicted by Dr. Kradin's and Dr. Cashman's testimony. Ex. C (Oct. 8, 2025 Ltr. From K. Ali to K. Fournier, et al.). The following week—after discovery had closed—J&J notified counsel for the first time that they intended to file a motion for sanctions against Dr. Kradin. The next day, counsel for the Doctors asked to meet and confer to better understand J&J's concerns about the ESI produced in the case, noting that, had J&J's counsel "raised this issue during the discovery period and explained what materials you thought might be missing from the record, we could have worked together to think through other possible ways to obtain that material." Lockwood Decl. ¶ 8. Later that day, J&J's counsel sent a PDF of their already-drafted spoliation motion. *Id.* ¶ 8. The parties then met and conferred, and J&J filed its motion (substantively unchanged from the draft) a few days later. *Id.* ¶ 8.

### C. J&J's "Evidence" of Supposed Spoliation.

To try to argue that Dr. Kradin intentionally deleted his emails, J&J relies on five pieces of discovery material (its Exhibits 1, 2, 7, 8, and 10).[3]  Exhibit 1 is an email from Dr. Kradin to Drs. Emory and Maddox from February 2020 where Dr. Kradin provided his final edits to the draft manuscript while noting, "I think that it is a major contribution to the field but get ready for the J&J lawyers!" When asked about this statement during his deposition—before J&J had ever raised any issue concerning Dr. Kradin's emails or any suggestion of spoliation—Dr. Kradin testified that he was referring to "my depositions related to some of these talc cases," where he "was being

---

[3] J&J's remaining exhibits do not bear on these issues. Exhibit 3 is the published Article. Exhibit 4 is a set of Dr. Kradin's discovery responses in this litigation. Exhibits 5 and 6 are excerpts of Dr. Cashman's and Dr. Emory's depositions in this case. Exhibit 9 is an email from Dr. Kradin to Dr. Maddox that attaches a draft of the Article and states, in full: "Let me know your thoughts. Let's try to fill in the blanks and wrap it up. Keep it simple." Exhibit 11 is Google's 2025 privacy policy.

asked very incisive and aggressive questions by the J&J lawyers concerning - - the subjects in the paper." Kradin Dep. Tr. 134:18–135:8. In other words, he was not exhibiting awareness that he might be named as a party to a lawsuit about the Article, but rather that he expected he might be asked about the Article during his ongoing expert witness work. And if there were any remaining doubt, Dr. Kradin testified unequivocally that he "didn't expect to be sued for my publications," *id.* 123:4–124:3, and in fact knew of no instance where a company had "taken medical researchers into the courtroom like this." *Id.* 149:4–14. *See also id.* 184:22–191:3 ("If there's a problem [with a paper] that's brought to the attention of the journal, the journal raises the question with the authors, and then the authors will respond . . . They don't sue people to get corrections on papers . . .."). Dr. Emory expressed similar sentiments. *See* Oct. 3, 2025 Emory Dep. at 121:4–15, ECF No. 95-5 ("Emory Dep. Tr.") ("If you don't like a paper, you do the normal thing, which is you – you write to the editor . . . You don't sue people for this sort of thing.").

J&J's Exhibit 7 is an email exchange among Drs. Maddox and Kradin in November 2019, in which Dr. Kradin suggested their "original data [m]ay be subpoenaed down the road!" Exhibit 8 is a November 2019 draft of the Article where Dr. Kradin wrote, as an explanation for his redlines: "You can be certain that J&J and Colgate are going to want to see the data on this paper, so it's critical that it can be well-defended . . .  " Exhibit 10 is a February 9, 2020 email chain in which Dr. Kradin wrote to his co-authors: "As we are all actively engaged in litigation, you can be sure that defense counsels will ask to see the data." In each instance, Dr. Kradin was relaying his expectation that personal injury defense attorneys might seek information about the Article's *data*—which, again, was preserved and produced in full—in connection with the Doctors' ongoing expert witness work. And with respect to Exhibit 10, Dr. Kradin specifically testified:

> Q.  And do you see this is an email between you and Dr. Emory and Dr. Maddox dated February 9, 2020?

A. Yes.

Q. And do you see in item number 6, it says: We are all actively engaged in litigation, you can be sure that defense counsels will ask to see the data, including reports, depositions, et cetera. Do you see that?

A. Yes.

Q. And so you were expecting that counsel for talc manufacturers would be asking to see information related to your article, correct?

A. I was expecting that that would be occurring in depositions or possibly in trials. I didn't expect it would be occurring in civil litigation like this.

Q. To be fair, and just to be clear, the - - the litigation where you serve as an expert witness is also civil litigation.

A. Right. But not – not – I didn't expect to be sued for my publication.

Q. Understood. But you expected that talc manufacturers would be asking to see the data underlying your article after it was published, correct?

A. The - - the lawyers at depositions were - - were frequently asking for that.

Kradin Dep. Tr. 123:4–124:3.

Finally, J&J points to a soundbite of deposition testimony, which it badly mischaracterizes to suggest Dr. Kradin admitted he deleted emails because "defense attorneys 'will use anything that you say in print against you.'" Plf.'s Mem. in Supp. of its Mot. for Sanctions as to Def. Dr. Kradin for the Spoliation of Evidence at 2 (Oct. 20, 2025), ECF No. 103 ("Mot."). What the record actually shows is that, while they were drafting a response to a Letter to the Editor about the Article in early 2020, Dr. Kradin urged Dr. Emory to be "objective" because defense lawyers would "use anything that you say in print against" her. Ex. D (Mar. 2020 email chain between R. Kradin and T. Emory). When asked about this comment at his deposition, Dr. Kradin confirmed he was (once again) referring to what "defense lawyers" would do in cosmetic talc litigation in connection with Dr. Emory's work as an expert—not forecasting that J&J or another manufacturer would file a civil suit naming the Doctors as defendants. Kradin Dep. Tr. 150:20–25.

Dr. Kradin also testified that he does not email with plaintiffs' lawyers except about upcoming expert testimony. *Id.* 89:14–17. J&J's lawyers never asked Dr. Kradin during his

deposition whether he communicated with any other plaintiff's expert about the Article—other than Dr. Moline, who J&J subpoenaed (along with her employer), and who testified at her October 30 deposition that she does not recall any "communication with" the Doctors about the Article, and "didn't know they were writing the paper." [4] Ex. G at 90:7–9 (Oct. 30, 2025 Moline Dep. Tr.)

