IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

| | |
|---|---|
| PECOS RIVER TALC LLC,<br><br>Plaintiff,<br><br>v.<br><br>DR. THERESA SWAIN EMORY, DR. RICHARD LAWRENCE KRADIN, AND DR. JOHM COULTER MADDOX,<br><br>Defendants. | Civil Action No. 1:24-cv-75-JKW-RJK |

**DECLARATION OF ELIZABETH LOCKWOOD IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PECOS RIVER TALC'S MOTION TO COMPEL**

I, Elizabeth C. Lockwood, declare as follows:

I am an attorney and a partner with the law firm Ali & Lockwood LLP, counsel for Defendants in the above-captioned matter. The facts stated in this Declaration are true and based on my personal knowledge. I submit this Declaration in Support of Defendants' Response in Opposition to Pecos River Talc's Motion to Compel.

1. Between March 13 and July 18, 2025, J&J issued four sets of interrogatories (totaling 19 requests) and four sets of requests for admission (totaling 20 requests). None of the interrogatories or requests for admission sought information related to whether anyone was funding the Doctors' defense, may do so in the future, or may pay any damages award.

2. On July 16–17, Defendants produced nearly 1,000 of the Doctors' emails from the relevant (2019–2020) period. Between this and an earlier production, Defendants substantially completed their document productions, producing nearly all of the documents responsive to J&J's document requests, with the exception of a small set of documents that required additional review for

1

privilege, which were produced a few weeks later.

3. J&J issued its first and second set of requests for production of documents on March 13, 2025, which included ten requests. It did not issue any additional requests for production of documents after that date. Defendants agreed to produce, among other things, all non-privileged documents and communications related to the development, research, drafting, and publication of the Article. J&J did not issue any document requests related to whether anyone was funding the Doctors' defense, may do so in the future, or may pay any damages award.

4. At Dr. Kradin's September 17, 2025 deposition, J&J's counsel did not ask Dr. Kradin whether anyone other than the Doctors (i) had made any statements or suggestions that they would or might contribute to his legal fees, or (ii) had agreed, stated, or suggested that they would or might contribute to any portion of the Doctors' damages. *See generally* Plf.'s MSJ Ex. 4, Sept. 17, 2025 R. Kradin Dep. Tr., ECF No. 95-4 ("Kradin Dep. Tr."). J&J's counsel also never stated on the record at Dr. Kradin's deposition or indicated to me during any break that it believed any of my privilege objections or instructions were improper. J&J's counsel ended Dr. Kradin's deposition before reaching its seven-hour limit.

5. At Dr. Maddox's September 19, 2025 deposition, J&J's counsel did not ask a single question related to the Steffen article, or regarding any communications between Dr. Maddox and the authors of that article. *See generally* Plf.'s MSJ Ex. 3, Sept. 19, 2025 J. Maddox Dep. Tr., ECF No. 95-3 ("Maddox Dep. Tr."). J&J's counsel never stated on the record or indicated to me during any break during Dr. Maddox's deposition that it believed any of my privilege objections or instructions were improper.

6. On September 26, a week after Dr. Maddox's deposition, J&J's counsel sent an email stating for the first time that they did not believe there was a basis to claim privilege over the

questions they had asked Drs. Maddox and Kradin related to litigation funding and/or damages contributions. *See* Ex. C at 7–8 (Oct. 2025 Email Chain between counsel). After reviewing the authority cited in J&J's counsel's email, I responded: "With respect to Dr. Emory's upcoming deposition, we will consider whether any privilege objections are appropriate based on the questions that you ask (and with the authority that you've cited below in mind), and I would hope that we could sort out any lingering disputes at that time." *Id.* at 6. J&J's counsel never responded to my email or otherwise communicated with me about this issue before Dr. Emory's deposition.

7. During Dr. Emory's deposition, I did not raise a single objection to any of J&J's questions related to any of the topics that are now the subject of J&J's motion to compel. *See generally* Plf.'s MSJ Ex. 5, Oct. 3, 2025 T. Emory Dep. Tr., ECF No. 95-5 ("Emory Dep. Tr."). J&J's counsel ended Dr. Emory's deposition before reaching its seven-hour limit.

8. On the afternoon of Friday, October 10, a week after Dr. Emory's deposition and the close of fact discovery, J&J's counsel asserted for the first time that Dr. Emory's deposition "did not resolve the issue of litigation funding" and demanded that all three Doctors respond to the interrogatories it has now proposed in its motion. *See* Ex. C at 5–6. J&J's counsel further suggested that the Doctors' counsel may have violated Virginia Rule of Professional Conduct 1.8(f). *Id.* at 5. On Monday, October 13 (a federal holiday), J&J's counsel said they would move to compel if the Doctors did not agree to answer their proposed interrogatories.

9. I responded the next day by email. I confirmed that we were confident we had had complied with our ethical obligations, and asked J&J's counsel to clarify why they believed their proposed interrogatories were warranted, given that they went "far beyond the questions [J&J] asked during" the Doctors' depositions, and "in many instances relate to issues that [they] never even attempted to explore in a particular Defendant's deposition." *Id.* at 4–5. J&J responded on October 14 by

3

sending a PDF of their "draft" motion to compel, which is nearly identical to the motion they eventually filed.

10. For all of the reasons set forth in the brief accompanying this Declaration, the Doctors maintain that there is no legitimate basis for J&J to compel discovery concerning litigation funding at all, much less to compel answers to deposition questions on this topic that it either never asked, or that the Doctors already answered within the bounds of their personal knowledge. Nonetheless, in an effort to try to put this issue to rest (including J&J's suggestion that our firm has violated our professional responsibilities), this declaration provides additional details regarding funding received in this litigation.

