**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

PECOS RIVER TALC LLC,

     Plaintiff,

     v.

DR. THERESA SWAIN EMORY, DR.
RICHARD LAWRENCE KRADIN, AND
DR. JOHN COULTER MADDOX,

     Defendants.

Civil Action No. 4:24-cv-75-JKW-RJK

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S OBJECTIONS TO
MEMORANDUM ORDER AND OPINION REGARDING PLAINTIFF'S
MOTION TO COMPEL DISCLOSURE OF INFORMATION RELATED TO
THIRD-PARTY LITIGATION FUNDING**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    A. The Doctors' Researching and Drafting of the Article. ................................................. 2

        1. The Genesis of the Article.................................................................................. 2

        2. The Doctors' Lack of Involvement in the Moline and Steffen Articles. ........... 2

        3. Dr. Emory's Limited Communications with SGP Staff to Eliminate Overlap.............................................................................................................. 5

    B. J&J Waits Until the Doctors' Depositions to Raise Any Questions About Funding. ......................................................................................................................... 7

    C. J&J's Motion to Compel. ..............................................................................................11

    D. The Magistrate Judge's Order Denying J&J's Motion to Compel............................... 14

LEGAL STANDARD .................................................................................................... 15

ARGUMENT ................................................................................................................. 16

    I. THE MAGISTRATE JUDGE'S CONCLUSION THAT J&J's MOTION WAS UNTIMELY IS NOT CLEARLY ERRONEOUS OR CONTRARY TO LAW................ 16

    II. THE MAGISTRATE JUDGE'S DETERMINATION THAT THE DISCOVERY SOUGHT IS OF MINIMAL RELEVANCE IS NOT CLEARLY ERRONEOUS OR CONTRARY TO LAW. ............................................................................................... 21

    III. ALTERNATIVELY, THE DECISION SHOULD BE AFFIRMED BECAUSE, AS THE MAGISTRATE JUDGE RECOGNIZED, THERE IS NOTHING TO COMPEL. ................................................................................................................. 26

CONCLUSION............................................................................................................... 30

## TABLE OF AUTHORITIES

**CASES**                                                                                              **Page(s)**

*Advanced Training Grp. Worldwide, Inc. v. Proactive Technologies Inc.*,
No. 19-cv-505, 2020 WL 2738381 (E.D. Va. Jan. 29, 2020)............................................... 15

*Alexander v. F.B.I.*,
186 F.R.D. 200 (D.D.C. 1999) ...................................................................................... 27

*Aliev v. Autos Direct, Inc.*,
No. 1:24-cv-2348, 2025 WL 2182318 (E.D. Va. July 1, 2025) ........................................ 16

*Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*,
300 F.R.D. 406 (C.D. Cal. 2014) .................................................................................. 25

*Ashghari-Kamrani v. United Servs. Auto. Ass'n,*
No. 2:15-cv-478, 2016 WL 11642670 (E.D. Va. May 31, 2016).................................... 22

*Babb v. Wade Hampton Golf Club, Inc.,*
No. 1:21-cv-333, 2023 WL 5281522 (W.D.N.C. Aug. 16, 2023).................................... 27

*Baxley v. Jividen,*
No. 3:18-cv-1526, 2020 WL 4282033 (S.D. W. Va. July 27, 2020) ................................ 21

*Benitez v. Lopez,*
No. 17-cv-3827, 2019 WL 1578167 (E.D.N.Y. Mar. 14, 2019) ................................ 22, 23

*Bonumose Biochem, LLC v. Yi-Heng Zhang,*
No. 3:17-cv-33, 2018 WL 10068639 (W.D. Va. Sept. 10, 2018)..................................... 25

*Bonumose Biochem, LLC v. Yi-Heng Zhang,*
No. 3:17-cv-33, 2018 WL 10069553 (W.D. Va. May 21, 2018)...................................... 25

*C&J Equip. Mfg. Corp. v. Grady*,
No. 23-cv-99, 2023 WL 7388866 (D.N.M. Nov. 8, 2023)............................................... 29

*Colibri Heart Valve LLC v. Medtronic CoreValve LLC,*
No. 8:20-cv-847, 2021 WL 10425630 (C.D. Cal. Mar. 26, 2021).................................. 25

*Everett v. Cherry*,
671 F. Supp. 2d 819 (E.D. Va. 2009) ............................................................................. 15

*Flame S.A. v. Indus. Carriers, Inc.,*
No. 2:13-cv-658, 2014 WL 12547260 (E.D. Va. July 31, 2014) .................................... 16

*Glass v. Beer,*
No. 1:04-cv-5466, 2007 WL 913876 (E.D. Cal. Mar. 23, 2007) ...................................... 28

*Glover v. EQT Corp.,*
No. 5:19-cv-223, 2023 WL 3922650 (N.D. W. Va. May 10, 2023) ................................. 21

*Green v. Batchelor,*
No. 2:19-cv-538, 2021 WL 2365063 (E.D. Cal. June 9, 2021) ........................................ 29

*Gulfstream, Inc. v. PalmYacht Sales, Inc.,*
No. 94-2155, 1999 WL 202641 (4th Cir. Apr. 12, 1999) .................................................. 17

*Hare v. Comcast Cable Comm. Mgmt., LLC,*
No. 13-1896, 2014 WL 1284829 (4th Cir. Apr. 1, 2014) .................................................. 16

*Harrington v. RoundPoint Mortg. Servicing Corp.,*
No. 215-cv-322, 2017 WL 10651262 (M.D. Fla. Jan. 23, 2017) ...................................... 29

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
491 U.S. 657 (1989) .......................................................................................................... 24

*Haysbert v. Bloomin' Brands, Inc.,*
No. 4:20-cv-121, 2021 WL 5003280 (E.D. Va. Aug. 10, 2021) ................................. 15, 16

*Henderson v. Frank,*
No. 06-cv-12, 2006 WL 3377567 (W.D. Wis. Aug. 8, 2006) .......................................... 27

*Hendon v. Cal. State Senate,*
No. 21-cv-505, 2023 WL 2620147 (S.D. Cal. Mar. 23, 2023) ........................................ 27

*Hicks v. Robeson Cnty.,*
187 F.R.D. 232 (E.D.N.C. 1999) ...................................................................................... 29

*Hoffman v. Neves,*
No. 17-13263, 2019 WL 13323954 (E.D. Mich. Jan. 30, 2019) ...................................... 29

*In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prod. Liab. Litig.,*
405 F. Supp. 3d 612 (D.N.J. 2019) ....................................................................... 22, 23, 25

*Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda,*
390 F. Supp. 2d 479 (D. Md. 2005) .................................................................................. 16

*JTH Tax, Inc. v. ITS Fin., LLC,*
No. 2:08-cv-271, 2009 WL 10731084 (E.D. Va. Jan. 27, 2009) ...................................... 16

*Malibu Media, LLC v. John Does 1-23*,
　　878 F. Supp. 2d 628 (E.D. Va. 2012) ................................................................. 15

*Miller v. McWilliams,*
　　No. 1:20-cv-671, 2021 WL 11723055 (E.D. Va. May 6, 2021) ........................... 16

*MLC Intellectual Property LLC v. Micron Technology, Inc.,*
　　No. 14-cv-3657, 2019 WL 118595 (N.D. Cal. Jan. 7, 2019) ............................... 23

*Patrick v. Teays Valley Trustees, LLC*,
　　297 F.R.D. 248 (N.D. W. Va. 2013) ................................................................... 21

*Ralls v. BMW of N. Am., LLC,*
　　No. 22-437, 2023 WL 3151860 (C.D. Cal. Apr. 21, 2023) ................................. 25

*Reuber v. Food Chem. News, Inc.*,
　　925 F.2d 703 (4th Cir. 1991) ............................................................................. 24

*Silver v. Tenet Health Care Corp.,*
　　No. 09-80365, 2010 WL 11444064 (S.D. Fla. Aug. 6, 2010) ............................. 29

*Smith v. Jefferson Cnty. Comm'n,*
　　No. 3:10-cv-106, 2012 WL 112345 (N.D. W. Va. Jan. 12, 2012) ....................... 27

*Spano v. Satz,*
　　No. 09-cv-60255, 2010 WL 3123182 (S.D. Fla. Aug. 9, 2010) .................... 27, 29

*State Farm Fire & Cas. v. Omega Flex, Inc.,*
　　No. 4:16-cv-387, 2017 WL 465468 (E.D. Ark. Feb. 3, 2017) ........................... 28

*Trs. of Purdue Univ. v. STMicroelectronics, Inc.,*
　　No. 6:21-cv-00727, 2023 WL 11917023 (W.D. Tex. Jan. 18, 2023) ................. 22

*United States ex rel. Jallali v. Sun Healthcare Grp.,*
　　No. 12-cv-61011, 2013 WL 12177059 (S.D. Fla. July 18, 2013) ....................... 29

*United States v. Schwartz*,
　　332 F. Supp. 820 (N.D. Ga. 1971) .................................................................... 29

*V5 Techs. v. Switch, Ltd.*,
　　334 F.R.D. 306 (D. Nev. 2019) ......................................................................... 22

*VHT, Inc. v. Zillow Grp., Inc.,*
　　No. C15-1096, 2016 WL 7077235 (W.D. Wash. Sept. 8, 2016) ....................... 22