## LEGAL STANDARD

Spoliation is "the destruction or material alteration of evidence or [] the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). Fed. R. Civ. P. 37(e) governs the spoliation analysis for electronically stored information. It provides that if ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; [or] (B) instruct the jury that it may or must presume the information was unfavorable to the party . . ." Fed. R. Civ. P. 37(e).

"Thus, a movant must satisfy four threshold requirements before a court decides if any spoliation sanction is appropriate: (1) ESI should have been preserved; (2) ESI was lost; (3) the

---

[4] J&J issued a document and deposition subpoena to Dr. Moline on August 15, seeking all communications the Doctors and/or Dr. Siobhan Cashman "related to the Emory Article." Ex. E at 3 (Aug. 8, 2025 J. Moline subpoena objections). After Dr. Moline reported that she had conducted a reasonable search but located no responsive documents, *see* Mem. of Law in Supp. of Dr. Moline's Mot. to Quash at 6, *Moline v. Pecos River Talc LLC*, No. 1:25-mc-00391 (S.D.N.Y. Sept. 11, 2025), ECF No. 1-1, J&J issued a document subpoena to her employer for the same documents, and has since moved to compel their production. *See* Mot. to Compel Northwell Health, Inc. to Comply with Subpoena, *Pecos River Talc LLC v. Northwell Health, Inc.*, No. 1:25-mc-456 (S.D.N.Y. Oct. 17, 2025), ECF No. 1.

loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery." *Steves & Sons, Inc.*, 327 F.R.D. at 104. "Courts in the Fourth Circuit generally require proof of intent to deprive by clear and convincing evidence, especially when—as here—an adverse inference instruction is requested." *Haysbert v. Bloomin' Brands, Inc.*, No. 4:20-cv-121, 2021 WL 5003284, at *4 (E.D. Va. July 9, 2021), *aff'd*, No. 4:20-cv-121, 2021 WL 5003280 (E.D. Va. Aug. 10, 2021). *See also Steves & Sons, Inc.*, 327 F.R.D. at 104 (same, and collecting cases).

## ARGUMENT

## I.    THERE HAS BEEN NO SPOLIATION.

### A.  Dr. Kradin Had No Duty to Preserve His Emails in 2019 & 2020.

"Generally, it is the filing of a lawsuit that triggers the duty to preserve evidence." *Steves and Sons, Inc.*, 327 F.R.D. at 106–07 (quoting *Turner v. United States,* 736 F.3d 274, 282 (4th Cir. 2013)). However, the duty also extends to the period before litigation is filed if the party "reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001). This inquiry has two components: whether a party should reasonably have (1) anticipated litigation and (2) known that the evidence deleted might be relevant to such litigation. *Mod. Remodeling, Inc. v. Tripod Holdings, LLC*, No. CCB-19-1397, 2021 WL 3852323, at *6 (D. Md. Aug. 27, 2021) (citation omitted).

"[T]he mere existence of a potential claim or the distant possibility of litigation . . . does not trigger the duty to preserve." *Snell v. Reid*, No. 22-1869, 2024 WL 2815061, at *2 (4th Cir. June 3, 2024) (quoting *Micron Tech., Inc. v. Rambus*, Inc., 645 F.3d 1311, 1320 (Fed. Cir. 2011)); *see also Bhattacharya v. Murray*, No. 3:19-CV-54, 2022 WL 875032, at *2–4 (W.D. Va. Mar. 23, 2022) ("The undeniable reality is that litigation is an ever-present possibility in our society. Thus, while a party should take steps to find and safeguard potentially relevant materials after receiving

unequivocal notice of impending litigation, the duty to preserve those materials also should require more than a mere possibility of litigation.") (internal citations and quotations omitted). "Instead, the duty seems to begin 'somewhere between knowledge of the dispute and direct, specific threats of litigation.'" *Steves & Sons*, 327 F.R.D. at 106 (quoting *Huggins v. Prince George's Cty.*, 750 F.Supp.2d 549, 560 (D. Md. 2010)).

Dr. Kradin had no reason to believe that his emails would be relevant to any litigation when he deleted them (again, as part of a routine practice, along with all of his other emails) three and four years before this suit was first filed. There was no indication that Dr. Kradin would be personally sued in connection with the Article, and he testified that he was shocked when that happened. Kradin Dep. Tr. 123:4–124:3; 149:4–14; *see also* Emory Dep. Tr. 121:14–15. At the time he deleted the emails, there had been no "threats of litigation," and Dr. Kradin did not even have "knowledge of [any] dispute" between himself and J&J to which his emails might be relevant. *See Steves & Sons*, 327 F.R.D. at 106. Courts in the Fourth Circuit have found no duty to preserve in cases with far more notice than this one. *See, e.g.*, *Webb v. Daymark Recovery Servs., Inc.*, No. 1:21-cv-424, 2022 WL 17832160, at *3 (M.D.N.C. July 26, 2022), *report and recommendation adopted*, No. 1:21-cv-424, 2022 WL 19001534 (M.D.N.C. Oct. 31, 2022) (rejecting argument that defendant should have anticipated litigation where it received an email that showed "a generalized concern about possible litigation"); *Snell*, No. 2022 WL 2812056, at *3 (emails where tenant informed landlord that she was injured on the stairs, believed stairs were dangerous, and requested repairs, did nothing more than show "'the mere existence of a potential claim or the distant possibility of litigation' which 'does not trigger the duty to preserve'" (quoting *Micron Tech., Inc.*, 645 F.3d at 1320)); *Bhattacharya*, 2022 WL 875032, at *3 (statements about "hiring lawyers" and defendants "violating [] rights" were "too ambiguous" to trigger duty to preserve).

12

And unlike in other contexts where lawsuits are common, litigation over peer-reviewed publications is exceedingly rare, so Dr. Kradin had no reason to reasonably anticipate being sued over the Article. *Cf. Barnes v. Harling*, 368 F. Supp. 3d 573, 607 (W.D.N.Y. 2019) (finding defendants s" should have reasonably anticipated" a lawsuit because " that "in the hundreds of other instances where inmates have been injured while in [] custody, lawsuits. . . have invariably ensued." (quoting *Taylor v. City of New York,* 293 F.R.D. 601, 610 (S.D.N.Y. 2013))).