11. Our firm has received sporadic donations from a collection of donors to a trust account to help offset the Doctors' fees and expenses in this matter. No donor has received any confidential or otherwise non-public information about this case or our representation. No donor has any influence whatsoever over this litigation, or has interfered in any way with our representation of the Doctors. Nor does any donor have any financial stake in the outcome of this litigation.

12. Our firm has handled communications with donors, which have been very limited and have focused on donation logistics rather than substance. Whatever limited knowledge the Doctors may have about any donations received has come through conversations with counsel, and often during conversations where we were also providing legal advice, which is why I made limited objections at the depositions of Drs. Maddox and Kradin to ensure they did not reveal our privileged communications.

13. Each donation was made for the Doctors' benefit in an amount determined by the donor. Neither our firm nor the Doctors have ever had any understanding or agreement—either formal or informal, written or oral—with any past or potential donor that requires anyone to contribute any

amount to the Doctors' defense or any potential damages, or that provides any donor with anything in exchange for their donation.

14. The donations we have received on the Doctors' behalf account for less than 25% of the fees and expenses incurred in this litigation to-date.

15. Before accepting any donations, my partner and I researched the question of whether any ethical obligations might be implicated by accepting crowdfunded or other donations for the Doctors' benefit. As part of our diligence, we consulted with both private ethics counsel and the Virginia State Bar's Legal Ethics Hotline. Among other considerations, we evaluated how generally applicable rules of professional responsibility applied to such circumstances, and how to ensure compliance with ethics opinions that more squarely addressed this specific issue. *See, e.g.*, *Ethical Considerations of Crowdfunding*, DC Ethics Opinion 375 (Published Nov. 2018), *available at* https://www.dcbar.org/for-lawyers/legal-ethics/ethics-opinions-210-present/ethics-opinion-375. During the course of accepting donations for the Doctors' benefit, we were careful to adhere to all of the ethics advice and guidance we received.

16. After J&J sent our firm its "draft" motion to compel on October 14, we again consulted with ethics counsel at the Virginia State Bar. We described the donation arrangement in some detail, and asked whether anything in Virginia Rule of Professional Conduct 1.8(f), or any other rule, required that we inform the Doctors of the identity of each donor. Ethics counsel confirmed that neither Rule 1.8(f) nor any other Virginia Rule of Professional Conduct required providing this information to our clients, so long as they generally consented to receiving donations (they did) and were comfortable not being informed of individual donors' identities (they are). The Virginia State Bar's ethics counsel otherwise reaffirmed that there was nothing problematic about the arrangement.

17. When the parties met and conferred on October 17 regarding J&J's proposed motion to compel, we specifically told J&J's counsel that we had sought ethics advice from private counsel and the Virginia State Bar, and assured them that we were compliant with our ethical obligations.

18. We also asked J&J's counsel whether they had sought or were aware of any contrary ethics advice. In response, J&J's counsel simply stated that they did not understand how the Doctors could have given "informed consent" on these issues without having the donors' identities. J&J's counsel did not otherwise indicate that he was aware of any conflicting ethics opinions or had received any contrary ethics advice. I then told J&J's counsel that I hoped they would remove any unsubstantiated accusations about supposed ethics violations from their motion to compel.

19. During that same meet and confer, I indicated that our small team had an oral argument at the U.S. Court of Appeals for the Fourth Circuit and four depositions in other cases scheduled within the next three business days, but that we would consult with our clients and prepare a counterproposal by October 22. J&J's counsel indicated that they were open to considering a counterproposal, including one where only certain Defendants responded to the interrogatories. J&J's counsel suggested, as an example, that perhaps only Dr. Maddox would be required to respond.

20. After consulting with our clients, I sent a counterproposal on October 22, proposing that Drs. Kradin and Maddox respond to the following interrogatories, *see* Ex. C at 3–4:

    a. **Defendants' Proposal re. ROG 19.** Identify all Persons or Entities other than Defendants who (A) are providing Funding for the defense of this Action; or (B) have agreed to provide Funding for the defense of this Action.

    b. **Defendants' Proposal re. ROG 20.** Identify all Persons or Entities other than Defendants who (C) have agreed to provide Funding for any portion or all of

    Defendants' Damages; or (D) stated or suggested that they would or might provide Funding for any portion or all of Defendants' Damages.

  c. **Defendants Proposal re. ROG 21.** For all Persons or Entities identified in response to Interrogatories 19 and 20, describe in detail the nature of any Funding arrangements, including but not limited to the terms and conditions relating to any such Funding.

21. I did not receive a response to my counterproposal until October 28, when J&J's counsel rejected it without explanation, stating they intended to file their motion to compel that afternoon. When I asked for more information to try to ascertain whether another compromise might be feasible to avoid unnecessary motions practice, J&J's counsel made clear they would not accept anything that deviated from their initial proposal. Ex. C at 2–3. A few hours later, they filed this Motion, which is nearly identical to the draft they circulated two weeks earlier.

22. Attached hereto as **Exhibit A** is a true and correct copy of excerpts of the October 30, 2025 deposition transcript of non-Party Dr. Jacqueline Moline.

23. Attached hereto as **Exhibit B** is a true and correct copy of Defendants' Amended Responses and Objections to First Set of Requests for Production and Responses and Objections to Second Set of Requests for Production Served by Plaintiff Pecos River Talc LLC, dated April 14, 2025.

24. Attached hereto as **Exhibit C** is a true and correct copy of an October 2025 email chain between counsel for the parties regarding "PRT v. Emory - Privilege Assertions."

Dated: November 12, 2025      By: /s/ *Elizabeth C. Lockwood*
                    Elizabeth C. Lockwood