*W. Emulsions, Inc. v. Copperstate Emulsions, Inc.*,
No. 95-cv-690, 1997 WL 579200 (D. Ariz. Mar. 18, 1997) ............................................. 28

*Wilkins v. Ragoodial,*
No. 2:20-cv-14203, 2021 WL 1579955 (S.D. Fla. Apr. 21, 2021) ................................... 29

*Wooten v. Commonwealth of Virginia,*
No. 6:14-cv-13, 2015 WL 13658068 (W.D. Va. June 9, 2015) ......................................... 16

*Yousefi v. Delta Electric Motors, Inc.,*
No. 13-cv-1632, 2015 WL 11217257 (W.D. Wash. May 11, 2015) .................................. 22

## STATUTES

28 U.S.C. § 636(b)(1)(A) ...................................................................................................... 15

## FEDERAL RULES

Fed. R. Civ. P. 37(a)(4) ........................................................................................................ 26

## STATE RULES

Va. R. Civ. P. 37(e) ............................................................................................................... 19

Va. Rule of Professional Conduct 1.8(f) ..................................................................... 11, 12

## OTHER AUTHORITIES

U.S. FDA, *FDA Advises Consumers to Stop Using Certain Cosmetic Products*
(Oct. 18, 2019), https://shorturl.at/O9wF1 .......................................................................... 3

**INTRODUCTION**

The Magistrate Judge correctly declined to consider J&J's untimely motion to compel. It was filed 25 days after the close of discovery, after summary judgment briefing was underway, concerning a topic that J&J never bothered (in the previous seven months) to serve any written discovery about. This decision was not only well within the Magistrate Judge's broad discretion in managing discovery, it also is the norm in this District, where courts routinely deny discovery motions filed after the close of discovery. J&J identifies no clear error at all in the Magistrate Judge's opinion. Instead, it spends most of its brief trying to relitigate the facts underpinning that decision and recasting its own delays as the Doctors' fault. But the full record of the meet and confer process, which the Magistrate Judge closely examined and still found could not excuse J&J's lateness, refutes its self-serving retelling.

Nor has J&J identified any clear error in the Magistrate Judge's second, independent basis for denying the motion: that the information the motion seeks is of little to no relevance to J&J's trade libel claim. Any financial help the Doctors have received—years later—to offset the hundreds of thousands of dollars of legal fees this lawsuit has spawned has no bearing on the Article or the Doctors' state of mind when writing it. J&J's motion is instead a last-ditch effort to find support for its (false) theory that a plaintiff's law firm played puppet-master to the Article and two others—baseless speculation that has been disproven in discovery. But speculation is categorically insufficient to justify discovery, as courts time and again have found, much less the untimely and inappropriate discovery J&J now seeks.

And there is a *third* independent reason to deny J&J's motion: there is nothing to compel because (as the Magistrate Judge also found), the Doctors have already answered the questions that J&J's counsel actually asked in their depositions. J&J now wants answers to new questions—ones it never asked in written discovery or at the Doctors' depositions—but that is not how motions

1

to compel work. J&J has no basis to require the Doctors to answer questions it failed to even ask.

## BACKGROUND

### A. The Doctors' Researching and Drafting of the Article.

#### 1. The Genesis of the Article.

The Article's genesis was laid out below, *see* Defs.' Resp. in Opp. to Pecos River Talc's Mot. to Compel at 2–5 (Nov. 12, 2025), ECF No. 122 ("Defs.' MTC Opp."), but in sum: Dr. Kradin and Dr. Maddox decided on their own to write the Article to report on their years of observations on mesothelioma diagnoses in their clinical cases and expert witness work. *Id.* at 2–3. No one gave them the idea—not plaintiffs' lawyers or anyone else. *Id.* The Doctors had full control over the methodology of the study and the subjects they included. Sept. 19, 2025 Maddox Dep. at 23:16–24:1, ECF No. 95-3 ("Maddox Dep. Tr."). They had occasional communications with plaintiffs' lawyers while drafting the Article, only to get information about specific cases they had worked on with those lawyers. Defs.' MTC Opp. 3–4. This made sense; when the Doctors serve as experts, they receive exposure history information from plaintiffs' attorneys, just as experts retained by J&J and other defendants receive this kind of information from the defense counsel who retain them.[1]

#### 2. The Doctors' Lack of Involvement in the Moline and Steffen Articles.

As the Doctors made clear in their depositions, there was no coordination between their article and the Moline or Steffen Articles. *See* Sept. 17, 2025 Kradin Dep. at 98:2–4, ECF No. 95-4 ("Kradin Dep. Tr.") (denying that there was "any coordination" "with respect to the publication

---

[1] J&J misleadingly states that "Leah Kagan from Simon Greenstone emailed Dr. Maddox an initial set of cases for him to include in his Article upon his request." Obj. 7. What actually happened is that Dr. Maddox asked Ms. Kagan for a list of Cashmere Bouquet cases where a tissue digestion had been performed as he began his research for the Article. Maddox Dep. Tr. 94:16–97:5. Although Dr. Maddox testified he figured it was "fairly obvious that I wanted to study them," he did not even communicate that he was working on an article at that point. *Id.* Leah Kagan did not coordinate or influence anything, she merely responded to Dr. Maddox's request. *Id.*

2

of any of these articles"); *id.* at 89:11–24 (Dr. Kradin testifying that he generally does not speak to plaintiffs' attorneys about topics other than his upcoming testimony in cases and had no recollection of any conversations with plaintiffs' attorneys about the Moline or Steffen publications); Oct. 3, 2025 Emory Dep. at 363:17–24, ECF 95-5 ("Emory Dep. Tr.") (denying that any plaintiffs' lawyer "orchestrate[d]" the Article). They had no knowledge of these other articles when they started working on their own paper. Maddox Dep. Tr. 168:11–169:8; Kradin Dep. Tr. 94:2–4. When they learned that Dr. Moline was writing a paper on a similar topic, they considered scrapping their project entirely. *See* Obj. Ex. 8 (Mar. 24, 2026), ECF No. 146-8 ("we may have become moot"). They ultimately decided to continue, but tried to ensure they were not reporting on the same cases. Kradin Dep. Tr. 102:9–12; 113:7–24. As to the Steffen article, the Doctors did not even know of its existence until it was published, around the time that their own article was being finalized. Kradin Dep. Tr. 94:2–11. It is unremarkable that three papers on similar topics came out around the same time: as Dr. Kradin explained, "once something becomes an area of interest for [] medical researchers, it's not unusual to see papers follow one after the other." Kradin. Dep. Tr. 96:23–97:3. At this particular time, "we were all becoming aware that there was an issue with respect to cosmetic talc and individuals developing mesothelioma," Kradin Dep. Tr. 97:4–12—indeed, it was around this time that FDA testing showed J&J's baby powder was contaminated with asbestos, leading to a product recall. *See* U.S. FDA, *FDA Advises Consumers to Stop Using Certain Cosmetic Products* (Oct. 18, 2019), https://shorturl.at/O9wF1. After Dr. Moline's article was published, Dr. Kradin congratulated her, and she "encouraged [him] to submit [the Doctors'] article asap," Obj. Ex. 15 (Mar. 24, 2026), ECF No. 146-15; *see also* Obj. Ex. 14, (Mar. 24, 2026), ECF No. 146-14. That is because "when individuals make research contributions, they like to have other – other people confirm their findings, if that's indeed the case." Kradin Dep. Tr. 111:4–13.

3

J&J speculates that one of Dr. Kradin's many edits to the draft Article on July 31, 2019—the first time he edited the draft—shows coordination between the Article and Dr. Moline's article. *See* Pecos River Talc LLC's Mem. in Supp. of its Obj. to Magistrate Judge's Order Denying Plf.'s Mot. to Compel Disclosure of Information Related to Third-Party Litig. Funding at 7 (Mar. 24, 2026), ECF No. 145 ("Obj.").[2] The original draft said the Article included subjects "in which historical exposure is to cosmetic talcum powder, either solely or predominantly." Defs.' MSJ Ex. 16 at 2 (Oct. 17, 2025), ECF No. 88-17. Dr. Kradin edited it to say it included patients "whose only known exposure to asbestos" was via talc. *Id.* This term—"known exposure"—is frequently used by plaintiff and defense experts alike, and by physicians and scientists in medical records and publications. *See, e.g.,* Defs.' Mem. in Opp. to Plf.'s Mot. for Summ. J. at 2–3 (Nov. 7, 2025), ECF No. 113 ("Defs.' MSJ Opp.") (collecting evidence). When asked why he deleted the "solely or predominantly" language, Dr. Kradin explained that he thought they should be reporting on "individuals who had not been exposed to additional sources of asbestos," because reporting on subjects with mixed exposures would not "add anything that's new to the medical literature." Kradin Dep. Tr. 83:20–84:3. That was the Doctors' understanding of what they had done—selected individuals who had "talc-only" exposure histories—so he was editing the language to reflect that. Defs.' Mem. in Supp. of their Mot. for Summ. J. ¶¶ 6–8, 11–15, 17–18, 20, 28 30, 35–36 (Oct. 17, 2025), ECF No. 92 ("Defs.' MSJ"). At this time, Dr. Kradin didn't even know of Dr. Moline's article, and he testified that he would not "have known anything" about its contents. Kradin Dep.