All of the "evidence" J&J has put forth to argue that Dr. Kradin anticipated litigation related to the Article demonstrates only that he was aware that talc defendants might try to poke holes in the Article's methodology or attack its conclusions in ongoing cosmetic talc litigation, not that he anticipated being named as a defendant in any standalone lawsuit. *See supra* § C. These documents also uniformly reflect Dr. Kradin's understanding that what talc manufacturers might seek was the Article's underlying *data*, *see supra* § C; they show no awareness on Dr. Kradin's part that these manufacturers might seek his emails (which they did not).

J&J tries to sidestep this issue by arguing that it is sufficient that Dr. Kradin knew there would be litigation activity related to the Article generally, even if he did not anticipate this trade libel lawsuit. Mot. at 7.[5] But all of the cases J&J cites for this proposition involve alleged spoliators who anticipated some sort of litigation *in which they would be a party*, even if they did not anticipate the specific litigation that arose. Here, the only litigation Dr. Kradin anticipated back in 2019 and 2020 were cosmetic talc personal injury cases, in which he would have been an expert

---

[5] J&J cites *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 496 (E.D. Va. 2011) for the proposition that "all that matters is that litigation *generally* was reasonably foreseeable." Mot. at 7. But *E.I. du Pont* does not say that. Instead, it makes clear that a party is not required to preserve "every shred of paper," but only has a duty to preserve documents that it knows or reasonably should know are relevant to ongoing litigation or anticipated litigation. *E.I. du Pont*, 803 F. Supp. at 496. The court in that case ultimately found only that the duty to preserve arose no later than the date that the defendant learned the complaint had been filed. *Id.* at 500.

witness, not a party. As a non-party, his anticipation of this potential future litigation did not create any duty to preserve his emails. *See Johns v. Gwinn*, 503 F. Supp. 3d 452, 462–63 (W.D. Va. 2020) ("duty to preserve does not generally apply to non-parties to the litigation[.]"); *Rodo Inc. v. Guimaraes*, No. 22-cv-9736, 2023 WL 8520426, at *2 (S.D.N.Y. Dec. 8, 2023) (while a *party*'s duty to preserve arises when it "reasonably anticipates litigation," non-parties "typically [have] no duty to preserve" (internal quotation marks and citations omitted)).

And since Dr. Kradin had no reason to think his personal emails would be relevant to his work as an expert witness in cosmetic talc injury litigation, he had no duty to preserve them. True, a party need not know the exact nature of the anticipated litigation to trigger a duty to preserve relevant evidence, but the party must know enough to be on notice that the at-issue evidence might be relevant to the potential litigation. *See* Fed. R. Civ. P. 37, cmt. (although a party may be alerted to the prospect of litigation, they may only have "limited information about that prospective litigation, [] so the scope of information that should be preserved may be uncertain"; courts should not be "blinded to this reality by hindsight arising from familiarity with an action as it is actually filed"). Documents from the relevant time show, once again, that Dr. Kradin understood that the Article's data might be relevant to his (and his co-authors') expert witness work, but they do not reflect any understanding that he would ever be asked to produce his *emails* in that context.

All of the cases J&J cites in its motion, Mot. at *7, involve evidence that would clearly be sought in the kind of litigation anticipated by the alleged spoliators at the time it was lost or destroyed, even if that litigation was different from that which ultimately arose. For example, in *Title Cap. Mgmt., LLC v. Progress Residential, LLC*, No. 16-21882-CV, 2017 WL 5953428 (S.D. Fla. Sept. 29, 2017), the defendant wiped evidence "relevant to [a] contract dispute" between the plaintiff and defendant during a time when "it was reasonably foreseeable that [contract] litigation

14

might arise." *Id.* at *2, 4. The plaintiff then sued the defendant for copyright violations, and the defendant argued that it had no duty to preserve because "the copyright litigation was not reasonably foreseeable at the time the evidence was lost[.]" *Id.* at *4. The court rejected this argument because the deleted evidence would also have been relevant to the contract claim, which the defendant did anticipate. *Id.*; *see also Zbylski v. Douglas Cnty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1163–64 & 1167 n.9 (D. Colo. 2015) (school district should have anticipated litigation when it "was on notice of concerns regarding [teacher's] inappropriate conduct with children" and had placed him on leave, even if it wasn't aware of specific incident; "party's duty to preserve arises when it has notice that documents might be relevant to a *reasonably-defined* future litigation") (emphasis added); *Rambus, Inc. v. Infineon Techs., AG*, 220 F.R.D. 264, 270, 280, 287 n.30 (E.D. Va. 2004) (where plaintiff destroyed evidence related to patent issue despite anticipating litigation with manufacturers of a product generally, it did not matter that plaintiff didn't know there would be litigation with this particular defendant manufacturer).

In cases like this one, where Dr. Kradin had no reason to believe his personal emails would be relevant to any reasonably anticipated litigation, there is no duty to preserve them. *See Evans v. Medtronic, Inc.*, No. 3:04-cv-97, 2005 WL 3547240, at *14–15 (W.D. Va. Dec. 27, 2005) (no duty to preserve where defendants should have anticipated "some kind of litigation" but "it was less obvious that this potential litigation would involve a products liability claim involving the [allegedly spoliated evidence]"); *Equal Emp. Opportunity Comm'n v. Performance Food Grp., Inc.*, No. CCB-13-1712, 2019 WL 1057385, at *3 (D. Md. Mar. 6, 2019) (no duty to preserve broader evidence related to a pattern-or-practice claim where defendants were only on notice of individual employee claims); *Eller v. Prince George's Cnty. Pub. Sch.*, No. 18-cv-3649, 2020 WL 7336730, at *4 (D. Md. Dec. 14, 2020) (report about harassment by one staff member alerted

defendants to the need to preserve evidence related to that allegation, but was not enough to put them on notice of litigation about workplace hostility generally); *see also Mod. Remodeling, Inc. v. Tripod Holdings, LLC*, No. 19-cv-1397, 2021 WL 3852323, at *6 (D. Md. Aug. 27, 2021) (even if alleged spoliator anticipated litigation, "it would only indicate that [they] may have anticipated an action for fraud, but not the unfair competition litigation that is the subject of this action").