---

[2] Dr. Kradin made several other edits in the 18-page draft that are not reflected in the one-page excerpt J&J filed. *Compare* Obj. Ex. 9 (Mar. 24, 2026), ECF 146-9, *with* Defs.' MSJ Ex. 16, ECF No. 88-17. For example, in the Results section, he added: "No subject reported additional occupational, paraoccupational, or environmental exposures[.]" *Id.* at 6.

4

Tr. 91:1–13; *see also id.* 103:11–25; *see also* Maddox Dep. Tr. 169:3–8.[3]

J&J had already begun to spin up its (baseless) coordination theory by early August 2025, when it issued a subpoena to Dr. Moline about these and other topics. *See* Dr. Kradin's Opp. to Plf.'s Mot. for Sanctions, Ex. E at 2 (Oct. 31, 2025), ECF No. 110-6 (Moline's Responses and Objections to Subpoena). But J&J's counsel did not serve any discovery requests on the Doctors on this topic. Nor did they ask Dr. Maddox at his deposition if he was aware of the Steffen article before it was published, or if he ever communicated with those authors. Nov. 12, 2025 Decl. of E. Lockwood in Supp. of Defs.' Resp. in Opp. to Plf.'s Mot. to Compel ¶ 5, ECF No. 122-1 ("Lockwood Decl."). J&J's counsel had asked Dr. Kradin at his deposition two days earlier if he knew "anything about the content of" the Steffen article before it was published; he knew "[n]ot a thing." Kradin Dep. Tr. 94:2–11. They also asked Dr. Kradin if he had "any conversations with any attorneys regarding th[e] Steffen article before it was published"; he had not. *Id.* at 94:8–11.

J&J points to a court's finding that its "evidence" of coordination was enough to justify deposing Dr. Moline about the issue, Obj. 10, but fails to mention that Dr. Moline's resulting testimony repudiated J&J's theory of coordination altogether. Dr. Moline testified that she did not coordinate with the Doctors or the Steffen paper's authors on specific language or the publications more generally, and did not recall communicating with any attorneys about her article pre-submission. *See* Defs.' MTC Opp. 7–8 (summarizing testimony).

3. <u>Dr. Emory's Limited Communications with SGP Staff to Eliminate Overlap.</u>

Dr. Maddox retired in January 2020, and recruited Dr. Emory to help get the Article over the finish line. Defs.' MSJ Ex. 17 at 2 (Oct. 17, 2025), ECF No. 88-18; Defs.' MSJ Ex. 48 at 64:10–

---

[3] J&J misleadingly states that "[a]round the same time" the Doctors learned of Dr. Moline's article from Chris Panatier. Obj. 7. But they learned of Moline's article ten days after Dr. Kradin made the edit that J&J zeroes in on, and even at that time, Dr. Kradin had no "specifics" of Dr. Moline's article. Kradin Dep. Tr. 91:1–13.

13 (Oct. 17, 2025), ECF No. 89-7; Emory Dep. Tr. 38:24–43:18, 332:6–18. As Dr. Emory worked to prepare a new draft and organize the data, Dr. Maddox suggested that she "[c]all Christi Dutton," a file manager at Simon Greenstone Panatier ("SGP"), if she wanted "additional documentation, like deps or answers to rogs." Defs.' MSJ Ex. 61 at 2 (Oct. 17, 2025), ECF No. 89-20. At the time, Dr. Emory "didn't know" Ms. Dutton, and "had no relationship with" her beyond maybe something "around having a deposition scheduled" for a "specific case." Emory Dep. Tr. 205:19–206:5. In fact, Dr. Emory had given her first deposition in a talc case just one month earlier. *Id.* at 215:5–216:22, 217:16–20.

Because Dr. Emory was "doing everything [she] could think of to try to get rid of overlaps," Emory Dep. Tr. 203:6–9, she heeded Dr. Maddox's suggestion and contacted Ms. Dutton, sending a table with the last names of 79 potential subjects.[4] *See* Obj. Ex. 17 (Mar. 24, 2026), ECF No. 146-17; Defs.' MSJ Opp. 11. She was trying to ascertain if these cases "may have been reviewed by Dr. Moline," Obj. Ex. 18 at 3 (Mar 24, 2026), ECF No. 146-18, which she thought might help identify possible overlaps. Ms. Dutton responded to say she needed to talk with "attorney Leah Kagan," who was "planning to call Dr. Moline." *Id.* at 2. Dr. Emory "didn't know who [Ms. Kagan] was" at the time, Emory Dep. Tr. 214:15–215:4, and never learned if that conversation happened, *id.* at 216:6–9.[5] She also had not met Dr. Moline at that time. *Id.* at 216:14–22; *see also* Oct. 30, 2025 Moline Dep. at 65:6–11, ECF No. 110-8 ("Moline Dep. Tr."). Dr. Emory does not recall whether Dr. Maddox or someone at SGP (or anyone else) advised her to contact Dr. Moline, but

---

[4] When asked about the eventual overlaps at her deposition, Dr. Emory acknowledged she "made a mistake," is "not perfect," but did her "best." She noted how busy she was at the time with her competing professional commitments, and grew emotional—and had to take a break from the deposition—because she felt "so horrible about the whole thing," and "never imagined that [she'd] go bankrupt from making some mistakes." Emory Dep. Tr. 208:8–209:20.

[5] Dr. Moline had no recollection at her October 2025 deposition of any communication from Ms. Kagan in February 2020 about the Article. Moline Dep. Tr. 68:11–15.

she did so on February 13, as part of her ongoing effort to identify and eliminate overlap between the articles. Emory Dep. Tr. 221:7–223:15; *see also* Defs.' MSJ Opp. 9 ¶¶ 117, 119; *id.* at 38–39.

**B. J&J Waits Until the Doctors' Depositions to Raise Any Questions About Funding.**

The Doctors produced all of the communications catalogued above to J&J by mid-July, along with all "non-privileged documents and communications related to the development, research, drafting, and publication of the Article," including "any communications with attorneys or law firms" relating to "(i) the 75 Study Participants' inclusion in the Article or (ii) the development, research, drafting, and/or publication of the Article and response to the Letter to the Editor during the January 2019 through April 2020 time period." Lockwood Decl. Ex. B at 8 (Nov. 12, 2025), ECF No. 122-3; Lockwood Decl. ¶¶ 2–3. Although the Doctors' document responses were initially due in mid-April (less than three months before the original early-July discovery deadline), the parties requested that the Court extend the discovery deadline to October 3 to allow time for the Court to resolve the parties' competing motions to compel. *See* Scheduling Order (June 5, 2025), ECF No. 60 ("Scheduling Order").

J&J did not issue a single document request, interrogatory, or request for admission about whether anyone was funding the Doctors' defense, may do so in the future, may pay any damages award, or anything else about litigation funding. Lockwood Decl. ¶¶ 1, 3. Instead, J&J strategically waited to raise the question of funding until the Doctors' depositions, which took place toward the end of the discovery period on dates agreed to by both parties.

***Dr. Kradin's Testimony:*** In the first minutes of Dr. Kradin's deposition, J&J's counsel asked him if anyone other than the Doctors was "paying for [their] attorneys in this case," to which he responded: "Not to my knowledge." Kradin Dep. Tr. 11:15–17. When asked "[i]s there any reason somebody would be paying [his] attorneys without [his] knowledge," he stated "[t]here could be." *Id.* at 11:18–20. When J&J asked, "why is that," counsel permitted him to answer if he

7

could do so "without revealing privileged communications," but otherwise "instruct[ed] [him] not to answer." *Id.* at 11:22–25. Dr. Kradin responded: "I really just don't know. I don't know the answer." *Id.* at 12:1. J&J's counsel later asked Dr. Kradin whether he and his co-defendants had any agreement "allocating damages or providing indemnification in the event of liability." Dr. Kradin said no. *Id.* at 151:24–52:4. Although J&J now claims it was "false" for Dr. Kradin to testify "that he did not know why someone might be paying for his attorney's fees without his knowledge[,]" Obj. 12, Dr. Kradin's response was a reasonable interpretation of the (convoluted) question: he has very limited personal knowledge about the contributions to his defense, and simply testified that he didn't know why someone would contribute (which makes sense given that he doesn't even know *who* has contributed).

J&J's counsel did not ask Dr. Kradin any other questions about whether anyone other than the Doctors had (i) made any statements or suggestions that they would or might contribute to his legal fees, or (ii) agreed, stated, or suggested they would or might contribute to any damages award. J&J's counsel ended the deposition well before its seven-hour limit. Lockwood Decl. ¶ 4. At no point during the deposition did J&J's counsel suggest that Dr. Kradin was improperly prevented from answering questions on this topic, or that he had provided any evasive or incomplete answer.

***Dr. Maddox's Testimony:*** Two days later, at the very start of Dr. Maddox's deposition, J&J's counsel asked him the same question: whether anyone was "paying for [his] attorneys." Maddox Dep. Tr. 15:25–16:2. Defense counsel cautioned Dr. Maddox "not to reveal the contents of any of our privileged communications." *Id.* at 16:3–5. Dr. Maddox responded that he has had to write "several checks," which he sent to counsel. *Id.* at 17:5–19. Counsel gave the "same instruction" when Dr. Maddox was asked if he knew "if any plaintiffs law firm is agreeing to pay for [his] defense in this case," and Dr. Maddox responded: "I've been instructed not to answer, and

8

I don't know the answer to that anyhow." *Id.* at 17:24–18:4.[6] J&J's counsel next asked if Dr. Maddox had "any form of agreement with anybody or any entity where someone other than" the Doctors "will pay any portion of" any damages award; Dr. Maddox responded that he had "no written or verbal agreement to that effect." *Id.* at 18:12–18.