J&J also suggests that Dr. Kradin had a heightened duty to preserve his emails because he is "legally sophisticated." Mot. at 5 (citing *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F4th 1290, 1313–14 (11th Cir 2023). But Dr. Kradin is not a "multinational company" with "an active litigation hold" like the alleged spoliator in the case J&J cites. *See Skanska USA*, 75 F4th at 1313–14. He is an individual who is "less familiar with preservation obligations" outside of the normal course of his expert practice, *see* Rule 37(e), cmt., who did not predict a lawsuit to which his personal emails might be relevant. In any event, a party's sophistication is relevant only to the "reasonableness of evidence preservation efforts" once the party is on notice of litigation, not the determination of whether he should have anticipated litigation or had a duty to preserve in the first place. *See Skanska*, 75 F4th at 1313–14; *see also id.* (alleged spoliator is "not being held liable for a failure of imagination"; they "had an active litigation hold, but took no steps to implement it"); Rule 37(e) & cmt. (rule applies only if ESI is lost because party failed to take reasonable steps to preserve; courts should weigh sophistication of parties in evaluating preservation efforts).

## B. J&J Has Not Carried its Burden, Much Less by Clear and Convincing Evidence, to Show that any ESI Was Lost, Or That It Could Not Have Been Recovered or Restored.

J&J also cannot shoulder its burden to show that any ESI relevant to this litigation was lost at all, or that any missing emails could not have been obtained through other sources had J&J made any effort to raise this issue or pursue it at any point during discovery.

16

1. **J&J has offered no evidence that any relevant evidence has been lost.**

As an initial matter, there is no basis to find that any relevant information is missing from the record at all. "To establish that spoliation has occurred, Plaintiff, as the moving party, 'must prove that ESI was 'lost,'" which requires proving "that the evidence at issue actually existed,' since 'spoliation sanctions can be imposed only when the party seeking such sanctions demonstrates that *relevant evidence* has been lost.'" *Industria de Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*, No. 16-6576, 2022 WL 1683747, at *9–10 (D.N.J. May 26, 2022), *objections overruled*, 2023 WL 4197114 (D.N.J. June 27, 2023) (quoting *Kavanagh v. Refac Optical Grp.,* No 15-4886, 2017 WL 6395848, at *2 (D.N.J. Dec. 14, 2017), emphasis added).

J&J speculates that Dr. Kradin's emails might have included "[e]mails to plaintiffs' attorneys or other plaintiffs' experts," or emails Dr. Kradin could have "sen[t] himself while working on the Article." Mot. 8. But Dr. Kradin testified he does not communicate with plaintiffs' attorneys about anything outside of his deposition and trial testimony, and J&J does not point to a single plaintiffs' expert—outside of Dr. Moline, whose emails it has sought from her and her employer through pending third-party subpoenas—that they believed he communicated with about the Article. Nor did J&J ever issue any sort of discovery request to try to determine who Dr. Kradin communicated with about the Article outside of his co-authors and Dr. Cashman (who have produced hundreds of emails on this issue). *See supra* § B.

J&J's vague conjecture that Dr. Kradin might have been clandestinely emailing with unknown third parties about some plan to publish junk science, or in ways that showed he harbored doubts about the Article's truthfulness, is also wholly implausible given the robust contemporaneous record that consistently points in the opposite direction. *See, e.g.*, ECF 92 ¶¶ 7, 9, 11, 13, 24–25; *see also id.* ¶¶ 10, 14, 20 (Dr. Kradin admonishing his co-authors that "we need to be absolutely confident about the exposures, "EVERYTHING in this paper must be

ABSOLUTELY ACCURATE," and "I would not republish Moline's cases knowingly"). And because J&J bears the burden to show by clear and convincing evidence that any relevant information was actually lost—by pointing to "evidence, not the hyperbole of argument," that the lost materials were "likely to have been favorable"—the Court's inquiry can stop here. *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 498 (E.D. Va. 2011). *See also Haysbert*, 2021 WL 5003284, at *6–7 (party failed to establish that any lost ESI was relevant where there was no evidence it would have captured "essential details" of events); *Profit Point Tax Techs., Inc. v. DPAD Grp., LLP*, No. 2:19-cv-698, 2023 WL 11968310, at *5 (W.D. Pa. Apr. 26, 2023), *report and recommendation adopted*, No. 2:19-cv-698, 2023 WL 11968047 (W.D. Pa. May 16, 2023), *reconsideration denied*, No. 2:19-cv-698, 2023 WL 11968110 (W.D. Pa. June 8, 2023) ("[G]eneralized assertions about ESI that may have been lost border on speculation and do not satisfy the standards applied by courts in determining whether spoliation has been established."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 541–42 (S.D.N.Y. 2022) (no spoliation where party seeking sanctions failed to develop facts showing supposedly lost documents "ever existed," where witness testified he sometimes took notes but there was no concrete evidence that notes existed for specific meeting at issue); *Industria de Alimentos Zenu S.A.S.*, 2022 WL 1683747, at *9–10 (no spoliation where plaintiff lacked facts showing loss of any *relevant* ESI, even where facts showed party "threw out" ESI after receiving litigation hold); *Air Prods. & Chemicals, Inc. v. Wiesemann*, No. 14-1425, 2017 WL 758417, at *1 (D. Del. Feb. 27, 2017) (rejecting spoliation finding where defendants fail to "clear the threshold issue of showing that relevant evidence was lost or destroyed").