J&J's counsel next asked, multiple times, if Dr. Maddox had any "expectation that someone" would contribute to any damages award. *Id.* at 18:19–20:25. Dr. Maddox repeatedly testified that he had no such agreement, but "hopes"—just like how he "hopes that [he'll] win the Powerball"—that if "there was a bad outcome," "others would help" because he's "at the end of [his] career," has only "retirement funds" remaining, and is "not going to have a chance to make much more in life" at 75 years old. *Id.* at 19:3–20:25. He speculated that "[p]eople with who [he's] worked, other doctors, other attorneys perhaps" might assist in such a situation. *Id.* at 21:3–4. When asked if that included SGP attorneys, Dr. Maddox said he did not know, but "if the worst happened, [he] hope[s] that" the firm would "take notice and act accordingly." *Id.* at 21:5–19. J&J's counsel then asked if he had "hope or expectation that" other law firms would contribute to any damages. *Id.* at 22:16–22. Dr. Maddox responded: "Hope, yes. Expectation, neutral, no." *Id.*

J&J's counsel did not ask Dr. Maddox any more questions about whether anyone other than the Doctors had (i) said or suggested they would or might contribute to his legal fees, or (ii) agreed, stated, or suggested that they would or might contribute to any portion of the Doctors' damages. J&J's counsel used their full seven hours to depose Dr. Maddox. Maddox Dep. Tr. 339:2–17. A week later, J&J's counsel asserted for the first time that they believed there was no basis to claim

---

[6] Contrary to J&J's assertion that Dr. Maddox "refused to give complete, responsive answers" as to whether he was "aware of funding" for his defense in this case, Obj. 12, this testimony clearly supports the Magistrate Judge's finding that Maddox "testified in the negative" when asked whether he was aware of plaintiffs' firms providing any such funding, *see* Mem. Op. and Order at 2.

privilege over questions about litigation funding. Lockwood Decl. ¶ 6; Lockwood Decl. Ex. C at 7–8 (Nov. 12, 2025), ECF No. 122-4 ("Lockwood Decl. Ex. C"). The parties had some back and forth by email, with counsel for the Doctors stating: "With respect to Dr. Emory's upcoming deposition, we will consider whether any privilege objections are appropriate based on the questions that you ask (and with the authority that you've cited below in mind), and I would hope that we could sort out any lingering disputes at that time." Lockwood Decl. ¶ 6; Lockwood Decl. Ex. C at 6. J&J's counsel did not respond.

***Dr. Emory's Testimony:*** When Dr. Emory was deposed on October 3—the last day of discovery—her counsel allowed her to answer J&J's counsel's questions related to the topics that are now the subject of J&J's motion to compel. Lockwood Decl. ¶ 7. As with Drs. Kradin and Maddox, the first substantive question Dr. Emory was asked was whether anyone other than the Doctors was "paying for [their] attorneys in this case." Emory Dep. Tr. 13:20–22. Dr. Emory testified that her employer had reimbursed a portion of her fees, and that she understood there had been contributions to offset the Doctors' collective fees. *Id.* at 13:23–17:14. Dr. Emory explained that the Doctors had asked "our attorneys to look into" whether there was anyone who could "help" them (such as "trying to do a GoFundMe or something"), "[b]ecause [she's] in private practice and the two other defendants are retired," so they felt "very helpless." *Id.* at 15:16–17:2. She said "that is how [she] left it with [the attorneys]." *Id.* at 16:13–21. J&J argues that this testimony is contradicted by the fact that Dr. Emory "gave her consent" to receive donations without awareness of the donors' identities. Obj. 15. But both things can be (and are) true: At the time Dr. Emory asked counsel to explore crowdfunding or other donations to try to help offset legal expenses, she consented to receive any such donations without being informed of the donors' identities. Counsel began receiving donations, and—consistent with that prior consent—the details of each donation

10

were not discussed further with Dr. Emory, except—as Dr. Emory acknowledged—when she was made aware that "there's been some contributions to whatever trust," Emory Dep. Tr. 16:21–17:2.

Dr. Emory also confirmed she had no "information at all that somebody may at any point in the future reimburse [her] for some or all of [her] attorney's fees," or pay those fees "directly." *Id.* at 18:7–16. And with respect to any potential damages, Dr. Emory confirmed she had no "information that someone" other than the Doctors "might compensate [them] in any way or for any portion of the damages in the event [they're] found liable." *Id.* at 18:17–23. Instead, Dr. Emory and her husband have "planned that [they're] going to be bankrupt," and recently purchased a "cemetery plot so that [her] son wouldn't be left with" that purchase. *Id.* at 18:24–19:3. J&J's counsel did not ask Dr. Emory additional questions about whether anyone other than the Doctors had (i) said or suggested they would or might contribute to her legal fees, or (ii) agreed, stated, or suggested that they would or might contribute to any portion of the Doctors' damages. J&J's counsel ended the deposition short of its seven-hour limit. Lockwood Decl. ¶ 7. J&J's counsel never asserted during Dr. Emory's deposition that she had given an evasive or incomplete answer on this topic, or that she had been obstructed from answering questions due to any objection.

### C.  J&J's Motion to Compel.

On the afternoon of Friday, October 10—a week after discovery closed—J&J's counsel asserted for the first time that Dr. Emory's deposition "did not resolve the issue of litigation funding" and demanded that all three Doctors respond to the interrogatories it has now proposed in its motion. Lockwood Decl. ¶ 8; Lockwood Decl. Ex. C at 5–6. J&J's counsel further suggested that the Doctors' counsel may have violated Virginia Rule of Professional Conduct 1.8(f). Zero business days later (October 13, a federal holiday), J&J's counsel said they would move to compel if the Doctors did not agree to answer the interrogatories. Lockwood Decl. ¶ 8. This was the first time J&J mentioned the possibility of a motion to compel on this issue.

11

In response, the Doctors' counsel affirmed that they had fully complied with their ethical duties and asked J&J's counsel to clarify the basis for their proposed interrogatories, given that they went far beyond the questions J&J asked during the depositions. Lockwood Decl. ¶ 9; Lockwood Decl. Ex. C at 4–5. J&J's counsel responded the same day by sending a PDF of their already-drafted motion to compel. Lockwood Decl. ¶ 9.

The Doctors' counsel asked to meet and confer, which the parties did on October 17. During that meeting, undersigned counsel told J&J's counsel that, based on advice from both private ethics counsel and the Virginia Bar, they were comfortable they had fully complied with Rule 1.8 and all of their other ethical obligations, and that they hoped J&J would consider deleting those accusations from its motion. Lockwood Decl. ¶¶ 16–18. The Doctors' counsel also asked J&J's counsel whether they had sought or were aware of any contrary ethics advice. *Id.* ¶ 18. J&J's counsel did not identify any. *Id.* During the same meeting, J&J's counsel stated they were open to considering a narrower proposal where only certain Defendants responded, such as Dr. Maddox. *Id.* ¶ 19. Undersigned counsel explained that they were in the middle of back-to-back depositions in another matter and preparing for an imminent Fourth Circuit argument, but committed to consulting with their clients and providing a counterproposal by October 22. *Id.*

While preserving their objection that there was no legitimate basis for J&J's proposed interrogatories, the Doctors made their counterproposal in a show of good faith and in an effort to avoid needless motions practice. Specifically, the Doctors proposed that Drs. Kradin and Maddox would respond to the following interrogatories:

- **ROG 19.** Identify all Persons or Entities other than Defendants who (A) are providing Funding for the defense of this Action; or (B) have agreed to provide Funding for the defense of this Action.
- **ROG 20.** Identify all Persons or Entities other than Defendants who (C) have agreed to provide Funding for any portion or all of Defendants' Damages; or (D) stated or suggested that they would or might provide Funding for any portion or all of Defendants' Damages.

- **ROG 21.** For all Persons or Entities identified in response to Interrogatories 19 and 20, describe in detail the nature of any Funding arrangements, including but not limited to the terms and conditions relating to any such Funding.

*Id.* ¶ 20; Lockwood Decl. Ex. C at 3–4. Six days later, J&J's counsel rejected this proposal without explanation, stating that they planned to file their motion to compel that afternoon. Lockwood Decl. ¶ 21; Lockwood Decl. Ex. C at 3. Undersigned counsel asked for more information to assess whether another compromise might be possible. *Id.* J&J's response made clear it would not agree to anything that deviated from its initial proposal. Lockwood Decl. ¶ 21; Lockwood Decl. Ex. C at 2. J&J then filed its motion to compel, which was nearly identical to the draft it shared with counsel two weeks prior. Lockwood Decl. ¶ 21.