### 2.   J&J also has not shown that whatever information may be missing is "lost."

Nor has J&J shown that any ESI from Dr. Kradin's Gmail account has been "lost" within the meaning of Rule 37. "Information is lost for purposes of Rule 37(e) only if it is irretrievable

from another source, including other custodians." *Steves & Sons, Inc.*, 327 F.R.D. at 107. *See also* Fed. R. Civ. P. 37, Comm. Notes on Rules—2015 Amendment ("Because [ESI] often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere."). "This reading is consistent with the definition of 'lost' as being 'beyond the possession and custody of its owner and *not locatable by diligent search*.'" *Steves & Sons, Inc.*, 327 F.R.D. at 107 (quoting Black's Law Dictionary (10th ed. 2014) (emphasis in original)) (deleted emails are not lost if obtainable via other custodians). *See also, e.g.*, *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.,* No. 13-cv-2581, 2021 WL 4190628, at *11 (S.D.N.Y. Aug. 18, 2021) ("[O]nly emails that were also deleted from other custodians' email accounts can be considered permanently lost"); *Envy Hawaii LLC v. Volvo Car USA LLC*, No. 17-00040, 2019 WL 1292288, at *2–3 (D. Haw. Mar. 20, 2019) ("[E]-mails are not lost when one custodian deletes them from his mailbox but they remain available in the records of another custodian"); *Ellis v. PB Ventilating Sys., Inc*., No. 23-cv-4629, 2024 WL 4002798, at *2 (E.D.N.Y. Aug. 30, 2024) (similar); *AliveCor, Inc. v. Apple, Inc.,* No. 21-cv-3958, 2023 WL 4335293, at *5 (N.D. Cal. June 2, 2023) (similar).

To show that relevant ESI has been "lost" for purposes of the Rule 37(e) analysis, therefore, J&J must show that it could not have obtained it through some other means in discovery. *Steves & Sons, Inc.*, 327 F.R.D. at 108. Because it made no effort whatsoever during discovery to explore whether the information it now speculates might be missing (a) ever existed or (b) could have been obtained through some other source, it cannot meet this burden.

J&J has known since July, when Defendants substantially completed their productions, that Dr. Kradin no longer had his emails from the relevant time period. J&J has also had nearly all of the documents it now cites as "evidence" of supposed spoliation since that time, including some that were produced months before. *See* Ex. J to Defs.' Opp. to Plf.'s Mot. to Compel (May 20,

2025), ECF No. 53-11. And yet J&J did nothing to try to remedy whatever gaps it might have thought were missing from the evidentiary record at any point prior to the close of discovery. J&J could have, for example, served written discovery requests on Dr. Kradin asking for a list of anyone he recalled emailing with, or might have emailed with, about the Article during the drafting process, which it then could have used to serve third party discovery to try to obtain any missing communications from the recipients or senders of any such emails. It could have served similar requests on Dr. Kradin's research assistant. J&J could have subpoenaed Google to ascertain whether the emails were, in fact, permanently lost. It could have served written discovery requests on Drs. Maddox and Emory to ask whether they were aware if Dr. Kradin ever spoke with third parties about the Article, or explored that topic in their depositions. Its lawyers also, of course, could have probed this topic in detail at Dr. Kradin's deposition, instead of asking him a few high-level questions and then concluding the deposition early. It did not do any of those things.

So while J&J now says it has "no way to know who" Dr. Kradin might have communicated with, that is the result of its own lack of diligence. And J&J clearly has at least a partial list of possible senders or recipients in mind, as evidenced by the fact that its counsel questioned the Doctors' consumer survey expert—a university professor with absolutely no connection to cosmetic talc or asbestos personal injury litigation—about his (nonexistent) ties to seven particular law firms during his deposition. *See* Ex. F at 27–29. At a minimum, J&J could have made an effort to subpoena these firms—and any others it had reason to believe may have emailed with Dr. Kradin about the Article—to try to restore any lost information.

Accordingly, while J&J claims that "no matter how many document requests or subpoenas Pecos River services [sic], the end result is that all those emails will never see the light of day," Mot. at 9, the fact of the matter is that J&J did not take a single step during discovery to ascertain

whether that is, in fact, true. Instead, J&J waited until the night before discovery closed, months after the Doctors produced the bulk of their documents and J&J knew what was in their possession and what was not, and weeks after Dr. Kradin's deposition—to raise anything having to do with this issue for the very first time. By the time J&J asked to meet and confer on the issue, it already had its spoliation motion drafted, so clearly was not interested in actually problem solving how to fill any gaps in the evidentiary record for use in this case. J&J should not be permitted to benefit from its own lack of diligence during discovery by pointing to a list of unknowns that it elected not to explore when it had ample opportunity to do so.

**3.  J&J also has not shown that any missing emails could not have been recovered.**

Further, even if J&J could show that Dr. Kradin's emails are "lost," it still must separately show—again, by clear and convincing evidence—that they could not have been recovered through other means. "This factor does not require that [J&J] pursue every possible avenue for replacing or restoring the ESI, but it must show that it made some good-faith attempt to explore its alternatives before pursuing spoliation sanctions." *Steves & Sons, Inc.*, 327 F.R.D. at 108–109 (collecting cases and finding that party had "not provided clear and convincing evidence to satisfy this element"); *Lamb*, 2023 WL 2172729, at *5 ("Courts within the Fourth Circuit have noted that 'spoliation sanctions motions often follow only where extensive ESI recovery efforts have failed'" (quoting *Steves & Sons, Inc.,* 327 F.R.D. at 108)); *Envy Hawaii LLC*, 2019 WL 1292288, at *2 ("sanctions *are foreclosed* if the purportedly 'lost' electronically stored information may be retrieved from additional discovery or discovery from third-parties" (citation omitted, emphasis added)); *Hugler v. Sw. Fuel Mgmt., Inc.*, No. 16-cv-4547, 2017 WL 8941163, at *8 (C.D. Cal. May 2, 2017) ("[I]f the despoiled information can be restored or replaced through additional discovery, the Court *cannot impose sanctions* under Rule 37(e)" (emphasis added)).

Courts have found this requirement satisfied where, for example, the party arguing

spoliation "issued subpoenas, engaged in forensic analysis of a defendant's laptop, and sent discovery requests encompassing the documents 'in an effort to recover what [was] destroyed.'" *Lamb*, 2023 WL 2172729, at *6 (requirement met by evidence that party "attempt[ed] to directly retrieve missing ESI, through subpoenaing third parties, pursuing forensic analysis, and directing interrogatories to [defendant]"). *See also, e.g.*, *GMS Indus. Supply, Inc. v. G&S Supply, LLC,* No. 2:19-cv-324, 2022 WL 853626, at *6 (E.D. Va. Mar. 22, 2022) (element met where "Plaintiff had [defendant]'s laptop forensically examined, issued a subpoena to DLA, and sent discovery requests encompassing the documents in an effort to recover what [defendant] destroyed").