The Doctors opposed the motion to compel, and in an attempt to put the issue to rest, attached a sworn declaration from undersigned counsel that provided details regarding the funding the defense has received in this litigation. *See generally* Defs.' MTC Opp.; Lockwood Decl. Specifically, counsel explained that they have received sporadic donations from a collection of donors to help offset the costs of the Doctors' legal fees and expenses. Lockwood Decl. ¶ 11. These donations have been entirely handled by counsel, with the Doctors having at most only "limited knowledge" about the donations. Lockwood Decl. ¶ 12. The Doctors agreed to this arrangement, and counsel cleared it with the Virginia State Bar's Legal Ethics Hotline. Lockwood Decl. ¶¶ 15–16. The donations received have covered less than 25% of the total fees and expenses that the Doctors have incurred in defending this case. Lockwood Decl. ¶ 14. As for damages, counsel made clear that "[n]o one has offered to pay [the Doctors'] damages in the event of an adverse judgment[,]" Defs.' MTC Opp. 1; Lockwood Decl. ¶ 13, and that "[n]either the Doctors' counsel nor the Doctors themselves have any understanding or agreement—formal or informal, written or oral—with any existing or potential donor related to the Doctors' attorneys' fees or damages,"

13

Defs.' MTC Opp. 23 n.10. Despite these sworn assurances by an officer of the court, J&J continues to theorize without basis that "Simon Greenstone has told Defendants—perhaps through counsel—that it will cover some or all of Defendants' attorneys' fees and/or damages[,]" and that defense counsel has an "understanding" with Simon Greenstone. Obj. 14; *see also id.* at 6 (implying there is "an arrangement where Simon Greenstone agrees to pay not only for the defense of the case, but also for any damages awarded); Pecos River Talc LLC's Reply in Supp. of its Mot. to Compel Disclosure of Information Related to Third-Party Litig. Funding at 2 (Nov. 18, 2025), ECF No. 125  (Pecos River believes . . . Simon Greenstone told defense counsel that it has Defendants' back and will cover all their litigation costs and any damages when the case is over . . . . No agreements. Just an understanding.").

### D.  The Magistrate Judge's Order Denying J&J's Motion to Compel.

The Magistrate Judge found that J&J's motion to compel was untimely because it was not filed until 25 days after the close of fact discovery (a deadline that had already been extended by three months upon joint request of the parties). Mem. Op. & Order at 5 (Mar. 10, 2026), ECF No. 141 ("Mem. Op. & Order"). He declined to exercise his discretion to consider the motion despite its untimeliness, holding that J&J failed to show good cause for its delay. Mem. Op. & Order 8. In particular, the Magistrate Judge found that J&J was aware of the dispute underlying the motion to compel as early as Dr. Maddox's deposition on September 17, 2025, but waited nine days to first raise the issue, and an additional seven days after Dr. Emory's deposition to re-raise the issue. He rejected J&J's arguments that these delays were justified because J&J was waiting for the final deposition transcripts, noting that J&J's counsel "was present for each of the depositions" and "was [] in a position to contemporaneously assess whether defendants' answers were satisfactory." Mem. Op. & Order 7. Further, the Magistrate emphasized that J&J did not even raise the possibility that it might file a motion to compel until 10 days after the close of discovery. Mem. Op. & Order

14

8. The Magistrate concluded that "[d]espite claiming that defendants are prone to delay tactics, [J&J] did not act expeditiously to ensure its motion was considered by the Court as soon as possible." Mem. Op. & Order 8 (citations omitted).

The Magistrate Judge found in the alternative that even if the motion had been filed timely, it would be denied on the merits. Mem. Op. & Order 8 n.2. He held that the requested discovery about the Doctors' litigation funding "is tangential, at best, and of little to no relevance to the merits of the pending claim." Mem. Op. & Order 8 n.2; *see also id.* at 2 (noting that plaintiffs' firm Simon Greenstone Panatier was "only mentioned once in the complaint"). The Magistrate Judge emphasized that J&J did not serve any written discovery about this subject and asked only "relatively few questions" about it at the depositions, which the Doctors largely answered. Mem. Op. & Order 8 n.2. Citing the Doctors' argument that J&J's proposed remedy is "untethered to its deposition questions and overbroad," the Magistrate Judge concluded that J&J's "dissatisfaction, after the fact, with some or all of the answers provided does not excuse the decision not to more vigorously pursue this topic during the depositions" or "warrant reopening discovery outside the schedule previously set by the Court." *Id.*

## LEGAL STANDARD

"The court will not disturb a magistrate judge's ruling on non-dispositive pre-trial matters, unless the ruling was 'clearly erroneous or is contrary to law.'" *Everett v. Cherry,* 671 F. Supp. 2d 819, 820–21 (E.D. Va. 2009) (quoting 28 U.S.C. § 636(b)(1)(A)). "The decisions of a magistrate judge concerning discovery disputes should be afforded great deference." *Advanced Training Grp. Worldwide, Inc. v. Proactive Technologies Inc.,* No. 19-cv-505, 2020 WL 2738381, at *1 (E.D. Va. Jan. 29, 2020) (quoting *Malibu Media, LLC v. John Does 1-23,* 878 F. Supp. 2d 628, 629 (E.D. Va. 2012)). "It is not the function of objections to discovery rulings to allow wholesale relitigation of issues resolved by the magistrate judge." *Haysbert v. Bloomin'Brands, Inc.,* No. 4:20-cv-121, 2021

15

WL 5003280, at *1 (E.D. Va. Aug. 10, 2021) (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda,* 390 F. Supp. 2d 479, 486 (D. Md. 2005)). "Rather, the court is only required to determine whether the magistrate judge's findings are reasonable and supported by the evidence." *Id.*

## ARGUMENT

### I.   THE MAGISTRATE JUDGE'S CONCLUSION THAT J&J'S MOTION WAS UNTIMELY IS NOT CLEARLY ERRONEOUS OR CONTRARY TO LAW.

The Magistrate Judge correctly applied the law in this District and Circuit, which is that motions to compel "filed close to, or after, the close of discovery" are untimely and should be denied. Mem. Op. & Order 5 (citing *Miller v. McWilliams,* No. 1:20-cv-671, 2021 WL 11723055, at *1 (E.D. Va. May 6, 2021) (collecting cases)); *see also, e.g., Flame S.A. v. Indus. Carriers, Inc.,* No. 2:13-cv-658, 2014 WL 12547260, at *2 (E.D. Va. July 31, 2014) (collecting cases and denying motion to compel filed one day before discovery cutoff); *Aliev v. Autos Direct, Inc.,* No. 1:24-cv-2348, 2025 WL 2182318, at *1 (E.D. Va. July 1, 2025) (similar, where motions were filed four and ten days after discovery closed); Defs.' MTC Opp. 15–17 (citing additional authority). Particularly where a party has had ample opportunity to pursue an issue *during* the discovery period, courts are well within their discretion to decline to reopen discovery upon an untimely motion to compel. *See, e.g., Hare v. Comcast Cable Comm. Mgmt., LLC,* No. 13-1896, 2014 WL 1284829, at * 1 (4th Cir. Apr. 1, 2014) (affirming denial of motion to compel evidence plaintiff claimed was "crucial" when plaintiff had ample time to pursue issue but did not move to compel until discovery closed); *JTH Tax, Inc. v. ITS Fin., LLC,* No. 2:08-cv-271, 2009 WL 10731084, at *4 (E.D. Va. Jan. 27, 2009) (no good cause to reopen discovery when party could have pursued information earlier); *Wooten v. Commonwealth of Virginia,* No. 6:14-cv-13, 2015 WL 13658068, at *2 (W.D. Va. June 9, 2015) ("Untimely motions to compel are less likely to be considered when the parties have 'had

16

adequate opportunity'" to pursue discovery (quoting *Gulfstream, Inc. v. PalmYacht Sales, Inc.,* No. 94-2155, 1999 WL 202641, at *4 (4th Cir. Apr. 12, 1999))).

Here, J&J filed its motion to compel 25 dates after the close of discovery, when summary judgment briefing was already well underway. That makes it untimely. J&J raised the issue of litigation funding for the very first time in the seventh month of fact discovery—which, as the Magistrate Judge noted, he had "already extended . . . by three months." Mem. Op. & Order 5. It had ample opportunity to explore the topic earlier: It could have served the very interrogatories it now asks the Court to compel, or any other discovery relating to its speculation about litigation funding that it believed was relevant and proportional—but did not. J&J never explains why it failed to do so, but it plainly was not because J&J was unaware of the issue. The very first substantive question J&J's counsel asked Dr. Kradin—the first of the Doctors to be deposed—at his September 17 deposition was about funding. *See* Kradin Dep. Tr. 10:8–11:16.

And J&J was aware of the dispute over the sufficiency of the Doctors' answers to its deposition questions "as early as September 17, 2025," yet still failed to file its motion until October 28. Mem. Op. & Order 6. The Magistrate Judge acknowledged that the parties were engaging in a meet and confer process and closely examined the contents of their communications over that period, see Mem. Op. & Order 6–7 (chronicling the parties' communications), concluding that "these efforts do not excuse the fact that the motion was not filed until 25 days after the close of discovery." Mem. Op. & Order 7. The Magistrate Judge highlighted several of J&J's unexplained delays during that period, including that after the issue first arose at Dr. Kradin's deposition on September 17, J&J's counsel waited nine days to approach the Doctors' counsel about it, and that after Dr. Emory's deposition on October 3, J&J's counsel waited an additional seven days to notify the Doctors that it thought the answers were unsatisfactory. *Id.* at 7.