As discussed above, J&J did not take a single one of these (or any other) steps to try to retrieve whatever information it claims is missing. The only thing J&J points to anywhere in its motion as support for its argument that "Dr. Kradin's emails are lost and cannot be replaced," is Google's current "technology retention" policy that J&J pulled from Google's website.[6] Mot. 8. Courts have expressly rejected precisely this kind of half-hearted showing, which does not come close to the kind of reasonable investigation that courts have found necessary to meet this element. *See, e.g.*, *Envy Hawaii LLC*, 2019 WL 1292288, at *2–3 ("Defendant claims that [plaintiff] used Google Enterprise to store its e-mails" and that "it believes Google Enterprise's policy is to delete

---

[6] The privacy policy that J&J cites appears to be Google's current (2025) policy addressing "How Google Retains Data We Collect"—in other words, how Google retains and deletes information *it* collects, and does not address email anywhere in that policy. Even if this 2025 policy had some bearing on deletion of email in 2019 and 2020, it still does not support a finding that information deleted from Google accounts is permanently deleted in all cases. *See* Plf's Ex. 11. That policy says that information is "generally" deleted after a specified period, but that there is "often" a recovery period and "deletion could sometimes take longer." It also says that Google's services "use encrypted backup storage," and that, "[a]s with any deletion process, things like routine maintenance, unexpected outages, bugs, or failures in our protocols may cause delays." Had J&J made some effort to try to retrieve Dr. Kradin's emails through the discovery process, it might have been able to satisfactorily answer whether Dr. Kradin's ESI is permanently lost. But a generally applicable policy (which does not even appear to have been the policy in place at the relevant time) is not clear and convincing evidence that ESI *in this case* was permanently lost.

e-mails within a short number of days . . . Defendant has not sought any e-mails or discovery directly from Google and cannot demonstrate that the e-mails are otherwise lost.").

J&J's failure to demonstrate that any lost emails were irretrievable is dispositive. *See, e.g.*, *Steves & Sons, Inc.*, 327 FR.D. at 109; *Ellis*, 2024 WL 4002798, at *2 (rejecting sanctions where plaintiff "made no effort to show that the deleted messages are irretrievable, nor has it indicated any attempt to obtain the deleted messages from other custodians"); *Ahern Rentals, Inc. v. Eure*, No. 2:20-cv-1680, 2022 WL 18670848, at *5 (D. Nev. Mar. 16, 2022) (no spoliation where plaintiff had "not put forth *any* evidence of what steps it has taken to ascertain whether this information can be restored or replaced. Instead, it simply states that the information is forever gone.") (emphasis in original); *Envy Hawaii LLC*, 2019 WL 1292288, at *2–3 (citing *Steves & Sons, Inc.* and rejecting spoliation finding where plaintiff had not subpoenaed or otherwise attempted to retrieve lost information from third parties); *HighMark Digital, Inc. v. Casablanca Design Centers, Inc.*, No. 18-6105, 2019 WL 13038414, at *5 (C.D. Cal. Oct. 3, 2019) (rejecting spoliation motion where plaintiff failed to make "a credible effort" to obtain information from other sources); *Ellis*, 2024 WL 4002798, at *2 (because "'the law is clear that the burden remains with the moving party' to show that the information cannot be restored or replaced," "Defendant's attempt to rest on plaintiff's purported wrongdoing is simply not sufficient to meet its burden under Rule 37(e).").

## II. THERE IS NO BASIS FOR ANY SANCTION.

Even if the Court were to find spoliation, J&J has failed to carry its burden to show that any sanction is warranted under either provision of Rule 37(e).

### A. There Is Zero Evidence of Intent, Which Precludes Sanctions Under Rule 37(e)(2).

Harsh sanctions like an adverse inference are available only if the court makes a predicate finding, based on clear and convincing evidence, that the spoliating party "acted with the intent to deprive another party of the [lost] information's use in the litigation." Fed. R. Civ. P. 37(e)(2). As

courts in this District have acknowledged—and as J&J itself has argued in defending against spoliation accusations—this requires a showing akin to bad faith; negligence or even gross negligence is not enough. *Haysbert*, 2021 WL 5003284, at *7–8; Ex. H at 18 & n.11 (J&J arguing that "mere negligence in losing or destroying records is not enough for an adverse inference, as it does not sustain an inference of consciousness of a weak case. In fact, even gross negligence is insufficient[.]"). There is not a shred of evidence supporting such a finding here.

There is no suggestion—nor any basis for one—that Dr. Kradin has deleted any potentially relevant ESI after this suit was first filed in New Jersey in 2023. *See supra* § A. As for the time period preceding this litigation, Dr. Kradin testified under oath that he routinely deleted *all* of his emails, not just emails that might have been related to the Article or other issues in this case. Dr. Cashman corroborated this, while sharing her (relatable) frustration that this has sometimes resulted in Dr. Kradin deleting things like airline tickets and other receipts. Dr. Kradin also testified that he never anticipated ever being named in a lawsuit related to the Article—and in fact was not aware of *any* other instance where a medical researcher had been sued like this.

J&J suggests Dr. Kradin's rationale for deleting his emails is not credible because "at no charge, Google allocates *15 gigabytes* of space of storage for a Google account." Mot. 11–12 (emphasis in original). But there is no basis to presume that Dr. Kradin—a 75 year old retired physician—understood this, much less any actual evidence showing he did. And it ignores that Dr. Kradin further clarified that he deletes emails because he does not "like having long chains of emails in [his] inbox." Kradin Dep. Tr. 121:11–21. The only other thing J&J points to as evidence of supposed intent are the same handful of emails discussed above. *See supra* §§ C, I.A. Once again, Dr. Kradin has explained precisely what he meant by these statements: that he expected J&J and other talc manufacturers might request the *data* underlying the Article in connection with his

work as an expert witness, not that he ever expected to be haled into court in a suit like this, or asked to produce his personal emails. *See id.*

On this record, J&J has not come close to showing clear and convincing evidence of intent. *See, e.g., N. Am. Sci. Assocs., LLC v. Conforti*, No. 24-cv-287, 2024 WL 4903753, at *25–26 (D. Minn. Nov. 27, 2024) (court may not *presume* intent to deprive where party has offered credible explanation for destruction of evidence); *Booker v. Mass. Dept. of Pub. Health*, 612 F.3d 34, 47 (1st Cir. 2010) (spoliation instruction not warranted where plaintiff showed employees routinely deleted emails, "some of which may have concerned her, but produced no evidence that defendants destroyed emails with knowledge they were relevant" to claims).