Furthermore, "plaintiff's counsel did not circulate a draft of the motion to compel, or mention that one might be filed, until 10 days after discovery closed." Mem. Op. & Order 8. Under these circumstances, the Magistrate Judge was well within his discretion to decline to reopen discovery. J&J does not argue that the Magistrate Judge made any error in his description of the facts or the timeline of communications. Instead, J&J tries to relitigate who is at fault for its late filing. But that falls far short of meeting the high bar to justify disturbing the decision of a magistrate judge on a discovery matter. It is also contradicted by the record. Although J&J now attempts to pin the lateness of the depositions on a separate discovery dispute, Obj. 11, the initial discovery period was extended by over three months to account for any delays due to this dispute. *See* Scheduling Order. J&J—represented by two large law firms and at least a dozen lawyers—certainly had the resources to review the Doctors' productions quickly enough to schedule the depositions earlier in the discovery period. Instead, J&J's counsel requested that the depositions be scheduled in September, and accepted the Doctors' available dates without ever raising any concerns.

Throughout the meet and confer process, the Doctors responded promptly, occasionally taking a few days to respond where research, review of a draft motion or proposal, or consultation with clients was necessary. For example, after J&J's counsel raised the issue for the first time on September 26, the Doctors responded six days later (during which time they were reviewing the legal authority J&J had cited and researching the privilege issues J&J raised). Lockwood Decl. Ex. C at 6–8. In the Doctors' October 2 response, they explained their position that Drs. Kradin and Maddox had adequately answered the questions asked of them, and stated that they were hopeful "we could sort out any lingering disputes" at Dr. Emory's deposition. *Id.* When Dr. Emory was deposed the following day—the last day of discovery—her counsel allowed her to answer *all* of J&J's counsel's questions related to the topics that are now the subject of J&J's motion to compel.

18

Nor did the Doctors draw out the meet and confer process after J&J re-raised the issue on October 10. J&J's chief complaints appear to be that (1) the Doctors sought more information about what J&J planned to move to compel on October 14; and (2) first consulted with their clients on the matter after the October 17 meet and confer. Both were entirely reasonable. After Dr. Emory answered every litigation funding question posed to her at her October 3 deposition and J&J raised no issues, the Doctors reasonably believed the matter was resolved—there was no pending demand, and no reason to consult with their clients. J&J asserted its contrary position a week later, insisting that the Doctors answer a new set of interrogatories which were, in the Doctors' view, inappropriate, untimely, and overbroad. *Id.* at 4–5. Given the significant mismatch between the interrogatories and the questions asked at depositions, the Doctors reasonably asked for clarity on what exactly J&J planned to move to compel (since a party can only move to compel an answer to a question it actually asked). And in light of the gulf between the parties' positions, the Doctors' counsel waited until the October 17 meet and confer to see if the issues could be narrowed at all before consulting their clients. This was also the week that summary judgment briefs were due. The Doctors informed J&J that they would provide a counterproposal on October 22, and did so. Lockwood Decl. ¶ 6. Those couple days of deliberation were productive: the Doctors put together a reasonable counterproposal—in which they offered to respond to nearly all of J&J's questions, see *id.* § C—as a show of good faith and in an effort to "decrease, in every way possible the filing of unnecessary discovery motions[,]" E.D. Va. L. Civ. R. 37(e). J&J was silent for the next six days, at which point it rejected the proposal and then filed its motion to compel.

On these facts, the Magistrate Judge was well within his discretion to find J&J's motion untimely. The Doctors did not "draw out" the meet and confer process, contrary to J&J's one-sided narrative. They took the time necessary to give full consideration to J&J's eleventh-hour demands

19

and try to reach a compromise. Nor did the Doctors ever make "assurances" that they would answer all of J&J's late and improper discovery requests—as the Magistrate Judge observed, they "only promised to work with plaintiff's counsel to resolve the issue, not to answer the questions as plaintiff's counsel wished." Mem. Op. & Order 8.

J&J now says some of its delays were because it was waiting on transcripts. But the Magistrate Judge knew this and rejected it as a sufficient justification, noting that Plaintiff's counsel "was present for each of the depositions" and "in a position to contemporaneously assess whether defendants' answers were satisfactory," and so didn't need to wait for transcripts to raise its concerns. Mem. Op. & Order 7. Again J&J points the finger at the Doctors, arguing that, in their October 2 email, the Doctors "requested that Pecos River wait until defense counsel had an opportunity to review the transcript." Obj. 21. That email, however, provided a full substantive response to J&J's position, and merely added that "[i]f there is specific testimony you'd like us to review and get back to you on, we can do that once we get the transcript[.]" Lockwood Decl. Ex. C at 6. The Doctors never stated or suggested that productive conversations could not occur absent transcripts; they took detailed notes during the depositions and were fully equipped to engage on the substance of any disputes (and also could have responded to concerns live during the depositions if J&J's counsel had ever raised them).[7]

J&J does not cite a single case from this District permitting a motion to compel filed after the close of discovery, much less show that it was *clear error* for the Magistrate Judge to apply the usual rule in this District in this instance. The three cases from other district courts that J&J does

---

[7] J&J asserts that the Magistrate Judge's opinion will discourage parties from attempting to resolve discovery disputes on their own. Obj. 22. Hardly. The Magistrate Judge merely found that on the facts of this case, including J&J's repeated delays—and the fact that it served no written discovery on this topic and raised it at the tail end of a seven-month discovery period—excusing the untimely motion was not warranted.

cite to argue that the Magistrate Judge should have excused its late filing, Obj. 20, merely emphasize that analyzing these sorts of disputes is fact-intensive and properly within the discretion and purview of a Magistrate Judge managing discovery. *See Glover v. EQT Corp.,* No. 5:19-cv-223, 2023 WL 3922650, at *2 (N.D. W. Va. May 10, 2023) (magistrate was within discretion to consider untimely motion to compel based on a number of case-specific facts). In *Baxley v. Jividen*, for example, a judge excused a late filing because the party had timely raised the same issue in an earlier motion to compel. No. 3:18-cv-1526, 2020 WL 4282033, at *4–5 (S.D. W. Va. July 27, 2020). And in *Patrick v. Teays Valley Trustees, LLC,* the party opposing discovery had continued supplementing its document productions *after* the deadline for a motion to compel and made "repeated assurances that further responses would be forthcoming." 297 F.R.D. 248, 255 (N.D. W. Va. 2013). This is exactly what the Magistrate Judge correctly found did *not* happen here, because the Doctors made no assurances that they would "answer the questions as plaintiff's counsel wished," but only "promised to work with plaintiff's counsel to resolve the issue." Mem. Op. & Order 8. None of these cases look anything like this one, nor provides any basis to disturb the Magistrate Judge's determination.

## II.    THE MAGISTRATE JUDGE'S DETERMINATION THAT THE DISCOVERY SOUGHT IS OF MINIMAL RELEVANCE IS NOT CLEARLY ERRONEOUS OR CONTRARY TO LAW.

The Magistrate Judge found a second, independent reason to deny J&J's motion: the discovery it seeks is "tangential, at best" to its trade libel claim. Mem. Op. & Order 8 n.2. That claim hinges on whether the Doctors published deliberate falsehoods with actual malice when they published the Article in 2020. Any financial help they've received—years later—to offset the hundreds of thousands of dollars of legal fees this lawsuit has spawned has no bearing on the Article or the Doctors' state of mind when writing it. For all those reasons, the Magistrate Judge was correct to join the chorus of other courts that have concluded the discovery J&J seeks is "of

little to no relevance to the merits of the pending claim." Mem. Op. & Order 8 n.2. *See, e.g., Ashghari-Kamrani v. United Servs. Auto. Ass'n,* No. 2:15-cv-478, 2016 WL 11642670, at *4, *6 (E.D. Va. May 31, 2016) (rejecting discovery of third-party litigation funding); *Trs. of Purdue Univ. v. STMicroelectronics, Inc.,* No. 6:21-cv-00727, 2023 WL 11917023, at *3 (W.D. Tex. Jan. 18, 2023) ("Courts, in this district and elsewhere, have routinely held that information about litigation funding is largely irrelevant and thus beyond the scope of discovery . . ."); *In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prod. Liab. Litig.,* 405 F. Supp. 3d 612, 616–18, 619 (D.N.J. 2019) (denying request for discovery into litigation funding as "irrelevant to the claims and defenses in the case"); *Benitez v. Lopez,* No. 17-cv-3827, 2019 WL 1578167, at *1 (E.D.N.Y. Mar. 14, 2019) (rejecting discovery into litigation funding); *V5 Techs. v. Switch, Ltd.,* 334 F.R.D. 306, 312 (D. Nev. 2019), *aff'd sub nom. V5 Techs., LLC v. Switch, LTD.,* No. 2:17-c-2349, 2020 WL 1042515 (D. Nev. Mar. 3, 2020) ("Courts will compel discovery into funding sources only upon the presentation of 'some objective evidence' that the discovering party's 'theories of relevance are more than just theories.'" (quoting *VHT, Inc. v. Zillow Grp., Inc.,* No. C15-1096, 2016 WL 7077235, at *1, 2 (W.D. Wash. Sept. 8, 2016))); *VHT, Inc.,* 2016 WL 7077235, at *1 ("Although [defendant] poses several imaginable hypotheticals in which [plaintiff]'s litigation funding scenario becomes relevant, the dearth of evidence on the record supporting [defendant]'s position renders that information negligibly relevant[.]"); *Yousefi v. Delta Electric Motors, Inc.,* No. 13-cv-1632, 2015 WL 11217257, at *2 (W.D. Wash. May 11, 2015) (similar).