J&J does not cite a single case where a court has imposed *any sanction*—much less an adverse inference—in circumstances like these. And plenty of courts have rejected requests for sanctions under Rule 37(e)(2) on facts that come much closer to showing intent.

For example, in *Steves & Sons, Inc.*—which has been cited and relied upon by more than twenty courts all over the country—the evidence suggested that the plaintiff had hired one of the defendant's former employees and used him to "obtain information covertly" from the defendant. 327 F.R.D. at 101. That former employee sent several emails predicting that this might cause legal trouble, and that if the former employer "did file a suit, the first things we would see would probably be an order to send to them copies of all correspondence that we have exchanged, and all reports that I have provided." *Id.* at 102. He then proposed a series of "precaution[ary]" steps, including "Delet[ing] from all of our email servers, programs, and folders all copies of every email and document we have exchanged to this point, including every copy that is in the 'SENT' email folder"; "Delet[ing] all meeting notes"; "Hav[ing] me re-compose all of the information that I've sent you to remove indications that any of it is verified current information"; and "[S]end[ing] you

re-drafted versions of all the information that I have provided so far—to eliminate any references that indicate that current informa[ti]on was passed to me by current [JELD–WEN] employees." *Id.* (alterations in original). This former employee explained that taking these "inexpensive precautions . . . before a discovery order is received" would allow them to "comply with any such request with reasonable documents that might not be incriminating to anyone" because, "We can't unring a bell, but perhaps we can replace the bell with one that's more attractive to [us] . . . and less attractive to [the former employer]." *Id.* And yet—despite all of this—Judge Payne found that even this evidence was not enough to show intent under Rule 37(e)(2). *Id.* at 110.

That is in line with how other courts have conducted this analysis, and demonstrates how heavy J&J's burden is to prove intent under Rule 37(e)(2).[7] *See, e.g.*, *Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd.*, 343 F.R.D. 474, 482–83 (D. Md. 2023) (finding no intent to deprive even where a J&J subsidiary destroyed ESI "eight months *after* suit was filed") (emphasis in original); *Conforti*, 2024 WL 4903753, at *25–26 ("even if the Court did find the requisite intent, the Court is not persuaded that [plaintiff] has made enough of a showing to warrant an adverse inference"); *Knight v. Boehringer Ingelheim Pharms., Inc.*, 323 F. Supp. 3d 837, 860–61 (S.D.W. Va. 2018) (where record did not support finding of intent, "the severe sanction of an adverse inference instruction—the only sanction requested by Plaintiffs—does not fit the circumstances, and this

---

[7] All of the cases J&J cites involve situations where the alleged spoliator (i) intentionally deleted ESI *after litigation was already underway* or (ii) was a plaintiff who knew they were about to file suit. *See Painadath v. Good Shepherd Penn Partners*, 348 F.R.D. 16, 26–27 (E.D. Pa. 2024) (plaintiff "affirmatively deleted a good chunk of" data on his phone 18 months after filing suit); *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 339–40 (D. Ariz. 2022) (finding intent to deprive (applying a preponderance standard) where plaintiff deleted Facebook posts after her counsel sent a demand letter, and where contemporaneous documents showed she understood the posts were relevant to her claims); *Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*, No. 15-cv-2926, 2019 WL 5694256, at *11 (E.D.N.Y. July 22, 2019) (plaintiff deleted ESI years after suit was filed, and its owner "joke[d] during his deposition about throwing out and burning computer backup tapes").

Court will not impose such a sanction."); *In re Johnson & Johnson Talcum Powder Prods. Mktg. , Sales Pracs., & Prods. Liab. Litig.*, No. MDL 2738, 2024 WL 111069, at *10 (D.N.J. Jan. 10, 2024) (even if J&J "intentionally spoliated relevant evidence," plaintiff had no evidence that the ESI "was destroyed *with the intent to defeat plaintiffs' claims*," which was fatal to spoliation claim) (emphasis added). *See also generally* Fed. R. Civ. P. 37(e)(2) ("The remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss.").[8]

## B. J&J Also Has Not Shown Prejudice, Much Less by Clear and Convincing Evidence.

J&J also has not shown prejudice, as is needed for an award of lesser sanctions under Rule 37(e)(1). *Steves & Sons, Inc.*, 327 F.R.D. 96 at 109–10 (prejudice is a necessary prerequisite to imposing sanctions under Rule 37(e)(1), which "must be 'no greater than necessary to cure the prejudice.'"). "This analysis 'necessarily includes an evaluation of the [ESI]'s importance in the litigation.'" *Id.* (quoting Fed. R. Civ. P. 37, Comm. Notes on Rules—2015 Amendment). "[P]rejudice results when the movant 'cannot present evidence essential to its underlying claim,' such that its 'ability to present its case . . . is compromised.'" *Steves & Sons, Inc.*, 327 F.R.D. 96 at 110 (citation omitted). *See also FA ND CHEV, LLC v. Kupper*, No. 1:20-cv-138, 2022 WL 16699304, at *3 (D.N.D. Aug. 31, 2022) ("Prejudice likely exists from lost or destroyed ESI 'if the lost or missing evidence would be different or more helpful to the party claiming spoliation' than the evidence already in existence.'" (cleaned up)). "[P]rejudice does not exist when there is no 'support for the speculation that the [lost] evidence would have affected the litigation.'" *FA ND*

---

[8] J&J also never explains how an adverse inference would work here, where there is substantial, direct evidence of Dr. Kradin's mental state during the relevant period and (ii) it is undisputed that there is no basis to find any spoliation by or impose any sanction on his co-authors.

*CHEV, LLC*, 2022 WL16699304, at *3 (internal citations omitted, alteration in original).