J&J principally claims "any funding by the plaintiffs' bar is relevant to Defendants' credibility." *See* Obj. 24–25. The Magistrate Judge properly rejected this relevance theory outright, observing that, "given plaintiff's familiarity with defendants and their public and active roles in asbestos litigation over many years," they already have plenty of fodder for challenging the

Doctors' credibility on this ground. Mem. Op. & Order 8 n.2. Many courts have rejected similar arguments. *See, e.g., Benitez*, 2019 WL 1578167, at *1; *MLC Intellectual Property LLC v. Micron Technology, Inc.,* No. 14-cv-3657, 2019 WL 118595, at *2 (N.D. Cal. Jan. 7, 2019).

Resisting this conclusion, J&J argues that "evidence that a plaintiff's asbestos firm has secretly communicated that it will pay any damages award is an order of magnitude stronger than other bias arguments[.]" Obj. 24. But this argument runs headlong into facts J&J already knows. Counsel and the Doctors have confirmed that no one has agreed to pay any damages award. Lockwood Decl. ¶ 13; Emory Dep. Tr. 18:17–23; Maddox Dep. Tr. 18:12–23:1 (there is no testimony from Dr. Kradin on this topic because J&J didn't even ask Dr. Kradin this question). And J&J's eagerness to accuse the Doctors, without foundation, of being willing to intentionally lie to "appease" some hypothetical funder makes no sense. No matter who is paying the Doctors' legal fees (and they are paying the vast majority of them), their motivation in this case would be the same: to defend their work and the Article.

J&J's speculation that the Doctors wrote a false Article as a favor to Simon Greenstone Panatier and because they did not fear the financial burden of this suit is equally deficient. Obj. 24. Again, any financial contributions the Doctors have received years later are of extremely attenuated relevance to J&J's theory of pre-Article coordination. And that's all this is—a baseless theory. Speculation alone of course "does not justify discovery," *In re Valsartan N-Nitrosodimethylamine*, 405 F. Supp. 3d at 619, and that is particularly the case here where these allegations have all already been disproven. The Doctors' contemporaneous emails show the Article was entirely their idea. *See supra* Background § A. They thought it might improve public health, worked hard to get the Article right, believed it was accurate, and never expected to be sued over it. *See id*. When J&J's counsel asked the Doctors about coordination with other scientists, or

23

orchestration by the plaintiffs' bar, they all testified they had no idea what J&J was talking about, and flatly denied the accusations. *See supra* Background § A. They have since suffered enormous financial, reputational, professional, and emotional costs as a result of this suit—including paying hundreds of thousands of dollars out of pocket—so the idea that they have been protected from any adverse consequences via some secret pre-Article agreement is badly mistaken. It's also incredibly far-fetched: To credit this argument, the Court would have to believe that the Doctors expected to be sued, secured assurances *before they published* that their fees for this hypothetical suit would be paid, and were so emboldened by those assurances that they were comfortable throwing away their reputations and livelihoods by publishing deliberate falsehoods. This is completely unmoored from reality. And—further refuting J&J's baseless conjecture of a pre-Article indemnification agreement—it was not until 2022, years after the Article was written and after this lawsuit was filed, that the Doctors asked their counsel to explore "a GoFundMe or something" to alleviate this immense financial burden. Emory Dep. at 15:3–17:2.[8]

These attenuated relevance theories are even more dubious given that, as the Magistrate Judge recognized, "the plaintiff served no written discovery upon defendants directed to the matters about which it now seeks to reopen discovery." Mem. Op. & Order 8 n.2. J&J waited until a few weeks before discovery closed to raise this issue for the first time, and then failed to ask additional questions during Dr. Emory's deposition despite being unconstrained by objections or

---

[8] Although J&J half-heartedly argues in its introduction that funding goes to "motive," it never develops this argument in its brief, much less points to any cases where courts found litigation funding was relevant to a trade libel claim's "actual malice" inquiry. *See* Obj. 6, 23–25. In any event, neither profit nor bias adds up to malice without evidence that those motives facilitated the making of a false statement, of which there is zero evidence here. *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715–16 (4th Cir. 1991); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666–67 (1989); *see also* Defs.' MTC Opp. 27 (further distinguishing the case law J&J relied on before the Magistrate).

time left on the clock. *See, e.g., Ralls v. BMW of N. Am., LLC,* No. 22-437, 2023 WL 3151860, at *9 (C.D. Cal. Apr. 21, 2023) (delay in pursuing discovery undermines arguments regarding the importance of the discovery); *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.,* 300 F.R.D. 406, 411 (C.D. Cal. 2014) (similar); 8B Charles Alan Wright et al., Fed. Prac. & Proc. § 2285 (3d ed. 2010 & Supp. 2015) (similar).

J&J attempts to distinguish the many cases where courts have found litigation funding discovery irrelevant by arguing that here, unlike in those cases, the potential funder is "involved in the very wrongful conduct underlying the case." *See* Obj. 24–25. But again, the premise of that argument, that there is some funder who was involved in creating the Article (and persuading the Doctors to publish deliberate falsehoods), is "pure speculation"—exactly what courts hold insufficient to sustain relevance arguments. *See In re Valsartan N-Nitrosodimethylamine*, 405 F. Supp. 3d at 616; *Colibri Heart Valve LLC v. Medtronic CoreValve LLC,* No. 8:20-cv-847, 2021 WL 10425630, at *3–4 (C.D. Cal. Mar. 26, 2021) (rejecting relevance argument based on "mere suspicion or speculation" and collecting additional cases). It also, again, has been disproven by the record. Defs.' MTC Opp. 2–8 (collecting evidence showing Article was Doctors' own idea); Defs.' MSJ at 31–33 (detailing the origins and drafting process of the Article).

Finally, as it did below, J&J also relies heavily on *Bonumose Biochem, LLC v. Yi-Heng Zhang,* No. 3:17-cv-33, 2018 WL 10068639, at *2 (W.D. Va. Sept. 10, 2018). That case is an outlier: there, the court permitted funding-related discovery because the claims themselves depended on whether the defendant had conspired with a Chinese institute to misappropriate trade secrets, and the requests pertained to whether that institute was funding the defense. *Id.* at *2; *see also Bonumose Biochem, LLC v. Yi-Heng Zhang,* No. 3:17-cv-33, 2018 WL 10069553, at *5, *11 (W.D. Va. May 21, 2018), *report and recommendation adopted,* No. 3:17-cv-33, 2018 WL

25

10068672 (W.D. Va. June 11, 2018) (describing trade secret and conspiracy claims and their connection to the alleged funder). Moreover, there was firm evidence of conspiracy: the institute had confidential information that could only have come from the defendant. Illustrating the centrality of the litigation funding issue to that case, it was the very first interrogatory the plaintiff propounded on the defendants. Here, by contrast, J&J's unfounded accusations about supposed coordination by the plaintiff's bar are a sideshow, disconnected from the elements of its trade libel claim, and that J&J failed to pursue for the vast majority of the discovery period.

## III.   ALTERNATIVELY, THE DECISION SHOULD BE AFFIRMED BECAUSE, AS THE MAGISTRATE JUDGE RECOGNIZED, THERE IS NOTHING TO COMPEL.

There is another basis to affirm the Magistrate Judge's decision: there is nothing to compel because the Doctors' answers were not evasive or incomplete. *Cf.* Fed. R. Civ. P. 37(a)(4). As the Magistrate found, "Defendants answered all of the relatively few questions asked about [their litigation funding], with perhaps two exceptions."[9] Mem. Op. & Order 8 n.2. *See also id.* (quoting with approval the Doctors' argument that J&J's proposed remedy is "untethered to its deposition questions and overbroad"). To the extent J&J lacks information it now seeks to compel, that is because it: (1) "served no written discovery" on this subject, instead waiting to raise the issue until depositions, *id.*, and then (2) failed to "vigorously pursue this topic during the depositions" despite having "sufficient opportunity," *id.*, because its counsel asked a few poorly framed questions the Doctors did not know the answers to, and then moved on.  As the Magistrate held, "[p]laintiff's dissatisfaction, after the fact, with some or all of the answers provided does not excuse the decision not to more vigorously pursue this topic during the depositions" nor "warrant reopening written discovery outside the schedule previously set by the Court." *Id.*

---

[9] The Magistrate did not specify what these two possible exceptions were, but the Doctors' briefing below identified two questions that J&J seemed to assert Dr. Maddox did not answer, *see* Defs.' MTC Opp. 21, which are addressed *infra*.