J&J's prejudice argument is confined to a single paragraph, where it says it has "lost some ability to use Dr. Kradin's own words to test his mental state regarding the Article," and "has no way to test what he said about his Article to plaintiffs' counsel, other plaintiffs' experts, or anyone else," which it says is "critical to the 'actual malice' mental state element." Mot. 13. But, as discussed above, there is no evidence supporting J&J's suggestion that Dr. Kradin ever emailed "about his Article to plaintiffs' counsel, other plaintiffs' experts, or anyone else," Mot. 13, aside from his email communications with Drs. Emory, Maddox, and Cashman, and an isolated communication with Dr. Moline—all of which were produced. *See Steves & Sons, Inc.*, 327 F.R.D. at 110 (finding no prejudice where "[t]he record here does not indicate that the ESI lost because of Pierce's deletion policy would have significantly improved JELD–WEN's ability to prove trade secret misappropriation, if at all. Indeed, much of the potential prejudice seems to have been avoided by [another custodian's] retention of communications and documents from Pierce."). In fact, Dr. Kradin testified that he did not email with plaintiffs' lawyers about the Article, or about anything other than upcoming expert testimony. *See supra* § C. J&J does not cite anything to rebut this testimony, offering only vague speculation that (i) Dr. Kradin might have emailed with other people (though J&J developed no facts about who or on what topics during discovery), and (ii) those emails might have been different than what is in the existing record.

This does not come close to demonstrating prejudice, which "cannot be grounded on the basis that *some* evidence no longer exists." *Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*, No. 15-cv-2926, 2019 WL 5694256, at *12 (E.D.N.Y. July 22, 2019), *report and recommendation adopted*, No. 15-cv-2926, 2020 WL 1242616 (E.D.N.Y. Mar. 16, 2020), *judgment aff'd, appeal dismissed in part*, No. 24-2294-cv, 2025 WL 2778968 (2d Cir. Sept. 30, 2015) (emphasis in

original). While J&J of course does not need to specify exactly what evidence is missing, it must offer some specificity based on concrete facts. *See Steves & Sons, Inc.*, 327 F.R.D. at 110 (no prejudice where "any benefit from ESI beyond that produced by [plaintiff] is almost totally speculative" and where defendant was "steadfast in his declarations that" there were no missing communications); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. at 541–42 (no prejudice where party failed to adduce support for claim that any missing evidence likely would have been favorable); *Capricorn Mgmt. Sys., Inc.*, 2019 WL 5694256, at *12 ("Defendants have over 500 e-mails from DePace's Gmail account, and while [] these may not be all the e-mails from the account, Defendants must show with some degree of specificity how the purported missing e-mails would have been helpful [to their claims]") (cleaned up); *Ward v. Schaefer*, No. 16-12543, 2019 WL 13196106, at *8–9 (D. Mass. Sept. 18, 2019) (plaintiff's argument was "like a wish list of the evidence that [plaintiff] would like to put forward," but did "not translate into the kind of 'concrete suggestions' that the law requires. It is too speculative"); *Fuhs v. McLachlan Drilling Co.*, No. 16-376, 2018 WL 5312760, at *15 (W.D. Pa. Oct. 26, 2018) (no prejudice where movants "offered conjecture as to what they believe may have been on the devices" but not "concrete, plausible suggestions as to any *relevant* ESI that was lost") (emphasis in original); *Sampson v. City of Cambridge, Md.*, 251 F.R.D. 172, 180 (D. Md. 2008) (prejudice requires showing "reasonable possibility, based on concrete evidence rather than fertile imagination, that access to the lost material would have produced evidence favorable to his cause" (quoting *Gates Rubber Co. v. Bando Chemical Indus., Ltd.,* 167 F.R.D. 90, 104 (D. Colo. 1996))).

That is particularly true here, where the record contains a trove of evidence—through emails produced by Drs. Emory, Maddox, and Cashman, the deposition testimony of all of these witnesses of Dr. Kradin (not to mention half a million pages of data from the subjects' underlying

cases)—that offers clear, direct evidence of Dr. Kradin's subjective state of mind at that time, painting a vivid picture of the Doctors' good faith scientific process. *See* ECF No. 92 at 29–35. *See Knight*, 323 F. Supp. 3d at 860–61 (finding that where one year of emails were lost, there was no prejudice because "[a]lthough some unknown emails may have been lost, Plaintiffs already possess emails from [witness]" that it seems to think support its claim, since it used those emails "to rebut Defendant's summary judgment motion"); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. at 541–42 ("Keurig is simply wrong that 'we have no record of what happened' during the Costco Meeting . . . JBR produced 23 documents pertaining to" the meeting, there was "deposition testimony" about it, and "[t]hat Keurig did not elicit more detail about what Jim Rogers and the Costco employees discussed during the Costco Meeting appears to have been Keurig's conscious choice"); *See Indem. Ins. Co. of N. Am. v. Liebert Corp.*, No. 96-cv-6675, 1998 WL 363834, at *5 (S.D.N.Y. June 29, 1998) (defendants failed to show prejudice where they were able to depose third party witnesses with relevant knowledge).

Even setting aside that there was no spoliation here, because J&J has not shown prejudice from the loss of any emails, there is no basis to impose any sanction under Rule 37(e)(1).

## CONCLUSION

For these reasons, Dr. Kradin respectfully requests that this Court deny J&J's Motion.


Dated: October 31, 2025              Respectfully submitted,

                                      By:    /s/ *Kathryn Ali*
                                               Kathryn M. Ali (VSB No. 97966)
                                               Elizabeth C. Lockwood (admitted *pro hac vice*)
                                               Meghan Palmer (admitted *pro hac vice*)
                                               ALI & LOCKWOOD LLP
                                               501 H Street, Suite 200
                                               Washington, D.C. 20002
                                             Telephone: 202-651-2476
                                             katie.ali@alilockwood.com

liz.lockwood@alilockwood.com
meghan.palmer@alilockwood.com

*Attorneys for Defendant Dr. Richard Kradin*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of October, 2025, a copy of the foregoing has been filed electronically. Notice of this filing has been served upon counsel of record via the Court's electronic filing system.  Access to this filing can be obtained via the Court's electronic filing system.

*/s/ Kathryn Ali*
Kathryn Ali