J&J barely addresses this aspect of the Magistrate's decision. *See* Obj. 15. J&J says the Magistrate failed to cite authority for the proposition that "lack of 'vigor' in questioning is a basis for rejecting discovery," *id.* at 25, but there is a mountain of case law holding that a party cannot compel answers to questions it never asked. *See, e.g., Smith v. Jefferson Cnty. Comm'n*, No. 3:10-cv-106, 2012 WL 112345, at *3 (N.D. W. Va. Jan. 12, 2012) (court "is not able to compel responses to questions that were not ever posed"); *see also Babb v. Wade Hampton Golf Club, Inc.,* No. 1:21-cv-333, 2023 WL 5281522, at *4 (W.D.N.C. Aug. 16, 2023), *aff'd,* No. 1:21-cv-333, 2023 WL 8103162 (W.D.N.C. Nov. 21, 2023) (rejecting motion to compel defendant "to answer a question which Plaintiffs' counsel never asked"); *Hendon v. Cal. State Senate,* No. 21-cv-505, 2023 WL 2620147, at *3 (S.D. Cal. Mar. 23, 2023) ("The first problem with Plaintiff's motion is that counsel seeks to compel an answer to a question [plaintiff's counsel] never asked the deponent.").[10]

J&J references the Doctors' testimony in the background section of its brief and vaguely asserts (without explanation or citation) that "Defendants gave false, evasive, and nonresponsive answers" and J&J's "most basic questions were stymied," Obj. 25, but never explains which questions or answers the Magistrate supposedly incorrectly analyzed, much less why his conclusions were clearly erroneous or contrary to law. In any event, the Doctors' opposition to J&J's Motion addressed these issues in detail, explaining (i) why their counsel's limited, good faith privilege objections were appropriate, *see* Defs.' MTC Opp. 19–20; *supra* Background § B;[11] (ii)

---

[10] *See also Alexander v. F.B.I.,* 186 F.R.D. 200, 204 n. 2 (D.D.C. 1999) ("[T]he court will only rule on objections to questions asked at the deposition"). Meritorious motions to compel answers to deposition questions usually involve complete refusals to answer, *Spano v. Satz*, No. 09-cv-60255, 2010 WL 3123182, at *1, *3 (S.D. Fla. Aug. 9, 2010); "[g]eneralized statements of incompleteness or evasiveness are insufficient[.]" *Henderson v. Frank*, No. 06-cv-12, 2006 WL 3377567, at *1 (W.D. Wis. Aug. 8, 2006); *see also id.* ("an answer . . . is not evasive or incomplete just because plaintiff says it is"; plaintiff must identify "specific reasons" why answer was inadequate).

[11] It also is not true that "Defendants abandoned any claim of privilege before the Magistrate Judge." Obj. 12–13. As the Doctors previously argued, their counsel's objections were perfectly

that J&J's counsel never challenged these objections during the depositions, see *id.*; (iii) that after J&J belatedly challenged counsel's limited privilege objections, it had the opportunity for fulsome (and completely unimpeded) questioning of Dr. Emory, *see* id; *see also* Defs.' MTC Opp. 22; and (iv) that none of J&J's proposed interrogatories are tied to the limited questions that their counsel actually asked in the Doctors' depositions, see Defs.' MTC Opp. 24–25; *supra* Background § B.

Start with Drs. Emory and Kradin. J&J has never identified a single question from either deposition that it contends was not fully answered. Instead, J&J claims without basis that some of their answers were untruthful or "suspicious[]." *See* Obj. 12, 15. They were not, see Background § B, and in any event "a bare assertion that [an] answer is not honest is not grounds to compel[,]" *Glass v. Beer,* No. 1:04-cv-5466, 2007 WL 913876, at *11 (E.D. Cal. Mar. 23, 2007). *See also State Farm Fire & Cas. v. Omega Flex, Inc.,* No. 4:16-cv-387, 2017 WL 465468, at *2 (E.D. Ark. Feb. 3, 2017) (denying motion to compel where movant asserted response was non-credible); *W. Emulsions, Inc. v. Copperstate Emulsions, Inc.,* No. 95-cv-690, 1997 WL 579200, at *2 (D. Ariz. Mar. 18, 1997) (party that "does not believe the answer" to a discovery question "cannot use a motion to compel to get a more favorable answer"). As for Dr. Maddox, J&J says he gave incomplete or evasive answers to two questions: (1) whether anybody is paying his fees, and (2) whether he expects any third party to pay any damages award. Obj. 12–13. But Dr. Maddox answered both questions within the bounds of his knowledge. *See* Defs.' MTC Opp. 21–22 (discussing this testimony at length); *see also* supra Background § B.

J&J's real grievance seems to be that it does not like the answers it got to the questions it

---

reasonable: the Doctors' counsel have handled communications with donors, and whatever limited knowledge the Doctors may have on this subject has come through discussions with counsel, which typically have been intertwined with legal advice. Lockwood Decl. ¶ 12. It therefore was appropriate to try to ensure the Doctors did not reveal privileged communications. *See* Defs.' MTC Opp. 19–20 (collecting authority).

asked. *See* Pecos River Talc LLC's Mem. of Law in Supp. of its Mot. to Compel Disclosure of Information Related to Third-Party Litig. Funding at 3 (Oct. 28, 2025), ECF No. 106 (complaining that the Doctors' answers "did not resolve the dispute" because they testified they do not know who is contributing to their defense). Yet J&J has never cited a single case—in its objections or in its briefing before the Magistrate—where a court compelled a party or witness to answer post-deposition questions in circumstances that look anything like these. Instead, courts routinely find that a party cannot be compelled "to provide better answers to questions to which they have already sworn that they do not know the answer." *United States ex rel. Jallali v. Sun Healthcare Grp.,* No. 12-cv-61011, 2013 WL 12177059, at *2 (S.D. Fla. July 18, 2013). *See also, e.g., C&J Equip. Mfg. Corp. v. Grady,* No. 23-cv-99, 2023 WL 7388866, at *8 (D.N.M. Nov. 8, 2023) (where party denied knowledge, "[p]laintiff may not like the answer, but it does not mean the answer is incomplete"); *Spano,* 2010 WL 3123182, at *3 ("Although Plaintiff may not like the answers that she received to the questions asked, that, in and of itself, does not make the responses evasive or otherwise improper"); *Silver v. Tenet Health Care Corp.,* No. 09-80365, 2010 WL 11444064, at *2 (S.D. Fla. Aug. 6, 2010) (deponent "noting they do not in fact have the information requested" is "in essence a full response[,]" and although the deposing party "may not like [that answer], that does not render the response insufficient").[12]

 Finally, even if Dr. Maddox's answers to J&J's deposition questions were somehow

---

[12] *See also, e.g., Harrington v. RoundPoint Mortg. Servicing Corp.*, No. 215-cv-322, 2017 WL 10651262, at *2 (M.D. Fla. Jan. 23, 2017) (party's response that they do not know the answer to a deposition question is not evasive or incomplete on its face); *Hicks v. Robeson Cnty.*, 187 F.R.D. 232, 235–36 (E.D.N.C. 1999) (if witness does not know the answer to a question, court cannot compel him to provide more complete answers); *United States v. Schwartz*, 332 F. Supp. 820, 823 (N.D. Ga. 1971) ("court cannot compel [witness] to testify to facts she does not know"); *Green v. Batchelor*, No. 2:19-cv-538, 2021 WL 2365063, at *2 (E.D. Cal. June 9, 2021) (similar); *Wilkins v. Ragoodial*, No. 2:20-cv-14203, 2021 WL 1579955, at *2 (S.D. Fla. Apr. 21, 2021) (similar); *Hoffman v. Neves*, No. 17-13263, 2019 WL 13323954, at *1 (E.D. Mich. Jan. 30, 2019) (similar).

insufficient—and not remedied by J&J's opportunity to question Dr. Emory on the same topics, *see* Background § B—J&J's proposed remedy is overbroad and inappropriate. Rather than requesting responses from Dr. Maddox to the only two deposition questions J&J says were not fully answered, J&J says it is entitled to serve a whole new set of interrogatories on all three Doctors, most of which bear no relation to any question actually asked at their depositions. *See* Obj. 25–26; *see also* Mem. Op. & Order 8 n.2 (quoting with approval the Doctors' argument that J&J's requested interrogatories are "untethered to its deposition questions"). For example, two of J&J's proposed interrogatories seek the identities of anyone who *has "suggest[ed] that they would or might* provide Funding for the defense of this action" or "for any portion or all of Defendants' Damages." Obj. 25–26 (emphasis added). But J&J did not ask these questions at any of the Doctors' depositions. J&J also seeks information about funding for damages, *id.*, which it did not ask Dr. Kradin a single question about. As another example, J&J requests information about the nature of any "Funding arrangements or statements, including the terms, conditions, and communications relating to any such Funding." *Id.* Again, J&J could have asked these questions of Dr. Emory and failed to do so.

To the extent J&J lacks answers to its proposed interrogatories, it is not because it was "stymied," Obj. 25, but because it did not ask them in written discovery or at the Doctors' depositions. The Magistrate was right to conclude that although J&J may be "dissatisf[ied]" with this strategic decision, that is not grounds for a motion to compel. Certainly, that decision was within the bounds of his broad discretion and not contrary to law or clear error.

### CONCLUSION

For all of these reasons, the Doctors respectfully request that the Court affirm the Memorandum Opinion and Order deny Plaintiff's motion to compel.

Dated: April 7, 2026                    Respectfully submitted,


                          By:    /s/ *Kathryn M. Ali*
                                 Kathryn M. Ali (VSB No. 97966)
                                 Elizabeth C. Lockwood (admitted *pro hac vice*)
                                 Meghan Palmer (admitted *pro hac vice*)
                                 ALI & LOCKWOOD LLP
                                 501 H Street, Suite 200
                                 Washington, D.C. 20002
                                 Telephone: 202-651-2476
                                 katie.ali@alilockwood.com
                                 liz.lockwood@alilockwood.com
                                 meghan.palmer@alilockwood.com

                                 *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of April, 2026, a copy of the foregoing has been filed electronically. Notice of this filing has been served upon counsel of record via the Court's electronic filing system. Access to this filing can be obtained via the Court's electronic filing system.

*/s/ Kathryn Ali*

Kathryn Ali